# EXHIBIT A



IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
CIVIL

| | |
|---|---|
| **H&M HOLDINGS GROUP, LLC,**<br>**HAUSER FAMILY FARMS, LLC,**<br>**MELINDA H. DAVIS and**<br>**HANNAH M. HAUSER,**<br>          **Plaintiffs**<br><br>     **v.**<br><br>**ALAN KIM PATRONO,**<br>**JONATHAN ALAN PATRONO,**<br>**JANE HAUSER PATRONO,**<br>**POLLY E. PATRONO a/k/a**<br>**POLLY E. PATRONO-CARLSON,**<br>**JOHN J. MURPHY, III,**<br>**PATRONO & MURPHY, LLC,**<br>**APPLE LEAF ABSTRACTING &**<br>  **SETTLEMENT COMPANY and**<br>**JOHN DOE(S)/JANE DOE(S),**<br>          **Defendants** | **2018-SU-1293**<br><br>**No. 517 MDA 2024** |

## OPINION PURSUANT TO Pa. R.A.P. 1925(a)

This appeal results from the unfortunate alienation of a family which was

fueled by mistrust and alleged self-serving actions which often accompany a failed

family business venture.[1]  The ultimate demise of family relationships finds its

genesis in efforts of family members to reinvest the significant estate of the late

Helen Hauser.  Helen Hauser died on March 7, 2012.  Her heirs are sisters Melinda

---

[1] The factual and procedural history of this matter is derived from the docketed record, admissions in the pleadings, deposition and hearing testimony, and exhibits attached to the pleadings or introduced at evidentiary hearing.  The docketed filings in this matter exceed 10,000 pages.  At the time of the writing of this Opinion, this writer did not have access to the physical record as it was in the custody of the Superior Court due to a prior appeal in this litigation.  As such, this Opinion, to a large extent, is written based upon notes taken at various proceedings.  The factual history, not evidenced by docket entries or admissions in the pleadings, is based upon factual findings made by this Court following credibility determinations of testimony at the various hearings.

Davis and Hannah Hauser ("Appellees"),[2] and Jane Hauser Patrono ("Appellant"). Jane Hauser Patrono is married to Alan Kim Patrono ("Appellant"). Jonathan Patrono and Polly Patrono a/k/a Polly Patrono-Carlson are the children of Alan Patrono and Jane Hauser Patrono.[3]

During the 1990s, Helen Hauser was the owner of three pieces of property in Adams County utilized for purposes of furthering the family's apple orchard business.[4] Unfortunately, in the late 1990s into the early 2000s, the apple business was struggling to maintain profitability.

Sometime in the mid-2000s, Jonathan Patrono proposed that the family convert the orchards into a winery.[5] At Jonathan Patrono's suggestion, on October 5, 2006, Hauser Estate, Inc. ("Hauser Estate") was incorporated to operate the winery.[6]

---

[2] In addition to Melinda Davis and Hannah Hauser, the term "Appellees" as used throughout this Opinion includes H&M Holdings, LLC and Hauser Family Farms, LLC.

[3] Alan Patrono; Jonathan Patrono; Jane Hauser Patrono; Polly Patrono a/k/a Polly Patrono-Carlson; Patrono & Murphy, LLC; and Apple Leaf Abstracting & Settlement Company comprise the remaining Defendants in this matter. John Murphy was initially named as a Defendant in this litigation; however, pursuant to agreement of the parties, he has been removed as a party. Patrono & Murphy, LLC is a legal office of which Alan Patrono and John Murphy were partners during the relevant time period. Appellant Apple Leaf Abstracting & Settlement Company is a fictitious name owned Apple Real Estate Services, LLC whose shareholders are Patrono & Murphy, LLC.

The substance of the appeal is solely related to the aspects of this Court's March 12, 2024 Order which dismissed the various Counterclaims filed by Alan and Jane Patrono. The Counterclaims which are the subject of this appeal are brought only by Alan and Jane Patrono. Yet, in a practice which has plagued the entirety of this litigation, the appeal is filed by all of the Defendants collectively. More specifically, Jonathan Patrono, Patrono & Murphy, LLC, and Apple Leaf Abstracting & Settlement Company are listed as parties in the Notice of Appeal, however, are not involved, in any way, in the subject of the appeal. This act is indicative of a procedural history in this matter where all Patrono Defendants acted collectively in pleadings and discovery rather than as individual Defendants.

[4] For purposes of this Opinion, the properties will be referred to as the Winery Property, the Orchard Property, and the Royer Farm.

[5] At least one version of Jonathan Patrono's proposal was in writing; however, the exact date of the proposal is unknown as it is undated. At the time of his proposal, Jonathan Patrono was a licensed Pennsylvania attorney who was employed by Patrono & Associates, LLC as an associate attorney. As of August 20, 2021, Jonathan Patrono remained included on public websites as an attorney with Patrono & Murphy, LLC and Apple Leaf Abstracting & Settlement Company and remains licensed to practice law in Pennsylvania as of this writing.

[6] The record is not yet fully developed as to how Hauser Estate was initially capitalized; however, the record circumstantially indicates that Melinda Davis, Hannah Hauser, and Jane Hauser Patrono

2

The corporation issued 1,000 non-voting shares and 1,000 voting shares. The 1,000 non-voting shares were generally divided equally among the respective families of the three sisters. The voting shares were allocated differently with Jonathan Patrono being awarded 51 percent of the voting shares despite making no capital contribution to the creation of the corporation. Melinda Davis and Hannah Hauser were each issued 14.5 percent of the total voting shares with 20 percent of the voting shares remaining unissued. Pursuant to the corporation by-laws and accompanying shareholders agreement, Jonathan Patrono effectively gained control of Hauser Estate.[7] Jonathan Patrono was also designated as the corporate president. Alan Patrono, a Pennsylvania licensed attorney, prepared all documents related to the incorporation of Hauser Estate.

On July 20, 2007, at the suggestion of Alan Patrono, Hauser Family Farms, LLC ("HFF") was formed. Once again, all legal work necessary to form HFF was prepared by Alan Patrono. Helen Hauser maintained a 100 percent interest in the limited liability corporation. The corporation was primarily capitalized by Helen Hauser's transfer of the Winery Property real estate to the corporation. HFF was apparently formed to operate – and perhaps insulate – the real property upon which the Hauser Estate business would be located. Alan Patrono, and/or the legal or real estate entities controlled by him, effectuated the transfer of the property.

---

equally contributed a total of approximately $600,000 either directly or by foregoing direct distribution from Helen Hauser's estate.

[7] There is some confusion concerning the date of incorporation of Hauser Estate as the shareholders agreement is dated October 5, 2006; however, the notarized signature of Jonathan Patrono is dated October 5, 2007. Neither party has filed of record the actual incorporation documents as maintained by the Pennsylvania Department of State. Circumstantially, the record supports that the corporation was formed on October 5, 2006. A shareholder's agreement executed on July 23, 2007 between the

On July 23, 2007, Helen Hauser gifted 1 percent of her interest in HFF to each of her daughters. Also, that same date, Jonathan Patrono, Polly Patrono, Melinda Davis, Hannah Hauser, and Jane Hauser Patrono, as shareholders of Hauser Estate, and, in some instances, as members of HFF, executed a "Shareholder/Member Agreement." The agreement contemplated the eventual transfer of the Royer Farm property to HFF. The agreement further indicated that the Royer Farm would be sold with the proceeds from the sale being used to develop a facility on the Winery Property owned by HFF. A term in the agreement restricted the transfer of the shares in either Hauser Estate or HFF to immediate family members. Additionally, despite Jonathan Patrono having no legal interest in either the Winery Property or the Royer Farm, the agreement provided that Hauser Estate purchase an annual renewable term life policy for him in the face amount of $500,000 with beneficiary designation to be determined by him. Again, the agreement was prepared by Alan Patrono. Additionally, all signatures to the agreement were witnessed by Alan Patrono. Approximately two weeks later, on August 10, 2007, Helen Hauser gifted one-third of her remaining interest in HFF to each of her three daughters. Once again, all legal documentation executed in furtherance of the transfer was prepared by Alan Patrono.

On January 31, 2008, by written agreement, HFF leased the Winery Property to Hauser Estate. The property consisted of 170 acres; less two dwelling houses located on the property. The lease term was 29.5 years with the consideration being Hauser Estate paying real estate taxes and providing maintenance of the property.

---

parties references the existence of Hauser Estate at that time. *See* Plaintiffs' Third Amended

4

No additional rent payment was due; however, the lease provided that "[a]dditional rent may be charged and paid as determined by Lessor and Lessee..."[8] The lease was executed by Jonathan Patrono as president of Hauser Estate and appears to be executed by Melinda Davis as managing member of HFF.[9] Alan Patrono prepared the lease and witnessed both signatures.

On March 7, 2012, Helen Hauser passed away and the Orchard Property, consisting of 364 acres was bequeathed to her three daughters. Alan Patrono and Melinda Davis were co-executors under Helen Hauser's will. Alan Patrono and/or his affiliated offices prepared all legal documentation necessary for the transfer of real estate and the closing of Helen Hauser's estate.

Over the years, Jonathan Patrono acted as president of Hauser Estate. There is factual dispute as to the extent he actually controlled the corporation as the record makes clear that Alan Patrono, despite his efforts in deposition and hearing testimony to minimize his involvement, actively participated in the corporation's management and decision making. Although Appellants claim all family members were regularly consulted in decision making, there are few documents produced to date that support their claim. On the other hand, significant documentation supports Alan Patrono's active participation in decision making for the corporate entities despite his lack of ownership of shares in either. For instance, although Alan Patrono denies acting as

---

Complaint, Exhibit D.

[8] Exhibit M, pg. 1, Defendants' Answer to Plaintiffs' Third Amended Complaint with Amended New Matter and Counterclaims ("Defendants' Answer"). In his original proposal suggesting creation of the winery, Jonathan Patrono represented, "[t]he lease will be of value and not a 'phony' lease." Exhibit L, pg. 1, Defendants' Answer. As a result of the lease, Hauser Estate, with Jonathan Patrono as its majority voting shareholder, had effectively gained control over HFF real estate for minimal consideration.

an attorney for the parties or corporate entities, his law office was used as the corporate address on incorporation documents and corporate records were maintained at that location.

During this same time, Melinda Davis and Hannah Hauser became suspicious over the management of the two corporate entities. Requests for additional financing by Jonathan and Alan Patrono led to questions concerning the financial operation of Hauser Estate. In this regard, Hauser Estate had originally incurred start-up debt with PNC Bank which was subsequently refinanced through a loan with Members First Federal Credit Union ("Members 1st") in an amount of $300,000 ("Loan 1"). Jonathan Patrono and Alan Patrono suggested Hauser Estate increase Loan 1 to $500,000 and an additional loan of $1,475,000 ("Loan 2") be obtained.[10] The loans were secured by personal guarantees executed by Melinda Davis, Hannah Hauser, Jane Patrono, Alan Patrono, and Jonathan Patrono. Concurrent with the execution of the Members 1st loans, and in order to clarify the responsibility of each of the Hauser sisters for future debt, a contribution agreement was prepared by Alan Patrono. The contribution agreement essentially provided that liability for any loans made for the benefit of Hauser Estate and/or HFF to which the parties are borrowers shall be shared equally among the three sisters. Additionally, the agreement provided that the parties will be one-third liable for any future loans made to the

---

[9] The authenticity of Melinda Davis's signature has not yet been established by credible evidence. It is noted only that Melinda Davis, in her testimony at other hearings, has taken issue with the authenticity of her signature on a different document prepared and allegedly witnessed by Alan Patrono.
[10] The reason purported by Jonathan and Alan Patrono for the additional financing was to expand the winery into the cider business. Yet, approximately $600,000 of the Members 1st loan was paid to Alan and Jane Patrono and Apple Leaf Abstracting as repayment for alleged loans previously made to Hauser Estate. June 21, 2021 Tr., pg. 123.

benefit of Hauser Estate and/or HFF by either the sisters and/or Alan Patrono. Jonathan Patrono was not a party to the contribution agreement.[11]

Unfortunately, financial woes continued with net profits failing to meet the goals established in Jonathan Patrono's original business plan. Melinda Davis and Hannah Hauser continued to question the expenses at Hauser Estate. Requests for capital infusions from the respective families of the sisters became regular. Alan and Jane Patrono claim that following the Members 1st loans, they individually loaned Hauser Estate approximately $3 million in order to keep Hauser Estate operating. They claimed the loans came from their personal accounts as well as through the accounts of the businesses affiliated with Alan Patrono.

Melinda Davis and Hannah Hauser suspected the misuse and comingling of funds was the real cause of the financial bleeding. They noticed Jane Hauser Patrono was draining another jointly-owned business, 17 On the Square, by diverting over $70,000 from that business to Hauser Estate. They also were concerned that the apple crop from the Orchard Property, which was owned individually by the three

---

[11] There is a factual dispute concerning execution of the contribution agreement. The Patrono Defendants' Answer to Plaintiffs' Third Amended Complaint alleges the contribution agreement was originally executed on June 22, 2011; however, an identical copy dated December 3, 2012 was produced during discovery. Both agreements were prepared by Alan Patrono. Appellees dispute the authenticity of the signatures on the earlier document. The signatures on the first agreement were not witnessed; however, on the second agreement, all signatures were witnessed by Alan Patrono.

Prior to execution of the December 3, 2012 contribution agreement, Hannah Hauser was represented by Attorney James Hughes. Attorney Hughes was not present at execution of the agreement; however, email exchanges reflect he advised Hannah Hauser to sign the agreement based upon representation from Alan Patrono that certain language was changed in the agreement, and also that an amended shareholders agreement would be executed concurrently with the contribution agreement. Among the agreed-upon changes was the requirement that all future loans from any of the parties to Hauser Estate be evidenced by prior written agreement. Alan Patrono never made the agreed-upon changes to the contribution agreement prior to Hannah Hauser's signature. Additionally, on November 16, 2012, Attorney Hughes asked Alan Patrono to send him a copy of the executed amended shareholders agreement. Alan Patrono claimed he did not have a signed copy of the document as of that date. Incidentally, none of the approximately $3 million in loans currently being claimed by Alan and Jane Patrono are evidenced by a prior written agreement.

7

sisters, was being used by Hauser Estate without any compensation to the owners of the property.[12] When Melinda Davis and Hannah Hauser asked about the dissipation of Hauser Estate assets, they claimed they were told the funds were being used for "payroll expenses." Melinda Davis and Hannah Hauser suspected that Jonathan Patrono was making self-serving transactions utilizing the Members 1st loan to pay himself and that he in turn recycled the money back to Members 1st to pay the mortgage on his personal home.[13]

In an apparent effort to stop the financial bleeding, at the bequest of Jonathan and Alan Patrono, investors were sought. Jonathan Patrono proposed an investor, however, would not disclose the investor's name to Melinda Davis and Hannah Hauser citing "confidentiality concerns." Ultimately, Melinda Davis and Hannah Hauser discovered the unidentified investor was Pennsylvania Hard Cider, LLC, an entity formed by Alan Patrono and Jonathan Patrono.

With the parties' inability to locate an acceptable investor, and the unwillingness of Melinda Davis and Hannah Hauser of shareholders to further capitalize Hauser Estate without an accounting and some relinquishment of control by Jonathan Patrono, on July 31, 2018, Jonathan Patrono filed a voluntary Chapter 11 bankruptcy petition on behalf of Hauser Estate in the United States Bankruptcy

---

[12] Melinda Davis and Hannah Hauser also noticed the comingling of funds between Hauser Estate and HFF, as well as proceeds from the sale of the apple crop owned by HFF being deposited in the Hauser Estate account.

[13] In his initial business plan, Jonathan Patrono represented, "Rather than bill the new company or take a salary, my time and expertise is my capital contribution, and it will more than equal what I am proposing to receive in shares. That exact theory applies also to Polly...." Exhibit L, pg. 2, Defendants' Answer. True to his proposal, neither Jonathan Patrono nor Polly Patrono made capital contributions to any of the subject corporations; however, documents reflect that Jonathan Patrono thereafter drew a salary of possibly as much as $120,000 per year. The commencement and extent to which Jonathan Patrono, and perhaps Polly Patrono, withdrew salary or pay is not fully known as the

Case 1:25-bk-02214-HWV    Doc 32-2    Filed 08/29/25    Entered 08/29/25 13:28:55    Desc
Exhibit    Page 9 of 48

Court for the Middle District of Pennsylvania. The decision to file bankruptcy occurred after a vote of the majority of the voting shareholders at a duly authorized meeting. Melinda Davis and Hannah Hauser did not participate in the vote. They made known their opposition to the filing of bankruptcy and allege that the shareholders meeting at which the bankruptcy filing was authorized was scheduled by Jonathan Patrono for a day on which it was known they would not be available.

Around this same time period, the Members 1st loans, secured by the personal guarantees, were in default. Melinda Davis and Hannah Hauser decided to form H&M Holdings Group, LLC ("H&M"). H&M subsequently purchased the assignment of the personal guarantees from Members 1st at the full-face value of the outstanding notes held by Members 1st.

On July 27, 2018, H&M filed Confession of Judgment actions in Adams County ("Confession Action 1") under the personal guarantees against Alan Patrono, Jane Patrono, and Jonathan Patrono. In violation of the express terms of the personal guarantees, and aware that the notes had been purchased but unsure as to who the purchaser was, on July 18, 2018, Alan Patrono, Jane Patrono, and Jonathan Patrono transferred their respective interests in five separate properties to Polly Patrono for consideration of $1 in each transfer. The Patrono Defendants have each acknowledged that the purpose of the transfers was to "slow down" collection on the personal guarantees to the notes.

While the Confession of Judgment actions were pending in Adams County, on December 11, 2018, H&M, HFF, Melinda Davis, and Hannah Hauser (hereinafter

_____

necessary documents to fully trace their income are unavailable or at least have not been provided

9

collectively referred to as "H&M") filed a *Lis Pendens* against the properties which were transferred to Polly Patrono. The *Lis Pendens* was accompanied by the filing of a Writ of Summons.[14]

On August 24, 2018, the Patrono Defendants filed a Petition to Strike or Open Confessed Judgments with Request for Stay of Execution. Perhaps foreshadowing the nature of the litigation that was to follow, Confession Action 1 involved several discovery disputes and emergency motions for relief. Additionally, mediation, which was agreed to by all parties, proved unsuccessful. Ultimately, on November 1, 2019, the Honorable Judge Thomas Campbell granted the Petition to Strike the Confessed Judgments.

On October 30, 2019, H&M initiated litigation in Dauphin County against each of the Patrono Defendants.[15] On November 27, 2019, H&M initiated Confession of Judgment actions against the Patrono Defendants in the Court of Common Pleas of Cumberland County ("Confession Action 2").[16] Confession Action 2 was met by a Petition to Strike and Open filed by each of the Patrono Defendants.

In Confession Action 2, the Patrono Defendants alleged they lent approximately $3,000,000 to Hauser Estate.[17] They claimed that under the contribution agreement, they were entitled to one-third of these loans from both Melinda Davis and Hannah Hauser as an offset in the Confession of Judgment

---

during discovery.

[14] It was the commencement of this action which generated the controlling docket number in this litigation.

[15] The Dauphin County action is captioned at 2019-CV-7967. It included claims of legal malpractice, breach of fiduciary duties, and fraud.

[16] The litigation filed in Cumberland County was filed under Cumberland County Docket No's. 2019-12300; 2019-12301; and 2019-12302. Ultimately, by agreement of the parties, the Cumberland

actions. They further claimed that H&M was a sham corporation and, as such, was not a proper holder of the personal guarantees.

A discovery deadline was set in Confession Action 2 which resulted in a Motion to Compel Responses to Written Discovery Requests against the Patrono Defendants. The motion alleged the Patrono Defendants were nonresponsive to a request for production of documents which included, *inter alia*, a request for the Patrono Defendants' previous five years of federal tax returns including supporting documentation. Ultimately, a discovery master was appointed. By Order dated November 5, 2020, based upon the master's report, Judge Smith directed all parties to answer the discovery requests within 20 days with the exception that the Patrono Defendants' individual financial status need not be disclosed at that time without prejudice to H&M to pursue future discovery on the issue.

In bifurcated proceedings, the Petition to Open the Confessed Judgments was denied by the Honorable Judge Matthew Smith. Hearing on the Petition to Strike was held over multiple days in February of 2021. Relevant testimony during the three-day proceeding before Judge Smith included representations by Alan Patrono that proceeds from the Members 1st loans were used to reimburse Apple Leaf Abstracting $300,000 allegedly loaned to Hauser Estate.[18] Alan Patrono claimed an additional $300,000 of the loan proceeds was used to reimburse him personally.[19] Alan Patrono testified that subsequent to the Members 1st loans, either he or affiliated

---

County Confession of Judgment actions were transferred to this jurisdiction and are now docketed in the above-captioned docket number as part of this litigation.
[17] Petition to Strike or Open Confessed Judgment, Cumberland County, paragraph 60.
[18] February 23, 2021 Tr., pg. 123.
[19] February 23, 2021 Tr., pg. 103, 123.

11

entities lent Hauser Estate an additional $3,000,000.[20] Jane Hauser Patrono claimed

the infusion of cash from the Patronos and affiliated agencies were evidenced "by

checks written to pay bills and employees."[21] Despite the infusion of funding from the

Members 1st loans and the alleged loans by Alan Patrono and his affiliated

businesses, Hauser Estate never made a profit or paid a dividend.[22]

During testimony before Judge Smith, an issue arose concerning the

execution, timing, and accuracy of signatures on the contribution agreement

prepared by Alan Patrono. In an apparent effort to explain the two separate

executed contribution agreements, and the lack of the represented changes, Alan

Patrono attempted to introduce at trial certain emails in his possession. The

evidence, however, was precluded by Judge Smith on the basis that Alan Patrono

had not previously provided the emails during discovery.[23]

On March 11, 2021, Judge Smith entered an Order opening the confessed

judgments. Although he did not reach a conclusion as to whether H&M was a "sham"

corporate entity, he did conclude that the defense, if proven, was meritorious and that

sufficient evidence existed to require submission of the issue to a factfinder.[24]

Following Judge Smith's Order, and by agreement of the parties, the Cumberland

County litigation was transferred to the jurisdiction of the Adams County Court of

Common Pleas on April 30, 2021.

---

[20] February 23, 2021 Tr., pg. 67, 123.
[21] February 23, 2021 Tr., pg. 30.
[22] February 23, 2021 Tr., pg. 123.
[23] February 23, 2021 Tr., pg. 126.
[24] A trial court may open a confessed judgment "if the petitioner (1) acts promptly, (2) alleges a meritorious defense, and (3) can produce sufficient evidence to require submission of the case to a jury." *Pops PCE TT, LP v. R&R Restaurant Group, LLC*, 208 A.3d 79, 85-86 (Pa. Super. 2019).

Unaware of the Cumberland County litigation and due to the case's inactivity, this Court listed the *Lis Pendens* litigation for a pre-trial conference on October 2, 2020. The Court's action apparently spawned activity as the Patrono Defendants filed a Rule to File Complaint on October 16, 2020. At the pre-trial conference held on October 27, 2020, it was discovered that Confession Action 2 was pending and that the H&M had also filed a Complaint in Dauphin County. The parties discussed the timing for the filing of a complaint in the pending *Lis Pendens* action, as well as consolidation of the numerous actions pending in the three separate counties. Ultimately, the filing of the Complaint in the *Lis Pendens* action was met by Preliminary Objections followed by the filing of an Amended Complaint on December 21, 2020. Two days later, on December 23, 2020, the Dauphin County action was transferred to this jurisdiction based upon stipulation of the parties.

In an effort to bring some sense to the numerous litigations, as well as the different procedural stances of the various litigations, a status conference was held on August 16, 2021. At the conference, the parties agreed to stay Confession Action 2. The parties further agreed that H&M would file a Third Amended Complaint incorporating all other causes of action alleged in either the *Lis Pendens* action or the Dauphin County litigation.

On September 7, 2021, H&M filed a Third Amended Complaint ("Complaint") against the Patrono Defendants.[25] On September 28, 2021, the Patrono Defendants

---

[25] The Third Amended Complaint consisted of claims for breach of duty of good faith; breach of fiduciary duties; professional negligence; four counts of fraudulent transfer of real estate; civil conspiracy to commit fraudulent transfer; and three counts of civil conversion. The overriding theme of the allegations in the Third Amended Complaint is a claim of co-mingling of funds among the separate corporations, self-dealing by the Patrono Defendants, and inaccurate record keeping. Plaintiffs' Third Amended Complaint, pg. 98.

13

filed an Answer to Third Amended Complaint with New Matter and Counterclaims ("Answer 1"). In their New Matter, the Patrono Defendants alleged that Alan Patrono, Jane Hauser Patrono, and their affiliated businesses lent Hauser Estate $2,970,772.80. The Patrono Defendants' Counterclaims consisted of six claims of breach of the contribution agreement; one count of unjust enrichment; one count of promissory estoppel; and eight counts of breach of fiduciary duties.

Relevant representations in the Patrono Defendants' verified Answer 1 included a representation that Jonathan Patrono, at relevant times, was receiving income for other interests in addition to that received from Hauser Estate. Answer 1, pp. 65. The Patrono Defendants also claimed that Hauser Estate continuously borrowed money from Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono and their affiliated interests. Id., pp. 359. The moneys were allegedly transferred to Hauser Estate through a series of loans that were used to pay various expenses. Id., pp. 361-62. Although Answer 1 referenced alleged loans totaling $2,970,772.80, attached to the pleading is correspondence from Jane Hauser Patrono to her sisters alleging she is owed $3,211,042.22 for the loans. Id., Exhibit WW. Although the Patrono Defendants claimed throughout the pleading that Alan Patrono acted neither as counsel nor as an officer/employee of Hauser Estate, attached to the pleading is an email from Alan Patrono clearly evidencing his active role in making decisions relative to the operations of Hauser Estate. Id., Exhibits X, BB.

Patrono Defendants' Answer 1 was met with a number of Preliminary Objections by H&M. The Preliminary Objections were 19 in number with an overarching theme relating to the insufficiency and verbosity of Defendants' 619

14

paragraph and 52 exhibit pleading. Ironically, H&M complained that the Patrono Defendants' reference to alleged loans made to Hauser Estate lacked detail and any supporting documentation. The Patrono Defendants countered the sufficiency objection by noting that discovery is available to obtain the detailed information being sought.

By Order dated March 16, 2022, the Preliminary Objections were sustained in part and overruled in part, with the Patrono Defendants being granted an opportunity to amend. In the Order, this Court specifically noted inherent contradictions and inconsistencies in the Patrono Defendants' pleading related to the amount of money allegedly lent by the Patrono Defendants to Hauser Estate and the lack of specificity in identifying the actual individual or entity by whom the money was lent. Specifically, this Court noted, "Defendants' current pleading, which lumps what appear to be several distinct loans into an aggregate claim, improperly denies the responding parties an opportunity to individually defend each of the loans which were allegedly provided..." March 16, 2022 Order, paragraph 4.

Following the Court's Order, the Patrono Defendants filed an Answer with Amended New Matter and Counterclaims ("Answer 2"). Once again, the amended pleading was met by Preliminary Objections from H&M.[26] In their Preliminary Objections and supporting Brief filed on May 4, 2022, H&M, *inter alia*, again complained about the lack of any supporting documentation for the alleged loans by the Patrono Defendants to Hauser Estate and also the Patrono Defendants' failure to

---

[26] H&M's Preliminary Objections correctly noted the Patrono Defendants realleged paragraphs in the amended pleading which were identical to paragraphs which were previously ruled improper and stricken by this Court's March 16, 2022 Order.

identify the purpose for which the loans were made. In their Brief in Opposition to the Preliminary Objections, the Patrono Defendants repeated their argument that discovery is the proper means by which to obtain the specific factual information sought by H&M, citing **General State Authority v. Lawrie & Green**, 356 A.2d 851, 854 (Pa. Cmwlth. 1976). By Order dated August 1, 2022, H&M's Preliminary Objection based upon insufficiency of the pleading was denied as the Court accepted the Patrono Defendants' implicit representation that they would act in good faith in providing the information lacking in the pleading through discovery.

After a conference on September 28, 2022, the Court entered an Order setting trial for October 30, 2023. The Order further directed that factual discovery be completed prior to January 27, 2023, with expert reports being provided by March 31, 2023 and responsive expert reports provided by June 2, 2023. The Order specifically indicated that failure to comply with the discovery schedule would result in the preclusion of evidence at trial. Additionally, the Order scheduled a settlement conference for February of 2023.

As the litigation was unfolding in court, discovery was ongoing. At his deposition on January 19, 2021, Alan Patrono conceded that proceeds from the $1.475 million Members 1st loan were entirely used to pay off Hauser Estate debt, January 19, 2021 Tr., pg. 81, including payments to Alan Patrono's personal line of credit and Apple Leaf Abstracting's line of credit. January 19, 2021 Tr., pg. 78. Alan Patrono further claimed that, following receipt of the Members 1st loans, he continued to provide loans to Hauser Estate by writing checks from his personal account. He indicated that Melinda Davis and Hannah Hauser had access to the "records" which

Case 1:25-bk-02214-HWV    Doc 32-2    Filed 08/29/25    Entered 08/29/25 13:28:55    Desc
Exhibit    Page 17 of 48

supported the loans. January 19, 2021 Tr., pg. 26-27. Although acknowledging that his personal guarantee to Members 1st required notice to Members 1st prior to Hauser incurring further debt, he attempted to excuse his failure to give Members 1st prior notice by claiming he provided Members 1st with his personal tax returns which evidenced the loans. January 19, 2021 Tr., pg. 90.

At her January 19, 2021 deposition, Jane Hauser Patrono also claimed loans by her, her husband, and her husband's law firm were made to Hauser Estate subsequent to the Members 1st loans. She indicated that she believed her husband kept documents about the purpose of the loans. January 19, 2021 Tr., pg. 23. Interestingly, she acknowledged that a number of checks written from her personal account to Hauser Estate were specific dollar and cent amounts as compared to general lump sum payments. January 19, 2021 Tr., pg. 49. Jane Hauser Patrono represented she wrote checks for significant funds from her personal account which she claimed were for Hauser Estate expenses but were payable to "cash." January 19, 2021 Tr., pg. 52.

On September 30, 2022, H&M propounded Interrogatories and Request for Production of Documents to each of the Patrono Defendants. Included in the Interrogatories was a request for the Patrono Defendants to provide "[t]he current location of any and all documents evidencing the existence and terms of [the loans allegedly made to Hauser Estate]" and a request for "all documents supporting ... such loans." Timeline with Exhibits in Support of Plaintiffs' Motion for Default Judgment ("Timeline"), Exhibit 5. The Request for Production of Documents also included requests for all documents relating to the formation, capitalization, or

operations of Hauser Estate, Inc. and HFF and all documents related to any communications concerning the subject matter of the litigation. Finally, the Request for Documents requested personal tax information for all Patrono Defendants from 2011 through the date of the request.

In response to the request concerning the loans allegedly advanced by the Patrono Defendants, the Patrono Defendants indicated "[c]opies of all documents in the Defendants' possession have been provided during the course of discovery" and directed H&M to "[s]ee documents previously produced." However, only copies of checks to Hauser Estate were previously provided without any supporting records relating to the loans. Timeline, Exhibit 6. Additionally, the Patrono Defendants raised boilerplate objections. In regard to requests for personal income tax information, the Patrono Defendants objected on the ground that it was beyond the scope of a response reasonably required by the Pennsylvania Rules of Civil Procedure and was unduly burdensome, overbroad, and aggressive.

On November 14, 2022, counsel for H&M forwarded a deficiency letter. Included in the alleged deficiencies was the failure to produce documentation concerning the alleged loans made by the Patrono Defendants. Additionally, the deficiency letter asked the Patrono Defendants to clarify the identity of the documents allegedly provided which were responsive to the specific interrogatory. The letter also pointed out the respective deficiencies in the Patrono Defendants' response to requests for interrogatories. Timeline, Exhibit 7.[27]

---

[27] In furtherance of what was rapidly developing into a "tit-for-tat" course of conduct, the next day, November 15, 2022, counsel for Patrono Defendants provided counsel for H&M a deficiency letter related to alleged deficiencies in their discovery responses to the Patrono Defendants on August 25, 2022.

When the deficiency letter went unaddressed, on January 6, 2023, H&M counsel made a second request for response. As additional depositions of the Patrono Defendants were scheduled to begin on January 13, 2023, the correspondence requested prompt response by the Patrono Defendants. By letter dated January 11, 2023, Patrono Defendants' counsel advised they would not be providing Alan Patrono's individual tax records. The response indicated that it otherwise included the "various documents responsive to the notice to attend separate from the requested tax returns." Timeline, Exhibit 17.[28] The correspondence from Patrono Defendants' counsel also acknowledged that the best evidence concerning the potential diversion of moneys from Hauser Estate "would be bank records or other records of the business itself, ..." *Id.*

At his subsequent deposition on January 13, 2023, Alan Patrono did not bring any of the documents requested in the notice of deposition. In response to various questions about his failure to bring those documents, Alan Patrono stated under oath that "I looked through everything that I could remember, and I looked through your responses. And when this suit started a long time ago, I sent a lot of things up to [my counsel], and **that's all I have**." January 13, 2023 Tr., pgs. 8-9 (emphasis added). Relevantly, at various times during the deposition, Alan Patrono alluded to the possibility that he could recreate the actual history related to the particular inquiry by reviewing his "notes." January 13, 2023 Tr., pg. 260; pgs. 209-210; pgs. 189-190.

---

[28] On January 11, 2023 at 3:45 p.m., 337 documents were provided by the Patrono Defendants to H&M counsel without labeling or explanation. On January 12, 2023, the Patrono Defendants provided two sets of documents to H&M counsel. The first set consisted of the 337 documents provided on January 11, 2023; however, this time the documents were Bates labeled. The second set consisted of 660 documents without explanation. The second document disclosure occurred on the day prior to

However, at other times, Alan Patrono affirmatively stated that supporting records did not exist. Specifically, when asked about the existence of supporting documents to checks which allegedly evidenced loans of the Patronos to Hauser Estate, the following exchange occurred:

Q.   Would you agree with me that there is no explanation or supporting documentation?
A.   **I'll agree to for all of them there's no explanation and supporting documents, but I also tell you that we gave you the checks.**

January 13, 2023 Tr., pg. 263 (emphasis added).

Later during the same sequence, he again reiterated there is no supporting documentation to the checks evidencing the alleged loans. In an apparent contradiction, Alan Patrono later acknowledged that such records existed in approximately 50 boxes in his office. January 13, 2023 Tr., pg. 266. Counsel for H&M promptly made an on-the-record request for all such supporting documentation. January 13, 2023 Tr., pg. 267. During the deposition, Alan Patrono admitted that **"The tax returns detail the contributions that we made every year."** January 13, 2023 Tr., pg. 264 (emphasis added).

Jane Hauser Patrono was deposed on January 18, 2023. During her deposition, she claimed to be generally unaware of the specifics concerning the formation and operation of the various corporate entities, however, generally relied on the guidance of her husband concerning those matters. She also claimed to be unaware of the request of her to produce documents at the deposition, January 18, 2023 Tr., pg. 11, and of the Answer and New Matter filed on her behalf. January 18,

---

scheduled depositions of the Patrono Defendants and were apparently in response to the discovery

2023 Tr., pg. 22. She claimed not to have possession of any documents related to the business but, relevantly, she admitted that Alan Patrono took notes of the various meetings involving the corporate entities and was "sure he kept them in a file," probably in his law office. January 18, 2023 Tr., pg. 52-53. H&M counsel promptly made an on-the-record request for a copy of the meeting minutes. January 18, 2023 Tr., pg. 63.

At his deposition on January 19, 2023, despite the lack of any prior objection on his behalf, Jonathan Patrono defiantly acknowledged he failed to comply with H&M counsel's request to bring his personal income tax returns and other documents to the deposition as specified on the deposition notice. January 19, 2023 Tr., pg. 16. In response to specific inquiry, he claimed he had not performed legal work since 2012 despite his name being listed on the website as an attorney for Apple Leaf Abstracting & Settlement Company as late as 2021. January 19, 2023 Tr., pg. 24. He stated he was unsure for whom he was working during the relevant time periods. Despite direct questioning, Jonathan Patrono would not confirm whether a 2014 loan document listing his income at $120,000 annually was accurate. January 19, 2023 Tr., pg. 69. He reiterated that **only tax documents** would accurately establish his income through the years. January 19, 2023 Tr., pg. 75. In response to his answers, H&M counsel immediately made an on-the-record request for his federal W-2 statements.

Jonathan Patrono's deposition testimony indicated there were "giant boxes" of records related to the operation of the subject corporate entities which had not yet

---

requests made by H&M counsel on September 30, 2022.

been provided to counsel. January 19, 2023 Tr., pg. 37. He claimed he was unaware of where the corporate minute book for Hauser Estate was currently located. January 19, 2023 Tr., pg. 64. Later in the deposition, when he once again alluded to the corporate records being housed in "boxes and boxes", January 19, 2023 Tr., pg. 133,[29] H&M counsel promptly made an on-the-record request for all such documents. January 19, 2023 Tr., pg. 135. Jonathan Patrono wavered in his later deposition testimony when he claimed he wasn't sure if he retained documents regarding Hauser Estate and wasn't certain if corporate documents were at Alan Patrono's office. He stated that a "couple months ago" was the first time he did a document search in response to prior discovery request. January 19, 2023 Tr., pg. 160-161.

At his continued deposition on January 24, 2023, Jonathan Patrono confirmed his general ignorance of specifics concerning Hauser Estate expenditures. He acknowledged that paper files related to Hauser Estate and HFF existed at Alan Patrono's office. January 24, 2023 Tr., pg. 215-216. This acknowledgment was immediately met by a repeated on-the-record request of H&M counsel for production of such documents. Jonathan Patrono generally acknowledged that he could not explain the purpose of the alleged loaned funds claiming he "cannot tell you what any of the checks exactly were for **without looking through the records**." January 24, 2023 Tr., pg. 280 (emphasis added). Contrary to his January 19, 2023 deposition testimony, he claimed that corporate minutes related to Hauser Estate were in possession of the bankruptcy receiver; however, as President of Hauser Estate, he

---

[29] Jonathan Patrono opined that Alan Patrono was fully aware of the existence of the documents at the

never requested the return of those documents in response to discovery requests in this litigation. January 24, 2023 Tr., pg. 197.

On January 25, 2023, H&M counsel forwarded correspondence confirming the on-the-record deposition requests for the host of documents. Included in those were requests for personal tax returns and all documentation supporting the alleged loans and Hauser Estate expenditures. Timeline, Exhibit 26.

On April 10, 2023, H&M filed a "Motion to Compel Discovery and for Imposition of Discovery Sanctions Against Defendants and Their Counsel" seeking compliance by the Patrono Defendants with earlier discovery requests. On April 21, 2023, the Patrono Defendants filed an Answer to Plaintiffs' Motion to Compel Discovery and Sanctions. On at least two occasions in their pleading, the Patrono Defendants claimed that other than the tax returns, all information requested in discovery has been provided. Defendants' Answer, pp. 23, 36.

On April 21, 2023, the Court conducted hearing and argument on H&M's Motion to Compel Discovery and Sanctions. Counsel for H&M indicated to the Court that, other than cancelled checks from the Patrono Defendants, there was no supporting documentation evidencing the debt or loans allegedly made by the Patrono Defendants. Following hearing, the Court specifically directed, *inter alia*, the Patrono Defendants provide H&M with copies of their individual tax returns for the years 2011 through and including 2021, including therewith any schedules and supporting documentation within 20 days of the date of the Order. Additionally, despite the Patrono Defendants' claim that they did not have any documents to

---

Patrono and Murphy law office. January 19, 2023 Tr., pg. 135.

support their alleged loans other than copies of the checks and bank deposit information, the Court graciously granted the Patrono Defendants an additional 20 days to provide any supporting documentation related to the alleged loans. The Court cautioned that should the Patrono Defendants fail to produce any such documentation, their testimony on the subject would be limited to evidence related to the authenticity of the written checks and bank records.

On May 25, 2023, H&M filed a Motion for Citation of Contempt Against Defendants Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono alleging Alan and Jane Patrono failed to provide income tax records for 2018 and 2019 and that Jonathan Patrono failed to provide income tax records for 2011 through 2014. Additionally, H&M alleged the Patrono Defendants failed to provide other records concerning Hauser Estate operations and expenses. By Answer filed on June 6, 2023, the Patrono Defendants expressly represented to the Court, **"Defendant had previously provided or made available all documents in their possession concerning the financial records of Hauser Estate."** Defendants' Answer to Motion for Citation of Contempt, paragraph 3 (emphasis added).

At hearing on June 7, 2023, Jonathan Patrono claimed his tax returns for the years 2011 through 2014 were filed through Turbo Tax and therefore were automatically purged. As a result, he represented he did not have access to the same. Counsel for the Patrono Defendants produced a request for transcript of tax returns dated May 25, 2023 allegedly filed on behalf of Jonathan Patrono. The document indicated only a request for a copy of the tax return transcript from the IRS which would contain only line-item amounts on the tax returns but would not include

24

identification of the specific sources comprising the entry. No proof of mailing to the IRS nor any other indication that the request had actually been filed or receipt acknowledged by the IRS was presented. Alan and Jane Patrono claimed they did not file 2018 or 2019 federal tax returns.

In regard to H&M's request for supporting documentation for the alleged loans and/or expenditures related to the loans, Patrono Defendants claimed they provided reports from the Xero bookkeeping software to H&M. Patrono Defendants' counsel confirmed his previous representation to the Court that the Patrono Defendants did not have any supporting documents. Counsel went on to state, "What we have are the checks and the bank statements all of which had been produced." Counsel reiterated, "That answer has not changed." June 7, 2023 Tr., pg. 19. Counsel for Patrono Defendants further explained:

> "Those expenses that was what we needed to get from the Xero program, Your Honor, and the Xero program, as they were told back in October of 2022, when the trustee came in and took over - - the bankruptcy trustee came in and took over, he denied them access to the Xero program. That's where the documentation existed.
>
> So in light of the Court's Order, we went back - - the Patronos went back to the trustee and got permission to get into that Xero program. We printed out what we could printout, which shows the expenses. **It doesn't show - - what's left in Xero is the actual receipts for each - - or invoices for each one of the expenses, but the printouts show the amount and who it was paid for.** So they have all of that."
>
> ...
>
> THE COURT: Let me just touch on that point. Are you indicating to me that documents were turned over to the bankruptcy trustee and **copies of those were not kept by your clients or by counsel?**
>
> [ATTORNEY FOR PATRONO DEFENDANTS]: **That is correct.** That is correct..."

25

June 7, 2023 Tr., pg. 20 (emphasis added). Patrono Defendants' counsel further indicated that the Patronos did not retain copies of any documents. June 7, 2023 Tr., pg. 21. The Patrono Defendants conceded access to the Xero bookkeeping software was not granted to H&M until June 1, 2023. All Appellants were in the courtroom throughout counsel's representations.[30]

By Order dated June 12, 2023, the Court directed Alan and Jane Patrono to file verified statements confirming representations made by their counsel that they had not filed 2018 or 2019 federal income tax returns. The Court also directed that Alan and Jane Patrono provide documentation for the calendar years 2018 and 2019 related to their income sources. Additionally, the Court directed Jonathan Patrono to provide documentation in his possession concerning his income from all sources for the calendar years 2011 through 2014. In compliance with the Court's April 25, 2023 directive, the Court Order also limited evidence in support of the Counterclaims to the authenticity of actual checks and bank records evidencing monetary transfers to Hauser Estate.[31]

On July 19, 2023 – four days past the deadline established by the Court – Alan and Jane Patrono filed a verified statement indicating they did file a personal income tax return for 2018 and that a copy of the same was forwarded to counsel for H&M. They also verified they did not file 2019 federal tax returns, nor were they granted an extension.

---

[30] It is important to note that the Court has not found any misconduct on the part of counsel for Patrono Defendants at the June 7, 2023 hearing as it was clear to the Court that counsel was relying on information provided to him by the Patrono Defendants.
[31] Each Patrono Defendant was also sanctioned in the amount of $3,500.

On August 9, 2023, H&M again filed a Motion for Discovery Sanctions against the Patrono Defendants. The motion suggested the tax documents provided were incomplete and that Jonathan Patrono's representations that he was actively attempting to obtain tax records were contradicted by the documents he provided. Following argument on September 25, 2023, the Court ordered that the Patrono Defendants produce within seven days verified statements indicating they had provided H&M accurate copies of all federal income tax returns filed by them or on their behalf for the tax years 2011 through current. In an effort to avoid any claim of uncertainty by the Patrono Defendants, the Order was specific in identifying the documentation required to be produced. In light of the impending jury trial date, the Court directed the Patrono Defendants to provide documentation within seven days.

On October 2, 2023, the Patrono Defendants filed a "Motion for Reconsideration and Modification of the September 25, 2023 Order or, Alternatively, to Extend the Deadline" to provide the documentation. Subsequently, the Court entered an Order denying the Motion for Reconsideration, however, granting the Patrono Defendants until October 16, 2023 to comply with the terms of the September 25, 2023 Order.

On October 19, 2023, the Patrono Defendants filed a Second Motion for Reconsideration of the Order of Court dated September 25, 2023. The motion represented that on October 6, 2023, Alan Patrono notified counsel that he had at least 37 banker boxes of records potentially responsive to the Court's September 25, 2023 Order. Apparently, discovery of the boxes did not occur until after October 2, 2023 as the Patrono Defendants' prior motion made no mention of the extent of the

records at issue. By Order dated October 26, 2023, the Patrono Defendants' Second Motion for Reconsideration was denied.

On October 26, 2023, H&M filed a "Motion for Default Judgment Against Defendants Pursuant to Pa. R. Civ. P. 4019(c)(3) or, in the Alternative, Emergency Motion for Continuance of Trial and Request for Corresponding Imposition of Delay Sanctions." The Court scheduled an immediate telephone conference for October 27, 2023. During the conference, Patrono Defendants' counsel indicated he had not reviewed the content of the boxes referenced in his second Petition for Reconsideration and that they were not in his possession, but rather in the possession of a third party copying service. October 27, 2023 Tr., pg. 5-6. Following further discussion, the Court listed H&M's Motion for Default Judgment for hearing and argument on November 2, 2023 and granted H&M's request for trial continuance, continuing trial to February 26, 2024.[32]

---

[32] Earlier in the litigation, in an effort to streamline proceedings, the five causes of action relating to the fraudulent transfer of real estate and conspiracy were severed from the remaining causes of action. Following a non-jury trial on those issues held on April 25, 2023 and April 26, 2023, this Court found that Alan Patrono, Jane Patrono, and Jonathan Patrono transferred title to respective real estate owned by them with actual intent to defraud creditors. Specifically, the Court found that Alan Patrono, Jane Patrono, and Jonathan Patrono transferred title of their properties to Polly Patrono in an effort to avoid H&M collecting on the personal guarantees securing the Members 1st loan. As a result, the Court enjoined the Patrono Defendants from further encumbrance or transfer of the subject real estate.

On August 18, 2023, Hammerhead Realty, LLC ("Hammerhead") filed a Petition for Relief from the *Lis Pendens* on Property Located at 28 West Middle Street, Adams County, Pennsylvania. The property housed the law office of Patrono & Murphy, LLC and was one of the subject properties enjoined by previous Order of Court. By Order dated October 2, 2023, Hammerhead, through its sole shareholder, John Murphy, Esquire, was directed to disclose all written agreements relating to the sale and ownership of 28 West Middle Street. The documents disclosed by Hammerhead included a number of documents relevant to the fraudulent transfer litigation which were not previously disclosed by Alan Patrono during discovery or during Alan Patrono's testimony during the fraudulent transfer non-jury trial despite the relevancy of the documents being self-evident. For instance, Alan Patrono attempted to avoid a finding of fraud when he, on the advice of counsel, arranged the return of the properties at issue from Polly Patrono to their original title owners. He failed to mention, however, that following the return of title to him, he entered a sales agreement to once again transfer the property and also entered a one-year lease encumbering the property through December 31, 2023. Timeline, Exhibits 42 & 46. As an officer of the court, Alan Patrono remained silent about the sales agreement

---

28

At the beginning of the November 2, 2023 hearing, Patrono Defendants' counsel indicated that approximately 2,789 documents were forwarded to H&M counsel on October 20, 2023. The documents were reported to be the records obtained from two accountants who provided accounting services to the Patrono business entities and Alan and Jane Patrono personally. November 2, 2023 Tr., pg. 25.

At the beginning of his testimony, Alan Patrono confirmed his representations during prior proceedings, that he had provided all documentation concerning the alleged loans to Hauser Estate to his counsel. November 2, 2023 Tr., pg. 37. In regard to his personal tax returns, he claimed that an accountant prepares his tax returns; however, the accountant is unwilling to sign the tax returns as preparer. Rather, the accountant returns the tax returns to Alan Patrono who signs the documents as "self-prepared." November 2, 2023 Tr., pg. 46-47. Apparently, this practice results from the preparer being unwilling to verify the accuracy of information concerning the alleged loans to Hauser Estate. Interestingly, during his testimony, Alan Patrono continued to advance his claim that the tax returns would not contain any information relevant to the litigation, November 2, 2023 Tr., pg. 57, despite his

---

and the lease encumbrance on 28 West Middle Street at the same time during which the Court was considering issues relating to preservation of clear title to the property in order to protect creditors.

The concealed documents also included relevant information contrary to deposition and court proceeding testimony provided by Jonathan Patrono and Alan Patrono. For instance, the purchase agreement of Patrono & Associates, LLC and Apple Leaf Abstracting & Settlement Company indicated that Jonathan Patrono has not practiced law with either of those entities since 2008 despite his January 19, 2023 deposition testimony during which he claimed he worked at the respective corporate entities through 2012. Compare Timeline, Exhibit 42 with January 19, 2023 Tr., pgs. 21-24. Similarly, despite Alan Patrono's varying degrees of accuracy concerning the existence of supporting documentation for operations related to Hauser Estate, the February 10, 2022 sales agreement for 28 West Middle Street specifically includes the provision that Alan Patrono remove all materials related to Hauser Estate located at that property, including therewith, the Hauser Estate items located in Jonathan Patrono's office. Timeline, Exhibit 42.

earlier testimony acknowledging that the alleged loans to Hauser Estate were declared by him in both his 2016 and 2022 tax returns. November 2, 2023 Tr., pg. 51-52.[33]

In regard to the recently discovered 37 boxes containing tax information ("tax boxes"), Alan Patrono claimed he was unaware that the boxes even existed as of September 25, 2023. November 2, 2023 Tr., pg. 67. He indicated he was unsure as to the content of the boxes as he had not looked through them since prior to commencement of the litigation in 2018. November 2, 2023 Tr., pg. 73. He generally described the tax boxes as containing personal tax information and tax information for Apple Leaf Abstracting, Patrono & Murphy, LLC, and Patrono & Associates, LLC. November 2, 2023 Tr., pg. 83-85. He conceded at least one of the tax boxes contained financial information for HFF. November 2, 2023 Tr., pg. 84. He also conceded that checks supporting the alleged loans were written through his law firm entities including Apple Leaf Abstracting. November 2, 2023 Tr., pg. 90. During his testimony, Alan Patrono recognized the difference between records related to his personal income tax information as compared to the tax records related to his law business entities. November 2, 2023 Tr., pg. 132-133; pg. 143-144. Notably, the September 25, 2023 Order related only to his personal taxes.

During his testimony, Alan Patrono unexpectedly admitted that an additional 37 boxes of records related to Hauser Estate ("Estate boxes") were maintained in his law office. November 2, 2023 Tr., pg. 151. Although once again acknowledging he

---

[33] Alan Patrono did not explain why he declared the same loss in tax returns for two separate years.

did not know the specific content of documents in the boxes, November 2, 2023 Tr., pg. 152, he claimed that they included:

> **Accounting records, vendor records, miscellaneous documents for the operation of Hauser Estate over a period of x-number of years.** I don't know the time span. That's what's in there. I can't be more specific than that.

November 2, 2023 Tr., pg. 154 (emphasis added). His testimony clearly reflected that the Estate boxes were in his possession during the relevant periods of time during which the Patrono Defendants were indicating to the Court that all such records were in the possession of the bankruptcy receiver and therefore unavailable to them.[34]

During his testimony, Jonathan Patrono acknowledged he was aware of the existence of the Estate boxes as was Alan Patrono. November 2, 2023 Tr., pg. 226-227. He described the Estate boxes as the "old winery boxes." November 2, 2023 Tr., pg. 229. He also understood that the records were directly relevant to this litigation. November 2, 2023 Tr., pg. 231. Jonathan Patrono claimed, however, that there were only 5 to 10 Estate boxes at the law office. November 2, 2023 Tr., pg. 226. He claimed to have looked through the Estate boxes on two occasions; once before and once after his January 19, 2023 deposition. November 2, 2023 Tr., pg. 234. He later contradicted himself by indicating he went through the Estate boxes in the fall of 2018 and again in 2022. November 2, 2023 Tr., pg. 248. He identified the documents in the Estate boxes as being the original documents supporting the Xero

---

[34] Incidentally, his testimony reflected that the first inquiry to obtain the records maintained by the receiver was not made until May 12, 2023 and, shortly thereafter, access was granted. Apparently, a period of over four years transpired between the time when the relevancy of the records, and the request for their disclosure, was first known and his subsequent effort to obtain the records.

accounting system. November 2, 2023 Tr., pg. 248-249. Throughout his testimony, Jonathan Patrono acknowledged he had access to the Estate boxes over the course of this litigation and only provided H&M access to what he claimed to be copies of the documents in the Xero accounting software in May of 2023.

Jane Hauser Patrono was also called as a witness during the hearing. During the majority of her testimony, she claimed ignorance as to details. She claimed lack of memory as to what documents she may or may not have seen and, as for those documents she might have seen, she could not recall any details. She essentially claimed that in regard to all issues relevant to this litigation, she deferred to her husband, Alan Patrono, and allowed him to make decisions in regard to the litigation on her behalf.

The final witness who provided material information was the law partner of Alan Patrono, Attorney John Murphy. Attorney Murphy testified that he observed three or four boxes in Alan Patrono's office which were labeled with the names of the winery corporate entities relevant to this litigation. November 3, 2023 Tr., pg. 311. He further indicated there were approximately 25-30 additional boxes labeled with the names of the relevant corporate entities which were housed in a different location in the law office. November 3, 2023 Tr., pg. 312. He claimed not to have seen Jonathan Patrono use the offices housing the Estate boxes since approximately 2007-2008. November 3, 2023 Tr., pg. 312.

Finally, Jonathan Patrono was re-called as a witness. He once again claimed that everything in the Estate boxes was also entered in the Xero accounting system. November 3, 2023 Tr., pg. 360. He stated the records in the Xero accounting system

spanned 2012 through 2018 and included backup documentation for Hauser Estate expenditures. November 3, 2023 Tr., pg. 364.[35] He further claimed that all information in the Estate boxes was entered in the Xero accounting system by his bookkeeper. November 3, 2023 Tr., pg. 384.

During a cursory review of the Xero system conducted in the courtroom, the Court did not observe any entries by the bookkeeper but rather observed entries which indicated they were entered by Jonathan Patrono. November 3, 2023 Tr., pg. 393-396. Additionally, the Court observed numerous entries which lacked any backup information or supporting documentation. Two of the entries observed during the brief review lacked supporting documentation, however, were designated as payments by Hauser Estate to Polly Patrono. November 3, 2023 Tr., pg. 395-396.

Following the close of testimony and argument, on February 8, 2024, this Court entered default judgment in favor of H&M and against Alan Patrono and Jonathan Patrono on the cause of action for breach of fiduciary duty; against Jane Hauser Patrono on the count of civil conspiracy for breach of fiduciary duty; on a claim of professional negligence against Alan Patrono and Jonathan Patrono; on two counts of civil conversion against Alan Patrono and Jonathan Patrono; and on the claim of civil conversion against Alan and Jane Patrono. The Court also entered default judgment against Alan and Jane Patrono on all of their Counterclaims.

On February 29, 2024, the Patrono Defendants filed a "Petition to Open Default Judgments on Various Counterclaims and to Strike, or in the alternative,

---

[35] This claim is directly in contradiction to the claim made by Alan Patrono, under oath, at his January 13, 2023 deposition, *see* Tr., pg. 263, and by the Patrono Defendants' counsel to the undersigned, in open court, and in the presence of Jonathan Patrono, on June 7, 2023. *See* Tr., pg. 20. At those proceedings, Alan Patrono continuously and adamantly claimed such documents did not exist.

Open Default Judgments on Counterclaims." By Order dated March 12, 2024, the Petition to Open/Strike the Default Judgments entered on February 8, 2024 was denied. This appeal followed.

In discussing the merits of this appeal, it is important to consider whether the appeal is an improper interlocutory appeal. Relevant to this discussion is the procedural record which reflects that this Court's Order granting the default judgments, and the subsequent Order denying the Petition to Open and/or Strike Default Judgments, were entered pursuant to Pa. R. Civ. P. 4019(c)(3). That rule authorizes a court to enter judgment of default against a party who has been disobedient in complying with discovery obligations. *See also Taylor v. City of Phila.*, 692 A.2d 308, 313-14 (Pa. Cmwlth. 1997) *affirmed* 699 A.2d 730 (Pa. 1997) (judgment by default may be entered against disobedient party as sanctioned for failure to respond adequately to discovery requests); *Fox v. Gabler*, 626 A.2d 1141, 1143 (Pa. 1993) (court acts well within its discretion and latitude in entering judgment by default against disobedient party inadequately responding to discovery requests). Case law is equally clear that it is improper to challenge a default judgment entered by the trial court pursuant to Pa. R. Civ. P. 4019(c)(3) by a petition to strike and/or open. *See Simpson v. Allstate Ins.*, 504 A.2d 335, 337 (Pa. Super. 1986); *Miller Oral Surgery, Inc. v. Dinello*, 493 A.2d 741, 743 (Pa. Super. 1985); *Livolsi v. Crosby*, 495 A.2d 1384, 1385 (Pa. Super. 1985). The proper method for review of the trial court's action in entering default judgment pursuant to Pa. R. Civ. P. 4019 is to file an appeal within the time prescribed by the Pennsylvania Rules of Appellate Procedure after final judgment consisting of a determination of both liability and

34

damages by the trial court. *Livolsi*, 495 A.2d at 1385. Under this well-established authority, the current appeal should be quashed as an improper interlocutory appeal.

In order to avoid this conclusion, Appellants argue, contrary to the Court's clear language in its Order, that the judgments entered against Appellants on their Counterclaims are actually judgments of *non pros*. In their pleadings before this Court, Appellants cited *Dombrowski v. Cherkassky*, 691 A.2d 976 (Pa. Super. 1997), in support of their argument. *Dombrowski*, however, does nothing more than define a *non pros* as a judgment entered due to the failure of a plaintiff to properly and/or promptly prosecute a case. *Id.* at 976-77. *Dombrowski* neither discusses nor prohibits relief authorized elsewhere in the Pennsylvania Rules of Civil Procedure. *See generally Id.* Specifically, *Dumbrowski* does not, in any way, speak to the authority of the court under Pa. R. Civ. P. 4019 to address discovery violations. *Id.*

The gist of Appellants' argument appears to be a suggestion that Rule 4019 limits a court to entering a judgment of *non pros*, rather than default judgment, in circumstances where a counterclaim plaintiff commits significant discovery violations. This writer has been unable to find any authority for the proposition, nor has any been cited by Appellants. Importantly, R. Civ. P. 4019 does not impose any such limitation. In light of the lack of any definitive guidance, this Court concluded for purposes of clarity and efficiency that the entry of default judgment, under the circumstances, was procedurally and practically proper as Pa. R. Civ. P. 4019, without any other clarification or reservation, expressly permits the same.

Importantly, accepting Appellants' arguments will result in an absurd, and inefficient, result in both this and future litigations. Evidence of such a ludicrous interpretation is the current procedural conundrum facing both this and the appellate court.[36] Specifically, this Court has entered default judgments under Rule 4019 against Appellants and other Patrono Defendants on H&M's several causes of actions. Pursuant to the authority of *Livolsi*, *supra*, interlocutory appeal on those matters is clearly improper. If, as suggested by Appellants, the judgments entered on Appellants' Counterclaims are required by law to be considered judgments of *non pros*, an appeal on the Counterclaims is permissible pursuant to Pa. R. App. P. 311 (an order refusing to open or strike judgment as an interlocutory appeal is permitted as of right). In that circumstance, the end result is a bifurcated, inefficient, and lengthy resolution of essentially identical issues in the same litigation through multiple appeals. Under Appellants' theory, the default judgments entered on the causes of action brought by H&M in the Complaint are not subject to interlocutory review; however, the judgments entered on the Patrono Defendants' Counterclaims are permitted interlocutory appeal. As such, Appellants' position directly violates the stated goal of appellate procedure in limiting appellate review to final orders so as to prevent piecemeal determinations and the consequent protraction of litigation. ***Rivera v. Carbon County Tax Claim Bureau***, 857 A.2d 208, 212 (Pa. Cmwlth. 2004), *appeal denied* 878 A.2d 866, 583 Pa. 692. Since Pa. R. Civ. P. 4019 does not prohibit, but rather authorizes, the entry of default judgment under the current

---

[36] In addition to this appeal, there are, or have been, four separate appeals related to this litigation before the Superior Court docketed at 985 MDA 2023; 986 MDA 2023; 518 MDA 2024; 519 MDA 2024; and 520 MDA 2024. As a result, the record is duplicative and, at times, confusing and disjointed in each of the appeals.

36

circumstances, Appellants should not be permitted to redefine the Court's action in order to further delay ultimate resolution of the substantive issues before the Court.

Regardless of how the judgment is styled, it does not change the fact that judgment was properly entered against Appellants on the Counterclaims and that the Petition to Strike and/or Open the judgments was properly denied. Regardless of whether the judgment is treated as a default judgment or a judgment of *non pros*, relief from either requires the complainant to establish a reasonable explanation or a legitimate excuse for the conduct that gave rise to entry of the judgment. Compare Pa. R. Civ. P. 3051 (petitioner seeking relief from judgment must show, *inter alia*, a reasonable explanation or legitimate excuse for conduct giving rise to the judgment) with **Hutchison by Hutchison v. Luddy**, 611 A.2d 1280, 1292 n.10 (Pa. Super. 1992), *appeal granted*, 625 A.2d 1193, 533 Pa. 660, *appeal dismissed*, 649 A.2d 435, 538 Pa. 484) (sanction under Pa. R. Civ. P. 4019 must consider whether reasonable justification exists for parties' questionable conduct). In light of the record set forth hereinabove, as will further be discussed below, there is no reasonable explanation or legitimate excuse for Appellants' egregious conduct in this litigation.

Before discussing the merits of the sanction imposed by the Court, the Court will address Appellants' separate claim of error in entering judgment against Jane Hauser Patrono. In their Concise Statement of Matters Complained of on Appeal, Appellant Jane Hauser Patrono claims the evidence did not establish that she was responsible for the failure to produce documents as they were not in her possession.

Throughout this litigation, the Patrono Defendants have acted in unison as all pleadings have been collectively pled and filed despite the existence of multiple

37

Defendants. During discovery proceedings and throughout court hearings, Jane Hauser Patrono has consistently represented that she has allowed her husband, Alan Patrono, to act as her agent on her behalf in every aspect of this litigation. To now argue that his failure to properly respond to discovery cannot bind her simply defies the record.

The irony of her current claim is that it highlights the inconsistency of the Patrono Defendants' position throughout this litigation. Despite drafting significant legal documents for the formation and operation of Hauser Estate and HFF, and actually conducting negotiations and performing management services on behalf of the corporate entities, Alan Patrono attempts to redefine his role from that of legal counsel to one of a family member only doing favors for his relatives. If that is indeed true, he has no legal right to possess any of the documents concerning Hauser Estate or any of the other corporate entities as they properly belong to the corporate entities, or the officers and shareholders of the corporate entities, to which they relate. Under these circumstances, as a shareholder, Jane Hauser Patrono had a right superior to Alan Patrono to any documents related to Hauser Estate and/or HFF. Just as importantly, the documents at issue were located in a building of which she was part owner. By her own testimony, she was aware of the existence of the boxes containing Hauser Estate documents at all relevant times to this litigation. It is nonsensical to argue that Jane Hauser Patrono did not have access to documents over which she had legal authority which were located in a building of which she was part owner at a time when she had knowledge of the documents' existence. The fact that she delegated litigation authority to her husband does not absolve her of

38

responsibility for the significant discovery violations. As such, she is equally subject to the appropriate sanctions.

The primary thrust, and the pivotal issue, of the current appeal is the propriety of the sanctions imposed against the Appellants on their Counterclaims. Appellants argue the sanction of entering judgment against them on their Counterclaims was an unnecessarily severe penalty. Appellate courts have instructed that in determining whether discovery violations warrant the sanction dismissal, the court must consider:

1. the nature and severity of the discovery violation;
2. the willfulness or bad faith on the part of the defaulting party;
3. the extent of prejudice to the opposing party;
4. the ability of the prejudice to be cured; and
5. the importance of the precluded evidence in light of the failure to comply.

*Rohm & Haas Co. v. Lin*, 992 A.2d 132, 142 (Pa. Super. 2010).

In analyzing this issue, it is important to understand the full nature of the Patrono Defendants' noncompliance with discovery requirements. Certainly, significant effort has been devoted, unnecessarily, to obtaining the Patrono Defendants' federal tax records; however, the Patrono Defendants' noncompliance with reasonable discovery requests is much more aggravated. Since the initiation of this litigation in 2018, the consistent and dominating theme advanced by H&M focuses on allegations of fraudulent conduct by the Patrono Defendants resulting in the financial failure of Hauser Estate at the expense of personal financial gain by the Patrono Defendants. In furtherance of those allegations, H&M has alleged the existence of doctored records and have attempted to uncover documents supporting this claim as well as documents evidencing monetary transfers to the Patrono Defendants without concurrent legitimate expense and corporate mismanagement

39

and manipulation by the Patrono Defendants. Critically, the Patrono Defendants, personally and through counsel, have repeatedly claimed under oath and in court proceedings, that the very documents which would corroborate or refute H&M's claims did not exist. It is against this backdrop, after five years of litigation, that one must view the disclosure of approximately 30 to 37 boxes of Estate records within days of trial.

Generally, discovery is liberally allowed with respect to any matter which is not privileged, and which is otherwise relevant to the cause being tried. Pa. R. Civ. P. 4003.1. The threshold inquiry in determining relevancy focuses upon whether the discovery request can be reasonably calculated to lead to the discovery of admissible evidence. Pa. R. Civ. P. 4003.1(a). Appellants have not cited, nor has this Court located, any authority that applies a different standard to a party's personal tax records.

The income tax records of Alan and Jane Patrono are relevant, and thus subject to discovery, because of the Counterclaims asserting significant personal loans to Hauser Estate. Prior to the Members 1st loan in 2015, Alan and Jane Patrono, individually and through related businesses, alleged they made $600,000 in loans to the corporation. Post-2015, they alleged they made almost $3 million in additional loans to Hauser Estate. At his deposition, Alan Patrono acknowledged the loans would be evidenced on their tax records, thereby directly placing the documents at issue as material evidence. As the existence and the amounts of the alleged loans are matters central to this litigation, the tax records are pivotal to assist the fact-finder in making credibility determinations. Moreover, Alan and Jane Patrono

Case 1:25-bk-02214-HWV    Doc 32-2    Filed 08/29/25    Entered 08/29/25 13:28:55    Desc
Exhibit    Page 41 of 48

have indicated contradicting amounts for the alleged loans and ambiguously identified their actual source, either personally or through Alan Patrono's various business entities. In light of Alan Patrono's repetitive claims that the only supporting documents to the alleged loans are the actual checks and bank statements, the personal tax returns take on heightened importance as either verification or contradiction. In regard to the relevancy of most recent tax returns, Alan Patrono has testified that he included losses related to the alleged loans in his personal tax return as recently as 2022.

In regard to Jonathan Patrono, both his role and status as an attorney for Patrono & Associates, LLC and the amount of actual income received from Hauser Estate, are matters in dispute in this litigation. Contradictory information exists as to when he concluded his legal practice to assume greater duties for Hauser Estate. The precise date of that transition will be reflected by evidence of income during the relevant period. In light of the looming professional malpractice claim against Jonathan Patrono, that date has heightened importance. Similarly, his actual income throughout the period of time he was serving in his role with Hauser Estate is directly relevant to whether he manipulated estate assets to his financial benefit.[37] Indeed, during his depositions, Jonathan Patrono recognized the importance of the tax records when he conceded his personal income tax records would have information relevant to the litigation which was not available elsewhere.

Unquestionably, the importance of the tax returns was evident to all parties as early as 2018 when H&M properly utilized the discovery pursuant to the Rules of Civil

Procedure in an attempt to obtain the same from Appellants. Appellants, however, refused to answer repeated discovery requests and failed to bring the tax records to depositions in response to proper requests for production of documents. Although the Appellants repeatedly stated their position that the tax returns were not a proper target of discovery, they were directed by the Court to disclose the records. It was not until the eve of trial that they claimed unavailability for the first time.[38] It was only on May 25, 2023, the same day as the filing of Appellees' Motion for Citation of Contempt, that Jonathan Patrono allegedly made any effort to obtain his tax records from the Internal Revenue Service. Alan and Jane Patrono simply maintained they did not file 2018 and 2019 federal taxes. When the Court directed Appellants to file verified statements confirming their representations in court concerning the unavailability of documents, it took the Appellants over 30 days to comply. Even then, their compliance was marginal as they did not fully provide documentation of income for the relevant years as directed. Their cavalier approach to compliance with this Court's Order resulted in the September 25, 2023 Order which expanded the search for supporting documentation. Appellants' response, however, was to obfuscate the record, and perhaps intentionally delay trial, with a document dump of corporate tax records rather than personal tax records. Incidentally, at least one of the 37 boxes of supposed tax records located by Appellants contained records related to HFF, the content of which remains unknown.

---

[37] As previously indicated, Jonathan Patrono, in attempting to gain support for his proposal to create the winery, indicated he would not draw a salary.

[38] In their 24-page Answer to Appellees' Motion to Compel Discovery, Appellants never indicated any lack of possession or filing of their personal income tax records. Despite this Court's Order dated April 25, 2023 directing Appellants to produce their tax returns within 20 days, for the first time on May 10,

Even more egregious is the Appellants' treatment of the business records of Hauser Estate. Throughout this litigation, the Appellants have made affirmative and clearly erroneous statements during depositions and in actual court hearings as to the lack of any supporting documentation concerning the alleged loans from Appellants to Hauser Estate. As previously mentioned, on June 7, 2023, counsel for Appellants affirmatively advised the Court that supporting documents for the alleged loans did not exist. Despite the Patrono Defendants sitting on "giant boxes" of documents at the Patrono law office, counsel advised the Court that all of those same documents were in the possession of bankruptcy counsel for Hauser Estate and they no longer had access to the same. June 7, 2023 Tr., pg. 20.

The record is saturated with directions by the Court to produce Hauser Estate records and repeated denials by Appellants as to their existence. Yet, for the first time at hearing held just days prior to the commencement of jury trial, the Appellants acknowledged that approximately 30 boxes of records related to Hauser Estate, the contents of which are unknown, were and had been in their possession the entire time.[39]

---

2023, Appellants claimed the unavailability of certain tax records. Even then, Jonathan Patrono waited 15 days before making any effort to retrieve the information from the IRS.

[39] The Court rejects the self-serving testimony of Jonathan Patrono claiming the existence of only "five to ten boxes" and his representations as to the contents of the Estate boxes. Jonathan Patrono's testimony is contradictory on several key points related to his inspection of the Estate boxes and their content. His testimony is also contradicted by that of Alan Patrono, who had much more contact with the Estate boxes and who indicated the number of Estate boxes to be approximately 37. Alan Patrono's testimony is also corroborated by Attorney John Murphy who had more opportunity than Jonathan Patrono to view the Estate boxes. Attorney Murphy credibly indicated approximately three or four Estate boxes were located in Alan Patrono's office and an additional 25-30 Estate boxes were located in a separate room. This Court determined as a matter of fact that the Estate boxes exceeded 28 in number and possibly are as many as 37. Additionally, there is at least one additional box which has been identified as holding tax information for HFF that conceivably holds business records relevant to this litigation. This Court also found that neither Alan Patrono nor Jonathan Patrono credibly testified as to their knowledge of the contents of the Estate boxes other than that the boxes

43

Throughout this litigation, there is direct and circumstantial evidence that:

1. At least one signature of an H&M Plaintiff on a document prepared by Alan Patrono was forged;

2. Alan Patrono represented to Hannah Hauser and Melinda Davis's counsel that he would make changes to documents before they were executed when, in fact, he subsequently did not make those changes, yet permitted execution of the same;

3. Appellants converted checks for apple crops made out to HFF to the accounts of Hauser Estate without authority;

4. Appellants wrote checks for significant dollar amounts made out to "cash" and allegedly tendered to Hauser Estate but for which no documentation identifying the purpose of the payments has been produced;

5. Appellants transferred real estate with the intended purpose of defrauding creditors;

6. Appellants Alan and Jane Patrono failed to timely file at least one federal tax return or obtain an extension for the filing thereof;

7. Appellants produced two versions of a contribution agreement allegedly executed by Plaintiffs Hannah Hauser and Melinda Davis both of which appears to be the same document but were executed on completely different dates;

8. Appellants repeatedly transferred and encumbered real estate securing significant loans with Members 1st despite contractual representations of which they were aware which indicated they would not do so; and

9. Hearing evidence presented by Alan Patrono was precluded by the Cumberland County Court of Common Pleas due to a discovery violation.

While these issues, and other allegations of a significant number of self-serving business transactions alleged by Appellees, are best vetted by the finders of fact in a trial, if true, they are certainly an indication of the trustworthiness of Appellants' representations. Appellants' admitted suppression of approximately 30 boxes of relevant documentation not only circumstantially corroborates H&M's allegations, but also precludes a fair hearing on the same as Appellants have knowingly denied Appellees access to important records.

---

included "Accounting records, vendor records, and miscellaneous documents for the operation of Hauser Estate over a period of x-number of years." November 2, 2023 Tr., pg. 154.

The Appellants' repeated claims that H&M was granted access to the bookkeeping records contained in the Xero accounting program is nothing more than a red herring. First of all, access to the same was not granted until May of 2023. The grant of access to the Xero accounting program at that time neither explains nor justifies Appellants' failure to produce dozens of Estate boxes of documents which were in their possession over the five-year course of this litigation. Moreover, the Xero accounting program only relates to documents post-2015 when, in fact, material activities related to the subject of this litigation occurred prior thereto. Whether the dozens of Estate boxes are pre-Xero accounting records is unknown as Appellants have not disclosed those records as of yet. Moreover, this Court rejected Appellants' claim that the Xero accounting program contains all of the records which may be in the boxes. Indeed, a small sample of the Xero accounting program records displayed during hearing was, at best, inconclusive, if not contradictory, to Jonathan Patrono's claim on this issue. It is not unreasonable to expect a party to perform an actual inventory of records potentially related to pending litigation so their content can be affirmatively known. However, rather than pursue this course of conduct, for approximately five years the Appellants denied the existence of the records when, in all actuality, the records were in their possession.

The severity of the Appellants' discovery violations is beyond question. Moreover, when viewed within the entire record, Appellants acted willfully and with bad faith. The extent of the prejudice to Appellees is self-evident. Ultimate disclosure of the documents occurred just weeks prior to trial which had been scheduled for over a year. Because of Appellants' noncompliance, it was impossible

Case 1:25-bk-02214-HWV    Doc 32-2    Filed 08/29/25    Entered 08/29/25 13:28:55    Desc
Exhibit    Page 46 of 48

for Appellees to determine the extent of inculpatory evidence which was withheld, or which might lead to further avenues of discovery. Interestingly, even as of this writing, Appellants have made no effort to provide the records or present evidence of their content or insignificance. Importantly, the prejudice cannot be cured without significant delay and expense to Appellees. Numerous experts have been retained by the Appellees in preparation for trial whose testimony does not take into account potentially thousands of pages of documents which may relate to substantive issues. Requiring Appellees to "hit the restart button" and commence preparation of this litigation from scratch is simply unfair.

The Superior Court reiterated the expectations on a party in responding to discovery requests as follows:

> A party's belief that discovery orders are wrong does not justify or excuse its violation of those orders. Rather, such defiance is a direct affront to the authority of the trial court and to the integrity of the judicial system and rule of law.

> A litigant cannot be permitted to determine what constitutes discoverable information. The Pennsylvania Superior Court in addressing a similar discovery issue in *George*, [] expressed its reluctance "to allow a participant in a lawsuit to dictate the determination of what is, and what is not, relevant. To allow this practice is akin to allowing a participant in a contest to referee the contest. In the contest of litigation, the judge and the judge alone, acts as the referee."

*Rohm & Haas Co.*, 992 A.2d at 143, (citing 6 Standard Pa. Practice, 2d, 34:85, p. 441; *Luszczynski v. Bradley*, 729 A.2d 83 (Pa. Super. 1999); *George v. Schirra*, 814 A.2d 202, 205 (Pa. Super. 2002); Trial Court Opinion (1556 EDA 2008), 7/17/08, at 11-12.)

46

In sum, this litigation involves significant allegations of misrepresentation and fraud. The litigation involved three separate jurisdictions over a period in excess of five years. From initiation of the litigation throughout the life thereof, Appellees have attempted to gain access to documents concerning the formation and operation of Hauser Estate and loans alleged to have been provided to Hauser Estate by Appellants. At times, Appellants have denied the existence of documents and failed to provide access of the same to Appellees. Suddenly, at a hearing just weeks before trial, Appellants, while discussing tax records, inadvertently disclosed the existence of at least 28 boxes, and as many as 37 boxes, of documents which relate to the formation and operation of Hauser Estate, and which include documents not previously provided to Appellees. Even more egregious is the fact that two of the three Appellants are licensed attorneys who are presumably familiar with their ethical obligations including their duty of candor to the Court. It is difficult to imagine a more glaring or deplorable misconduct on the part of a party in responding to reasonable discovery requests.

For the foregoing reasons, it is respectfully requested that this Court's Order be affirmed and the appeal in this matter be dismissed.

BY THE COURT:

_____
**MICHAEL A. GEORGE**
**President Judge**

Date filed: August 9, 2024

47