# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| **In re:** | : | **Bankruptcy No. 1:25: bk-02214 (HWV)** |
| **ALAN KIM PATRONO ET AL.** | : | |
| | : | **CHAPTER 11** |
| **Debtors.** | : | |
| | : | |

**CREDITORS, H&M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA H. DAVIS and HANNAH M. HAUSER, REPLY IN OPPOSITION/OBJECTION TO DEBTORS' MOTION TO APPOINT MARSHALL L. MILLER AND MOUNTAIN REALTY ERA POWERED AS REALTOR FOR THE DEBTORS**

AND NOW come Creditors, H&M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA H. DAVIS, and HANNAH M. HAUSER (hereinafter collectively "Hauser Creditors") and file their Reply in Opposition/Objection to Debtors' Motion to Appoint Marshall L. Miller and Mountain Realty Era Powered As Realtor For the Debtors (ECF No. 55), and in support thereof aver as follows:

1. Admitted.

2. The Hauser Creditors are without knowledge sufficient to form a belief as to what the Debto<u>r</u> (emphasis added to the original) "wishes" and strict proof of the same, if relevant, is demanded at the time of hearing. By way of further reply, Debtor Alan Kim Patrono has no right, title or ownership interest in the real property known and numbered as 410 Cashtown Road, Biglerville, PA ("Cashtown Road

1

4932-5794-6734 v1

Property") which is the subject of the second listing agreement attached to Debtors' Motion, (although it is incorrectly identified as "496 Cashtown Road, Cashtown, PA 17310" in the listing agreement dated September 25, 2025 attached to the Debtors' Motion). Finally, and by way of further reply, the Cashtown Road, Property is owned by Hauser Family Farms, LLC, ("HFF") a Pennsylvania limited liability company whose managing member is Melinda H. Davis <u>NOT</u> Debtor, Jane Patrono. *See* Exhibit "A" and Exhibit "B". The Debtors themselves identified that the Cashtown Road Property is owned by HFF- a limited liability company in which Debtor, Jane Patrono only has a 1/3 interest. *See* Debtors' Schedule A/B, page 3 (ECF 22). Per the terms of the HFF Operating Agreement, (that was prepared by Debtor, Alan Kim Patrono), the only member of the HFF, LLC who has the authority to list the Cashtown Road Property for sale is Melinda Davis. *See* Exhibit "B", ¶16. Moreover, the Debtors have incorrectly reported on their Schedules that the Cashtown Road Property is subject to a mortgage held by Members 1st despite the fact that Debtors are clearly aware that the mortgages on the Cashtown Road Property held by Members 1st were assigned to H&M Holdings Group, LLC in July 2018. See Exhibit "C". The Debtors are further aware that the Cashtown Road Property is also the subject to an additional mortgage held by H&M Holdings Group, LLC. *See* Exhibit "D" attached hereto. *Compare* Debtors' Schedule D, page 4 (ECF No. 22).

2

4932-5794-6734 v1

3. Admitted in part and denied in part. It is admitted only that Debtors apparently "selected Marshall L. Miller and Mountain Realty ERA Powered" to serve as their Realtor. It is denied that Debtors had the ability to enter into any Listing Agreement for the Cashtown Road Property as the only member of HFF who has the authority to do so is Melinda Davis. *See* Exhibit "B", ¶16. It is further denied that the Debtors had the authority to enter into any Listing Agreement for any real property without prior approval from this Honorable Court- yet as is consistent with the Debtors' past practice of taking actions without securing prior court approval Debtors have nevertheless proceeded to do so on September 25, 2025, (5 days prior to filing their Motion with the Court), as evidenced by the Listing Agreements attached to their Motion.[1]

4. Admitted only that the written Listing Agreements attached to the Debtors' Motion say what they say. <u>The Court should note however, that per the terms of the Listing Agreement for the property located at 28 West Middle Street, Gettysburg, PA and sale **would "be subject to [Debtors'] ability to do a 1031 Tax Deferred Exchange."**</u> *See* ECF Doc. 55-1 (marked as Exhibit "A", page 9 of 9).

---

[1] This is not the first time that the Debtors have tried to sell the Cashtown Road Property through Realtor Marshall Miller (aka "Marty" Miller) without seeking prior Court approval DESPITE being required to do so. *See* Plaintiffs' Emergency Motion for Special Relief Against Defendants filed on July 11, 2023, <u>sans</u> Exhibits attached hereto as Exhibit "E". On October 13, 2023, an Order was entered in the Adams County Court of Common Pleas prohibiting, *inter alia*, the Debtors from selling, transferring or encumbering any interest in HFF Properties without prior court approval and any such action would be "void *ab inito." See* Exhibit "F".

3

(Emphasis added). In other words, the Debtors want to replace this business property with a like-kind property and be able to defer the capital gains on the sale of this property. Thus, the only parties who will benefit from the proposed sale of the 28 W. Middle Street Property per the terms of the Listing Agreement attached to the Debtors' Motion would be the Debtors and their proposed Realtor. Clearly, any sale of the 28 W. Middle Street Property would afford no benefit to the Creditors of the Debtors Estate, per the current terms of the Listing Agreement. The Court should not indulge this folly.

Finally, it is denied that Debtors have the legal right, title or interest in the Cashtown Road Property to enter into a Listing Agreement for the same for all of the reasons previously set forth herein. The Hauser Creditors are without knowledge sufficient to form a belief as to what Marshall Miller does or does not understand regarding a "dual agency not being permitted" and strict proof of the same, if relevant, is demanded at the time of hearing.

5. This paragraph (which is incorrectly numbered as Paragraph 6) states conclusions of law to which no response is required.

WHEREFORE, the Hauser Creditors, jointly and severally, respectfully request that this Honorable Court deny the Debtors' Motion to Appoint Marshall L. Miller and Mountain Realty Era Powered Realtor for the Debtors, and further award

4

the Hauser Creditors all such other relief as is proper and just.

Respectfully submitted,

OBERMAYER REBMANN
MAXWELL & HIPPEL, LLP

Date: October 3, 2025

*/s/ Paige Macdonald-Matthes*
Paige Macdonald-Matthes, Esquire
Attorney ID No. 66266
Jennifer Bruce, Esquire
Attorney ID No. 329351
200 Locust Street, Suite 400
Harrisburg, PA  17101
(717) 234-9730 Telephone
(717) 236-2485 Facsimile
Email:  pmm@obermayer.com
*Counsel for Hauser Creditors*

# CERTIFICATE OF SERVICE

I hereby certify on this 3rd day of October 2025, that a true and correct copy of the *Hauser Creditors' Reply In Opposition/Objection to the Debtors' Motion to Appoint Marshall L. Miller and Mountain Realty Era Powered As Realtor for the Debtors* (ECF Doc. No. 55) has been served upon all parties of interest registered with the Bankruptcy Court Clerk to receive electronic notice via the CM/ECF system.

*/s/ Paige Macdonald-Matthes*
Paige Macdonald-Matthes, Esquire

4932-5794-6734 v1

6

# EXHIBIT A

| | | |
|---|---|---|
| tamp # 2007-017718 Consideration | $1.00 | |
| oc Franklin Township | Afft Y | |
| ommonWealth of Pennsylvania | $0.00 | |
| ranklin Township | $0.00 | |
| iettysburg Area School District | $0.00 | |
| iy : FEE USER Total : | $0.00 | |

Image ID: 000001460389 Type: GEN
Recorded: 08/14/2007 at 01:10:44 PM
Fee Amt: $40.00 Page 1 of 5
Instr# 200700015421
Adams County, PA
Patsy S. Gochenauer Recorder of Deec
BK 4944 PG 209

# This Indenture, made the 20ᵗ day of July , 2007,

## Between

**HELEN B. HAUSER, WIDOW, DOING BUSINESS AS CONEWAGO ORCHARDS,**

(hereinafter called the Grantor), of the one part, and

**HAUSER FAMILY FARMS, LLC, A PENNSYLVANIA LIMITED LIABILITY COMPANY,**

(hereinafter called the Grantee), of the other part,

**Witnesseth,** that the said Grantor for and in consideration of the sum of **One and 00/100 Dollar ($1.00)** lawful money of the United States of America, unto her well and truly paid by the said Grantee, at or before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, has granted, bargained and sold, released and confirmed, and by these presents does grant, bargain and sell, release and confirm unto the said Grantee.

**ALL** that tract of land situate in **Franklin Township, Adams County, Pennsylvania,** bounded and described as follows:

**BEGINNING** at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¾-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58

1



Image ID: 000001460390 Type: GEN
Page 2 of 5

BK**4944** PG**210**

minutes 20 seconds East 1,212.75 feet to a ¾-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¾-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of **BEGINNING. CONTAINING** 170.585 acres.

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

**BEING** the same tract of land which Mary B. Deardorff, widow, by her deed dated January 5, 1990, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 543 at Page 1061, granted and conveyed unto Helen B. Hauser, doing business as Conewago Orchards, Grantor herein.

**Together with** all and singular the buildings and improvements, ways, streets, alleys, driveways, passages, waters, water-courses, rights, liberties, privileges, hereditaments and appurtenances, whatsoever unto the hereby granted premises belonging, or in anywise appertaining, and the reversions and remainders, rents, issues, and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever of her, the said grantor, as well at law as in equity, of, in and to the same.

**To have and to hold** the said lot or piece of ground described above, with the buildings and improvements thereon erected, hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, their successors, heirs and/or assigns, to and for the only proper use and behoof of the said Grantee, their successors, heirs and/or assigns, forever.

**And** the said Grantor, for herself and her heirs, executors and administrators, does, by these presents, covenant, grant and agree, to and with the said Grantee, their successors, heirs and/or assigns, that she, the said Grantor, and her heirs, all and singular the hereditaments and premises herein described and granted, or mentioned and intended so to be, with the appurtenances, unto the said Grantee, their successors, heirs and/or assigns, against her, the said Grantor, and her heirs, will specially warrant and defend against the lawful claims of all persons claiming by, through or under the said Grantor but not otherwise.

2

Image ID: 000001460391 Type: GEN
Page 3 of 5

BK**4944** PG**211**

**In Witness Whereof,** the party of the first part has hereunto set her hand and seal. Dated the day and year first above written.

**Sealed and Delivered**
IN THE PRESENCE OF US:

**HELEN B. HAUSER d/b/a CONEWAGO ORCHARDS:**

_Helen B. Hauser_ {SEAL}

**Helen B. Hauser**

3

Image ID: 000001460392 Type: GEN
Page 4 of 5
BK 4944 PG 212

Commonwealth } ss of Pennsylvania
County of Adams

On this the 20⁺ day of July, 2007, before me, the undersigned Notary Public, personally appeared Helen B. Hauser d/b/a Conewago Orchards, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
Notary Public
My commission expires _____

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Alan Kim Patrono, Notary Public
Gettysburg Boro, Adams County
My Commission Expires Nov. 26, 2009
Member, Pennsylvania Association of Notaries

The address of the above-named Grantee is:

30 West Middle Street, Gettysburg, PA 17325.

_____
On behalf of the Grantee

File No. A-766.000

4

REV-183 EX (11-04)



COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF REVENUE
BUREAU OF INDIVIDUAL TAXES
PO BOX 280603
HARRISBURG PA 17128-0603

# REALTY TRANSFER TAX
# STATEMENT OF VALUE

See Reverse for Instructions

| RECORDER'S USE ONLY | |
|---|---|
| State Tax Paid | O |
| Book Number | 4944 |
| Page Number | 209 |
| Date Recorded | 8-14-07 |

Complete each section and file in duplicate with Recorder of Deeds when (1) the full value/consideration is not set forth in the deed, (2) when the deed is without consideration, or by gift, or (3) a tax exemption is claimed. A Statement of Value is not required if the transfer is wholly exempt from tax based on: (1) family relationship or (2) public utility easement. If more space is needed, attach additional sheet(s).

## A. CORRESPONDENT – All inquiries may be directed to the following person:

Name
Alan K. Patrono

Telephone Number:
(717) 334-8098

| Street Address | City | State | Zip Code |
|---|---|---|---|
| 30 West Middle Street | Gettysburg | PA | 17325 |

## B. TRANSFER DATA

### Date of Acceptance of Document

| Grantor(s)/Lessor(s) | Grantee(s)/Lessee(s) | | |
|---|---|---|---|
| Helen B. Bauser d/b/a Conewago Orchards | Hauser Family Farms, LLC | | |

| Street Address | Street Address | | |
|---|---|---|---|
| 98 North Main Street | 30 West Middle Street | | |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Biglerville | PA | 17307 | Gettysburg | PA | 17325 |

## C. PROPERTY LOCATION

| Street Address | City, Township, Borough |
|---|---|
| 496 Cashtown Road | Franklin Township |

| County | School District | Tax Parcel Number |
|---|---|---|
| Adams | Gettysburg | 12-D09-0023 |

## D. VALUATION DATA

| 1. Actual Cash Consideration | 2. Other Consideration | 3. Total Consideration |
|---|---|---|
| 0.00 | + 0.00 | = 0.00 |
| 4. County Assessed Value | 5. Common Level Ratio Factor | 6. Fair Market Value |
| 52,634.00 | X 4.53 | = 238,432.02 |

## E. EXEMPTION DATA

| 1a. Amount of Exemption Claimed | 1b. Percentage of Interest Conveyed |
|---|---|
| 238,432.02 | 100% |

Image ID: 000001460393 Type: GEN
Page 5 of 5

BK **4944** PG **213**

### 2. Check Appropriate Box Below for Exemption Claimed

☐ Will or intestate succession _____

(Name of Decedent)                                    (Estate File Number)

☐ Transfer to Industrial Development Agency.

☐ Transfer to a trust. (Attach complete copy of trust agreement identifying all beneficiaries.)

☐ Transfer between principal and agent. (Attach complete copy of agency/straw party agreement.)

☐ Transfers to the Commonwealth, the United States and Instrumentalities by gift, dedication, condemnation or in lieu of condemnation. (If condemnation or in lieu of condemnation, attach copy of resolution.)

☐ Transfer from mortgagor to a holder of a mortgage in default. Mortgage Book Number _____, Page Number _____.

☐ Corrective or confirmatory deed. (Attach complete copy of the prior deed being corrected or confirmed.)

☐ Statutory corporate consolidation, merger or division. (Attach copy of articles.)

☒ Other (Please explain exemption claimed, if other than listed above.) _____

   Section 91.193.19 transfer of real estate devoted to the business of agricultural in entity owned by the grantor.

**Under penalties of law, I declare that I have examined this Statement, including accompanying information, and to the best of my knowledge and belief, it is true, correct and complete.**

| Signature of Correspondent or Responsible Party | Date |
|---|---|
| *Alan K. Patrono* | 7/20/07 |

**FAILURE TO COMPLETE THIS FORM PROPERLY OR ATTACH APPLICABLE DOCUMENTATION MAY RESULT IN THE RECORDER'S REFUSAL TO RECORD THE DEED.**

# EXHIBIT B

OPERATING AGREEMENT
OF
*Hauser Family Farms, LLC*
(A Pennsylvania Limited Liability Company)

This Operating Agreement of *Hauser Family Farms* (the "Company"), dated this 20th day of _____, 2007, has been adopted by and between the Members of the Company.

## RECITALS

A.     The Company is to be organized as a Pennsylvania limited liability company by the filing of a certificate of organization with the Department of State of the Commonwealth of Pennsylvania under and pursuant to the Act.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and intending to be legally bound hereby, the Members agree as follows:

1.     Definitions. In addition to the terms defined in other provisions of this Agreement, the following terms shall have the meanings set forth below unless the context requires otherwise:

"Act." The Pennsylvania Limited Liability Company Law of 1994, 15 Pa.C.S. § 8901, et seq., and any successor statute, as amended from time to time.

"Affiliate." As to any Person, any other Person that directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with such Person or, if such Person is an individual, the Immediate Family of such Person or trusts solely for the benefit of such Immediate Family. As used in this definition, the term "control" means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or credit arrangement or otherwise.

"Agreement." This Operating Agreement, as amended, modified, supplemented, or restated from time to time.

"Capital Account." The individual account maintained by the Company with respect to each Member as provided in Section 7.

"Capital Contribution." The aggregate amount of cash and the agreed value of any property or services (as determined by the Member and the Company) contributed by each Member to the Company as provided in section 6. In the case of a Member that acquires a Membership Interest in the Company by an assignment or transfer in accordance with the terms of this Agreement, "Capital Contribution" means the Capital Contribution of that Member's predecessor proportionate to the acquired Membership Interest.

"Certificate." The certificate of organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Department of State of the Commonwealth of Pennsylvania pursuant to the Act.

"Claim." See section 21(b).

"Code." The Internal Revenue Code of 1986, as amended.

"Company." See the preamble.

"Covered Person." A Member, any Affiliate of a Member, any officer, director, shareholder, partner, employee, representative, or agent of a Member, or their respective Affiliates, or any officer, employee, or agent of the Company or its Affiliates.

"Damages." See section 21(a).

"Immediate Family." With respect to any individual, such individual's parents, spouse, issue, and adopted children, or any of them.

"Indemnified Party." See section 21(b).

"Laws." Any of the following:

(1)   all constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules, regulations, and municipal bylaws, whether domestic, foreign, or international;

(2)   all judgments, orders, writs, injunctions, decisions, rulings, decrees, and awards of any governmental body;

(3)   all policies, practices, and guidelines of any governmental body; and

(4)   any amendment, modification, re-enactment, restatement, or extension of any of the foregoing, in each case binding on or affecting the party or Person referred to in the context in which such word is used.

"Majority Vote." The written approval of, or the affirmative vote by, Members holding a majority of the Voting Rights.

"Manager."   A Person designated by the initial member to act as the manager of the Company pursuant to the powers set forth in this Agreement.

"Member." A Person who at the time is a member of the Company. "Members" means two or more Persons when acting in their capacities as members of the Company. For purposes of the application of a provision of the Act to the Company, the Members shall constitute one class or group of members. Annex A shall be amended from time to time to show the current Members.

"Membership Interest." The interest of a Member in the Company, including, without limitation, interests in the profits and losses, rights to distributions (liquidating or otherwise), allocations and information, and rights to consent to or approve actions by the Company, all in accordance with the provisions of this Agreement and the Act.

"Notice." See section 21(b).

"Percentage Interest." The proportionate Membership Interest of a Member expressed as a percentage as shown on Annex A.

"Person." A natural person, corporation, general or limited partnership, limited liability company, joint venture, trust, estate, association, or other legal entity or organization.

"Profits and Losses." For each taxable year or other period, an amount equal to the Company's taxable income or loss for that year or period, determined in accordance with Code

§ 703(a) (for these purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(1) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be added to such taxable income or loss.

(2) Any expenditures of the Company described in Code section 705(a)(2)(B) or that are treated as Code § 705(a)(2)(B) expenditures pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be subtracted from such taxable income or loss.

(3) In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (2), (3), or (4) of the definition of Gross Asset Value, the amount of the adjustment shall be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits and Losses.

(4) Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value.

(5) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for the taxable year or other period, computed in accordance with the definition of Depreciation under this Agreement.

(6) Notwithstanding the above, any items that are specially allocated to certain Members shall not be taken into account in computing Profits and Losses.

"Tax Payment Loan." See section 14.

"Treasury Regulations" or "Treas. Regs." The income tax regulations, including temporary regulations, promulgated under the Code, as those regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Voting Rights." The number of votes of each Member (as set forth in section 16(b)) for the purpose of voting on any matter arising under this Agreement.

"Withholding Tax Act." See section 14.

2. Organization. The Members hereby authorize the organization of the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties, and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Jonathan Patrono, Esq., as an authorized person, shall execute, deliver, and file the Certificate.

3. Purpose.

(a) The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, operating real estate for a family farm operation and engaging in any lawful act or activity for which limited liability companies may be

organized under the Act and engaging in any and all activities necessary, convenient, desirable, or incidental to the foregoing.

(b) The Company shall be required to enter into a lease with Hauser Estate, Inc., such that Hauser Estate, Inc. shall be responsible for the maintenance of the property plus, upon determination of the Board of Directors, Inc., a cash rental based upon the earnings of Hauser Estate, Inc. The initial Lease shall be twenty-five (25) years and six (6) months. At no time shall Hauser Family Farms, LLC be entitled to lease the premises to anyone other than Hauser Estate, Inc., unless approved in writing by Hauser Estate, Inc.

4. **Term.** The existence of the Company shall commence on the date the Certificate is filed in the office of the Department of State of the Commonwealth of Pennsylvania and shall continue until the Company is dissolved in accordance with the provisions of this Agreement.

5. **Principal Office.** The principal office of the Company shall be located at 30 West Middle Street, Gettysburg PA 17325, or at such other location as may be determined, from time to time, by the Members. The Company may also have such other offices at such other locations as, from time to time, may be determined by the Members.

6. **Company Capital and Percentage Interests.**

(a) **Initial Capital Contributions.** The initial Capital Contribution that each Member has made or is deemed to have made to the Company is set forth opposite the Member's name in Annex A.

(b) **Additional Capital Contributions.** A Member shall not be required to make any capital contribution to the Company not specifically agreed to in writing between the Member and the Company, or be obligated or required under any circumstances to restore any negative balance in the Member's Capital Account.

(c) **No Interest.** Interest shall not be paid on or with respect to the Capital Contribution or Capital Account of any Member.

(d) **No Right to Return of Capital Contributions.** Although the Company may make distributions to the Members from time to time as a return of their Capital Contributions, a Member shall not have the right to withdraw or demand a return of any of the Member's Capital Contribution or Capital Account, except upon dissolution or liquidation of the Company.

(e) **Percentage Interests.** The Percentage Interest of each Member shall be as set forth in Annex A.

7. **Capital Accounts.**

At all times while there is more than one Member, a Capital Account shall be established and maintained on the books of the Company for each Member.

(a) **Tax Provisions.** The allocation and capital account maintenance provisions of Treasury Regulations under section 704 of the Code are hereby incorporated by reference, including a "qualified income offset" within the meaning of Treas. Reg. § 1.704-1(b)(2)(ii)(d), the rules regarding allocation of "partner nonrecourse deductions" under Treas. Reg. § 1.704-2(i)(1), "minimum gain chargeback" under Treas. Reg. § 1.704-2(f) and "partner nonrecourse debt minimum gain chargeback" under Treas. Reg. § 1.704-2(i)(4), and the limitation on allocation of losses to any Member that would cause a deficit capital account in excess of such Member's capital contribution obligations and share of

minimum gain and partner nonrecourse debt minimum gain under Treas. Reg. § 1.704-1(b)(2)(ii)(d) as modified by Treas. Reg. §§ 1.704-2(g)(1) and 1.704-2(i)(5).

(b) Contributed Property. To the extent contributed property has a fair market value at the time of contribution that differs from the contributing Member's basis in the property, and to the extent the carrying value of property of the Company for Capital Account purposes otherwise differs from the Company's basis in such property, depreciation, gain, and loss for capital account purposes shall be computed by reference to such carrying value rather than such tax basis. In accordance with section 704(c) of the Code, income, gain, loss, and deduction with respect to such property shall, solely for tax purposes, be shared among the Members so as to take account of the variation between the basis of the property to the Company and its fair market value at the time of contribution, or at the time that the carrying value of such property is adjusted under Treas. Reg. § 1.704-1(b)(2)(iv)(f), as the case may be.

8. Allocation of Profits or Losses. At all times while there is more than one Member, Profits or Losses shall be allocated to the Members in accordance with Percentage Interests, except as otherwise provided in section 7.

9. Distributions.

(a) General Rule. Subject to subsection (b), distributions of cash and/or other assets or property of the Company, from whatever source (including, without limitation, net proceeds of Company operations and sale, and financing or refinancing of Company assets) shall be made to the Members in accordance with their respective Percentage Interests at such times, and in such amounts, as the Members shall determine. In making determinations regarding distributions, the Members may set aside funds and establish reserves for such items as the Members shall determine, including, without limitation, working capital, maintenance of bonding capacity, capital expenditures, acquisition of other assets by the Company, and the satisfaction of liabilities (including, without limitation, contingent liabilities).

(b) Minimum Distribution. With respect to any taxable year of the Company in which Members are allocated taxable income for federal income tax purposes (and for this purpose all items of income, gain, loss, or deduction required to be separately stated pursuant to section 703 of the Code shall be included in the calculation of taxable income (other than the amount, if any, by which capital losses exceed capital gains)), the Company shall distribute to the Members, within 90 days after the close of that taxable year, no less than the amount determined by multiplying the Company's taxable income (computed as set forth in this sentence) by the highest composite federal, state, and local income tax rate applicable to any Member. For purposes of the preceding sentence, the Company's taxable income for a year shall be reduced by any net loss of the Company in prior years that has not previously been so taken into account under this section 9(b). Nothing herein shall require the Company to borrow money or reduce its cash flow so as to restrict its ability to operate the day-to-day activities of the business in order to make such distributions.

10. Establishment of Reserves. The Members shall have the right and obligation to establish reasonable reserves for maintenance, improvements, acquisitions, capital expenditures, and other contingencies, such reserves to be funded with such portion of the operating revenues of the Company as the Members may deem necessary or appropriate for that purpose.

11. Tax Returns. The Members shall arrange for the preparation of all tax returns required to be filed for the Company. Each Member shall be entitled to receive copies of all federal, state, and local income tax returns and information returns, if any, which the Company is required to file. All information needed by the Members and other Persons who were Members during the

applicable taxable year for income tax purposes shall be prepared by the Company's accountants and furnished to each such Person after the end of each taxable year of the Company.

12. Tax Elections.

(a) Elections to be Made. To the extent permitted by applicable tax law, the Company may make the following elections on the appropriate tax returns:

(1) to adopt the calendar year as the Company's taxable year;

(2) to adopt the cash method of accounting and to keep the Company's books and records on the income-tax method;

(3) if a transfer of a Membership Interest as described in section 743 of the Code occurs, on written request of the transferee, or if a distribution of Company property is made on which gain described in section 734(b)(1)(A) of the Code is recognized or there is an excess of adjusted basis as described in section 734(b)(1)(B) of the Code, to elect, pursuant to section 754 of the Code, to adjust the basis of Company properties;

(4) to elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company ratably over a period of 60 months as permitted by sections 195 and 709(b) of the Code; and

(5) any other election the Members may deem appropriate and in the best interests of the Members.

(b) No Election of Corporate Taxation. Neither the Company nor any Member may make an election for the Company to be taxable as a corporation for federal income tax purposes or to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

13. Tax Matters Partner. If the Company is subject to the consolidated audit procedures of sections 6221 to 6234 of the Code, the "tax matters partner" of the Company pursuant to section 6231(a)(7) of the Code shall be a Member that is designated as such by vote of the Members. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of section 6223 of the Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. The Company shall reimburse the tax matters partner for any costs incurred representing the interests of the Members in respect of Company tax matters.

14. Tax Withholding. Unless treated as a Tax Payment Loan, any amount paid by the Company for or with respect to any Member on account of any withholding tax or other tax payable with respect to the income, profits, or distributions of the Company pursuant to the Code, the Treasury Regulations, or any state or local statute, regulation, or ordinance requiring such payment (each a "Withholding Tax Act") shall be treated as a distribution to the Member for all purposes of this Agreement. To the extent that the amount required to be remitted by the Company under a Withholding Tax Act exceeds the amount then otherwise distributable to the Member, the excess shall constitute a loan from the Company to the Member (a "Tax Payment Loan"). Each Tax

Case 1:25-bk-02214-HWV    Doc 57    Filed 10/03/25    Entered 10/03/25 16:28:25    Desc
Main Document      Page 19 of 210

Payment Loan shall be payable upon demand and shall bear interest, from the date that the Company makes the payment to the relevant taxing authority, at the applicable federal short-term rate under section 1274(d)(1) of the Code, determined and compounded semiannually. So long as any Tax Payment Loan or the interest thereon remains unpaid, the Company shall make future distributions due to the Member under this Agreement by applying the amount of any such distribution first to the payment of any unpaid interest on all Tax Payment Loans of the Member and then to the repayment of the principal of all Tax Payment Loans of the Member. The Members shall take all actions necessary to enable the Company to comply with the provisions of any Withholding Tax Act applicable to the Company and to carry out the provisions of this subsection.

15. Conflicts of Interest.

(a) Other Business Interests. Any Member or Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper. No Member or Affiliate thereof shall be obligated to present any particular investment opportunity to the Company even if the opportunity is of a character that, if presented to the Company, could be taken by the Company, and any Member or Affiliate thereof shall have the right to take for its own account (individually or as a partner or fiduciary) or to recommend to others any such particular investment opportunity.

(b) Interested Transactions. A contract or transaction between the Company and one or more of its Members or between the Company and another domestic or foreign association in which one or more of its Members have a management role or a financial or other interest, shall not be void or voidable solely for that reason, or solely because the Member is present at or participates in the meeting of the Members that authorizes the contract or transaction, or solely because the vote of the Member is counted for that purpose, if:

(1) the material facts as to the relationship or interest and as to the transaction are disclosed or known to the Members entitled to vote thereon and the contract or transaction is specifically approved in good faith by vote of those Members; or

(2) the contract or transaction is fair to the Company as of the time it is authorized, approved, or ratified by the Members.

16. Control and Management.

(a) Power and Authority of the Manager. Management of the business and affairs of the Company shall be vested in the Manager, who shall either be a member then designated as a Managing Member or a non-member then designated as Manager. Except as otherwise provided in this Agreement, any decision, determination, or other action to be made or taken by the Manager shall be as made by all the Members. The Manager shall be Melinda H. Davis who, after certain contemplated gifts, shall be the Managing Member. Should Melinda H. Davis be unwilling or unable to serve, the Manager shall be Jonathan A. Patrono. The Manager shall have all rights and powers relating to the Company, including, but not limited to, the following:

(1) to retain all or any part of the Company's assets as long as the Members deem advisable, and to invest, reinvest, and keep invested all or any part thereof, without being restricted in any way with respect to the type of assets retained or invested in or with respect to the portion of the assets devoted to any investment;

(2) to purchase, lease, or otherwise acquire the ownership, use, or benefit of assets, properties, rights, or privileges, real or personal, tangible or intangible, of any kind or description, whether income producing or not;

(3) to sell, pledge, mortgage, lease without limit of time, exchange, or to grant options for the purchase, lease, or exchange of any Company assets, on such terms and conditions as the Members may determine;

(4) to institute any legal action or proceeding on behalf of the Company;

(5) to assign, transfer, pledge, compromise, or release any claims or debts due the Company;

(6) to vote at any election or meeting of any corporation, partnership, limited liability company, joint venture, or other entity, in person or by proxy, to appoint agents to do so in the place and stead of the Members, and to exercise all rights (including without limitation approval and consent rights) that the Company may have with respect to such entity, whether pursuant to applicable law, governing documents, contracts, or otherwise;

(7) to borrow money for any purpose that the Members consider to be for the benefit of the Company or to facilitate its administration, and to mortgage or pledge Company assets to secure the repayment thereof;

(8) to retain and pay custodians, accountants, counsel, and other agents and to incur any other expenses which are reasonably related to the operation of the Company;

(9) to enter into agreements with, and to fix and adjust the compensation of, employees of the Company; and

(10) to invest in time deposits and savings accounts and to maintain banking accounts in any institutions determined by the Members.

(b)     Voting Rights.  Each Member shall have that number of Voting Rights as equals such Member's Percentage Interest in the Company (e.g., a Member who has a 10% Membership Interest in the Company has 10 Voting Rights).

(c)     Voting Procedures.  Members may vote in person or by proxy at a meeting of Members (which may be held by conference telephone), or by consent in lieu of a meeting. Proxies and consents shall be in writing or communicated by electronic means.

(d)     Binding Effect of Actions. Each Member shall be bound by, and hereby consents to, any and all actions taken and decisions made by the Manager in accordance with the terms of this Agreement. Any person designated by the Members, including a Member so designated, shall have the authority to bind the Company. Any act taken by, or any document executed by, Members holding a majority of the Voting Rights shall be binding on the Company with the same force and effect as if the action, or the execution of the document, were approved by a vote of the Members. Except as provided in this section 16(d), no Member shall have authority to bind the Company.

(e)     Business Transactions. Notwithstanding any other provision of this Agreement, unless approved by Members holding sixty-six percent (66%) of the Voting Rights, the Company may not:

(1)      engage in a merger or consolidation with or into any corporation, partnership, limited liability company, or any other entity, whether or not the Company shall be the surviving entity of such merger or consolidation;

(2)      sell all or substantially all of its assets to any person or entity;

(3)      divide into two or more limited liability companies; or

(4)      engage in any similar business transaction.

(5)      to borrow money for any purpose that the Members consider to be for the benefit of the Company or to facilitate its administration, and to mortgage or pledge Company assets to secure the repayment thereof;

17. Transfer of Interests; Admission of Additional Members.

(a)      It is the intent of the existing Sole Member to transfer her interest in part or in full to her three daughters and that they shall be governed by a Member's Agreement to be executed at the time of the first transfer.

(b)      Admission of new Members shall be governed by be Members Agreement to be executed by the original Member's daughters, pursuant to paragraph 17a.

18.      Dissolution.

(a)      Events of Dissolution. The Company shall dissolve, and its affairs shall be wound up, in accordance with the terms of the Member Agreement set forth in paragraph 17a.

(b)      Distributions upon Dissolution. In the event of the dissolution of the Company, the assets of the Company shall be liquidated in such manner as the Members shall determine and, after the obligations of the Company to third parties have been discharged or provided for in accordance with applicable law, the net proceeds of the liquidation shall be distributed in accordance with the following procedure:

(1)      The net proceeds shall be distributed first, among the Members, if any, who have made unrepaid loans or advances to the Company, in an amount up to the aggregate amount of such unrepaid loans and advances, and in proportion to the amount of such loans and advances and the unpaid interest thereon.

(2)      The Company may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members.

(3)      With respect to all Company property that has not been sold, the fair market value of that property shall be deemed and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution.

(4)      After completion of the steps in paragraphs (1) and (2), the remaining assets shall be distributed to the Members in an amount equal to the credit balance in each of their

Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

(c) Procedure. A reasonable time shall be allowed for the liquidation of the Company in order to minimize the losses normally attendant upon a liquidation.

(d) Certificate of Dissolution. On completion of the liquidation of Company assets as provided herein, the Members (or such other person or persons as the Act may require or permit) shall file a Certificate of Dissolution with the Department of State of the Commonwealth of Pennsylvania and take such other actions as may be necessary to terminate the existence of the Company.

(e) Final Accounting. In connection with the Company's liquidation, the Company's accountants shall compile and furnish to each Member a statement setting forth the assets and liabilities of the Company as of the date of complete liquidation.

10. Books and Records.

(a) General Rule. The Members shall cause to be kept full and accurate books and records of the Company. All books and records of the Company shall be kept at the Company's principal office and shall be available at such location at reasonable times for inspection and copying by the Members or their duly authorized representatives. The Company shall maintain the following records, among others:

(1) a current list of the full name and last known mailing address of each Member.

(2) a copy of the Certificate and all amendments thereto.

(3) copies of the Company's federal, foreign, state, and local income tax returns and reports.

(4) a copy of this Agreement and all amendments thereto.

(5) any financial statements of the Company.

(b) Annual Financial Information. The Company shall furnish to its Members annual financial statements, including at least a balance sheet as of the end of each fiscal year and a statement of income and expenses for the fiscal year. The financial statements shall be prepared on the basis of generally accepted accounting principles, if the Company prepares financial statements for the fiscal year on that basis for any purpose, and may be consolidated statements of the Company and one or more of its subsidiaries. The financial statements shall be mailed by the Company to each of the Members within 120 days after the close of each fiscal year. Statements that are not audited or reviewed by a certified public accountant shall be accompanied by a statement of the person in charge of the Company's financial records:

(1) stating his or her reasonable belief as to whether or not the financial statements were prepared in accordance with generally accepted accounting principles and, if not, describing the basis of presentation.

(2) describing any material respects in which the financial statements were not prepared on a basis consistent with those of the previous year.

20.     Liability of Members. The Members, as such, shall not be liable for the debts, obligations, or liabilities of the Company except to the extent required by the Act.

21.     Indemnification.

(a)     Indemnification of Covered Persons. Except as expressly prohibited by Law, the Company shall indemnify, defend, and hold harmless each Covered Person from and against any and all debts, losses, claims, damages, costs, demands, fines, judgments, contracts (implied and expressed, written and unwritten), penalties, obligations, payments, liabilities of every type and nature (whether known or unknown, fixed or contingent), including, without limitation, those arising out of any lawsuit, action, or proceeding (whether brought by or on behalf of a party to this Agreement or by any third party), together with any reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, out-of-pocket expenses, and other reasonable costs and expenses incurred in investigating, preparing, or defending any pending or threatened lawsuit, action, or proceeding) incurred in connection with the foregoing (collectively "Damages") suffered or sustained by such Covered Person by reason of any act, omission, or alleged act or omission by such Covered Person arising out of such Covered Person's activities taken primarily on behalf of the Company, or at the request or with the approval of the Company, or primarily in furtherance of the interests of the Company. Notwithstanding the foregoing, indemnification shall not be available under this section where the acts, omissions, or alleged acts or omissions upon which an actual or threatened action, proceeding, or claim is based constituted willful misconduct or recklessness.

(b)     Indemnification Procedure. The procedure under which indemnification shall be provided under this section shall be as follows:

(1)     A party seeking indemnification from the Company pursuant to subsection (a) (an "Indemnified Party") shall give prompt notice to the Company of the assertion of any claim, including any claim brought by a third party, in respect of which indemnity may be sought (a "Claim") and shall give the Company such information with respect thereto as the Company may reasonably request, but no failure to give such notice shall relieve the Company of any liability hereunder except to the extent the Company has suffered actual prejudice thereby.

(2)     Except as provided in paragraph (3), the Company shall have the right, exercisable by written notice (the "Notice") to the Indemnified Party (which Notice shall state that the Company expressly agrees that as between the Company and the Indemnified Party, the Company shall be solely obligated to satisfy and discharge the Claim) within 30 days of receipt of notice from the Indemnified Party of the commencement of or assertion of any Claim, to assume the defense of the Claim, using counsel selected by the Company and reasonably acceptable to the Indemnified Party. If the Company fails to give the Indemnified Party the Notice within the stated time period, the Indemnified Party shall have the right to assume control of the defense of the Claim and all Damages in connection therewith shall be reimbursed by the Company upon demand of the Indemnified Party.

(3)     The Company shall not have the right to assume the defense of a Claim:

(i)     seeking an injunction, restraining order, declaratory relief, or other non-monetary relief against the Indemnified Party (whether or not the Company is also named as a party), or

(ii)     if the named parties to the action (including any impleaded parties) include both the Indemnified Party and the Company and the Indemnified Party has been advised by counsel that there are one or more legal or equitable defenses

available to the Indemnified Party that are different from those available to the Company.

(4)     A party defending a Claim shall not have the right to compromise or settle any claim for non-monetary relief against any other party without the other party's consent. A party defending a Claim shall not have the right to compromise or settle any claim for monetary relief against any other party without the other party's consent unless the monetary relief is paid in full by the settling party. A party shall not unreasonably withhold or deny its consent under this paragraph, but an Indemnified Party shall not be required to consent to a compromise or settlement of a Claim if in the reasonable judgment of the Indemnified Party the compromise or settlement would have a continuing material adverse effect on the Indemnified Party's business (including any material impairment of its relationships with customers and suppliers).

(5)     If at any time after the Company assumes the defense of a Claim the situation changes such that the Company would not be able to assume the defense of the Claim under paragraph (3) if the Claim were newly filed at that time, the Indemnified Party shall have the same rights as if the Company never assumed the defense of the Claim.

(6)     The Company or the Indemnified Party, as the case may be, shall always have the right to participate, at its own expense, in the defense of any Claim that the other is defending.

(7)     Whether or not the Company chooses to defend or prosecute a Claim involving a third party, the Company and the Indemnified Party shall cooperate in the defense or prosecution thereof and shall furnish such records, information, and testimony, and attend such conferences, discovery proceedings, hearings, trials, and appeals as may be reasonably requested in connection therewith.

(c)     Right to Advancement of Expenses. Except as expressly prohibited by Law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit, or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit, or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in subsection (a).

(d)     Insurance. The Company may purchase and maintain insurance, to the extent and in such amounts as the Members shall deem reasonable, on behalf of Covered Persons and such other Persons as the Members shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement. The Company may enter into indemnity contracts with Covered Persons and such other Persons as the Members shall determine and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this section 21 and containing such other procedures regarding indemnification as are appropriate.

(e)     Non-exclusivity of Rights. The rights conferred on any person by this section 21 shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the Certificate, agreement, vote of Members, or otherwise.

(f)     Amendment or Repeal. Any repeal or modification of this section 21 shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.

(g)     Changes in Law. References in this section 21 to Law shall be to such Law as it existed on the date this Agreement was executed or as such Law thereafter may be changed, except that:

(1)     in the case of any change that limits the indemnification rights or the rights to advancement of expenses that the Company may provide, the rights to indemnification and to the advancement of expenses provided in this section 21 shall continue as theretofore agreed upon to the extent permitted by law; and

(2)     if the change permits the Company without the requirement of any further action by the Members to provide broader indemnification rights or rights to the advancement of expenses than the Company was permitted to provide prior to the change, then the rights to indemnification and the advancement of expenses shall be so broadened to the extent permitted by Law.

(h)     Applicability. The provisions of this section 21 shall be applicable to all actions, suits, or proceedings commenced after its adoption, whether such arise out of acts or omissions which occurred prior or subsequent to such adoption and shall continue as to a person who has ceased to be a Covered Person, and shall inure to the benefit of the heirs and personal representatives of such person.

22.     Miscellaneous.

(a)     Notices to Members. Any notice required to be given to a Member under the provisions of this Agreement or by the Act shall be given either personally or by sending a copy thereof:

(1)     by first class or express mail, postage prepaid, or courier service, charges prepaid, to the postal address of the Person appearing on the books of the Company for the purposes of notice. Notice pursuant to this paragraph shall be deemed to have been given to the Person entitled thereto when deposited in the United States mail or with a courier service for delivery to that Person.

(2)     by facsimile transmission, e-mail, or other electronic communication to the Person's facsimile number or address for e-mail or other electronic communications supplied by the Person to the Company for the purpose of notice. Notice pursuant to this paragraph shall be deemed to have been given to the Person entitled thereto when sent.

(b)     Entire Agreement. This Agreement constitutes the entire agreement among the Members with respect to the subject matter hereof and supersedes all prior agreements, express or implied, oral or written, with respect thereto. The express terms of this Agreement control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

(c)     Effect of Waiver or Consent. A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver

by that Person of its rights with respect to that default until the period of the applicable statute of limitations has run.

(d) Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. If executed in multiple counterparts, this Agreement shall become binding when any counterpart or counterparts, individually or taken together, bear the signatures of all of the parties.

(e) Amendments. The Certificate may be amended only if the amendment is approved by the vote, consent, or agreement of Members holding at least sixty-six percent ((66%) of the Voting Rights, except that any provision of this Agreement requiring a higher vote may only be amended or repealed by at least that higher vote. An amendment to this Agreement must be in writing and shall take effect when executed by Members holding at least the number of the Voting Rights required to approve the amendment, provided, however, that any provision relating to the Member Agreement as set forth in paragraph 17a shall require a unanimous agreement of all members to amend.

(f) Binding Effect and Rights of Third Parties. This Agreement has been adopted to govern the operation of the Company, and shall be binding on and inure to the benefit of the Members and their respective heirs, personal representatives, successors, and assigns. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person, except a Person entitled to indemnification or advancement of expenses under section 21. Except and only to the extent provided by applicable statute, no such creditor or other Person shall have any rights under this Agreement.

(g) Governing Law. This Agreement shall be governed by and interpreted and enforced in accordance with the substantive laws of the Commonwealth of Pennsylvania (including, without limitation, provisions concerning limitations of actions), without reference to the conflicts of laws rules of that or any other jurisdiction, except that federal law shall also apply to the extent relevant.

(h) Severability. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by law.

(i) Arbitration. All disputes arising under this Agreement shall promptly be submitted to arbitration in Getttysburg, Pennsylvania, before one arbitrator in accordance with the rules of the American Arbitration Association. The arbitrator may assess costs, including counsel fees, in such manner as the arbitrator deems fair and equitable. The award of the arbitrator shall be final and binding upon all parties, and judgment upon the award may be entered in any court of competent jurisdiction.

(j) Construction. Whenever the context requires, the gender of any word used in this Agreement includes the masculine, feminine, or neuter, and the number of any word includes the singular or plural. All references to articles and sections refer to articles and sections of this Agreement, and all references to annexes are to annexes attached hereto, each of which is made a part hereof for all purposes. The headings in this Agreement are for convenience only; they do not form a part of this Agreement and shall not affect its interpretation.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the date first above written.

_Helen B. Hauser_
HELEN B. HAUSER

Annex A

Date:

| Member (Name and Address) | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| Helen B. Hauser | | 100% |

# EXHIBIT C

**Parcel Identification**
**Number:** (16)-10-110

**RECORDATION**
**REQUESTED BY:**
PNC Bank, National
Association
Business Banking
4242 Carlisle Pike
Camp Hill, PA 17001

**WHEN RECORDED MAIL**
**TO:**
PNC Bank, National
Association
Attn: P5-PCLC-01-i
2730 Liberty Avenue
Pittsburgh, PA 15222

Image ID: 000001417801 Type: GEN
Recorded: 05/14/2007 at 10:48:31 AM
Fee Amt: $72.00 Page 1 of 12
Instr# 200700008862
Adams County, PA
Patsy S. Gochenauer Recorder of Deec
BK 4836 PG 223

_____ FOR RECORDER'S USE ONLY

## OPEN - END MORTGAGE
## THIS MORTGAGE SECURES FUTURE ADVANCES

**Amount Secured Hereby:** $500,000.00

THIS MORTGAGE dated May 7, 2007, is made and executed between ALAN K. PATRONO and JANE H. PATRONO, husband and wife, as tenants of an estate by the entireties, whose address is 98 EAST BROADWAY, GETTYSBURG, PA 17325 (referred to below as "Grantor") and PNC Bank, National Association, whose address is 4242 Carlisle Pike, Camp Hill, PA 17001 (referred to below as "Lender").

GRANT OF MORTGAGE. For valuable consideration, Grantor grants, bargains, sells, conveys, assigns, transfers, releases, confirms and mortgages to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all streets, lanes, alleys, passages, and ways; all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in ADAMS County, Commonwealth of Pennsylvania:

DEED RECORDED: 12-06-1993 DEED BOOK VOLUME: 816 PAGE: 84 SITUATE IN THE BOROUGH OF GETTYSBURG, COUNTY OF PENNSYLVANIA, AS MORE FULLY DESCRIBED IN EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

The Real Property or its address is commonly known as 30 WEST MIDDLE STREET, GETTYSBURG, PA 17325. The Real Property parcel identification number is (16)-10-110.

CROSS-COLLATERALIZATION. In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

REVOLVING LINE OF CREDIT. This Mortgage secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Borrower unless Borrower fails to comply with all the terms of the Note.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the

**Loan No: 011721349**

# MORGAGE
# (Continued)

**Page 2**

Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THE NOTE IN THE ORIGINAL PRINCIPAL AMOUNT OF $500,000.00, THE RELATED DOCUMENTS, AND THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (a) this Mortgage is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property; (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Borrower and Grantor shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**MORTGAGE**

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Subject to any notice or right to cure requirements that may be applicable, Lender may, at its option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without the Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest therein; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of Real Property interest. If any Grantor is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of Grantor. However, Lender shall not exercise this option if such exercise is prohibited by federal law or by state law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee

Image ID: 000001417803 Type: GEN
Page 3 of 12
BK4836 PG225

**MORTGAGE**
**(Continued)**

clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default. Grantor's obligation to Lender for all such expenses shall survive the entry of any mortgage foreclosure judgment.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in

Image ID: 000001417804 Type: GEN
Page 4 of 12
BK4836 PG226

**MORTGAGE**

**(Continued)**

this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all actual costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ADDITIONAL AUTHORIZATIONS.** The following provisions relating to further assurances and additional authorizations are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete,

Image ID: 000001417805 Type: GEN
Page 5 of 12
BK**4836**PG**227**

perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Additional Authorizations.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably authorizes Lender to make, execute, deliver, file, record and do all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph. It is understood that nothing set forth herein shall require Lender to take any such actions.

**FULL PERFORMANCE.** If Borrower and Grantor pay all the Indebtedness when due, and Grantor otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Borrower or Grantor or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Mortgage or any related document.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The death of Borrower or any Grantor, the dissolution of Grantor's (regardless of whether election to continue is made), any member withdraws from the limited liability company, or any other termination of Borrower's or Grantor's existence as a going business or the death of any member, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the

Image ID: 000001417806  Type: GEN
Page 6 of 12
BK4836 PG228

**MORTGAGE**
**(Continued)**

Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Events Affecting Property.** Any other creditor tries to take Property by legal process, any tax lien or levy is filed or made against any Grantor or the Property, or the Property is destroyed, seized or condemned by federal, state or local government.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option, after giving such notices as required by applicable law, to declare the entire Indebtedness immediately due and payable.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and, with or without taking possession of the Property, to collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably authorizes Lender to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose Grantor's interest in all or in any part of the Personal Property or the Real Property by non-judicial sale.

**Deficiency Judgment.** Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waive any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Unless otherwise required by applicable law, reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after

Image ID: 000001417807 Type: GEN
Page 7 of 12
BK 4836 PG 229

Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or Borrower and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Unless otherwise provided by applicable law, any notice required to be given under this Mortgage shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage and notices pursuant to 42 Pa. C.S.A. Section 8143, et. seq., shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**PROPERTY.** The word "Property" means collectively the Real Property and the Personal Property.

**GRANTOR'S REPORT ON INSURANCE.** Upon request of Lender, however, not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (a) the name of the insurer; (b) the risks insured; (c) the amount of the policy; (d) the property insured, the then current replacement value of such property, and the manner of determining that value; and (e) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**MULTIPLE PARTIES.** All obligations of Grantor and Borrower under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each of the persons signing below is responsible for all obligations in this Mortgage.

**NO WAIVER BY LENDER.** Lender shall not be deemed to have waived any rights under this Mortgage (or under the Related Documents) unless such waiver is in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by any party of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision. No prior waiver by Lender, nor any course of dealing between Lender and Grantor or Borrower, shall constitute a waiver of any of Lender's rights or any of Grantor or Borrower's obligations as to any future transactions. Whenever consent by Lender is required in this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required.

**AUTHORIZATION TO OBTAIN CREDIT REPORTS.** If the Mortgagor is/are an individual(s), by signing below, the undersigned individual(s), provides written authorization to Lender or its designee (and any assignee or potential assignee hereof) to obtain his/her/their personal credit profile(s) from one or more national credit bureaus. Such authorization shall extend to obtaining a credit profile(s) in considering any extension of credit to the Borrower or the Mortgagor and subsequently for the purposes of update, renewal or extension of such credit or additional credit and for reviewing or collecting the resulting account. A photocopy or facsimile copy of this authorization shall be valid as the original. By signature below, I/we affirm my/our identity as the respective individual/s identified in this Mortgage.

**CROSS COLLATERALIZATION.** In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts

Image ID: 000001417808 Type: GEN
Page 8 of 12

BK**4836** PG**230**

**MORTGAGE**

**(Continued)**

may be or hereafter may become otherwise unenforceable. .

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law. This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the Commonwealth of Pennsylvania.**

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any person or circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other person or circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successor Interests.** The terms of this Mortgage shall be binding upon Grantor, and upon Grantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**WAIVER OF JURY TRIAL. MORTGAGOR IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS MORTGAGE, ANY RELATED DOCUMENTS OR ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS MORTGAGE OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. MORTGAGOR ACKNOWLEDGES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means APPLE LEAF REAL ESTATE SERVICES, LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

Image ID: 000001417809 Type: GEN
Page 9 of 12

BK**4836**PG**231**

**MORTGAGE**

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means ALAN K. PATRONO and JANE H. PATRONO.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, cocts and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. The liens and security interests created pursuant to this Mortgage covering the Indebtedness which may be created in the future shall relate back to the date of this Mortgage. In addition to the Note, the word "Indebtedness" includes all obligations, debts and liabilities, plus interest thereon, of Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower, or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated and whether Borrower may be liable individually or jointly with others, whether obligated as guarantor or otherwise, and whether recovery upon such Indebtedness may be or hereafter may become barred by any statute of limitations, and whether such Indebtedness may be or hereafter may become otherwise unenforceable.

**Lender.** The word "Lender" means PNC Bank, National Association, its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means the promissory note dated May 7, 2007, **in the original principal amount of $500,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

Image ID: 000001417810 Type: GEN
Page 10 of 12

BK**4836** PG**232**

**MORTGAGE**

Loan No: 011721349

**(Continued)**

**Page 11**

**Uniform Commercial Code.** The words "Uniform Commercial Code" means the Uniform Commercial Code, as in effect from time to time, in the appropriate jurisdiction.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

EACH GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND EACH GRANTOR AGREES TO ITS TERMS.

THIS MORTGAGE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS MORTGAGE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GRANTOR:

X _____ (Seal)
**ALAN K. PATRONO**

X _____ (Seal)
**JANE H. PATRONO**

Image ID: 000001417811 Type: GEN
Page 11 of 12
BK**4836**PG**233**

---

## CERTIFICATE OF RESIDENCE

I hereby certify, that the precise address of the mortgagee, **PNC Bank, National Association**, herein is as follows:

**Business Banking, 4242 Carlisle Pike, Camp Hill, PA 17001**

_____
Attorney   or Agent   for Mortgagee

---

## INDIVIDUAL ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA                )
                                            ) SS
COUNTY OF _____Adams_____                    )

On this the __7th__ day of __May__, 20 __07__, before me _____ __Irene P. Tracey__, the undersigned Notary Public, personally appeared **ALAN K. PATRONO** and **JANE H. PATRONO**, known to me (or satisfactorily proven) to be the person whose names are subscribed to the within instrument, and acknowledged that they executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Irene P. Tracey, Notary Public
Gettysburg Boro, Adams County
My Commission Expires Apr. 2, 2008
Member, Pennsylvania Association Of Notaries

_____
Notary Public in and for the State of __PA__

LASER PRO Lending, Ver. 5.33.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2007. All Rights Reserved. - PA T:\CFI\LPL\G03.FC TR-80030709 PR-9

Order: 382426

## Legal Description

(16) - 10-110

ALL that certain tract of land situated, lying and being on the South side of West Middle Street, in the Borough of Gettysburg, Adams County, Pennsylvania, bounded and described as follows:

BEGINNING at a point on West Middle Street between Lots # 163 and # 164; thence South along line of said lots for a distance of 180 feet, more or less, to a point at a public alley; thence East along said alley for a distance of 21 feet, more or less, to a point; thence North through Lot # 164, for a distance of 180 feet, more or less, to a point on West Middle Street, aforesaid; thence West by said street for a distance of 21 feet, more or less, to a point, the place of BEGINNING.

Said lot being the western portion of Lot # 164 on the General Plan of the Borough.

Subject to any restrictions, easements, and/or adverses that pertain to this property.

Image ID: 000001417812 Type: GEN
Page 12 of 12
BK 4836 PG 234

Prepared By:  Members 1st FCU
               5000 Louise Drive
               Mechanicsburg, PA  17055

Return To:    Members 1st FCU
               Real Estate Department
               5000 Louise Drive
               Mechanicsburg, PA  17055
               (717)-795-6026

# OPEN-END MORTGAGE
## THIS MORTGAGE SECURES FUTURE ADVANCES

**AMOUNT OF PRINCIPAL INDEBTEDNESS: $** _100,000.00_
**THIS MORTGAGE IS DATED** 01/13/2011 _____ **, between** ALAN KIM PATRONO AND
JANE HAUSER PATRONO _____ ,
**whose address is** _98 E BROADWAY, Gettysburg, PA, 17325_
**(referred to below as "Grantor"); and** **MEMBERS 1ST FEDERAL CREDIT UNION** **, whose address is**
_____ P.O. Box 40,  Mechanicsburg, PA 17055 _____ **(referred to below as "Lender"),**
**a corporation organized and existing under the laws of the Federal Credit Union Act.**

**1.    GRANT OF MORTGAGE. For valuable consideration, Grantor grants, bargains, sells, conveys, assigns, transfers, releases, confirms and mortgages to Lender** all of Grantor's right, title, and interest in the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all streets, lanes, alleys, passages, and ways; all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation any rights the Grantor later acquires in the fee simple title to the land, subject to a Lease, if any, and all minerals, oil, gas, geothermal and similar matters:

    All that certain property of the Mortgagor located in _CUMBERLAND/GETTYSBURG_
_TOWNSHIP/BOROUGH_____ , _Adams_____ County, Pennsylvania.

SEE LEGAL DESCRIPTION

**The Real Property or its address is commonly known as** _____ 98 E BROADWAY_____
_Gettysburg_ , PA, _____17325_____

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all leases of the Property.

Account Number_____ AppID 4594620001

Image ID: 000002974051 Type: GEN
Recorded: 02/03/2011 at 12:37:31 PM
Fee Amt: $93.50 Page 1 of 14
Instr# 201100001529
Adams County, PA
Linda K Myers Register and Recorder
BK 5565 PG 636

**2. DEFINITIONS.** The following words shall have the following meanings when used in this Mortgage. Terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Pennsylvania Uniform Commercial Code.

**Borrower.** The word "Borrower" means each and every person who signs the Line of Credit Home Equity Agreement secured by this Mortgage.

**Credit Agreement.** The words "Credit Agreement" mean the revolving line of credit agreement dated 01/13/2011 _____ between Lender and Grantor with a credit limit of the amount shown on the first page of this Security Instrument, together with all renewals of, extensions of, modifications of, refinancing of, consolidations of, and substitutions for the Credit Agreement. The maturity date of this Mortgage, which is the date by which all Indebtedness under the Credit Agreement and this Mortgage is due is _January 31, 2026_____.

**Grantor.** The word "Grantor" means any and all persons and entities executing this Mortgage, including without limitation all Grantors named above. The Grantor is the mortgagor under this Mortgage. Any Grantor who signs this Mortgage, but does not sign the Credit Agreement, is signing this Mortgage only to grant and convey that Grantor's interest in the Real Property and to grant a security interest in Grantor's interest in the Rents and Personal Property to Lender and is not personally liable under the Credit Agreement except as otherwise provided by contract or law.

**Improvements.** The word "Improvements" means and includes without limitation all existing and future improvements, fixtures, buildings, structures, mobile homes affixed on the Real Property, facilities, additions and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal and interest payable under the Credit Agreement and any amounts expended or advanced by Lender to discharge obligations of Grantor or expenses incurred by Lender to enforce obligations of Grantor under this Mortgage, together with interest on such amounts as provided in this Mortgage. **Specifically, without limitation, this Mortgage secures a revolving line of credit, which obligates Lender to make advances to Grantor so long as Grantor complies with all the terms of the Credit Agreement. Such advances may be made, repaid, and remade from time to time, subject to the limitation that the total outstanding balance owing at any one time, not including finance charges on such balance at a fixed or variable rate or sum as provided in the Credit Agreement, any temporary overages, other charges, and any amounts expended or advanced as provided in this paragraph, shall not exceed the Credit Limit as provided in the Credit Agreement. Notwithstanding the amount outstanding at any particular time, this Mortgage secures the total Credit Agreement amount shown above. The unpaid balance of the revolving line of credit may at certain times be lower than the amount shown or zero. A zero balance does not terminate the line of credit or terminate Lender's obligation to advance funds to Grantor. Therefore, the lien of this Mortgage will remain in full force and effect notwithstanding any zero balance. The liens and security interests created pursuant to this Mortgage covering the Indebtedness which may be created in the future shall relate back to the date of this Mortgage.**

**Lease.** The word "Lease" means any lease between Grantor and the Lessor of the Property.

**Lender.** The word "Lender" means **MEMBERS 1ST FEDERAL CREDIT UNION** _____, its successors and assigns. The Lender is the mortgagee under this Mortgage.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

Page 2 of 13

Image ID: 000002974052 Type: GEN
Page 2 of 14
BK 5565 PG 637

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the property, interests and rights described above in the "Grant of Mortgage" section.

**Related Documents.** The words "Related Documents" mean and include without limitation all promissory notes, credit agreements, loan agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments and documents, whether now or hereafter existing, executed in connection with Grantor's Indebtedness to Lender.

**Rents.** The word "Rents" means all rents, revenues, income, issues, royalties, and profits from the Property.

**THIS MORTGAGE, AND, IF ANY, A SECURITY INTEREST IN THE PERSONAL PROPERTY, IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ALL OBLIGATIONS OF GRANTOR UNDER THIS MORTGAGE AND THE RELATED DOCUMENTS. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**3. PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Grantor shall pay to Lender all amounts secured by this Mortgage as they become due, and shall strictly perform all of Grantor's obligations under the Line of Credit Home Equity Agreement and under this Mortgage.

**4. POSSESSION AND MAINTENANCE OF THE PROPERTY.** Grantor agrees that Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until in default, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs and maintenance necessary to preserve its value.

**Hazardous Substances.** Grantor represents and warrants that the Property never has been, and never will be so long as this Mortgage remains a lien on the Property, used for the generation, manufacture, storage, treatment, disposal, release or threatened release of any hazardous waste or substance, as those terms are defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act ("SARA"), applicable state or Federal laws, or regulations adopted pursuant to any of the foregoing. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Grantor hereby (a) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws, and (b) agrees to indemnify and hold harmless Lender against any and all claims and losses resulting from a breach of this paragraph of the Mortgage. This obligation to indemnify shall survive the payment of the Indebtedness and the satisfaction of this Mortgage.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Specifically without limitation, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), soil, gravel or rock products without the prior written consent of Lender.

**Lender's Right to Enter.** Lender and its agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

Page 3 of 13

Image ID: 000002974053 Type: GEN
Page 3 of 14
BK 5565 PG 638

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations of all governmental authorities applicable to the use or occupancy of the Property. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon nor leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**5.   COMPLIANCE WITH LEASE.** If there is a Lease on the Property, Grantor will pay all rents and will strictly observe and perform on a timely basis all other terms, covenants, and conditions of the Lease. Grantor further agrees (a) not to surrender, terminate, or cancel the Lease, and (b) not to modify, change, supplement, alter, or amend the Lease, either orally or in writing, without Lender's prior written consent. No estate in the Property, whether fee title to the leasehold premises, the leasehold estate, or any subleasehold estate, will merge without Lender's express written consent; rather these estates will remain separate and distinct, even if there is a union of these estates in the landlord, Grantor, or a third party who purchases or otherwise acquires the estates. Grantor further agrees that if Grantor acquires all or a portion of the fee simple title, or any other leasehold or subleasehold title to the Property, that title will, at Lender's option, immediately become subject to the terms of this Mortgage, and Grantor will execute, deliver and record all documents necessary or appropriate to assure that such title is secured by this

**6.   REHABILITATION LOAN AGREEMENT.** Grantor shall fulfill all of Grantor's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Grantor may enter into with Lender. Lender, at Lender's option, may require Grantor to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Grantor may have against parties who supply labor, materials or services in connection with improvements made to the Property

**7.   DUE ON SALE - CONSENT BY LENDER.** Lender may, at its option, have the right to accelerate, that is, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without the Lender's prior written consent, of all or any pad of the Reel Property, or any interest in the Real Property. If Grantor sells or transfers the Real Property without the written consent of Lender, then, prior to acceleration Lender shall give notice to Grantor. The notice shall provide a period of not less than ten (10) days from the date of the notice within which Grantor may pay the sums declared due. If Grantor fails to pay those sums prior to the expiration of such period, Lender may, without further notice or demand on Grantor, invoke any remedies permitted in this Mortgage. A "sale or transfer" means the conveyance of Real Property or any right, title or interest therein; whether legal or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of Real Property interest. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Pennsylvania law.

**8.   TRANSFER OF PROPERTY.** The following provisions relating to the transfer of the Real Property are a pad of this Mortgage:

**Notice of Transfer.** Grantor shall give notice to Lender, as provided in this Mortgage, prior to any sale or transfer of all or part of the Property or any rights in the Real Property. Any person to whom all or part of the Real Property is sold or transferred also shall be obligated to give notice to Lender, as provided in this Mortgage, promptly after such transfer.

Image ID: 000002974054  Type: GEN
Page 4 of 14
BK**5565** PG**639**

**Advances After Transfer.** All amounts advanced under the Line of Credit Home Equity Agreement, up to the Credit Limit, are secured by this Mortgage, whether advanced before or after sale or transfer of the Real Property, except any amounts which may be advanced by Lender more than five (5) days after notice to Lender, as provided in this Mortgage, that such transfer or sale has occurred. Even if Grantor transfers the Real Property, Grantor will continue to be obligated under the Credit Agreement and this Mortgage unless Lender releases Grantor in writing. As a condition to Lender's consent to any proposed transfer or as a condition to the release of Grantor, Lender may require that the person to whom the Real Property is transferred sign an assumption agreement satisfactory to Lender and Lender may impose an assumption fee. The assumption agreement will not entitle the person signing it to receive advances under the Credit Agreement.

**9.    TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are a pad of this Mortgage.

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of all liens having priority over or equal to the interest of Lender under this Mortgage. except for the lien of taxes and assessments not due, except for the Existing Indebtedness referred to below, and except as otherwise provided in the following paragraph.

**Right To Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be assigned on account of the work, services, or materials and the cost exceeds $10,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

Image ID: 000002974055 Type: GEN
Page 5 of 14

BK**5565** PG**640**

**10. PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage.

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. If the Real Property is located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain Federal Flood Insurance to the extent such insurance is required and is available for the term of the loan and for the full unpaid principal balance of the loan. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $10,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. If, in Lender's judgment, the restoration or repair is economically feasible and Lender's security is not lessened, insurance proceeds shall be applied to restoration or repair of the damaged Property. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Mortgage whether or not then due, with any excess paid to Grantor. If Grantor abandons the Property, or does not answer within thirty (30) days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Mortgage, whether or not then due.

**Unexpired Insurance at Sale.** Any unexpired insurance shall inure to the benefit of, and pass to, the purchaser of the Property covered by this Mortgage at any trustee's sale or other sale held under the provision of this Mortgage, or at any foreclosure sale of such Property.

**Compliance with Existing Indebtedness.** During the period in which any Existing Indebtedness described below is in effect, compliance with the insurance provisions contained in the instrument evidencing such Existing Indebtedness shall constitute compliance with the insurance provisions under this Mortgage, to the extent compliance with the terms of this Mortgage would constitute a duplication of insurance requirement. If any proceeds from the insurance become payable on loss, the provisions in this Mortgage for division of proceeds shall apply only to that portion of the proceeds not payable to the holder of the Existing Indebtedness.

**11. EXPENDITURES BY LENDER.** If Grantor fails to comply with any provision of this Mortgage, including any obligation to maintain Existing Indebtedness in good standing as required below, or if any action or proceeding is commenced that would materially affect Lender's interests in the Property, Lender on Grantor's behalf may, upon notice to Grantor, but shall not be required to, take any action that Lender deems appropriate. Any amount that Lender expends in so doing will bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses, at Lender's option, will (a) be payable on demand, or (b) be added to the balance of the credit line. This Mortgage also will secure payment of these amounts. The rights provided for in this paragraph shall be in addition to any other rights or any remedies to which Lender may be entitled on account of the default. Any such action by Lender shall not be construed as curing the default so as to bar Lender from any remedy that it otherwise would have had.

Image ID: 000002974056 Type: GEN
Page 6 of 14
BK **5565** PG **641**

**12. WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage.

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property (including a leasehold interest, if any), free and clear of all liens and encumbrances except those of record, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**13. EXISTING INDEBTEDNESS.** The following provisions concerning existing indebtedness (the "Existing Indebtedness") are a part of this Mortgage.

**Existing Lien.** The lien of this Mortgage securing the Indebtedness may be secondary and inferior to an existing lien, if there is such a lien. Grantor expressly covenants and agrees to pay, or see to the payment of, the Existing Indebtedness and to prevent any default on such indebtedness, any default under the instruments evidencing such indebtedness, or any default under any security documents for such indebtedness.

**No Modification.** Grantor shall not enter into any agreement with the holder of any mortgage or other security agreement which has priority over this Mortgage by which that agreement is modified, amended, extended, or renewed without the prior written consent of Lender. Grantor shall neither request nor accept any future advances under any such security agreement without the prior written consent of Lender.

**14. CONDEMNATION.** The following provisions relating to condemnation of the Property are a part of this Mortgage.

**Application of Net Proceeds.** If all or any part of the Property is condemned, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness under the Line of Credit Home Equity Agreement, subject to the terms of any mortgage or deed of trust with a lien which has priority over this Mortgage. The net proceeds of the award shall mean the award after payment of all actual costs, expenses, and attorneys' fees necessarily paid or incurred by Grantor or Lender in connection with the condemnation.

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments as may be requested by it from time to time to permit such participation.

Imaqe ID: 000002974057 Tvpe: GEN
Paqe 7 of 14
BK 5565 PG 642

**15. IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (a) a specific tax upon this type of Mortgage or upon all or any pad of the Indebtedness secured by this Mortgage; (b) a specific tax on Grantor which Grantor is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (c) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (d) a specific tax on all or any portion of the indebtedness or on payments of principal and interest made by Grantor.

**16. FURTHER ASSURANCES.** The following provisions relating to further assurances are a part of this Mortgage.

**Further Assurances.** Upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (a) the obligations of Grantor under the Credit Agreement, this Mortgage, and the Related Documents, and (b) the liens and security interests created by this Mortgage on the Property. Unless prohibited by law or agreed to the contrary by Lender in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**17. FULL PERFORMANCE.** If Grantor pays all the Indebtedness when due, terminates the credit line account, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**18. DEFAULT.** Each of the following, at the option of Lender, shall constitute an event of default ("Event of Default") under this Mortgage: (a) Grantor commits fraud or makes a material misrepresentation at any time in connection with the credit line account. This can include, for example, a false statement about Grantor's income, assets, liabilities, or any other aspects of Grantor's financial condition. (b) Grantor does not meet the repayment terms of the credit line account. (c) Grantor's action or inaction adversely affects the collateral for the credit line account or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a lien on the dwelling without Lender's permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.



Imaqe ID: 000002974058 Tvpe: GEN
Paqe 8 of 14

BK**5565** PG**643**

**19. GRANTOR'S RIGHT TO CURE.** Upon the occurrence of any Event of Default (other than fraud or material misrepresentation) and prior to exercising any of the rights and remedies provided in this Mortgage or by law, Lender shall give notice as provided in the Mortgage and as required by applicable law. The notice may be combined or sent with any notice required by applicable law and shall specify: (a) the Event of Default; (b) the action required to cure the default; (c) a date not less than thirty (30) days (or any longer period as required by applicable law or elsewhere in this Mortgage) from the date the notice is given to Grantor by which the default must be cured and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Mortgage and sale of the property. The notice shall further inform Grantor of the right to reinstate after acceleration and the right to assert in a foreclosure proceeding the nonexistence of an event of default or any other defense of Grantor to acceleration and sale. However if Lender has given Grantor a right to cure with respect to a prior Event of Default which occurred within three hundred sixty-five (365) days of the present event of Default, Grantor shall not be entitled to receive the right to cure described in this paragraph.

**20. RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default and at any time thereafter, Lender, at its option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Subject to applicable law, Lender shall have the right at its option to declare the entire Indebtedness immediately due and payable.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Possession of the Property.** For the purpose of procuring possession of the Property, Grantor hereby authorizes and empowers any attorney of any court of record in the Commonwealth of Pennsylvania or elsewhere, as attorney for Lender and all persons claiming under or through Lender, to sign an agreement for entering in any competent court an amicable action in ejectment for possession of the Property and to appear for and confess judgment against Grantor, and against all persons claiming under or through Grantor, for the recovery by Lender of possession of the Property, without any stay of execution, for which this Mortgage, or a copy of this Mortgage verified by affidavit, shall be a sufficient warrant; and thereupon a writ of possession may be issued forthwith, without any prior writ or proceeding whatsoever.

**Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose Grantor's interest in all or in any part of the Personal Property or the Real Property by non judicial sale.

**Deficiency Judgment.** Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (a) pay a reasonable rental for the use of the Property, or (b) vacate the Property immediately upon the demand of Lender.

Image ID: 000002974059 Type: GEN
Page 9 of 14

BK**5565** PG**644**

Page 9 of 13

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Line of Credit Home Equity Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Grantor hereby waives any and all right to have the property marshaled. In exercising its rights and remedies, Lender shall be free to sell all or any pad of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Unless otherwise required by applicable law, reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition.

**Waiver; Election of Remedies.** A waiver by any party of a breach of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's rights otherwise to demand strict compliance with that provision or any other provision. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or take action to perform an obligation of Grantor under this Mortgage after failure of Grantor to perform shall not affect Lender's right to declare a default and exercise its remedies under this Mortgage.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and on any appeal. Whether or not any court action is involved, all reasonable expenses incurred by Lender that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest from the date of expenditure until repaid at the Credit Agreement rate. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**21. GRANTOR'S RIGHT TO REINSTATE.** If Grantor meets certain conditions, Grantor shall have the right to have enforcement of this Mortgage discontinued at any time prior to the earlier of (i) five (5) days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Mortgage or (ii) entry of a judgment enforcing this Mortgage. Those conditions are that Grantor: (a) pays Lender all sums which would then be due under this Mortgage and the Credit Agreement had no acceleration occurred; (b) cures all other defaults under this Mortgage and the Credit Agreement; (c) pays all reasonable expenses incurred in enforcing this Mortgage, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Mortgage, Lender's rights in the Property and Grantor's obligation to pay the sums secured by this Mortgage shall continue unchanged. Upon reinstatement by Grantor, this Mortgage and the obligations secured hereby shall remain fully effective as if no acceleration had occurred but Lender shall not be obligated to make any more credit advances. This right to reinstate shall apply if Grantor has not previously exercised the right to reinstate under this same Mortgage.

Image ID: 000002974060 Type: GEN
Page 10 of 14

BK **5565** PG **645**

**22. NOTICES TO GRANTOR AND OTHER PARTIES.** Unless otherwise provided by applicable law, any notice under this Mortgage shall be in writing and shall be effective when actually delivered or, if mailed, shall be deemed effective when deposited in the United States mail first class, registered mail, postage prepaid, directed to the addresses shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address.

**23. ASSOCIATION OF UNIT OWNERS.** The following provisions apply if the Real Property has been submitted to unit ownership law or similar law for the establishment of condominiums or cooperative ownership of the Real Property:

**Power of Attorney.** Grantor grants an irrevocable power of attorney to Lender to vote in its discretion on any matter that may come before the association of unit owners. Lender shall have the right to exercise this power of attorney only after default by Grantor; however, Lender may decline to exercise this power as it sees fit.

**Insurance.** The insurance as required above may be carried by the association of unit owners on Grantor's behalf, and the proceeds of such insurance may be paid to the association of unit owners for the purpose of repairing or reconstructing the Property. If not so used by the association, such proceeds shall be paid to Lender.

**Compliance with Regulations of Association.** Grantor shall perform all of the obligations imposed on Grantor by the declaration submitting the Real Property to unit ownership, by the bylaws of the association of unit owners, or by any rules or regulations thereunder. If Grantor's interest in the Real Property is a leasehold interest and such property has been submitted to unit ownership, Grantor shall perform all of the obligations imposed on Grantor by the lease of the Real Property from its owner.

**24. MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Applicable Law.** This Mortgage shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Grantor's Copy of Documents.** Lender agrees to provide Grantor with a conformed copy of both the Line of Credit Home Equity Agreement and this Mortgage at the time they are executed or within a reasonable time after this Mortgage is recorded.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be invalid or unenforceable as to any person or circumstance, such finding shall not render that provision invalid or unenforceable as to any other persons or circumstances. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Mortgage in all other respects shall remain valid and enforceable.

**Successors and Assigns.** Subject to the limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their heirs, personal representatives, successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the indebtedness.

**Time Is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waivers and Consents.** Lender shall not be deemed to have waived any rights under this Mortgage (or under the Related Documents) unless such waiver is in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by any party of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or any of Grantor's obligations as to any future transactions. Whenever consent by Lender is required in this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required.

Page 12 of 13

Image ID: 000002974062 Type: GEN
Page 12 of 14

BK5565 PG647

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

X _____ (seal)      X _____ (seal)
ALAN KIM PATRONO                          JANE HAUSER PATRONO

Signed, acknowledged and delivered in the presence of:

X _____               X _____
Witness                                    Witness

COMMONWEALTH OF PENNSYLVANIA, Cumberland _____ County ss.:

On this, the 24th day of January 201, before me, Jody L Travis the undersigned officer, personally appeared ALAN KIM PATRONO AND JANE HAUSER PATRONO

known to me (or satisfactorily proven) to be the person(s) whose name(s) _____ subscribed to the within instrument and acknowledged that _____ executed the same for the purposes herein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.
My Commission expires:

_____
Title of Officer

COMMONWEALTH OF PENNSYLVANIA
| Notarial Seal |
| Jody L. Travis, Notary Public |
| Lower Allen Twp., Cumberland County |
| My Commission Expires Sept. 29, 2012 |
Member, Pennsylvania Association of Notaries

## Certificate of Residence of Mortgagee

Members 1st Federal Credit Union, Mortgagee within named, hereby certifies that its residence is 5000 Louise Drive, Mechanicsburg, PA 17055.

By _____

Page 13 of 13

Image ID: 000002974063 Type: GEN
Page 13 of 14
BK 5565 PG 648

Order ID: 637250

## LEGAL DESCRIPTION

Parcel Number 16004-0039

All that certain tract of land situate partly in the Borough of Gettysburg and partly in Cumberland Township, Adams County, Pennsylvania, which division being one-third in the Borough and two-thirds in the Township, more particularly bounded and described as follows:

Beginning at a point in the center of the State Highway leading from Gettysburg to Harrisburg at land now or formerly of Adams County Institution District and at the Northeast corner of land herein conveyed; thence in the center of State Highway South 34 degrees 45 minutes West, 132.3 feet to a point in the center of said State Highway; thence in said highway North 65 degrees 30 minutes West 25.4 feet to point at the Western edge of said State Highway; thence along the Western edge of said State Highway; thence along the Western edge of said State Highway, South 34 degrees 45 minutes West, 37.5 feet to a point on the Northern edge of East Broadway; thence along the Northern edge of East Broadway North 85 degrees West, 99.1 feet to a point at land formerly of Ralph E. and Rachael W. Barley; thence by same North 5 degrees East, 139.6 feet to a point at other land now or formerly of Adams County Institution District; thence by same South 85 degrees East, 208.4 feet to a point in the center of said State Highway leading from Gettysburg to Harrisburg, the place of beginning.

Subject to any restrictions, easements and/or adverses that pertain to this property.

Image ID: 000002974064 Type: GEN
Page 14 of 14
BK5565 PG649

*(1)*

Parcel Identification
   Number: D9-23

RECORDATION
   REQUESTED BY:
   Members 1st Federal
   Credit Union
   ATTN: Business Lending
   5000 Louise Drive
   Mechanicsburg, PA  17055

WHEN RECORDED MAIL
   TO:
   Members 1st Federal
   Credit Union
   ATTN: Business Lending
   5000 Louise Drive
   Mechanicsburg, PA  17055

SEND TAX NOTICES TO:
   Members 1st Federal
   Credit Union
   ATTN: Business Lending
   5000 Louise Drive
   Mechanicsburg, PA  17055

FOR RECORDER'S USE ONLY

# MORTGAGE

**MAXIMUM LIEN.  This Mortgage shall secure unpaid loan advances made after this Mortgage is recorded. The unpaid principal balance of advances exclusive of interest and other extensions of credit secured by the Mortgage made for the payment of taxes, assessments, maintenance charges, insurance premiums and costs incurred for the protection of the mortgaged premises shall not exceed at any one time $1,475,000.00.**

**Amount Secured Hereby:     $1,475,000.00**

**THIS MORTGAGE dated October 26, 2011, is made and executed between Hauser Family Farms LLC (referred to below as "Grantor") and Members 1st Federal Credit Union, whose address is ATTN: Business Lending, 5000 Louise Drive, Mechanicsburg, PA  17055 (referred to below as "Lender").**

GRANT OF MORTGAGE.  For valuable consideration, Grantor grants, bargains, sells, conveys, assigns, transfers, releases, confirms and mortgages to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all streets, lanes, alleys, passages, and ways; all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in Adams County, Commonwealth of Pennsylvania:**

> See Exhibit A, which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

**The Real Property or its address is commonly known as  410 Cashtown Rd, Biglerville, PA 17307.  The Real Property parcel identification number is D9-23.**

CROSS-COLLATERALIZATION.  In addition to the Note, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and

Image ID: 000003046404 Type: GEN
Recorded: 10/28/2011 at 01:31:04 PM
Fee Amt: $85.50 Page 1 of 12
Instr# 201100013459
Adams County, PA
Linda K Myers Register and Recorder
BK 5643 PG 658

whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

GRANTOR'S WAIVERS. Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

GRANTOR'S REPRESENTATIONS AND WARRANTIES. Grantor warrants that: (a) this Mortgage is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property; (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

PAYMENT AND PERFORMANCE. Except as otherwise provided in this Mortgage, Borrower and Grantor shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this Mortgage.

POSSESSION AND MAINTENANCE OF THE PROPERTY. Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

Possession and Use. Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

Duty to Maintain. Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

Compliance With Environmental Laws. Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

Nuisance, Waste. Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including

Image ID: 000003046405 Type: GEN
Page 2 of 12
BK 5643 PG 659

# MORGAGE
## (Continued)

oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Pennsylvania law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $5,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such

Image ID: 000003046406 Type: GEN
Page 3 of 12

BK5643 PG660

coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $5,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default. Grantor's obligation to Lender for all such expenses shall survive the entry of any mortgage foreclosure judgment.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time

Image ID: 000003046407 Type: GEN
Page 4 of 12
BK**5643**PG**661**

to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

*Survival of Representations and Warranties.* All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all actual costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ADDITIONAL AUTHORIZATIONS.** The following provisions relating to further assurances and additional authorizations are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and

Image ID: 000003046408 Type: GEN
Page 5 of 12

BK 5643 PG 662

deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Additional Authorizations.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably authorizes Lender to make, execute, deliver, file, record and do all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph. It is understood that nothing set forth herein shall require Lender to take any such actions.

**FULL PERFORMANCE.** If Borrower and Grantor pay all the Indebtedness when due, and Grantor otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Mortgage or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

Image ID: 000003046409 Type: GEN
Page 6 of 12

BK 5643 PG 663

# MORGAGE
## (Continued)

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Mortgage within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option, after giving such notices as required by applicable law, to declare the entire Indebtedness immediately due and payable.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and, with or without taking possession of the Property, to collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably authorizes Lender to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Possession of the Property.** For the purpose of procuring possession of the Property, Grantor hereby authorizes and empowers any attorney of any court of record in the Commonwealth of Pennsylvania or elsewhere, as attorney for Lender and all persons claiming under or through Lender, to sign an agreement for entering in any competent court an amicable action in ejectment for possession of the Property and to appear for and confess judgment against Grantor, and against all persons claiming under or through Grantor, for the recovery by Lender of possession of the Property, without any stay of execution, for which this Mortgage, or a copy of this Mortgage verified by affidavit, shall be a sufficient warrant; and thereupon a writ of possession may be issued forthwith, without any prior writ or proceeding whatsoever.

**Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose Grantor's interest in all or in any part of the Personal Property or the Real Property by non-judicial sale.

**Deficiency Judgment.** Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Borrower or Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

Image ID: 000003046410 Type: GEN
Page 7 of 12
BK 5643 PG 664

# MORTGAGE
## (Continued)

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waive any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Unless otherwise required by applicable law, reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or Borrower and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Unless otherwise provided by applicable law, any notice required to be given under this Mortgage shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Arbitration.** Borrower and Grantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Mortgage or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Property shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Property, including any claim to rescind, reform, or otherwise modify any agreement relating to the Property, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment

Image ID: 000003046411 Type: GEN
Page 8 of 12
BK5643 PG665

# MORTGAGE
## (Continued)

Page 9

upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Mortgage shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the Commonwealth of Pennsylvania.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Mortgage. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Mortgage.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successor Interests.** The terms of this Mortgage shall be binding upon Grantor, and upon Grantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury.** All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Hauser Estate, Inc.; and Hauser Family Farms LLC and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L.

Image ID: 000003046412 Type: GEN
Page 9 of 12
BK 5643 PG 666

# MORTGAGE
## (Continued)

No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means Hauser Family Farms LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Mortgage.

**Lender.** The word "Lender" means Members 1st Federal Credit Union, its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means the promissory note dated October 26, 2011, **in the original principal amount of $1,475,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of the Note is November 1, 2036. **NOTICE TO GRANTOR: THE NOTE CONTAINS A VARIABLE INTEREST RATE.**

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

Image ID: 000003046413 Type: GEN
Page 10 of 12

BK5643 PG667

`

# MORTGAGE
## (Continued)

Page 11

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

THIS MORTGAGE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS MORTGAGE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GRANTOR:

HAUSER FAMILY FARMS LLC

By: _____(Seal)
    Melinda H. Davis, Manager of Hauser Family Farms LLC

---

## CERTIFICATE OF RESIDENCE

I hereby certify, that the precise address of the mortgagee, **Members 1st Federal Credit Union,** herein is as follows:

**ATTN: Business Lending, 5000 Louise Drive, Mechanicsburg, PA 17055**

_____
        Attorney  or  Agent  for Mortgagee

---

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA             )
                                    ) SS

COUNTY OF *Adams*                   )

On this, the _____26th_____ day of _____October_____, 20 _11_, before me _____ _____Alan Kim Patrono_____, the undersigned Notary Public, personally appeared **Melinda H. Davis, Manager** of **Hauser Family Farms LLC,** who acknowledged himself or herself to be the member or designated agent of **Hauser Family Farms LLC,** a Limited Liability Company, and that he or she as such a member or designated agent, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the Limited Liability Company by himself or herself as a member or designated agent.

**In witness whereof, I hereunto set my hand and official seal.**

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Alan Kim Patrono, Notary Public
Gettysburg Boro, Adams County
My Commission Expires Nov. 25, 2013
Member, Pennsylvania Association of Notaries

_____
Notary Public in and for the State of _____

---

LASER PRO Lending, Ver. 5.57.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2011. All Rights Reserved. - PA C:\COMMERCIAL\CFI\LPL\G03.FC TR-2757 PR-6

Image ID: 000003046414 Type: GEN
Page 11 of 12
BK 5643 PG 668

## EXHIBIT "A"

**ALL** that tract of land situate in **Franklin Township, Adams County, Pennsylvania**, bounded and described as follows:

**BEGINNING** at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¾-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58 minutes 20 seconds East 1,212.75 feet to a ¾-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¾-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of **BEGINNING. CONTAINING** 170.585 acres.

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

**BEING** the same tract of land which Helen B. Hauser, widow, doing business as Conewago Orchards, by her deed dated July 20, 2007, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 4944 at Page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania Limited Liability Company.

Image ID: 000003046415 Type: GEN
Page 12 of 12

BK **5643** PG **669**

/ 2)

Parcel Identification
    Number: D9-23

RECORDATION
    REQUESTED BY:
    Members 1st Federal
    Credit Union
    ATTN: Business Lending
    5000 Louise Drive
    Mechanicsburg, PA  17055

WHEN RECORDED MAIL
    TO:
    Members 1st Federal
    Credit Union
    ATTN: Business Lending
    5000 Louise Drive
    Mechanicsburg, PA  17055

SEND TAX NOTICES TO:
    Members 1st Federal
    Credit Union
    ATTN: Business Lending
    5000 Louise Drive
    Mechanicsburg, PA  17055                                    FOR RECORDER'S USE ONLY

## ASSIGNMENT OF RENTS

THIS ASSIGNMENT OF RENTS dated October 26, 2011, is made and executed between Hauser Family Farms LLC (referred to below as "Grantor") and Members 1st Federal Credit Union, whose address is ATTN: Business Lending, 5000 Louise Drive, Mechanicsburg, PA  17055 (referred to below as "Lender").

ASSIGNMENT. For valuable consideration, Grantor hereby assigns, grants a continuing security interest in, and conveys to Lender all of Grantor's right, title, and interest in and to the Rents from the following described Property located in Adams County, Commonwealth of Pennsylvania:

>   See Exhibit A, which is attached to this Assignment and made a part of this Assignment as
>   if fully set forth herein.

The Property or its address is commonly known as  410 Cashtown Rd, Biglerville, PA  17307. The Real Property parcel identification number is D9-23.

CROSS-COLLATERALIZATION. In addition to the Note, this Assignment secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

THIS ASSIGNMENT IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF BORROWER AND GRANTOR UNDER THE NOTE, THIS ASSIGNMENT, AND THE RELATED DOCUMENTS. THIS ASSIGNMENT IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

GRANTOR'S WAIVERS. Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

BORROWER'S WAIVERS AND RESPONSIBILITIES. Lender need not tell Borrower about any action or inaction Lender

Image ID: 000003046416 Type: GEN
Recorded: 10/28/2011 at 01:32:39 PM
Fee Amt: $26.50 Page 1 of 8
Instr# 201100013460
Adams County, PA
Linda K Myers Register and Recorder
BK5643 PG670

# ASSIGNMENT OF RENTS
## (Continued)
**Page 2**

takes in connection with this Assignment. Borrower assumes the responsibility for being and keeping informed about the Property. Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Property, or any delay by Lender in realizing upon the Property. Borrower agrees to remain liable under the Note with Lender no matter what action Lender takes or fails to take under this Assignment.

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Assignment or any Related Documents, Grantor shall pay to Lender all amounts secured by this Assignment as they become due, and shall strictly perform all of Grantor's obligations under this Assignment. Unless and until Lender exercises its right to collect the Rents as provided below and so long as there is no default under this Assignment, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents, provided that the granting of the right to collect the Rents shall not constitute Lender's consent to the use of cash collateral in a bankruptcy proceeding.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that:

    **Ownership.** Grantor is entitled to receive the Rents free and clear of all rights, loans, liens, encumbrances, and claims except as disclosed to and accepted by Lender in writing.

    **Right to Assign.** Grantor has the full right, power and authority to enter into this Assignment and to assign and convey the Rents to Lender.

    **No Prior Assignment.** Grantor has not previously assigned or conveyed the Rents to any other person by any instrument now in force.

    **No Further Transfer.** Grantor will not sell, assign, encumber, or otherwise dispose of any of Grantor's rights in the Rents except as provided in this Assignment.

**LENDER'S RIGHT TO RECEIVE AND COLLECT RENTS.** Lender shall have the right at any time, and even though no default shall have occurred under this Assignment, to collect and receive the Rents. For this purpose, Lender is hereby given and granted the following rights, powers and authority:

    **Notice to Tenants.** Lender may send notices to any and all tenants of the Property advising them of this Assignment and directing all Rents to be paid directly to Lender or Lender's agent.

    **Enter the Property.** Lender may enter upon and take possession of the Property; demand, collect and receive from the tenants or from any other persons liable therefor, all of the Rents; institute and carry on all legal proceedings necessary for the protection of the Property, including such proceedings as may be necessary to recover possession of the Property; collect the Rents and remove any tenant or tenants or other persons from the Property.

    **Maintain the Property.** Lender may enter upon the Property to maintain the Property and keep the same in repair; to pay the costs thereof and of all services of all employees, including their equipment, and of all continuing costs and expenses of maintaining the Property in proper repair and condition, and also to pay all taxes, assessments and water utilities, and the premiums on fire and other insurance effected by Lender on the Property.

    **Compliance with Laws.** Lender may do any and all things to execute and comply with the laws of the Commonwealth of Pennsylvania and also all other laws, rules, orders, ordinances and requirements of all other governmental agencies affecting the Property.

    **Lease the Property.** Lender may rent or lease the whole or any part of the Property for such term or terms and on such conditions as Lender may deem appropriate.

    **Employ Agents.** Lender may engage such agent or agents as Lender may deem appropriate, either in Lender's name or in Grantor's name, to rent and manage the Property, including the collection and application of Rents.

    **Other Acts.** Lender may do all such other things and acts with respect to the Property as Lender may deem appropriate and may act exclusively and solely in the place and stead of Grantor and to have all of the powers of Grantor for the purposes stated above.

    **No Requirement to Act.** Lender shall not be required to do any of the foregoing acts or things, and the fact that Lender shall have performed one or more of the foregoing acts or things shall not require Lender to do any other specific act or thing.

**APPLICATION OF RENTS.** All costs and expenses incurred by Lender in connection with the Property shall be for Grantor's account and Lender may pay such costs and expenses from the Rents. Lender, in its sole discretion, shall determine the application of any and all Rents received by it; however, any such Rents received by Lender which are not applied to such costs and expenses shall be applied to the Indebtedness. All expenditures made by Lender under this Assignment and not reimbursed from the Rents shall become a part of the Indebtedness secured by this Assignment, and shall be payable on demand, with interest at the Note rate from date of expenditure until paid.

**FULL PERFORMANCE.** If Grantor pays all of the Indebtedness when due and otherwise performs all the obligations imposed upon Grantor under this Assignment, the Note, and the Related Documents, Lender shall execute and deliver to

Image ID: 000003046417 Type: GEN
Page 2 of 8

BK**5643**PG**671**

# ASSIGNMENT OF RENTS
## (Continued)

Grantor a suitable satisfaction of this Assignment and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Property. Any termination fee required by law shall be paid by Grantor, if permitted by applicable law.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Assignment or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Assignment or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Rents or the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Assignment also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Assignment:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Assignment or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default on Other Payments.** Failure of Grantor within the time required by this Assignment to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Default in Favor of Third Parties.** Borrower, any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's, any guarantor's or Grantor's property or ability to perform their respective obligations under this Assignment or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Assignment or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Assignment or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against the Rents or any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Property Damage or Loss.** The Property is lost, stolen, substantially damaged, sold, or borrowed against.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

Image ID: 000003046418 Type: GEN
Page 3 of 8
BK**5643**PG**672**

# ASSIGNMENT OF RENTS
## (Continued)

**Page 4**

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Assignment within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Subject to applicable law, Lender shall have the right at its option without notice to Borrower or Grantor to declare the entire Indebtedness immediately due and payable.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender shall have all the rights provided for in the Lender's Right to Receive and Collect Rents Section, above. If the Rents are collected by Lender, then Grantor irrevocably authorizes Lender to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Assignment or the Note or by law.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Assignment, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Assignment, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Assignment:

**Amendments.** This Assignment, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Assignment. No alteration of or amendment to this Assignment shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration.** Borrower and Grantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Assignment or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Property shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the

Image ID: 000003046419 Type: GEN
Page 4 of 8
BK5643 PG673

# ASSIGNMENT OF RENTS
## (Continued)

lawfulness or reasonableness of any act, or exercise of any right, concerning any Property, including any claim to rescind, reform, or otherwise modify any agreement relating to the Property, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Assignment shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Caption Headings.** Caption headings in this Assignment are for convenience purposes only and are not to be used to interpret or define the provisions of this Assignment.

**Governing Law.** This Assignment will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions. This Assignment has been accepted by Lender in the Commonwealth of Pennsylvania.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Assignment shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Assignment. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Assignment.

**Merger.** There shall be no merger of the interest or estate created by this assignment with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Interpretation.** (1) In all cases where there is more than one Borrower or Grantor, then all words used in this Assignment in the singular shall be deemed to have been used in the plural where the context and construction so require. (2) If more than one person signs this Assignment as "Grantor," the obligations of each Grantor are joint and several. This means that if Lender brings a lawsuit, Lender may sue any one or more of the Grantors. If Borrower and Grantor are not the same person, Lender need not sue Borrower first, and that Borrower need not be joined in any lawsuit. (3) The names given to paragraphs or sections in this Assignment are for convenience purposes only. They are not to be used to interpret or define the provisions of this Assignment.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Assignment unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Assignment shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Assignment. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Assignment, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Unless otherwise provided by applicable law, any notice required to be given under this Assignment shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Assignment. Any party may change its address for notices under this Assignment by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Exercise of Authorization and Powers.** The various authorizations and powers of attorney conveyed on Lender under this Assignment are granted for purposes of security and may not be revoked by Grantor until such time as the same are renounced by Lender. It is understood and agreed that any exercise of this authorization by Lender shall be on behalf of Lender and not on behalf of Grantor. Lender is not an agent or fiduciary of Grantor. However, in exercising the authorization granted hereby, Lender shall exercise reasonable caution and prudence and Lender shall keep full and accurate record of all actions, receipts and disbursements.

**Severability.** If a court of competent jurisdiction finds any provision of this Assignment to be illegal, invalid, or

Image ID: 000003046420 Type: GEN
Page 5 of 8
BK 5643 PG 674

# ASSIGNMENT OF RENTS
## (Continued)

unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Assignment. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Assignment shall not affect the legality, validity or enforceability of any other provision of this Assignment.

**Successor Interests.** The terms of this Assignment shall be binding upon Grantor, and upon Grantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Time is of the Essence.** Time is of the essence in the performance of this Assignment.

**Waive Jury.** All parties to this Assignment hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Waiver of Right of Redemption.** NOTWITHSTANDING ANY OF THE PROVISIONS TO THE CONTRARY CONTAINED IN THIS ASSIGNMENT, GRANTOR HEREBY WAIVES ANY AND ALL RIGHTS OF REDEMPTION FROM SALE UNDER ANY ORDER OR JUDGMENT OF FORECLOSURE ON GRANTOR'S BEHALF AND ON BEHALF OF EACH AND EVERY PERSON, EXCEPT JUDGMENT CREDITORS OF GRANTOR, ACQUIRING ANY INTEREST IN OR TITLE TO THE PROPERTY SUBSEQUENT TO THE DATE OF THIS ASSIGNMENT.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Assignment. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Assignment shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Assignment.** The word "Assignment" means this ASSIGNMENT OF RENTS, as this ASSIGNMENT OF RENTS may be amended or modified from time to time, together with all exhibits and schedules attached to this ASSIGNMENT OF RENTS from time to time.

**Borrower.** The word "Borrower" means Hauser Estate, Inc.; and Hauser Family Farms LLC.

**Default.** The word "Default" means the Default set forth in this Assignment in the section titled "Default".

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Assignment in the default section of this Assignment.

**Grantor.** The word "Grantor" means Hauser Family Farms LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Assignment, together with interest on such amounts as provided in this Assignment. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Assignment.

**Lender.** The word "Lender" means Members 1st Federal Credit Union, its successors and assigns.

**Note.** The word "Note" means the promissory note dated October 26, 2011, **in the original principal amount of $1,475,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Assignment" section of this Assignment.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all of Grantor's present and future rights, title and interest in, to and under any and all present and future leases, including, without limitation, all rents, revenue, income, issues, royalties, bonuses, accounts receivable, cash or security deposits, advance rentals, profits and proceeds from the Property,

Image ID: 000003046421 Type: GEN
Page 6 of 8
BK 5643 PG 675

# ASSIGNMENT OF RENTS
## (Continued)

and other payments and benefits derived or to be derived from such leases of every kind and nature, whether due now or later, including without limitation Grantor's right to enforce such leases and to receive and collect payment and proceeds thereunder.

THE UNDERSIGNED ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS ASSIGNMENT, AND NOT PERSONALLY BUT AS AN AUTHORIZED SIGNER, HAS CAUSED THIS ASSIGNMENT TO BE SIGNED AND EXECUTED ON BEHALF OF GRANTOR ON OCTOBER 26, 2011.

THIS ASSIGNMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS ASSIGNMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GRANTOR:

HAUSER FAMILY FARMS LLC

By: _____ (Seal)
Melinda H. Davis, Manager of Hauser Family Farms LLC

---

## CERTIFICATE OF RESIDENCE

I hereby certify, that the precise address of the mortgagee, **Members 1st Federal Credit Union**, herein is as follows:

**ATTN: Business Lending, 5000 Louise Drive, Mechanicsburg, PA 17055**

_____
Attorney or Agent for Mortgagee

---

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA )
) SS
COUNTY OF _Adams_ )

On this, the _26_ day of _October_, 20 _11_, before me _____ _Alan Kim Patrono_, the undersigned Notary Public, personally appeared **Melinda H. Davis, Manager** of **Hauser Family Farms LLC**, who acknowledged himself or herself to be the member or designated agent of **Hauser Family Farms LLC**, a Limited Liability Company, and that he or she as such member or designated agent, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the Limited Liability Company by himself or herself as a member or designated agent.

In witness whereof, I hereunto set my hand and official seal.

| COMMONWEALTH OF PENNSYLVANIA |
| --- |
| Notarial Seal |
| Alan Kim Patrono, Notary Public |
| Gettysburg Boro, Adams County |
| My Commission Expires Nov. 25, 2013 |
| Member Pennsylvania Association of Notaries |

_____

Notary Public in and for the State of _____

---

LASER PRO Lending, Ver. 5.57.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2011. All Rights Reserved. - PA C:\COMMERCIAL\CFI\LPL\G14.FC TR-2757 PR-6

Image ID: 000003046422 Type: GEN
Page 7 of 8
BK**5643**PG**676**

## EXHIBIT "A"

ALL that tract of land situate in **Franklin Township, Adams County, Pennsylvania,** bounded and described as follows:

BEGINNING at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¾-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58 minutes 20 seconds East 1,212.75 feet to a ¾-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¾-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of **BEGINNING. CONTAINING** 170.585 acres.

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

BEING the same tract of land which Helen B. Hauser, widow, doing business as Conewago Orchards, by her deed dated July 20, 2007, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 4944 at Page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania Limited Liability Company.

Image ID: 000003046423 Type: GEN
Page 8 of 8
BK5643 PG677

**Parcel Identification**
**Number: D9-23**

**RECORDATION**
**REQUESTED BY:**
Members 1st Federal
Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**WHEN RECORDED MAIL**
**TO:**
Members 1st Federal
Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**SEND TAX NOTICES TO:**
Members 1st Federal
Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055                          **FOR RECORDER'S USE ONLY**

# OPEN - END MORTGAGE AND SECURITY AGREEMENT

*(This instrument is an open-end mortgage and secures future advances pursuant to 42 Pa. C.S.*
*§§ 8143 and 8144, Act No. 126 of 1990)*

**MAXIMUM LIEN.** This Mortgage shall secure unpaid loan advances made after this Mortgage is recorded. The unpaid principal balance of advances exclusive of interest and other extensions of credit secured by the Mortgage made for the payment of taxes, assessments, maintenance charges, insurance premiums and costs incurred for the protection of the mortgaged premises shall not exceed at any one time $321,000.00.

**Amount Secured Hereby:**   $321,000.00

**THIS MORTGAGE** dated October 26, 2011, is made and executed between Hauser Family Farms LLC (referred to below as "Grantor") and Members 1st Federal Credit Union, whose address is ATTN: Business Lending, 5000 Louise Drive, Mechanicsburg, PA 17055 (referred to below as "Lender").

GRANT OF MORTGAGE. For valuable consideration, Grantor grants, bargains, sells, conveys, assigns, transfers, releases, confirms and mortgages to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all streets, lanes, alleys, passages, and ways; all easements, rights of way, all liberties, privileges, tenements, hereditaments, and appurtenances thereunto belonging or anywise made appurtenant hereafter, and the reversions and remainders with respect thereto; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, **(the "Real Property") located in Adams County, Commonwealth of Pennsylvania:**

> See Exhibit A, which is attached to this Mortgage and made a part of this Mortgage as if fully set forth herein.

The Real Property or its address is commonly known as 410 Cashtown Rd, Bigglerville, PA 17307. The Real Property parcel identification number is D9-23.

CROSS-COLLATERALIZATION. In addition to the Credit Agreement, this Mortgage secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Credit Agreement, whether voluntary or otherwise, whether due or

Image ID: 000003046424 Type: GEN
Recorded: 10/28/2011 at 01:33:41 PM
Fee Amt: $89.50 Page 1 of 13
Instr# 201100013461
Adams County, PA
Linda K Myers Register and Recorder
BK5643 PG678

# MORTGAGE
## (Continued)

not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**REVOLVING LINE OF CREDIT. This Mortgage secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Borrower unless Borrower fails to comply with all the terms of the Credit Agreement.**

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

**THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF EACH OF GRANTOR'S AGREEMENTS AND OBLIGATIONS UNDER THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (a) this Mortgage is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property; (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Borrower and Grantor shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether

Image ID: 000003046425 Type: GEN
Page 2 of 13
BK 5643 PG 679

# MORTGAGE
## (Continued)

Page 3

or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Pennsylvania law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and reasonable attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien. In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.** Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.** Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials and the cost exceeds $5,000.00. Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can

Image ID: 000003046426 Type: GEN
Page 3 of 13
BK 5643 PG 680

# MORTGAGE
## (Continued)

and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.** The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.** Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender. Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies. Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require. Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender. Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of thirty (30) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, for the maximum amount of Borrower's credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $5,000.00. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property. If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender. Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage. Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness. If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.** Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured, the then current replacement value of such property, and the manner of determining that value; and (5) the expiration date of the policy. Grantor shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default. Grantor's obligation to Lender for all such expenses shall survive the entry of any mortgage foreclosure judgment.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

**Title.** Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection

# MORGAGE
## (Continued)

with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

**Defense of Title.** Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all actual costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Credit Agreement; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient to Grantor and Lender and

Image ID: 000003046428 Type: GEN
Page 5 of 13
BK 5643 PG 682

# MORGAGE
## (Continued)

make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ADDITIONAL AUTHORIZATIONS.** The following provisions relating to further assurances and additional authorizations are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Credit Agreement, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Additional Authorizations.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably authorizes Lender to make, execute, deliver, file, record and do all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph. It is understood that nothing set forth herein shall require Lender to take any such actions.

**FULL PERFORMANCE.** If Borrower and Grantor pay all the Indebtedness when due, terminates the credit line account, and Grantor otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Mortgage or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall

Image ID: 000003046429 Type: GEN
Page 6 of 13
BK 5643 PG 683

# MORTGAGE
## (Continued)

not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Right to Cure.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Mortgage within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Lender shall have the right at its option, after giving such notices as required by applicable law, to declare the entire Indebtedness immediately due and payable.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably authorizes Lender to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Possession of the Property.** For the purpose of procuring possession of the Property, Grantor hereby authorizes and empowers any attorney of any court of record in the Commonwealth of Pennsylvania or elsewhere, as attorney for Lender and all persons claiming under or through Lender, to sign an agreement for entering in any competent court an amicable action in ejectment for possession of the Property and to appear for and confess judgment against Grantor, and against all persons claiming under or through Grantor, for the recovery by Lender of possession of the Property, without any stay of execution, for which this Mortgage, or a copy of this Mortgage verified by affidavit, shall be a sufficient warrant; and thereupon a writ of possession may be issued forthwith, without any prior writ or proceeding whatsoever.

**Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose Grantor's interest in all or in any part of the Personal Property or the Real Property by non-judicial sale.

**Deficiency Judgment.** Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to

Image ID: 000003046430 Type: GEN
Page 7 of 13
BK 5643 PG 684

# MORGAGE
## (Continued)

Lender after application of all amounts received from the exercise of the rights provided in this section.

**Tenancy at Sufferance.** If Grantor remains in possession of the Property after the Property is sold as provided above or Lender otherwise becomes entitled to possession of the Property upon default of Borrower or Grantor, Grantor shall become a tenant at sufferance of Lender or the purchaser of the Property and shall, at Lender's option, either (1) pay a reasonable rental for the use of the Property, or (2) vacate the Property immediately upon the demand of Lender.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Credit Agreement or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waive any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Unless otherwise required by applicable law, reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or Borrower and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Unless otherwise provided by applicable law, any notice required to be given under this Mortgage shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage and notices pursuant to 42 Pa. C.S.A. Section 8143, et. seq., shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**ADVANCE MONEY MORTGAGE.** (A) This Mortgage secures future advances made pursuant to the Credit Agreement or Related Documents. Without limiting the foregoing, this Mortgage secures all advances made by Lender or Banks of any kind or nature described in 42 Pa. C.S.A. § 8144. (B) If Grantor sends a written notice to Lender which purports to limit the indebtedness secured by this Mortgage and to release the obligation of Lender to make any additional advances to or for the benefit of Grantor, such a notice shall be ineffective as to any future advances made: (1) to enable completion of the improvements on the Real Property for which the loan secured hereby was originally made; (2) to pay taxes, assessments, maintenance charges and insurance premiums; (3) for costs incurred for the protection of the Property or the lien of this Mortgage; (4) on account of expenses incurred by Lender by reason of a default of Borrower or Grantor hereunder or under the Related Documents or under the Credit Agreement; and (5) on account of any other costs incurred by Lender to protect and preserve the Property or the lien of this Mortgage. It is the intention of the parties hereto that any such advance made by Lender after any such notice by Grantor shall be secured by the lien of this Mortgage on the Property.

Image ID: 000003046431 Type: GEN
Page 8 of 13
BK5643 PG685

# MORTGAGE
## (Continued)

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Arbitration.** Borrower and Grantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Mortgage or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Property shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Property, including any claim to rescind, reform, or otherwise modify any agreement relating to the Property, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Mortgage shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the Commonwealth of Pennsylvania.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Mortgage. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Mortgage.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or

Image ID: 000003046432 Type: GEN
Page 9 of 13
BK 5643 PG 686

# MORTGAGE
## (Continued)

estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successor Interests.** The terms of this Mortgage shall be binding upon Grantor, and upon Grantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury. All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Hauser Estate Inc and includes all co-signers and co-makers signing the Credit Agreement and all their successors and assigns.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated October 26, 2011, **with credit limit of $321,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The maturity date of the Credit Agreement is June 22, 2014. **NOTICE TO GRANTOR: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.**

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means Hauser Family Farms LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Credit Agreement.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage. The liens and security interests created pursuant to this Mortgage covering the Indebtedness which may be created in the future shall relate back to the date of this Mortgage. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Mortgage.

**Lender.** The word "Lender" means Members 1st Federal Credit Union, its successors and assigns.

Image ID: 000003046433 Type: GEN
Page 10 of 13
BK 5643 PG 687

# MORTGAGE
## (Continued)

**Page 11**

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

THIS MORTGAGE IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS MORTGAGE IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

GRANTOR:

**HAUSER FAMILY FARMS LLC**

By: _____ (Seal)
    **Melinda H. Davis, Manager of Hauser Family Farms LLC**

---

## CERTIFICATE OF RESIDENCE

I hereby certify, that the precise address of the mortgagee, **Members 1st Federal Credit Union,** herein is as follows:

**ATTN: Business Lending, 5000 Louise Drive, Mechanicsburg, PA 17055**

_____
Attorney or Agent for Mortgagee

Image ID: 000003046434 Type: GEN
Page 11 of 13
BK 5643 PG 688

## MORTGAGE
## (Continued)

---

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA ) 
 ) SS
COUNTY OF _Adams_ )

On this, the _26th_ day of _October_, 20_11_, before me _Alan Kim Patrono_, the undersigned Notary Public, personally appeared **Melinda H. Davis, Manager** of **Hauser Family Farms LLC**, who acknowledged himself or herself to be the member or designated agent of **Hauser Family Farms LLC**, a Limited Liability Company, and that he or she as such a member or designated agent, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the Limited Liability Company by himself or herself as a member or designated agent.

**In witness whereof, I hereunto set my hand and official seal.**

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Alan Kim Patrono, Notary Public
Gettysburg Boro, Adams County
My Commission Expires Nov. 25, 2013

Notary Public in and for the State of _____

---

LASER PRO Lending, Ver. 5.57.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2011. All Rights Reserved. - PA C:\COMMERCIAL\CFI\LPL\G03.FC TR-2758 PR-13

Image ID: 000003046435 Type: GEN
Page 12 of 13
BK**5643** PG**689**

## EXHIBIT "A"

**ALL** that tract of land situate in **Franklin Township, Adams County, Pennsylvania,** bounded and described as follows:

**BEGINNING** at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¾-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58 minutes 20 seconds East 1,212.75 feet to a ¾-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¾-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of **BEGINNING. CONTAINING** 170.585 acres.

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

**BEING** the same tract of land which Helen B. Hauser, widow, doing business as Conewago Orchards, by her deed dated July 20, 2007, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 4944 at Page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania Limited Liability Company.

Image ID: 000003046436 Type: GEN
Page 13 of 13
BK **5643** PG **690**

**Parcel Identification**
**Number:** D9-23

**RECORDATION**
**REQUESTED BY:**
Members 1st Federal
Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**WHEN RECORDED MAIL**
**TO:**
Members 1st Federal
Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**SEND TAX NOTICES TO:**
Members 1st Federal
Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

FOR RECORDER'S USE ONLY

## ASSIGNMENT OF RENTS

**THIS ASSIGNMENT OF RENTS dated October 26, 2011, is made and executed between Hauser Family Farms LLC (referred to below as "Grantor") and Members 1st Federal Credit Union, whose address is ATTN: Business Lending, 5000 Louise Drive, Mechanicsburg, PA 17055 (referred to below as "Lender").**

**ASSIGNMENT. For valuable consideration, Grantor hereby assigns, grants a continuing security interest in, and conveys to Lender all of Grantor's right, title, and interest in and to the Rents from the following described Property located in Adams County, Commonwealth of Pennsylvania:**

> **See Exhibit A, which is attached to this Assignment and made a part of this Assignment as if fully set forth herein.**

**The Property or its address is commonly known as 410 Cashtown Rd, Bigglerville, PA 17307. The Real Property parcel identification number is D9-23.**

**CROSS-COLLATERALIZATION.** In addition to the Credit Agreement, this Assignment secures all obligations, debts and liabilities, plus interest thereon, of either Grantor or Borrower to Lender, or any one or more of them, as well as all claims by Lender against Borrower and Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Credit Agreement, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Borrower or Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**REVOLVING LINE OF CREDIT. This Assignment secures the Indebtedness including, without limitation, a revolving line of credit, which obligates Lender to make advances to Borrower unless Borrower fails to comply with all the terms of the Credit Agreement.**

**THIS ASSIGNMENT IS GIVEN TO SECURE (1) PAYMENT OF THE INDEBTEDNESS AND (2) PERFORMANCE OF ANY AND ALL OBLIGATIONS OF BORROWER AND GRANTOR UNDER THE NOTE, THIS ASSIGNMENT, AND THE RELATED DOCUMENTS. THIS ASSIGNMENT IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:**

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for

Image ID: 000003046437 Type: GEN
Recorded: 10/28/2011 at 01:34:42 PM
Fee Amt: $28.50 Page 1 of 9
Instr# 201100013462
Adams County, PA
Linda K Myers Register and Recorder
BK **5643** PG **691**

# ASSIGNMENT OF RENTS
## (Continued)

deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**BORROWER'S WAIVERS AND RESPONSIBILITIES.** Lender need not tell Borrower about any action or inaction Lender takes in connection with this Assignment. Borrower assumes the responsibility for being and keeping informed about the Property. Borrower waives any defenses that may arise because of any action or inaction of Lender, including without limitation any failure of Lender to realize upon the Property, or any delay by Lender in realizing upon the Property. Borrower agrees to remain liable under the Credit Agreement with Lender no matter what action Lender takes or fails to take under this Assignment.

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Assignment or any Related Documents, Grantor shall pay to Lender all amounts secured by this Assignment as they become due, and shall strictly perform all of Grantor's obligations under this Assignment. Unless and until Lender exercises its right to collect the Rents as provided below and so long as there is no default under this Assignment, Grantor may remain in possession and control of and operate and manage the Property and collect the Rents, provided that the granting of the right to collect the Rents shall not constitute Lender's consent to the use of cash collateral in a bankruptcy proceeding.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that:

**Ownership.** Grantor is entitled to receive the Rents free and clear of all rights, loans, liens, encumbrances, and claims except as disclosed to and accepted by Lender in writing.

**Right to Assign.** Grantor has the full right, power and authority to enter into this Assignment and to assign and convey the Rents to Lender.

**No Prior Assignment.** Grantor has not previously assigned or conveyed the Rents to any other person by any instrument now in force.

**No Further Transfer.** Grantor will not sell, assign, encumber, or otherwise dispose of any of Grantor's rights in the Rents except as provided in this Assignment.

**LENDER'S RIGHT TO RECEIVE AND COLLECT RENTS.** Lender shall have the right at any time, and even though no default shall have occurred under this Assignment, to collect and receive the Rents. For this purpose, Lender is hereby given and granted the following rights, powers and authority:

**Notice to Tenants.** Lender may send notices to any and all tenants of the Property advising them of this Assignment and directing all Rents to be paid directly to Lender or Lender's agent.

**Enter the Property.** Lender may enter upon and take possession of the Property; demand, collect and receive from the tenants or from any other persons liable therefor, all of the Rents; institute and carry on all legal proceedings necessary for the protection of the Property, including such proceedings as may be necessary to recover possession of the Property; collect the Rents and remove any tenant or tenants or other persons from the Property.

**Maintain the Property.** Lender may enter upon the Property to maintain the Property and keep the same in repair; to pay the costs thereof and of all services of all employees, including their equipment, and of all continuing costs and expenses of maintaining the Property in proper repair and condition, and also to pay all taxes, assessments and water utilities, and the premiums on fire and other insurance effected by Lender on the Property.

**Compliance with Laws.** Lender may do any and all things to execute and comply with the laws of the Commonwealth of Pennsylvania and also all other laws, rules, orders, ordinances and requirements of all other governmental agencies affecting the Property.

**Lease the Property.** Lender may rent or lease the whole or any part of the Property for such term or terms and on such conditions as Lender may deem appropriate.

**Employ Agents.** Lender may engage such agent or agents as Lender may deem appropriate, either in Lender's name or in Grantor's name, to rent and manage the Property, including the collection and application of Rents.

**Other Acts.** Lender may do all such other things and acts with respect to the Property as Lender may deem appropriate and may act exclusively and solely in the place and stead of Grantor and to have all of the powers of Grantor for the purposes stated above.

**No Requirement to Act.** Lender shall not be required to do any of the foregoing acts or things, and the fact that Lender shall have performed one or more of the foregoing acts or things shall not require Lender to do any other specific act or thing.

**APPLICATION OF RENTS.** All costs and expenses incurred by Lender in connection with the Property shall be for Grantor's account and Lender may pay such costs and expenses from the Rents. Lender, in its sole discretion, shall determine the application of any and all Rents received by it; however, any such Rents received by Lender which are not applied to such costs and expenses shall be applied to the Indebtedness. All expenditures made by Lender under this Assignment and not reimbursed from the Rents shall become a part of the Indebtedness secured by this

Image ID: 000003046438 Type: GEN
Page 2 of 9
BK 5643 PG 692

# ASSIGNMENT OF RENTS
## (Continued)

Assignment, and shall be payable on demand, with interest at the Credit Agreement rate from date of expenditure until paid.

**FULL PERFORMANCE.** If Grantor pays all of the Indebtedness when due and otherwise performs all the obligations imposed upon Grantor under this Assignment, the Credit Agreement, and the Related Documents, Lender shall execute and deliver to Grantor a suitable satisfaction of this Assignment and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Property. Any termination fee required by law shall be paid by Grantor, if permitted by applicable law.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Assignment or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Assignment or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Rents or the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Credit Agreement; or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. The Assignment also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Assignment:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Assignment or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

**Default on Other Payments.** Failure of Grantor within the time required by this Assignment to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Default in Favor of Third Parties.** Borrower, any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's, any guarantor's or Grantor's property or ability to perform their respective obligations under this Assignment or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Assignment or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Assignment or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Death or Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against the Rents or any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Property Damage or Loss.** The Property is lost, stolen, substantially damaged, sold, or borrowed against.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

Image ID: 000003046439 Type: GEN
Page 3 of 9
BK 5643 PG 693

# ASSIGNMENT OF RENTS
## (Continued)

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Cure Provisions.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Assignment within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of any Event of Default and at any time thereafter, Lender may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

**Accelerate Indebtedness.** Subject to applicable law, Lender shall have the right at its option without notice to Borrower or Grantor to declare the entire Indebtedness immediately due and payable.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender shall have all the rights provided for in the Lender's Right to Receive and Collect Rents Section, above. If the Rents are collected by Lender, then Grantor irrevocably authorizes Lender to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Assignment or the Note or by law.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Assignment, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Assignment, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Credit Agreement rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's reasonable attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including reasonable attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees, title insurance, and fees for the Trustee, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Assignment:

**Amendments.** This Assignment, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Assignment. No alteration of or amendment to this Assignment shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Arbitration.** Borrower and Grantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Assignment or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Property shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes,

Image ID: 000003046440 Type: GEN
Page 4 of 9
BK 5643 PG 694

# ASSIGNMENT OF RENTS
## (Continued)

without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Property, including any claim to rescind, reform, or otherwise modify any agreement relating to the Property, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having jurisdiction. Nothing in this Assignment shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

**Caption Headings.** Caption headings in this Assignment are for convenience purposes only and are not to be used to interpret or define the provisions of this Assignment.

**Governing Law.** This Assignment will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the Commonwealth of Pennsylvania without regard to its conflicts of law provisions. This Assignment has been accepted by Lender in the Commonwealth of Pennsylvania.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cumberland County, Commonwealth of Pennsylvania.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Assignment shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Grantor signing below is responsible for all obligations in this Assignment. Where any one or more of the parties is a corporation, partnership, limited liability company or similar entity, it is not necessary for Lender to inquire into the powers of any of the officers, directors, partners, members, or other agents acting or purporting to act on the entity's behalf, and any obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Assignment.

**Merger.** There shall be no merger of the interest or estate created by this assignment with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Interpretation.** (1) In all cases where there is more than one Borrower or Grantor, then all words used in this Assignment in the singular shall be deemed to have been used in the plural where the context and construction so require. (2) If more than one person signs this Assignment as "Grantor," the obligations of each Grantor are joint and several. This means that if Lender brings a lawsuit, Lender may sue any one or more of the Grantors. If Borrower and Grantor are not the same person, Lender need not sue Borrower first, and that Borrower need not be joined in any lawsuit. (3) The names given to paragraphs or sections in this Assignment are for convenience purposes only. They are not to be used to interpret or define the provisions of this Assignment.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Assignment unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Assignment shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Assignment. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Assignment, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Unless otherwise provided by applicable law, any notice required to be given under this Assignment shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Assignment. Any party may change its address for notices under this Assignment by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided by applicable law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Exercise of Authorization and Powers.** The various authorizations and powers of attorney conveyed on Lender under this Assignment are granted for purposes of security and may not be revoked by Grantor until such time as the same are renounced by Lender. It is understood and agreed that any exercise of this authorization by Lender

Image ID: 000003046441 Type: GEN
Page 5 of 9
BK 5643 PG 695

# ASSIGNMENT OF RENTS
## (Continued)

shall be on behalf of Lender and not on behalf of Grantor. Lender is not an agent or fiduciary of Grantor. However, in exercising the authorization granted hereby, Lender shall exercise reasonable caution and prudence and Lender shall keep full and accurate record of all actions, receipts and disbursements.

**Severability.** If a court of competent jurisdiction finds any provision of this Assignment to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Assignment. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Assignment shall not affect the legality, validity or enforceability of any other provision of this Assignment.

**Successor Interests.** The terms of this Assignment shall be binding upon Grantor, and upon Grantor's heirs, personal representatives, successors, and assigns, and shall be enforceable by Lender and its successors and assigns.

**Time is of the Essence.** Time is of the essence in the performance of this Assignment.

**Waive Jury.** All parties to this Assignment hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Waiver of Right of Redemption.** NOTWITHSTANDING ANY OF THE PROVISIONS TO THE CONTRARY CONTAINED IN THIS ASSIGNMENT, GRANTOR HEREBY WAIVES ANY AND ALL RIGHTS OF REDEMPTION FROM SALE UNDER ANY ORDER OR JUDGMENT OF FORECLOSURE ON GRANTOR'S BEHALF AND ON BEHALF OF EACH AND EVERY PERSON, EXCEPT JUDGMENT CREDITORS OF GRANTOR, ACQUIRING ANY INTEREST IN OR TITLE TO THE PROPERTY SUBSEQUENT TO THE DATE OF THIS ASSIGNMENT.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Assignment. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Assignment shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Assignment.** The word "Assignment" means this ASSIGNMENT OF RENTS, as this ASSIGNMENT OF RENTS may be amended or modified from time to time, together with all exhibits and schedules attached to this ASSIGNMENT OF RENTS from time to time.

**Borrower.** The word "Borrower" means Hauser Estate Inc.

**Credit Agreement.** The words "Credit Agreement" mean the credit agreement dated October 26, 2011, **with credit limit of $321,000.00** from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement.

**Default.** The word "Default" means the Default set forth in this Assignment in the section titled "Default".

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Assignment in the default section of this Assignment.

**Grantor.** The word "Grantor" means Hauser Family Farms LLC.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Credit Agreement.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Credit Agreement or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Credit Agreement or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Assignment, together with interest on such amounts as provided in this Assignment. The liens and security interests created pursuant to this Assignment covering the Indebtedness which may be created in the future shall relate back to the date of this Assignment. Specifically, without limitation, Indebtedness includes all amounts that may be indirectly secured by the Cross-Collateralization provision of this Assignment.

**Lender.** The word "Lender" means Members 1st Federal Credit Union, its successors and assigns.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Assignment" section of this Assignment.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan

Image ID: 000003046442 Type: GEN
Page 6 of 9
BK 5643 PG 696

# ASSIGNMENT OF RENTS
## (Continued)

agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all of Grantor's present and future rights, title and interest in, to and under any and all present and future leases, including, without limitation, all rents, revenue, income, issues, royalties, bonuses, accounts receivable, cash or security deposits, advance rentals, profits and proceeds from the Property, and other payments and benefits derived or to be derived from such leases of every kind and nature, whether due now or later, including without limitation Grantor's right to enforce such leases and to receive and collect payment and proceeds thereunder.

THE UNDERSIGNED ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS ASSIGNMENT, AND NOT PERSONALLY BUT AS AN AUTHORIZED SIGNER, HAS CAUSED THIS ASSIGNMENT TO BE SIGNED AND EXECUTED ON BEHALF OF GRANTOR ON OCTOBER 26, 2011.

THIS ASSIGNMENT IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS ASSIGNMENT IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

**GRANTOR:**

**HAUSER FAMILY FARMS LLC**

By: _____(Seal)
     Melinda H. Davis, Manager of Hauser Family Farms LLC

---

## CERTIFICATE OF RESIDENCE

I hereby certify, that the precise address of the mortgagee, **Members 1st Federal Credit Union**, herein is as follows:

**ATTN: Business Lending, 5000 Louise Drive, Mechanicsburg, PA  17055**

_____
Attorney   or   Agent   for Mortgagee

Image ID: 000003046443  Type: GEN
Page 7 of 9

BK**5643** PG**697**

## ASSIGNMENT OF RENTS
### (Continued)

Page 8

---

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA )

) SS

COUNTY OF _Adams_ )

On this, the _26"_ day of _October_, 20 _11_, before me _Alan K. Patrono_, the undersigned Notary Public, personally appeared **Melinda H. Davis, Manager of Hauser Family Farms LLC,** who acknowledged himself or herself to be the member or designated agent of **Hauser Family Farms LLC,** a Limited Liability Company, and that he or she as such a member or designated agent, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the Limited Liability Company by himself or herself as a member or designated agent.

In witness whereof, I hereunto set my hand and official seal.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Alan Kim Patrono, Notary Public
Gettysburg Boro, Adams County
My Commission Expires Nov. 25, 2013
· · · · Association of Notaries

_Alan Kim Patrono_

Notary Public in and for the State of _____

---

LASER PRO Lending, Ver. 5.57.00.004 Copr. Harland Financial Solutions, Inc. 1997, 2011. All Rights Reserved. - PA C:\COMMERCIAL\CFI\LPL\G14.FC TR-2758 PR-13

Image ID: 000003046444 Type: GEN
Page 8 of 9
BK5643 PG698

## EXHIBIT "A"

**ALL** that tract of land situate in **Franklin Township, Adams County, Pennsylvania**, bounded and described as follows:

**BEGINNING** at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¾-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58 minutes 20 seconds East 1,212.75 feet to a ¾-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¾-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of **BEGINNING. CONTAINING** 170.585 acres.

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

**BEING** the same tract of land which Helen B. Hauser, widow, doing business as Conewago Orchards, by her deed dated July 20, 2007, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 4944 at Page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania Limited Liability Company.

Image ID: 000003046445 Type: GEN
Page 9 of 9
BK**5643**PG**699**

**Parcel Identification Number:**
12D09-0023—000

**RECORDATION REQUESTED BY:**
Members 1st Federal
Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**WHEN RECORDED MAIL TO:**
Members 1st Federal
Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

**SEND TAX NOTICES TO:**
Members 1st Federal
Credit Union
ATTN: Business Lending
5000 Louise Drive
Mechanicsburg, PA 17055

FOR RECORDER'S USE ONLY

# MODIFICATION OF MORTGAGE

**THIS MODIFICATION OF MORTGAGE dated April 10, 2014, is made and executed between Hauser Family Farms LLC (referred to below as "Grantor") and Members 1st Federal Credit Union, whose address is ATTN: Business Lending, 5000 Louise Drive, Mechanicsburg, PA 17055 (referred to below as "Lender").**

**MORTGAGE.** Lender and Grantor have entered into a Mortgage dated October 26, 2011 (the "Mortgage") which has been recorded in Adams County, Commonwealth of Pennsylvania, as follows:

**Open End Mortgage recorded in the Adams County Courthouse with Instrument # 201100013461 in Book 5643 on Page 678.**

**REAL PROPERTY DESCRIPTION.** The Mortgage covers the following described real property located in Adams County, Commonwealth of Pennsylvania:

See Exhibit A, which is attached to this Modification and made a part of this Modification as if fully set forth herein.

The Real Property or its address is commonly known as 410 Cashtown Rd, Biglerville, PA 17307. The Real Property parcel identification number is **12D09-0023—000.**

**MODIFICATION.** Lender and Grantor hereby modify the Mortgage as follows:

**Amount of Mortgage is being increased from $321,000.00 to $500,000.00.**

**CONTINUING VALIDITY.** Except as expressly modified above, the terms of the original Mortgage shall remain unchanged and in full force and effect and are legally valid, binding, and enforceable in accordance with their respective terms. Consent by Lender to this Modification does not waive Lender's right to require strict performance of the Mortgage as changed above nor obligate Lender to make any future modifications. Nothing in this Modification shall constitute a satisfaction or novation of the promissory note or other credit agreement secured by the Mortgage (the "Note"). It is the intention of Lender to retain as liable all parties to the Mortgage and all parties, makers and endorsers to the Note, including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, shall not be released by virtue of this Modification. If any person who signed the original Mortgage does not sign this Modification, then all persons signing below acknowledge that this Modification is given conditionally, based on the representation to Lender that the non-signing person consents to the changes and provisions of this Modification or otherwise will not be released by it. This waiver applies not only to any initial extension or modification, but also to all such subsequent actions.

Image ID: 000003447641 Type: GEN
Recorded: 04/11/2014 at 12:47:14 PM
Fee Amt: $20.50 Page 1 of 4
Instr# 201400003626
Adams County, PA
Linda K Myers Register and Recorder

BK**5928** PG**441**

# MODIFICATION OF MORTGAGE
## (Continued)

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MODIFICATION OF MORTGAGE AND GRANTOR AGREES TO ITS TERMS. THIS MODIFICATION OF MORTGAGE IS DATED APRIL 10, 2014.

THIS MODIFICATION IS GIVEN UNDER SEAL AND IT IS INTENDED THAT THIS MODIFICATION IS AND SHALL CONSTITUTE AND HAVE THE EFFECT OF A SEALED INSTRUMENT ACCORDING TO LAW.

**GRANTOR:**

**HAUSER FAMILY FARMS LLC**

By: _____(Seal)
Jane H. Patrono, Member of Hauser Family Farms LLC

By: _____(Seal)
Melinda H. Davis, Manager of Hauser Family Farms LLC

By: _____(Seal)
Hannah M. Hauser, Member of Hauser Family Farms LLC

**LENDER:**

**MEMBERS 1ST FEDERAL CREDIT UNION**

X_____(Seal)
Authorized Signer

---

## CERTIFICATE OF RESIDENCE

I hereby certify, that the precise address of the mortgagee, **Members 1st Federal Credit Union,** herein is as follows:

**ATTN: Business Lending, 5000 Louise Drive, Mechanicsburg, PA 17055**

_____
Attorney or Agent for Mortgagee

Image ID: 000003447642 Type: GEN
Page 2 of 4
BK 5928 PG 442

# MODIFICATION OF MORTGAGE
## (Continued)

Page 3

## LIMITED LIABILITY COMPANY ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA )
) SS
COUNTY OF _Adams_ )

On this, the _10ᵗʰ_ day of _April_, 20 _14_, before me _Alan Kim Patrono_, the undersigned Notary Public, personally appeared Jane H. Patrono, Member of Hauser Family Farms LLC; Melinda H. Davis, Manager of Hauser Family Farms LLC; and Hannah M. Hauser, Member of Hauser Family Farms LLC, who acknowledged themselves to be the members or designated agents of Hauser Family Farms LLC, a Limited Liability Company, and that they as such members or designated agents, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of the Limited Liability Company by themselves as members or designated agents.

In witness whereof, I hereunto set my hand and official seal.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Alan Kim Patrono, Notary Public
Gettysburg Boro, Adams County
My Commission Expires Nov. 25, 2017
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Notary Public in and for the State of _____

## LENDER ACKNOWLEDGMENT

COMMONWEALTH OF PENNSYLVANIA )
) SS
COUNTY OF _Adams_ )

On this, the _10ᵗʰ_ day of _April_, 20 _14_, before me _Alan Kim Patrono_, the undersigned Notary Public, personally appeared _Kristi A. Roykos_ who acknowledged himself or herself to be the _Business Loan Officer_ of Members 1st Federal Credit Union, and that he or she as such _Business Loan Officer_, being authorized to do so, executed the foregoing instrument for the purposes therein contained by signing the name of Members 1st Federal Credit Union by himself or herself as _Business Loan Officer_.

In witness whereof, I hereunto set my hand and official seal.

COMMONWEALTH OF PENNSYLVANIA
Notarial Seal
Alan Kim Patrono, Notary Public
Gettysburg Boro, Adams County
My Commission Expires Nov. 25, 2017
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Notary Public in and for the State of _____

LASER PRO Lending, Ver. 14.1.0.009 Copr. Harland Financial Solutions, Inc. 1997, 2014. All Rights Reserved. - PA
Z:\CFI\LPL\G201.FC TR-2758 PR-13

Image ID: 000003447643 Type: GEN
Page 3 of 4
BK 5928 PG 443

## EXHIBIT "A"

ALL that tract of land situate in **Franklin Township, Adams County, Pennsylvania,** bounded and described as follows:

BEGINNING at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¼-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58 minutes 20 seconds East 1,212.75 feet to a ¼-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¼-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of **BEGINNING.**

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

BEING the same tract of land which Helen B. Hauser, widow, doing business as Conewago Orchards, by her deed dated July 20, 2007, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 4944 at Page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania Limited Liability Company.

Image ID: 000003447644 Type: GEN
Page 4 of 4
BK 5928 PG 444

## ASSIGNMENT OF MORTGAGE (02 LOAN MORTGAGE)

KNOW ALL MEN BY THESE PRESENTS, that MEMBERS 1ST FEDERAL CREDIT

UNION, a federal credit union ("Assignor"), for and in consideration of the sum of Ten Dollars

($10.00), lawful money, and other good and valuable consideration paid unto it by H & M

HOLDINGS GROUP, LLC, a limited liability company formed under the laws of the

Commonwealth of Pennsylvania ("Assignee") at or before the time of the execution hereof, and

for other good and valuable consideration, the receipt and sufficiency of which is hereby

acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto the said

Assignee, its successors and assigns, all of Assignor's right, title and interest in that certain Open

– End Mortgage and Security Agreement (the "Mortgage"), made, executed and delivered by

HAUSER FAMILY FARMS LLC (a limited liability company formed under the laws of the

Commonwealth of Pennsylvania; the "Mortgagor") to and in favor of the Assignor, dated

October 26, 2011, in the original principal amount of Three Hundred Twenty-One Thousand

Dollars and No Cents ($321,000.00), said Mortgage having been being recorded with the

Recorder of Deeds of Adams County, Pennsylvania, on October 28, 2011, as instrument number
(BK 5643 PG 676)
201100013461, together with the Note of even date and in like amount secured thereby, all

monies, principal and interest, due and to grow due thereon, and all rights, remedies and

incidents thereunto belonging.

The Mortgage encumbers the Mortgagor's interest in a certain parcel of real property,

with improvements, located in Biglerville, Pennsylvania, and commonly known as 410

Cashtown Road, Biglerville, PA 17307, as more fully described therein, and on Exhibit "A" to

the Mortgage.

[CONTINUED ON NEXT PAGE]

Image ID: 000003870011 Type: GEN
Recorded: 07/27/2018 at 04:05:58 PM
Fee Amt: $60.75 Page 1 of 4
Instr# 201800008263
Adams County, PA
Karen Heflin Register and Recorder
BK 6402 PG 776

[CONTINUED FROM PREVIOUS PAGE]

THIS ASSIGNMENT is "AS-IS", without warranty or representation of any type, and absolutely WITHOUT RECOURSE to the Assignor, except as set forth in that certain Assignment Agreement of even date herewith by and between Assignor and Assignee.

TO HAVE, HOLD, RECEIVE and TAKE, all and singular, the hereditaments and premises hereby granted and assigned, or mentioned and intended so to be, with the appurtenances unto Assignees, their heirs and assigns, to and for their only proper use, benefit and behoof, forever.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Assignor has executed this assignment on July _18TH_, 2018.

MEMBERS 1ST FEDERAL CREDIT UNION

By: _____

Name: _ERIC N. FISCHER_

Title: _VP, BUSINESS LENDING SALES_

I hereby certify that the correct address
of the within assignee is :

_210 Ridgewood Dr._
_Gettysburg PA 17325_

_Melinda Hansen Davis_
for Assignee

[CONTINUED ON NEXT PAGE]

Image ID: 000003870012 Type: GEN
Page 2 of 4
BK 6402 PG 777

[CONTINUED FROM PREVIOUS PAGE]

COMMONWEALTH OF PENNSYLVANIA )
) ss.
COUNTY OF _Adams_ )

This record was acknowledged before me on the _18th_ day of _July_, 2018, by _Eric N. Fischer_ as Vice President of Members 1st Federal Credit Union, represents that he/she is authorized to act on behalf of Members 1st Federal Credit Union, and stated to my satisfaction that he/she:

(a)    Signed this Assignment as his/her own act;

(b)    Did so in his/her capacity as Vice President of the Assignor; and

(c)    Intended that this Assignment thereafter be recorded.

_____
Notary Public

My commission expires: _Nov. 20, 2019_

[Notary Seal]

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Ashley N. Seitler, Notary Public
Hanover Boro, York County
My Commission Expires Nov. 20, 2019
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Image ID: 000003870013  Type: GEN
Page 3 of 4
BK 6402 PG 778

## EXHIBIT "A"

ALL that tract of land situate in **Franklin Township, Adams County, Pennsylvania**, bounded and described as follows:

BEGINNING at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¾-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58 minutes 20 seconds East 1,212.75 feet to a ¾-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¾-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of BEGINNING. CONTAINING 170.585 acres.

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

BEING the same tract of land which Helen B. Hauser, widow, doing business as Conewago Orchards, by her deed dated July 20, 2007, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 4944 at Page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania Limited Liability Company.

Image ID: 000003870014 Type: GEN
Page 4 of 4
BK **6402** PG **779**

## ASSIGNMENT OF MORTGAGE (03 LOAN MORTGAGE)

KNOW ALL MEN BY THESE PRESENTS, that MEMBERS 1ST FEDERAL CREDIT

UNION, a federal credit union ("Assignor"), for and in consideration of the sum of Ten Dollars

($10.00), lawful money, and other good and valuable consideration paid unto it by H & M

HOLDINGS GROUP, LLC, a limited liability company formed under the laws of the

Commonwealth of Pennsylvania ("Assignee") at or before the time of the execution hereof, and

for other good and valuable consideration, the receipt and sufficiency of which is hereby

acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto the said

Assignee, its successors and assigns, all of Assignor's right, title and interest in that certain

Mortgage (the "Mortgage"), made, executed and delivered by HAUSER FAMILY FARMS LLC

(a limited liability company formed under the laws of the Commonwealth of Pennsylvania; the

"Mortgagor") to and in favor of the Assignor, dated October 26, 2011, in the original principal

amount of One Million Four Hundred Seventy-Five Thousand Dollars and No Cents

($1,475,000.00), said Mortgage having been being recorded with the Recorder of Deeds of

(BK 5643 PG 658)

Adams County, Pennsylvania, on October 28, 2011, as instrument number 201100013459,

together with the Note of even date and in like amount secured thereby, all monies, principal and

interest, due and to grow due thereon, and all rights, remedies and incidents thereunto belonging.

The Mortgage encumbers the Mortgagor's interest in a certain parcel of real property,

with improvements, located in Biglerville, Pennsylvania, and commonly known as 410

Cashtown Road, Biglerville, PA 17307, as more fully described therein, and on Exhibit "A" to

the Mortgage.

[CONTINUED ON NEXT PAGE]

Image ID: 000003870015 Type: GEN
Recorded: 07/27/2018 at 04:06:58 PM
Fee Amt: $60.75 Page 1 of 4
Instr# 201800008264
Adams County, PA
Karen Heflin Register and Recorder

BK 6402 PG 780

[CONTINUED FROM PREVIOUS PAGE]

THIS ASSIGNMENT is "AS-IS", without warranty or representation of any type, and absolutely WITHOUT RECOURSE to the Assignor, except as set forth in that certain Assignment Agreement of even date herewith by and between Assignor and Assignee.

TO HAVE, HOLD, RECEIVE and TAKE, all and singular, the hereditaments and premises hereby granted and assigned, or mentioned and intended so to be, with the appurtenances unto Assignees, their heirs and assigns, to and for their only proper use, benefit and behoof, forever.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Assignor has executed this assignment on July _i8th_, 2018.

MEMBERS 1ST FEDERAL CREDIT UNION

By: _____

Name: _ERIC N. FISCHER_

Title: _VP, BUSINESS LENDING SALES_

I hereby certify that the correct address
of the within assignee is :

_316 Ridgewood Dr._
_Gettysburg PA 17325_
_____

_Melindehouser Davis_
for Assignee

[CONTINUED ON NEXT PAGE]

Image ID: 000003870016 Type: GEN
Page 2 of 4
BK 6402 PG 781

[CONTINUED FROM PREVIOUS PAGE]

COMMONWEALTH OF PENNSYLVANIA      )
                                       )   ss.

COUNTY OF __Adams__      )

This record was acknowledged before me on the __18th__ day of __July__, 2018,

by __Eric N. Fischer__ as Vice President of Members 1st Federal Credit Union,

represents that he/she is authorized to act on behalf of Members 1st Federal Credit Union, and

stated to my satisfaction that he/she:

    (a)     Signed this Assignment as his/her own act;

    (b)     Did so in his/her capacity as Vice President of the Assignor; and

    (c)     Intended that this Assignment thereafter be recorded.

_____
Notary Public

My commission expires: Nov. 20, 2019

[Notary Seal]

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Ashley N. Seitler, Notary Public
Hanover Boro, York County
My Commission Expires Nov. 20, 2019
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Image ID: 000003870017 Type: GEN
Page 3 of 4
BK 6402 PG 782

Case 1:25-bk-02214-HWV   Doc 57   Filed 10/03/25   Entered 10/03/25 16:28:25   Desc
Main Document     Page 109 of 210     Book: 6402 Page: 780 Seq: 3

## EXHIBIT "A"

ALL that tract of land situate in **Franklin Township, Adams County, Pennsylvania**, bounded and described as follows:

**BEGINNING** at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¼-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58 minutes 20 seconds East 1,212.75 feet to a ¼-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¼-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of **BEGINNING**. **CONTAINING** 170.585 acres.

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

**BEING** the same tract of land which Helen B. Hauser, widow, doing business as Conewago Orchards, by her deed dated July 20, 2007, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 4944 at Page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania Limited Liability Company.

Franklin Township
Parcel No: 12D09-0023---000

## ASSIGNMENT OF MODIFICATION OF MORTGAGE

KNOW ALL MEN BY THESE PRESENTS, that MEMBERS 1ST FEDERAL CREDIT

UNION, a federal credit union ("Assignor"), for and in consideration of the sum of Ten Dollars

($10.00), lawful money, and other good and valuable consideration paid unto it by H & M

HOLDINGS GROUP, LLC, a limited liability company formed under the laws of the

Commonwealth of Pennsylvania ("Assignee") at or before the time of the execution hereof, and

for other good and valuable consideration, the receipt and sufficiency of which is hereby

acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto the said

Assignee, its successors and assigns, all of Assignor's right, title and interest in that certain

Modification of Mortgage (the "Modification of Mortgage"), made, executed and delivered by

HAUSER FAMILY FARMS LLC (a limited liability company formed under the laws of the

Commonwealth of Pennsylvania; the "Mortgagor") to and in favor of the Assignor, dated April

10, 2014, said Modification of Mortgage having been being recorded with the Recorder of Deeds
(BK 5928 PG 441)
of Adams County, Pennsylvania, on October 28, 2011, as instrument number 201400003626,

and all rights, remedies and incidents thereunto belonging.

The Modification of Mortgage modifies a previously filed Open End Mortgage, recorded
(BK 5643 PG 679)
as Instrument No. 201100013461 with the Recorder of Deeds of Adams County, Pennsylvania,

granted by Hauser Family Farms LLC to the Assignor, its successors and assigns which

encumbers the Mortgagor's interest in a certain parcel of real property, with improvements,

located in Biglerville, Pennsylvania, and commonly known as 410 Cashtown Road, Biglerville,

PA 17307, as more fully described therein, and on Exhibit "A" to the Modification of Mortgage.

[CONTINUED ON NEXT PAGE]

Image ID: 000003870019 Type: GEN
Recorded: 07/27/2018 at 04:07:50 PM
Fee Amt: $20.50 Page 1 of 4
Instr# 201800008265
Adams County, PA
Karen Heflin Register and Recorder
BK 6402 PG 784

[CONTINUED FROM PREVIOUS PAGE]

THIS ASSIGNMENT is "AS-IS", without warranty or representation of any type, and absolutely WITHOUT RECOURSE to the Assignor, except as set forth in that certain Assignment Agreement of even date herewith by and between Assignor and Assignee.

TO HAVE, HOLD, RECEIVE and TAKE, all and singular, the hereditaments and premises hereby granted and assigned, or mentioned and intended so to be, with the appurtenances unto Assignees, their heirs and assigns, to and for their only proper use, benefit and behoof, forever.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Assignor has executed this assignment on July _18TH_, 2018.

MEMBERS 1ST FEDERAL CREDIT UNION

By: _____

Name: _ERIC N. FISCHER_

Title: _VP, BUSINESS LENDING SALES_

I hereby certify that the correct address
of the within assignee is :

_210 Ridgewood Dr_
_Gettysburg PA 17325_

_Melinda Houser Davis_
for Assignee

[CONTINUED ON NEXT PAGE]

Image ID: 000003870020 Type: GEN
Page 2 of 4
BK 6402 PG 785

[CONTINUED FROM PREVIOUS PAGE]

COMMONWEALTH OF PENNSYLVANIA    )
                 )   ss.
COUNTY OF ___Adams___     )

This record was acknowledged before me on the _18th_ day of ___July___, 2018, by ___Eric N Fischer___ as Vice President of Members 1st Federal Credit Union, represents that he/she is authorized to act on behalf of Members 1st Federal Credit Union, and stated to my satisfaction that he/she:

 (a) Signed this Assignment as his/her own act;

 (b) Did so in his/her capacity as Vice President of the Assignor; and

 (c) Intended that this Assignment thereafter be recorded.

_____
Notary Public

My commission expires: _NOV. 20 2019_

[Notary Seal]

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Ashley N. Seitler, Notary Public
Hanover Boro, York County
My Commission Expires Nov. 20, 2019
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Image ID: 000003870021 Type: GEN
Page 3 of 4
BK 6402 PG 786

## EXHIBIT "A"

ALL that tract of land situate in **Franklin Township, Adams County, Pennsylvania**, bounded and described as follows:

BEGINNING at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¼-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58 minutes 20 seconds East 1,212.75 feet to a ¼-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¼-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of BEGINNING. CONTAINING 170.585 acres.

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

BEING the same tract of land which Helen B. Hauser, widow, doing business as Conewago Orchards, by her deed dated July 20, 2007, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 4944 at Page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania Limited Liability Company.

Franklin Township
Parcel No: 12D09-0023---000

## ASSIGNMENT OF ASSIGNMENT OF RENTS (02 ASSIGNMENT OF RENTS)

KNOW ALL MEN BY THESE PRESENTS, that MEMBERS 1ST FEDERAL CREDIT UNION, a federal credit union ("Assignor"), for and in consideration of the sum of Ten Dollars ($10.00), lawful money, and other good and valuable consideration paid unto it by H & M HOLDINGS GROUP, LLC, a limited liability company formed under the laws of the Commonwealth of Pennsylvania ("Assignee") at or before the time of the execution hereof, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto the said Assignee, its successors and assigns, all of Assignor's right, title and interest in that certain Assignment of Rents (the "Assignment of Rents"), made, executed and delivered by HAUSER FAMILY FARMS LLC (a limited liability company formed under the laws of the Commonwealth of Pennsylvania; the "Mortgagor") to and in favor of the Assignor, dated October 26, 2011, said Assignment of Rents having been being recorded with the Recorder of Deeds of Adams County, Pennsylvania, on October 28, 2011, as instrument number (BK 5643 PG 691) 201100013462, and all rights, remedies and incidents thereunto belonging.

The Assignment of Rents assigns to the Assignor, its successors and assigns that Mortgagor's interest in the rents of Mortgage encumbers the Mortgagor's interest in a certain parcel of real property, with improvements, located in Biglerville, Pennsylvania, and commonly known as 410 Cashtown Road, Biglerville, PA 17307, as more fully described therein, and on Exhibit "A" to the Assignment of Rents.

[CONTINUED ON NEXT PAGE]

Image ID: 000003870023 Type: GEN
Recorded: 07/27/2018 at 04:08:18 PM
Fee Amt: $20.50 Page 1 of 4
Instr# 201800008266
Adams County, PA
Karen Heflin Register and Recorder

BK **6402** PG **788**

[CONTINUED FROM PREVIOUS PAGE]

THIS ASSIGNMENT is "AS-IS", without warranty or representation of any type, and absolutely WITHOUT RECOURSE to the Assignor, except as set forth in that certain Assignment Agreement of even date herewith by and between Assignor and Assignee.

TO HAVE, HOLD, RECEIVE and TAKE, all and singular, the hereditaments and premises hereby granted and assigned, or mentioned and intended so to be, with the appurtenances unto Assignees, their heirs and assigns, to and for their only proper use, benefit and behoof, forever.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Assignor has executed this assignment on July 18th, 2018.

MEMBERS 1ST FEDERAL CREDIT UNION

By: _____

Name: _ERIC N. FISCHER_

Title: _VP, BUSINESS LENDING SALES_

I hereby certify that the correct address of the within assignee is :

_210 Ridgewood Dr_
_Gettysburg PA 17325_
_____

_Melinda Hauser-Davis_
for Assignee

[CONTINUED ON NEXT PAGE]

Image ID: 000003870024 Type: GEN
Page 2 of 4
BK 6402 PG 789

[CONTINUED FROM PREVIOUS PAGE]

COMMONWEALTH OF PENNSYLVANIA )
)        ss.
COUNTY OF ___Adams___ )

This record was acknowledged before me on the _18th_ day of _July_, 2018, by _Eric N Fischer_ as Vice President of Members 1st Federal Credit Union, represents that he/she is authorized to act on behalf of Members 1st Federal Credit Union, and stated to my satisfaction that he/she:

(a)     Signed this Assignment as his/her own act;

(b)     Did so in his/her capacity as Vice President of the Assignor; and

(c)     Intended that this Assignment thereafter be recorded.

_____
Notary Public

My commission expires: _Nov. 20, 2019_

[Notary Seal]

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Ashley N. Seitler, Notary Public
Hanover Boro, York County
My Commission Expires Nov. 20, 2019
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Image ID: 000003870025 Type: GEN
Page 3 of 4
BK 6402 PG 790

## EXHIBIT "A"

**ALL** that tract of land situate in **Franklin Township, Adams County, Pennsylvania,** bounded and described as follows:

**BEGINNING** at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¾-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58 minutes 20 seconds East 1,212.75 feet to a ¾-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¾-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of **BEGINNING. CONTAINING** 170.585 acres.

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

**BEING** the same tract of land which Helen B. Hauser, widow, doing business as Conewago Orchards, by her deed dated July 20, 2007, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 4944 at Page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania Limited Liability Company.

Image ID: 000003870026 Type: GEN
Page 4 of 4
BK 6402 PG 791

## ASSIGNMENT OF ASSIGNMENT OF RENTS (03 ASSIGNMENT OF RENTS)

KNOW ALL MEN BY THESE PRESENTS, that MEMBERS 1ST FEDERAL CREDIT UNION, a federal credit union ("Assignor"), for and in consideration of the sum of Ten Dollars ($10.00), lawful money, and other good and valuable consideration paid unto it by H & M HOLDINGS GROUP, LLC, a limited liability company formed under the laws of the Commonwealth of Pennsylvania ("Assignee") at or before the time of the execution hereof, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain, sell, assign, transfer and set over unto the said Assignee, its successors and assigns, all of Assignor's right, title and interest in that certain Assignment of Rents (the "Assignment of Rents"), made, executed and delivered by HAUSER FAMILY FARMS LLC (a limited liability company formed under the laws of the Commonwealth of Pennsylvania; the "Mortgagor") to and in favor of the Assignor, dated October 26, 2011, said Assignment of Rents having been being recorded with the Recorder of Deeds of Adams County, Pennsylvania, on October 28, 2011, as instrument number (BK 5643 PG 670) 201100013460, and all rights, remedies and incidents thereunto belonging.

The Assignment of Rents assigns to the Assignor, its successors and assigns that Mortgagor's interest in the rents of Mortgage encumbers the Mortgagor's interest in a certain parcel of real property, with improvements, located in Biglerville, Pennsylvania, and commonly known as 410 Cashtown Road, Biglerville, PA 17307, as more fully described therein, and on Exhibit "A" to the Assignment of Rents.

[CONTINUED ON NEXT PAGE]

Image ID: 000003870027 Type: GEN
Recorded: 07/27/2018 at 04:08:53 PM
Fee Amt: $20.50 Page 1 of 4
Instr# 201800008267
Adams County, PA
Karen Heflin Register and Recorder

BK 6402 PG 792

[CONTINUED FROM PREVIOUS PAGE]

THIS ASSIGNMENT is "AS-IS", without warranty or representation of any type, and absolutely WITHOUT RECOURSE to the Assignor, except as set forth in that certain Assignment Agreement of even date herewith by and between Assignor and Assignee.

TO HAVE, HOLD, RECEIVE and TAKE, all and singular, the hereditaments and premises hereby granted and assigned, or mentioned and intended so to be, with the appurtenances unto Assignees, their heirs and assigns, to and for their only proper use, benefit and behoof, forever.

IN WITNESS WHEREOF, and intending to be legally bound hereby, the Assignor has executed this assignment on July _18TH_, 2018.

MEMBERS 1ST FEDERAL CREDIT UNION

By: _____

Name: _ERIC N. FISCHER_

Title: _VP, BUSINESS LENDING SALES_

I hereby certify that the correct address
of the within assignee is :

___210 Ridgewood Dr.___
___Gettysburg PA 17325___
_____

___Melinda Hauser Louis___
for Assignee

[CONTINUED ON NEXT PAGE]

Image ID: 000003870028 Type: GEN
Page 2 of 4
BK 6402 PG 793

## [CONTINUED FROM PREVIOUS PAGE]

COMMONWEALTH OF PENNSYLVANIA       )

COUNTY OF _____Adams_____     )  ss.

           )

This record was acknowledged before me on the _18th_ day of _July_, 2018,

by _Eric N Fischer_ as Vice President of Members 1st Federal Credit Union,

represents that he/she is authorized to act on behalf of Members 1st Federal Credit Union, and

stated to my satisfaction that he/she:

(a)    Signed this Assignment as his/her own act;

(b)    Did so in his/her capacity as Vice President of the Assignor; and

(c)    Intended that this Assignment thereafter be recorded.

_____
Notary Public

My commission expires: Nov 20. 2019

[Notary Seal]

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Ashley N. Seitler, Notary Public
Hanover Boro, York County
My Commission Expires Nov. 20, 2019
MEMBER, PENNSYLVANIA ASSOCIATION OF NOTARIES

Image ID: 000003870029 Type: GEN
Page 3 of 4
BK 6402 PG 794

## EXHIBIT "A"

ALL that tract of land situate in **Franklin Township, Adams County, Pennsylvania,** bounded and described as follows:

BEGINNING at a railroad spike found in the center line of S. R. 3011, known as Cashtown Road, along land designated as Lot No. 1 on the draft referred to below, at corner of land now or formerly of Clair L. Sites and wife; thence by said land now or formerly of Clair L. Sites and wife, North 9 degrees 41 minutes 40 seconds West 1,000.19 feet to a 5/8-inch rebar found; thence by the same, North 46 degrees 55 minutes 15 seconds West 999.62 feet to a 5/8-inch rebar found; thence by the same, North 23 degrees 47 minutes 10 seconds West 370.48 feet to a 5/8-inch rebar found; thence by same, North 18 degrees 28 minutes 10 seconds East 377.19 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 49 minutes 55 seconds East, 355.36 feet to a 5/8-inch rebar found; thence by the same, North 11 degrees 52 minutes 45 seconds West 436.81 feet to a 5/8-inch rebar found; thence by the same, North 9 degrees 34 minutes 30 seconds West 305.77 feet to a 5/8-inch rebar found; thence by the same, North 67 degrees 29 minutes 20 seconds East 355.27 feet to a 5/8-inch rebar found; thence by the same, South 21 degrees 3 minutes 30 seconds East 21.30 feet to a 5/8-inch rebar found; thence by the same, North 64 degrees 53 minutes 35 seconds East 222.82 feet to an 18-inch white pine tree; thence by the same, North 61 degrees 23 minutes 35 seconds East 486.53 feet to a 5/8-inch rebar found along land of Boyer Nurseries & Orchards, Inc.; thence by land of Boyer Nurseries & Orchards, Inc., South 53 degrees 51 minutes 25 seconds East 175.53 feet to stones found; thence by the same, South 41 degrees 38 minutes 40 seconds East 759 feet to a ¾-inch steel rod set; thence by the same, South 61 degrees 34 minutes 5 seconds East 427.35 feet to stones found; thence by the same, South 15 degrees 58 minutes 20 seconds East 1,212.75 feet to a ¾-inch steel rod set; thence by the same, South 76 degrees 42 minutes 45 seconds East 798.60 feet to a ¾-inch steel rod set; thence by land now or formerly of Clarence W. Ketterman, et al, South 13 degrees 33 minutes 45 seconds West 594.66 feet to a 36-inch white oak tree; thence by the same, South 17 degrees 14 minutes 55 seconds East 326.68 feet to a railroad spike set in Boyer's Nursery Road; thence in or along said Boyer's Nursery Road, South 6 degrees 57 minutes 15 seconds West 225.26 feet to a railroad spike set in the center line of Cashtown Road; thence in the center of Cashtown Road and by land now or formerly of Todd M. Boden, South 54 degrees 11 minutes 45 seconds West 117.04 feet to a p.k. nail found in the center line of Cashtown Road; thence continuing in or along Cashtown Road and by land designated as Lot No. 1 on the draft referred to below, South 55 degrees 33 minutes 40 seconds West 666.05 feet to a 5/8-inch rebar set under guide rail; thence continuing in Cashtown Road and by said Lot No. 1, South 85 degrees 36 minutes 10 seconds West 1,378.99 feet to a railroad spike found in the center of said road, at corner of land now or formerly of Clair L. Sites and wife, the place of BEGINNING. CONTAINING 170.585 acres.

The foregoing description was obtained from a Final Plan of a subdivision prepared by Robert A. Sharrah, Professional Land Surveyor, dated November 16, 1989, recorded in the office of the Recorder of Deeds of Adams County, Pennsylvania, in Plat Book 54 at Page 56, the tract of land hereby conveyed being designated as Lot No. 4 on said Plan.

BEING the same tract of land which Helen B. Hauser, widow, doing business as Conewago Orchards, by her deed dated July 20, 2007, and recorded in the office of the Recorder of Deeds in and for Adams County, Pennsylvania, in Record Book 4944 at Page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania Limited Liability Company.

Image ID: 000003870030 Type: GEN
Page 4 of 4
BK 6402 PG 795

Image ID: 000004038007 Type: GEN
Recorded: 05/12/2020 at 02:59:37 PM
Fee Amt: $70.25 Page 1 of 4
Instr# 202000005001
Adams County, PA
Karen Heflin Register and Recorder

BK 6611 PG 443

# MORGAGE

This Indenture, made the __25th__ day of March, 2020.

Between **HAUSER FAMILY FARMS, LLC**, a Pennsylvania limited liability company, with a principal address of 410 Cashtown Road, Biglerville, PA 17307, hereinafter referred to as Mortgagor,

AND

**H&M HOLDINGS GROUP, LLC**, a Pennsylvania limited liability company, with a principal address of 210 Ridgewood Drive, Gettysburg, PA 17325, hereinafter referred to as Mortgagee.

Whereas, the Mortgagor, in and by its Secured Promissory Note, under its hand and seal duly executed and bearing even date herewith, stand bound unto the Mortgagee in an amount equivalent to double the Debt, hereinafter referred to, conditioned for the payment of the sum of Two Hundred Fifty Thousand ($250,000.00), herein referred to as the Debt, with payments to be made in accordance with the terms of the Secured Promissory Note of even date with the balance of principal and interest to be paid in full no later than March __25th__, 2025.

If without the written consent of the Mortgagee, the Mortgagor conveys the within described premises or any part thereof, or if, without the written consent of the Mortgagee, the title to the premises or any part thereof becomes vested in any manner in any person, corporation or legal entity, other than the Mortgagor, then this Mortgage and the accompanying Secured Promissory Note shall forthwith become due and payable.

Now This Indenture Witnesseth, that the Mortgagor, for and in consideration of the Debt, and for the better securing the payment thereof unto the Mortgagee, in discharge of said Secured Promissory Note, and for and in consideration of the further sum of One Dollar, well and truly paid to the Mortgagor by the Mortgagee, at and before the ensealing and delivery hereof, the receipt of which One Dollar is hereby acknowledged, has granted, bargained, sold, released, conveyed and confirmed, and by these presents does grant, bargain, sell, release, convey and confirm unto the Mortgagee, ALL that tract of land situate, lying and being in Franklin Township, Adams County, Pennsylvania, being more particularly bounded and described on Exhibit A attached hereto.

And it is further understood and agreed that the Mortgagor will keep the buildings erected upon the said premises insured in some good and reliable insurance company or companies to the amount in the aggregate of at least Two Hundred Fifty Thousand ($250,000.00), and such policy or policies of insurance shall be assigned to and held by the Mortgagees as collateral security for the payment of the Debt, and in case the Mortgagor shall neglect or fail to procure and so assign such insurance, the Mortgagee may take out such policy or policies of insurance in its own name, and any premium and/or assessment paid therefor shall bear interest from the time of payment

and be added to and collected as part of the Debt and in the same manner; and any such premium and/or assessment so paid by the Mortgagee shall be paid by the Mortgagor to the Mortgagee upon demand. Further, the Mortgagor agrees to pay all taxes and/or charges in the nature thereof levied and/or assessed and to be levied and/or assessed against the mortgaged premises, when they respectively become due and payable. Further, the Mortgagor agrees to pay all taxes and/or charges in the nature thereof, together with any interest and/or penalty thereon, which may be or become owing by the Mortgagor to the Commonwealth of Pennsylvania, any other Commonwealth or State, the Federal Government, or any political sub-division of any thereof, when they respectively become due and payable. If the Mortgagor shall neglect or fail to pay any of the taxes and/or charges in the nature thereof, hereinbefore mentioned, or any of the penalties and/or interest which may be added thereto, at the time or times hereinbefore specified, then and in such event, the Mortgagee shall have the option of paying the same or any thereof, and upon any such payment by the Mortgagee, the amount thereof shall automatically be added to and become a part of the Debt and shall bear interest from the time the same is so added to the Debt.

And it is further understood and agreed that in case a default or defaults be made at any time or times in the payment of the Debt, any installment of the Debt, interest and/or insurance premiums and/or assessments advanced by the Mortgagee as aforesaid, or any part thereof, for five days after the same falls due as aforesaid, and/or in case the Mortgagor fails to pay any or all of the aforesaid taxes and/or charges in the nature thereof, hereinbefore mentioned, or any of the penalties and/or interest which may be added thereto, at the time or times hereinbefore specified, then and in any of said events, the Debt, less all payments made thereon and plus all sums added thereto, together with interest to date and together also with 10% attorneys' commissions on said Debt and interest, shall, at the option of the Mortgagee, thereupon forthwith become due and payable, and such remedy or remedies as the law may now or hereafter provide may forthwith be invoked and prosecuted by the Mortgagee against the Mortgagor, including, but not limited to, an action of mortgage foreclosure. All errors in any proceedings, under any of said remedies, together with all stay of or exemption from execution, or extension of time of payment which may be given by any Act or Acts of Assembly now in force, or which may be enacted hereafter, and together also with the right of appraisement, the right of inquisition and the right of appeal, are hereby forever waived and released.

Provided Always, Nevertheless, that if the Mortgagor shall well and truly pay, or cause to be paid, unto the Mortgagee the Debt and the interest thereon as aforesaid, in the manner and at the times hereinbefore specified, and shall in all respects keep, perform, and fully comply with each and all of the covenants, promises and agreements hereinbefore contained, then this mortgage, as well as the Secured Promissory Note hereinbefore recited, shall thereupon forthwith become null and void to all intents and purposes, anything hereinbefore contained to the contrary notwithstanding.

The covenants, promises and agreements contained in the within mortgage shall be legally binding upon and inure to the benefit of the respective parties hereto and the personal representatives, successors or assigns of the respective parties hereto.

Image ID: 000004038008 Type: GEN
Page 2 of 4
BK **6611** PG**444**

In Witness Whereof, the Mortgagor has hereunto subscribed its hand and affixed its seal the day and year first above written.

Witness:                                        HAUSER FAMILY FARMS, LLC

_____          By: __Melinda Davis_____(SEAL)
                                              Melinda Davis, Managing Member

Image ID: 000004038009 Type: GEN
Page 3 of 4
BK **6611** PG**445**

COMMOWNEALTH OF PENNSYLVANIA        :
                                                        : SS.
COUNTY OF ADAMS                                 :

On this, the 25th day of March _____, 2020, before me, the undersigned officer, personally appeared Melinda Davis, managing member of Hauser Family Farms, LLC, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
            Notary public

My commission expires:

| Commonwealth of Pennsylvania - Notary Seal |
| Sherri L. Sensabaugh, Notary Public |
| Adams County |
| My commission expires July 17, 2023 |
| Commission number 1200863 |
| Member, Pennsylvania Association of Notaries |

I HEREBY CERTIFY that the precise residence address of the within named Mortgagee is 210 Ridgewood Drive, Gettysburg, PA 17325.

_____
            Attorney for Mortgagee

*EXHIBIT "A"*

LEGAL DESCRIPTION

Image ID: 000004038010 Type: GEN
Page 4 of 4
BK 6611 PG 446

"Hauser Family Farms, LLC Property"

Tax Parcel #12-D09-0023

ALL that tract of land situate, lying and being in Franklin Township, Adams County, Pennsylvania, being more particularly bounded and described as follows:

BEGINNING at a railroad spike set in Cashtown Road (SR 3011) at corner of land now or formerly of George Steinberger; thence along said Steinberger land the next eleven courses: [1] North 14 degrees 59 minutes 04 seconds West, 1,000.19 feet to a rebar; [2] North 52 degrees 12 minutes 39 seconds West, 999.62 feet to a rebar; [3] North 29 degrees 04 minutes 34 seconds West, 370.48 feet to a metal fence post; [4] North 13 degrees 05 minutes 46 seconds East, 377.19 feet to a rebar; [5] North 04 degrees 32 minutes 31 seconds East, 355.36 feet to a rebar; [6] North 17 degrees 10 minutes 09 seconds West, 436.81 feet to a rebar; [7] North 14 degrees 51 minutes 54 seconds West, 305.77 feet to a rebar; [8] North 62 degrees 11 minutes 56 seconds East, 355.27 feet to a rebar; [9] South 26 degrees 20 minutes 54 seconds East, 21.30 feet to a rebar; [10] North 59 degrees 36 minutes 11 seconds East, 222.82 feet to a 24" white pine; [11] North 56 degrees 06 minutes 11 seconds East, 486.53 feet to a rebar on line of land now or formerly of Boyer Nurseries & Orchards, Inc.; thence along said Boyer Nurseries & Orchards, Inc. land the next seven courses: [1] South 59 degrees 16 minutes 41 seconds East, 175.57 feet to a rebar at stones; [2] South 47 degrees 09 minutes 14 seconds East, 762.79 feet to a rebar; [3] South 66 degrees 42 minutes 52 seconds East, 427.35 feet to a rebar; [4] South 21 degrees 06 minutes 58 seconds East, 1,212.47 feet to a rebar at stones; [5] South 82 degrees 07 minutes 36 seconds East, 796.76 feet to a rebar; [6] South 08 degrees 16 minutes 21 seconds West, 594.66 feet to a point; [7] South 22 degrees 32 minutes 19 seconds East, 326.68 feet to a railroad spike set in Boyer Nursery Road (T-309); thence continuing in, along or near said Boyer Nursery Road the next four courses: [1] South 01 degree 39 minutes 51 seconds West, 225.26 feet to a railroad spike in Cashtown Road; [2] South 48 degrees 54 minutes 21 seconds West, 117.04 feet to a pk nail set in Cashtown Road; [3] South 50 degrees 16 minutes 16 seconds West, 666.05 feet to a rebar; [4] South 80 degrees 18 minutes 46 seconds West, 1,378.99 feet to the point and place of BEGINNING. CONTAINING 170.66 Acres.

The above description was taken from a Boundary Survey for the Land Conservancy of Adams County and Hauser Family Farms, LLC, by Beyond All Boundaries, LLC, dated May 7, 2015, a reduced copy of which is attached hereto as Exhibit "B" and a larger version of the same is being filed in the Miscellaneous Drawer in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

BEING the same which Helen B. Hauser, widow, doing business as Conewago Orchards, by deed dated July 20, 2007 and recorded on August 14, 2007 in the Office of the Recorder of Deeds of Adams County, Pennsylvania, in Record Book 4944 at page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania limited liability company.

# EXHIBIT D

Image ID: 000004038007 Type: GEN
Recorded: 05/12/2020 at 02:59:37 PM
Fee Amt: $70.25 Page 1 of 4
Instr# 202000005001
Adams County, PA
Karen Heflin Register and Recorder

BK 6611 PG 443

# MORTGAGE

This Indenture, made the 25th day of March, 2020.

Between **HAUSER FAMILY FARMS, LLC**, a Pennsylvania limited liability company, with a principal address of 410 Cashtown Road, Biglerville, PA 17307, hereinafter referred to as Mortgagor,

AND

**H&M HOLDINGS GROUP, LLC**, a Pennsylvania limited liability company, with a principal address of 210 Ridgewood Drive, Gettysburg, PA 17325, hereinafter referred to as Mortgagee.

Whereas, the Mortgagor, in and by its Secured Promissory Note, under its hand and seal duly executed and bearing even date herewith, stand bound unto the Mortgagee in an amount equivalent to double the Debt, hereinafter referred to, conditioned for the payment of the sum of Two Hundred Fifty Thousand ($250,000.00), herein referred to as the Debt, with payments to be made in accordance with the terms of the Secured Promissory Note of even date with the balance of principal and interest to be paid in full no later than March 25th, 2025.

If without the written consent of the Mortgagee, the Mortgagor conveys the within described premises or any part thereof, or if, without the written consent of the Mortgagee, the title to the premises or any part thereof becomes vested in any manner in any person, corporation or legal entity, other than the Mortgagor, then this Mortgage and the accompanying Secured Promissory Note shall forthwith become due and payable.

Now This Indenture Witnesseth, that the Mortgagor, for and in consideration of the Debt, and for the better securing the payment thereof unto the Mortgagee, in discharge of said Secured Promissory Note, and for and in consideration of the further sum of One Dollar, well and truly paid to the Mortgagor by the Mortgagee, at and before the ensealing and delivery hereof, the receipt of which One Dollar is hereby acknowledged, has granted, bargained, sold, released, conveyed and confirmed, and by these presents does grant, bargain, sell, release, convey and confirm unto the Mortgagee, ALL that tract of land situate, lying and being in Franklin Township, Adams County, Pennsylvania, being more particularly bounded and described on Exhibit A attached hereto.

And it is further understood and agreed that the Mortgagor will keep the buildings erected upon the said premises insured in some good and reliable insurance company or companies to the amount in the aggregate of at least Two Hundred Fifty Thousand ($250,000.00), and such policy or policies of insurance shall be assigned to and held by the Mortgagees as collateral security for the payment of the Debt, and in case the Mortgagor shall neglect or fail to procure and so assign such insurance, the Mortgagee may take out such policy or policies of insurance in its own name, and any premium and/or assessment paid therefor shall bear interest from the time of payment

and be added to and collected as part of the Debt and in the same manner; and any such premium and/or assessment so paid by the Mortgagee shall be paid by the Mortgagor to the Mortgagee upon demand. Further, the Mortgagor agrees to pay all taxes and/or charges in the nature thereof levied and/or assessed and to be levied and/or assessed against the mortgaged premises, when they respectively become due and payable. Further, the Mortgagor agrees to pay all taxes and/or charges in the nature thereof, together with any interest and/or penalty thereon, which may be or become owing by the Mortgagor to the Commonwealth of Pennsylvania, any other Commonwealth or State, the Federal Government, or any political sub-division of any thereof, when they respectively become due and payable. If the Mortgagor shall neglect or fail to pay any of the taxes and/or charges in the nature thereof, hereinbefore mentioned, or any of the penalties and/or interest which may be added thereto, at the time or times hereinbefore specified, then and in such event, the Mortgagee shall have the option of paying the same or any thereof, and upon any such payment by the Mortgagee, the amount thereof shall automatically be added to and become a part of the Debt and shall bear interest from the time the same is so added to the Debt.

And it is further understood and agreed that in case a default or defaults be made at any time or times in the payment of the Debt, any installment of the Debt, interest and/or insurance premiums and/or assessments advanced by the Mortgagee as aforesaid, or any part thereof, for five days after the same falls due as aforesaid, and/or in case the Mortgagor fails to pay any or all of the aforesaid taxes and/or charges in the nature thereof, hereinbefore mentioned, or any of the penalties and/or interest which may be added thereto, at the time or times hereinbefore specified, then and in any of said events, the Debt, less all payments made thereon and plus all sums added thereto, together with interest to date and together also with 10% attorneys' commissions on said Debt and interest, shall, at the option of the Mortgagee, thereupon forthwith become due and payable, and such remedy or remedies as the law may now or hereafter provide may forthwith be invoked and prosecuted by the Mortgagee against the Mortgagor, including, but not limited to, an action of mortgage foreclosure. All errors in any proceedings, under any of said remedies, together with all stay of or exemption from execution, or extension of time of payment which may be given by any Act or Acts of Assembly now in force, or which may be enacted hereafter, and together also with the right of appraisement, the right of inquisition and the right of appeal, are hereby forever waived and released.

Provided Always, Nevertheless, that if the Mortgagor shall well and truly pay, or cause to be paid, unto the Mortgagee the Debt and the interest thereon as aforesaid, in the manner and at the times hereinbefore specified, and shall in all respects keep, perform, and fully comply with each and all of the covenants, promises and agreements hereinbefore contained, then this mortgage, as well as the Secured Promissory Note hereinbefore recited, shall thereupon forthwith become null and void to all intents and purposes, anything hereinbefore contained to the contrary notwithstanding.

The covenants, promises and agreements contained in the within mortgage shall be legally binding upon and inure to the benefit of the respective parties hereto and the personal representatives, successors or assigns of the respective parties hereto.

Image ID: 000004038008 Type: GEN
Page 2 of 4
BK 6611 PG 444

In Witness Whereof, the Mortgagor has hereunto subscribed its hand and affixed its seal the day and year first above written.

Witness:                                          HAUSER FAMILY FARMS, LLC

_____   By: __Melinda Davis_____(SEAL)
                                                       Melinda Davis, Managing Member

Image ID: 000004038009 Type: GEN
Page 3 of 4

COMMOWNEALTH OF PENNSYLVANIA      :                 BK 6611 PG 445
                                                       : SS.
COUNTY OF ADAMS                            :

On this, the 25th day of March_____, 2020, before me, the undersigned officer, personally appeared Melinda Davis, managing member of Hauser Family Farms, LLC, known to me (or satisfactorily proven) to be the person whose name is subscribed to the within instrument, and acknowledged that she executed the same for the purposes therein contained.

IN WITNESS WHEREOF, I hereunto set my hand and official seal.

_____
              Notary public

My commission expires:

Commonwealth of Pennsylvania - Notary Seal
Sherri L. Sensabaugh, Notary Public
Adams County
My commission expires July 17, 2023
Commission number 1200863
Member, Pennsylvania Association of Notaries

I HEREBY CERTIFY that the precise residence address of the within named Mortgagee is 210 Ridgewood Drive, Gettysburg, PA 17325.

_____
              Attorney for Mortgagee

*EXHIBIT "A"*

LEGAL DESCRIPTION

Image ID: 000004038010 Type: GEN
Page 4 of 4
BK 6611 PG 446

"Hauser Family Farms, LLC Property"

Tax Parcel #12-D09-0023

ALL that tract of land situate, lying and being in Franklin Township, Adams County, Pennsylvania, being more particularly bounded and described as follows:

BEGINNING at a railroad spike set in Cashtown Road (SR 3011) at corner of land now or formerly of George Steinberger; thence along said Steinberger land the next eleven courses: [1] North 14 degrees 59 minutes 04 seconds West, 1,000.19 feet to a rebar; [2] North 52 degrees 12 minutes 39 seconds West, 999.62 feet to a rebar; [3] North 29 degrees 04 minutes 34 seconds West, 370.48 feet to a metal fence post; [4] North 13 degrees 05 minutes 46 seconds East, 377.19 feet to a rebar; [5] North 04 degrees 32 minutes 31 seconds East, 355.36 feet to a rebar; [6] North 17 degrees 10 minutes 09 seconds West, 436.81 feet to a rebar; [7] North 14 degrees 51 minutes 54 seconds West, 305.77 feet to a rebar; [8] North 62 degrees 11 minutes 56 seconds East, 355.27 feet to a rebar; [9] South 26 degrees 20 minutes 54 seconds East, 21.30 feet to a rebar; [10] North 59 degrees 36 minutes 11 seconds East, 222.82 feet to a 24" white pine; [11] North 56 degrees 06 minutes 11 seconds East, 486.53 feet to a rebar on line of land now or formerly of Boyer Nurseries & Orchards, Inc.; thence along said Boyer Nurseries & Orchards, Inc. land the next seven courses: [1] South 59 degrees 16 minutes 41 seconds East, 175.57 feet to a rebar at stones; [2] South 47 degrees 09 minutes 14 seconds East, 762.79 feet to a rebar; [3] South 66 degrees 42 minutes 52 seconds East, 427.35 feet to a rebar; [4] South 21 degrees 06 minutes 58 seconds East, 1,212.47 feet to a rebar at stones; [5] South 82 degrees 07 minutes 36 seconds East, 796.76 feet to a rebar; [6] South 08 degrees 16 minutes 21 seconds West, 594.66 feet to a point; [7] South 22 degrees 32 minutes 19 seconds East, 326.68 feet to a railroad spike set in Boyer Nursery Road (T-309); thence continuing in, along or near said Boyer Nursery Road the next four courses: [1] South 01 degree 39 minutes 51 seconds West, 225.26 feet to a railroad spike in Cashtown Road; [2] South 48 degrees 54 minutes 21 seconds West, 117.04 feet to a pk nail set in Cashtown Road; [3] South 50 degrees 16 minutes 16 seconds West, 666.05 feet to a rebar; [4] South 80 degrees 18 minutes 46 seconds West, 1,378.99 feet to the point and place of BEGINNING. CONTAINING 170.66 Acres.

The above description was taken from a Boundary Survey for the Land Conservancy of Adams County and Hauser Family Farms, LLC, by Beyond All Boundaries, LLC, dated May 7, 2015, a reduced copy of which is attached hereto as Exhibit "B" and a larger version of the same is being filed in the Miscellaneous Drawer in the Office of the Recorder of Deeds of Adams County, Pennsylvania.

BEING the same which Helen B. Hauser, widow, doing business as Conewago Orchards, by deed dated July 20, 2007 and recorded on August 14, 2007 in the Office of the Recorder of Deeds of Adams County, Pennsylvania, in Record Book 4944 at page 209, granted and conveyed unto Hauser Family Farms, LLC, a Pennsylvania limited liability company.

# EXHIBIT E

| | |
|---|---|
| H&M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA H. DAVIS, and HANNAH M. HAUSER | IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA |
| Plaintiff, | No. 2018-SU-1293 |
| v. | Civil Division |
| ALAN K. PATRONO, JONATHAN ALAN PATRONO, JANE HAUSER PATRONO, POLLY E. PATRONO a/k/a POLLY E. PATRONO-CARLSON, JOHN J. MURPHY, III, PATRONO & MURPHY, LLC, APPLE LEAF ABSTRACTING & SETTLEMENT COMPANY and JOHN DOE(S)/JANE DOE(S) | |
| Defendants. | |

## ORDER

AND NOW, this ___ day of July 2023, upon consideration of the Plaintiffs' Emergency Motion for Special Relief, it is **HEREBY ORDERED** that a hearing/oral argument on the Motion is scheduled for July __, 2023 at _____ a.m./p.m. in Courtroom No. _____ of the Adams County Court of Common Pleas.

BY THE COURT:

_____
Michael A. George
President Judge

<u>Distribution List:</u>
**Paige Macdonald-Matthes, Esquire, and Jennifer L. Bruce, Esquire,** *Obermayer Rebmann Maxwell & Hippel LLP,* 200 Locust Street, Suite 400, Harrisburg, PA 17101, *Counsel for Plaintiffs, H&M Holdings Group, LLC, Hauser Family Farms, LLC, Melinda H. Davis, and Hannah M. Hauser*
**Ronald L. Finck, Esquire and Aaron D. Martin, Esquire,** *Mette, Evans & Woodside,* 3401 North Front Street, Harrisburg, PA 17110, *Counsel for Defendants Alan K. Patrono, Jonathan Alan Patrono, Jane Hauser Patrono, Polly E. Patrono a/k/a Polly E. Patrono-Carlson, John J. Murphy, III, Patrono & Murphy, LLC, and Apple Leaf Abstracting & Settlement Company*

1

*OBERMAYER, REBMANN, MAXWELL & HIPPEL LLP*
*Paige Macdonald-Matthes, Esquire*
*Pa Supreme Court ID 66266*
*Jennifer L. Bruce, Esquire*
*Pa Supreme Court ID 329351*
*200 Locust Street, Suite 400*
*Harrisburg, PA 17101*
*(717) 234-9730 Telephone*
*(717) 236-2485 Facsimile*
*Email:* PMM@obermayer.com
*Attorneys for H&M Holdings Group, LLC, Hauser Family Farms, LLC, Melinda H. Davis, and*
*Hannah M. Hauser*

| | |
|---|---|
| H&M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA H. DAVIS, and HANNAH M. HAUSER | IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA |
| Plaintiff, | No. 2018-SU-1293 |
| v. | Civil Division |
| ALAN K. PATRONO, JONATHAN ALAN PATRONO, JANE HAUSER PATRONO, POLLY E. PATRONO a/k/a POLLY E. PATRONO-CARLSON, JOHN J. MURPHY, III, PATRONO & MURPHY, LLC, APPLE LEAF ABSTRACTING & SETTLEMENT COMPANY and JOHN DOE(S)/JANE DOE(S) | |
| Defendants. | |

## PLAINTIFFS' EMERGENCY MOTION FOR SPECIAL RELIEF AGAINST DEFENDANTS ALAN KIM PATRONO, JANE HAUSER PATRONO, JONATHAN PATRONO AND POLLY E. PATRONO a/k/a POLLY E. PATRONO-CARLSON

AND NOW, comes Plaintiffs, H&M Holdings Group, LLC, Hauser Family Farms, LLC, Melinda H. Davis, and Hannah M. Hauser (collectively, "Plaintiffs"), by and through their undersigned counsel, *Obermayer Rebmann Maxwell & Hippel LLP*, and file their Motion for

2

Special Relief against Defendants Alan Kim Patrono, Jane Hauser Patrono, Jonathan Patrono and Polly E. Patrono a/k/a Polly E. Patrono-Carlson (hereinafter for purposes of the within Motion only, collectively "Patrono Defendants"), and in support thereof avers as follows:

## ABBREVIATED RELEVANT PROCEDURAL HISTORY

1. On April 21, 2023, and April 27, 2023, the Court held a bench trial on Plaintiffs' Fraudulent Conveyance Claims that are included in Counts IV, V, VI and VII of Plaintiffs' Third Amended Complaint filed in the above captioned matter, and which the Court had bifurcated from the Third Amended Complaint.

2. On May 25, 2023, Plaintiffs filed their Motion for Citation of Contempt against the Patrono Defendants based on the Patrono Defendants' failure to comply with the Court's April 25, 2023 discovery Order, (which directed certain Patrono Defendants to, *inter alia*, "provide Plaintiffs' counsel copies of their individual tax returns for the years 2011 through and including 2021, including therewith any schedules or supporting documentation within 20 days of this Order"), as well as the Patrono Defendants' failure to comply with the Court's September 28, 2022 Case Management Order concerning the submission of expert reports and the Patrono Defendants' complete and total failure to identify any expert witness in response to Plaintiffs' timely served discovery requests.

3. Oral Argument was held on Plaintiffs' Motion for Citation of Contempt on June 7, 2023. During the Oral Argument, the Court was made aware that (a) Defendant Jonathan Patrono failed to provide tax returns and supporting information for tax years 2011-2014, and that Defendants Alan Kim Patrono and Jane Hauser Patrono **NEVER FILED FEDERAL TAX**

3

**RETURNS FOR CALENDAR YEARS 2018 and 2019[1], NOR DID THEY PROPERLY SEEK AN EXTENSION FROM THE IRS.[2]**

4. On June 12, 2023, the Court issued an Order (filed June 15, 2023), that instructed, *inter alia*, that (a) Defendants' Alan Kim Patrono and Jane Patrono file of record with the Court a verified statement that they did not file their federal tax returns in 2018 and 2019, and further did not request or receive an extension from the IRS for those tax years; and (b) Defendant Jonathan Patrono provide his tax returns and all income information for calendar years 2011-2014 within thirty (30) days of the Court's Order. *See* June 15, 2023, Order of Court attached hereto as **Exhibit "A"**.

5. On June 16, 2023, the Court issued Findings of Fact and Conclusions of Law supporting the entry of an Order of judgment in Plaintiffs' favor and against the Patrono Defendants on Counts IV, V, VI and VII of Plaintiffs' Third Amended Complaint, with all surviving Counts remaining viable and to be resolved by jury trial commencing October 30, 2023. A true and correct copy of the Court's June 16, 2023, Findings of Fact, Conclusions of Law and June 16, 2023, Order are collectively attached hereto and marked as **Exhibit "B"**.

6. In its June 16, 2023, Conclusions of Law, the Court noted, *inter alia*, that:

  a. The July 18, 2018, transfers of title to the real estate, and all subsequent transfers of the real estate, were fraudulent as to [Plaintiff] H&M. Conclusion of Law ¶8;

  b. The July 18, 2018, transfers of real estate and all subsequent transfers of the subject properties, were committed by Defendants Alan Kim Patrono, Jane

---

[1] Alan Patrono is a member of the Pennsylvania Bar and said failure to file federal income tax returns constitutes a violation of, *inter alia*, Pa. Rule of Professional Conduct 8.4
[2] The Court noted on the record that it would be referring the delinquent tax filing to the Internal Revenue Service. *See* June 7, 2023 N.T. 16, *ll.* 8-10.

4

Hauser Patrono, Jonathan Patrono, and Polly Patrono with the common purpose to do the unlawful act of defrauding creditors. Conclusion of Law ¶9;

c. Injunctive relief is necessary to prevent immediate and irreparable harm to the Plaintiffs which cannot be adequately compensated by money damages as Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono have evidenced a course of conduct aimed at attempted to render their assets judgment proof. Conclusion of Law ¶10;

d. Prohibiting Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono from transferring or encumbering real estate assets will result in lesser harm than the alternative of permitting Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono the ability to hinder collection of or unlawfully avoid Plaintiffs' ability to enforce a judgment should one be obtained in subsequent litigation. Conclusion of Law ¶11; and

e. The rights of Plaintiffs to secure the ability to collect against the assets of Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono in the event of a subsequent judgment is clear. Conclusion of Law ¶13.

7. In light of the Conclusions of Law reached by the Court, the Court enjoined the Patrono Defendants from selling, transferring, or otherwise encumbering five (5) separate properties that were the subject of Plaintiffs' fraudulent conveyance claims set forth in their Third Amended Complaint. *See* June 16, 2023, Order at ¶2(a)-(e).

8. The Court's June 16, 2023, Order specifically states that "all surviving Counts remaining viable and to be resolved by jury trial commencing October 30, 2023." By definition,

5

this would include Plaintiffs' claims for additional monetary damages arising out of their claims for Breach of Duty of Good Faith (Count I), Breach of Fiduciary Duty (Count II), Professional Negligence (Count III), Civil Conversion (Counts VIII and IX), and **Civil Conversion re 17 On The Square (Count X)** (emphasis added), as more fully set forth in the Third Amended Complaint, which is incorporated by reference as if more fully set forth at length herein.

9.     As of the date and time of the filing of this Emergency Motion for Special Relief, Defendants Alan Kim Patrono and Jane Hauser Patrono **have not complied with Court's directive to file a verified statement with the Court regarding their failure to file their federal tax returns for 2018 and 2019**[3], nor have they complied with the balance of the requirements set forth in the Court's June 15, 2023, Order.  The same is equally true as it pertains to Defendant Jonathan Patrono's non-compliance with the Court's June 15, 2023, Order as of the date and time of the filing of the within Motion.

**NEWLY DISCOVERED FACTS SUPPORTING PLAINTIFFS' REQUEST FOR EMERGENCY SPECIAL RELIEF – THE PATRONO DEFENDANTS CONTINUE TO TAKE STEPS TO TRANSFER ASSETS AND/OR FRUSTRATE THIS COURT'S ABILITY TO ADJUDICATE THIS CASE**

10.     A review of Count X of the Third Amended Complaint reveals that it is based on, *inter alia*, Defendants Alan Kim Patrono and Jane Hauser Patrono's series of unlawful advances against a Line of Credit ("LOC") for 17 On The Square,[4] as well as Defendant Jane Patrono's unlawful removal of $20,000 from the business operating account of 17 On The Square to pay the

---

[3] Plaintiffs believe and therefore aver that based on the Court's statements from the Bench during the Oral Argument on June 7, 2023, and further in light of the fact that requirement to file the Verified Statement Re: Non-Filing of Federal Tax Returns for 2018 and 2019 with the Court as stated in the June 15, 2023 Order did not include a 30 day grace provision as did all other paragraphs of the Order, that the filing of the Verified Statements Re: Non-Filing of Tax Returns was to be done immediately.

[4] "17 On The Square" is the name by which the parties referred to a mixed use commercial property located on the town square in Gettysburg, Pennsylvania, which Hannah Hauser, Melinda Davis, and Jane Hauser Patrono jointly inherited from the estate of their mother Helen Hauser and which they owned and operated as landlords through a partnership equally owned by the three sisters.

6

Hauser Estate payroll without Plaintiffs Hannah Hauser and Melinda Davis' knowledge and/or consent. A true and correct copy of the extract of Count X from Plaintiffs' Third Amended Complaint, together with Verification is attached hereto as **Exhibit "C."**

11. On March 16, 2023, Plaintiff Melinda Davis sent an email to Defendant Jane Hauser Patrono advising here that the tax return for 17 On The Square was complete and requesting that she send her share of the tax preparation fee to accountant John Martin, CPA ("Martin"). A true and correct copy of the entire email thread commencing on March 16, 2023, is attached hereto as **Exhibit "D"**.

12. On March 17, 2023, Defendant Alan Kim Patrono, after apparently having intercepted Plaintiff Melinda Davis' March 16, 2023, email to his wife, sent an email to Plaintiff Melinda Davis stating that he had picked up the tax return for 17 On The Square, notwithstanding the fact that he is not and never was a partner in 17 On the Square, and further advising that accountant Martin had advised Defendant Alan Patrono that "the capital accounts were not equal".[5] Plaintiff Melinda Davis immediately responded and advised Defendant Alan Kim Patrono that she "expected his response" and further reminded him about the unlawful removal of money from the 17 On The Square LOC – the very same issue that is the subject of Count X of Plaintiffs' Third Amended Complaint. *See* **Exhibit "C"** and **Exhibit "D."**

13. On March 27, 2023, Defendant Alan Kim Patrono took things further and sent an email to Richard Thrasher, Esquire who represented the Plaintiffs' interests in the sale of the 17 On The Square real estate owned in September 2022. In his email, Defendant Alan Kim Patrono acknowledged that he had been sent a letter from the Plaintiffs' undersigned counsel advising him

---

[5] At the time this representation was made by Martin, Martin was unaware of the unauthorized withdrawals from 17 On The Square accounts by Defendant Jane Hauser Patrono that are the subject of Count X of the Third Amended Complaint.

to cease and desist any direct communications with her clients and thus "[he was] forwarding the email chain to [Richard Thrasher, Esquire] **with the demand that [Plaintiffs] pay Jane the monies**." *See* **Exhibit "D."** (Emphasis added).

14. On June 26, 2023 – a mere 11 days after the Court issued its Order regarding Plaintiffs' Motion for Citation of Contempt – Defendant Alan Kim Patrono again sent yet another email to Attorney Thrasher in which he again made a demand for payment from Plaintiffs, but this time he included his threat that if Plaintiffs did not pay Defendant Jane Hauser Patrono, **"BY JULY 24, 2023", "JANE WILL FILE SUIT IN THE LOCAL MAGISTRATES [SIC] COURT."** (Emphasis added). *See* **Exhibit "D."**

15. In his June 26, 2023, email, Defendant Alan Kim Patrono also raised two (2) additional issues regarding 17 On The Square, to wit: the refurbishment of a Jeep vehicle that was owned by the three sisters' father, (the title for which is currently being unlawfully withheld by Defendant Alan Kim Patrono),[6] and Defendant Alan Kim Patrono's contention that the proceeds from the sale of 17 On The Square real estate had to be used by each of the three (3) sisters to "purchase a replacement property pursuant to Section 1031 of the IRS code." *See* **Exhibit "D."**

16. The assets of 17 On The Square, as well as any sale proceeds from the real estate previously owned by 17 On The Square are clearly encompassed in the issues set forth in Count X of Plaintiffs' Third Amended Complaint and which, per this Court's June 16, 2023 Order, are pending adjudication at the jury trial scheduled in this matter commencing on October 30, 2023. Thus, any suggestion that these matters are proper for consideration by "the local magistrate court" is not only incorrect, but also wholly improper.

---

[6] The three sisters' father, John A. Hauser, passed away in 1983, and Defendant Alan Kim Patrono was the executor of John A. Hauser's will and administered the resulting estate.

8

17. By threatening to file a lawsuit "in the local magistrates [sic] court" if Plaintiffs do not address the issues raised by Defendant Alan Kim Patrono in his June 26, 2023 email **"by July 24, 2023,"** it is clear that Defendant Alan Kim Patrono is attempting to engage in ill-conceived exercise in "forum shopping," and further that the Patrono Defendants are attempting to circumvent the Court's June 16, 2023 Order, as further evidenced by the additional facts below.

18. On Friday, June 30, 2023, Gettysburg realtor Marty Miller ("Miller") requested a meeting with Plaintiff Hannah Hauser, her husband Arturo Ottolenghi ("Ottolenghi"), and Plaintiff Melinda Davis to discuss a meeting he had with Defendants Alan Kim Patrono and Jane Hauser Patrono that took place on or about June 20, 2023 (the "Patrono Sale Meeting"). Defendants Alan Kim Patrono and Jane Hauser Patrono met with realtor Martin regarding their request that Miller sell Defendant Jane Hauser Patrono's 1/3 interest in Hauser Family Farms ("HFF") and her 1/3 interest in the farm/tasting room property that is owned by HFF. During Plaintiffs' meeting with Realtor Miller, Miller advised Plaintiffs Hannah Hauser and Melinda Davis and Ottolenghi that Miller wanted to meet with them before Miller presented the property held by HFF to prospective fruit growers who are allegedly interested in owning and managing orchards.

19. During the Patrono Sale Meeting, Defendants Alan Kim Patrono and Jane Hauser Patrono provided realtor Miller with the Operating Agreement of HFF, as well as other documentation, but never mentioned that there was a Court Order issued against them regarding the sale of certain real property, which Plaintiffs believe and therefore aver by implication would necessarily extend to any other attempted transfer of property subject to H&M's lien, which would likewise "be fraudulent as to H&M". Upon further information and belief, Defendant Alan Kim Patrono represented to realtor Miller that farm/tasting room property owned by HFF was "the least involved in the litigation between the Parties."

9

20. During Plaintiffs' meeting with realtor Miller on June 30, 2023, Ottolenghi advised realtor Miller that it was the Plaintiffs' understanding that all property, including the HFF farm/tasting room property was "frozen" per the June 16, 2023, Order and that any sale or conveyance of the same could not be perfected until after the jury trial starting October 30, 2023, was over. To be clear, the Plaintiffs do not consent to the sale of the farm/tasting room property owned by HFF, or to any sale of Defendant Jane Patrono's interest in HFF, which Defendant Alan Kim Patrono and Jane Hauser Patrono seem to be scheming to arrange. Moreover, given that the farm/tasting room property owned by HFF and Defendant Jane Patrono's interest in HFF are both collateral for the loans initially made by Members' First Federal Credit Union and now owned by Plaintiff H&M Holdings, LLC, and such property or interest sale is not legally proper.

21. Upon information and belief, subsequent to his meeting with the Plaintiffs, realtor Miller received a text message from Defendant Alan Kim Patrono asking him how the meeting with Plaintiffs went and realtor Miller texted back that HFF was "frozen." Upon further information and belief, Defendant Alan Kim Patrono then called Miller and advised Miller that "Frozen was not a word that he knows about or heard about regarding HFF."

**LEGAL GROUNDS SUPPORTING REQUESTED EMERGENCY SPECIAL RELIEF**

22. In its June 16, 2023 Findings of Fact, the Court recognized that "On October 26, 2011, Defendants Alan Patrono, Jane Hauser Patrono, Jonathan Patrono, Melinda Davis and Hannah Hauser executed commercial guarantees to secure a loan from Members 1st to Hauser Estate and HFF, jointly and severally, in the amount of $1,475,000.00 ("Promissory Note 2"), and that following default on, *inter alia*, Promissory Note 2, "Promissory Notes 1 and 2 was sold and assigned, along with the unconditional guarantees, to H&M for the full value of the notes." *See* June 16, 2023, Findings of Fact ¶¶ 9 and 14. (Emphasis added). Thus, the real estate held by HFF

10

(which was the subject of Defendants Alan Kim Patrono and Jane Hauser Patrono's discussion with realtor Miller) is clearly the subject of the pending litigation before this Honorable Court.

23. As noted by the Court in its June 16, 2023, Findings of Fact, Defendants Alan Kim Patrono, Jane Hauser Patrono, Jonathan Patrono [are] all aware of the personal liability under the guarantee. *See* June 16, 2023, Findings of Fact ¶¶ 33- 43.

24. This Court has the inherent power to enforce its Orders and Decrees by imposing penalties and sanctions for failure to obey or comply therewith. *See* Jack Rees Nursing and Rehabilitation Services v. Hersperger, 600 A.2d 207 (Pa. Super. Ct. 1991) ("It is clear that a court can for present or past acts of misbehavior amounting to civil contempt impose an unconditional compensatory fine and/or conditional fine and imprisonment, and such fine may be payable to . . . the individual who was injured.").

25. Admittedly, the June 16, 2023, Order only addressed the Patrono Defendants unlawful July 18, 2018, transfers of real estate outlined in Counts IV-VII of the Third Amended Complaint. Plaintiffs believe and therefore aver, however, that because the Court specifically recognized that "all subsequent transfers of the real estate, were fraudulent as to H&M," and further that "all subsequent transfers of the subject properties, were committed by the [Patrono Defendants] with the actual intent to hinder and delay collection against the properties pledged as collateral for the two Promissory Notes pursuant to the confessed judgments." *See* June 16, 2023, Conclusions of Law ¶¶ 33- 43. It stands to reason, as well as all logical inferences derived from the Court's June 16, 2023, Order, that the same rule of law/holding would apply equally to any other attempted sale, transfer or conveyance of property, real or otherwise, by the Patrono Defendants that is collateral for H&M's notes and corresponding personal guarantee. This would

11

necessarily include Defendant Jane Hauser Patrono's 1/3 ownership interest in HFF, as evidenced by her redacted K-1 attached hereto as **Exhibit "E".**

26.     As evidenced by paragraph 6 of the Operating Agreement for HFF, a copy of which is attached hereto as **Exhibit "F"**, no member of HFF has the right to withdraw or demand a return of any of the member's capital contributions or capital account, except upon dissolution of the Company.

27.     As further evidenced by paragraph 16 of the Operating Agreement for HFF, only the Manager, identified in that paragraph as Plaintiff, Melinda Davis, has the right "to sell, pledge, mortgage, lease without limit of time, exchange or grant options for the purchase, lease or exchange of any Company assets, on such terms and conditions as the Members may determine. Moreover, "**unless approved by Members holding sixty-six (66%) of the Voting Rights, the Company may not . . . sell all or substantially all of its assets to any persons or entity.**" *See* **Exhibit "F".**

28.     Having drafted the Operating Agreement for HFF, having represented HFF (in addition to Plaintiffs Hannah Hauser and Melinda Hauser Davis) for years and through numerous real estate and loan transactions, and as a currently licensed Pennsylvania attorney, Defendant Alan Kim Patrono, knows or has reason to know that his wife does not have the ability to legally sell and/or convey her ownership interest in HFF or in the farm/tasting room property, yet he nevertheless scheduled a meeting with Defendant Jane Hauser Patrono and realtor Miller to request that Miller negotiate the sale of Defendant Alan Kim Patrono's wife's interest in HFF and the farm/tasting room party to a third party.

29.     Having received a copy of the Court's June 16, 2023, Order, each of the Patrono Defendants knew or should have known that the Court concluded that assets pledged as collateral

12

for Promissory Notes 1 and 2, including *inter alia*, those owned and pledged by HFF could not be legally conveyed and/or transferred without further Order of this Court.

30. Plaintiffs believe and therefore aver that based on the Patrono Defendants' past conduct that they will endeavor to continue to try and circumvent the June 16, 2023 Order issued by this Honorable Court, using the argument that the June 16, 2023, Order "only addressed the properties that were the subject of Counts IV-VIII of the Third Amended Complaint and that they are free to dispose of any other assets as they so choose during the pendency of the above captioned litigation," – this notwithstanding the fact that the Patrono Defendants' assets are subject to the lien held by H&M. Further evidence of this intent is Defendant Alan Kim Patrono's alleged representation to realtor Miller that "Frozen is not a word that he knows or heard about regarding HFF". The Court should not indulge such improper folly.

31. Plaintiffs believe and therefore aver that unless this Honorable Court issues an Order specifically stating that the Patrono Defendants may not sell, convey, transfer, hypothecate, or otherwise encumber ANY real and personal property that is subject to H&M's lien, the Patrono Defendants will continue to act with the same fraudulent intent previously identified by the Court in its Findings of Law issued on June 16, 2023 using the absence of further specific prohibition on the transfer of assets in the current Order as both a weapon and a shield.

32. Plaintiffs likewise believe and therefore aver that given the Patrono Defendants' past conduct, that Defendants Alan Kim Patrono and Jane Hauser Patrono will follow through with their June 26, 2023, threat to wit: **"Jane will file suit in the local magistrates [sic] court" if Plaintiffs, Hannah Hauser and Melinda Davis do not pay her money she contends she is owed for her interest in 17 On the Square "by July 24, 2023."** *See* **Exhibit "D."**

13

33. Plaintiffs have been and continue to be prejudiced by the Patrono Defendants' continued unwillingness and outright refusal to comply with Orders issued by this Honorable Court. The June 26, 2023, email from Defendant Alan Patrono, that was sent 10 days after the Court issued its Order stating, *inter alia*, "all surviving Counts remain viable and shall be resolved at jury trial commencing October 30, 2023", is yet one more example of the Patrono Defendants' defiance of this Court's Orders and demonstrated willingness to circumvent the same. Thus, an Order prohibiting the Patrono Defendants from instituting <u>any</u> litigation regarding 17 On The Square is hereby requested based on the doctrine of *lis pendens,* as well as this Court's June 16, 2023, Order. Alternatively, the Plaintiffs request that the Court find the Patrono Defendants in contempt of the Court's June 16, 2023, Order should they follow through with the June 26, 2023, threat to "file suit in the local magistrates [sic] court", or in any other court.

34. A request for an Emergency Hearing or Oral argument is respectfully requested on this Motion **ESPECIALLY in light of the threat made by Defendants Alan Kim Patrono and Jane Hauser Patrono to take adverse action against the Plaintiffs, Hannah Hauser and Melinda Davis if they do not meet the Patrono Defendants' stated "deadline" of <u>"July 24, 2023</u>,"** coupled with the fact that the Patrono Defendants are clearly trying to sell assets with the intent to and purpose of hindering the owners of the notes and personal guarantees from collecting the obligations secured thereby from their personal assets. *See* June 16, 2023, Findings of Fact and Conclusions of Law.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court grant their request for Emergency Special Relief and enter Orders of Court directing Defendants Alan Kim Patrono, Jane Patrono, Jonathan Patrono and Polly E. Patrono a/k/a Polly E. Patrono-Carlson, jointly and severally, from (a) Conveying <u>ANY</u> property (real or otherwise) or assets that were pledged as

14

collateral and/or are subject to H&M's lien without further Order of Court; and (b) Prohibiting ALL Defendants from instituting ANY legal proceedings against Plaintiffs and/or communicating threats of legal action for any matters that are the subject of the remaining viable Counts in this litigation to Plaintiffs or other third parties, and further award Plaintiffs' all such other relief as is proper and just including but not limited to their Counsel Fees and Costs attendant with the preparation, filing and presentation of this Motion.

Respectfully submitted,
OBERMAYER REBMANN
MAXWELL & HIPPEL, LLP

Paige Macdonald-Matthes, Esquire
Attorney ID No. 66266
Jennifer L. Bruce, Esquire
Attorney ID No. 329351
200 Locust Street, Suite 400
Harrisburg, PA 17101
(717) 234-9730 Telephone
(717) 236-2485 Facsimile
Email: pmm@obermayer.com
*Attorneys for Plaintiffs*

Date: July 11, 2023

15

VERIFICATION

I, Melinda H. Davis, hereby verify that the statements made in the attached Plaintiffs'

Emergency Motion for Special Relief are true and correct to the best of my knowledge,

information, and belief. I understand that false statements herein are made subject to the

penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

_____
Melinda H. Davis

Dated: 07/10/2023

## VERIFICATION

I, Hannah M. Hauser, hereby verify that the statements made in the attached Plaintiffs'

Plaintiffs' Emergency Motion for Special Relief are true and correct to the best of my

knowledge, information, and belief. I understand that false statements herein are made subject to

the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

_Hannah M. Hauser_

Dated: July 10 2023

# CERTIFICATE OF COMPLIANCE

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

Respectfully submitted,
Obermayer Rebmann Maxwell
& Hippel, LLP

Date: July 11, 2023

Paige Macdonald-Matthes, Esquire
Attorney I.D. #66266
Jennifer L. Bruce, Esquire
Attorney I.D. #329351
200 Locust Street
Harrisburg, PA 17101
Telephone: (717) 221-1609
Facsimile: (717) 236-2485
*Attorneys for Plaintiffs*

16

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Plaintiffs' Emergency Motion for Special

Relief has been served upon all parties of interest via email and by placing the same in the

United States Mail, first-class, postage pre-paid, at Harrisburg, Pennsylvania on this 11th day of

July 2023, and addressed as follows:

Ronald L. Finck, Esquire
Aaron D. Martin, Esquire
Mette, Evans & Woodside
3401 North Front Street
Harrisburg, PA 17110
Email: rlfinck@mette.com
admartin@mette.com
*Counsel for Defendants*

**With Courtesy Copy Hand Delivered to**
The Chambers of President Judge, Michael A. George

Jennifer L. Bruce, Esquire

17

2023 JUL 11 PM 2:39
FILED
ADAMS COUNTY, PA
PROTHONOTARY

# CERTIFICATE OF NON-CONCURRENCE

In accordance with Adams County Local Rule 208.2(d), the undersigned counsel contacted Defendants' counsel by email on July 11, 2023, regarding the subject of the within Emergency Motion for Special Relief and to seek his/their concurrence with the same. Counsel for Defendants did not respond to the undersigned counsel's email by the requested deadline, and thus it is presumed, (given the nature of Plaintiffs' Motion) that Defendants do not concur with the same.

_____
Jennifer L. Bruce, Esquire

2023 JUL 11 PM 2:39
FILED
ADAMS COUNTY, PA
PROTHONOTARY

18

| | |
|---|---|
| H&M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA H. DAVIS, and HANNAH M. HAUSER | IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA |
| **Plaintiff,** | No. 2018-SU-1293 |
| v. | Civil Division |
| ALAN K. PATRONO, JONATHAN ALAN PATRONO, JANE HAUSER PATRONO, POLLY E. PATRONO a/k/a POLLY E. PATRONO-CARLSON, JOHN J. MURPHY, III, PATRONO & MURPHY, LLC, APPLE LEAF ABSTRACTING & SETTLEMENT COMPANY and JOHN DOE(S)/JANE DOE(S) | |
| **Defendants.** | |

## ORDER

AND NOW, this ___ day of July 2023, upon consideration of the Plaintiffs' Emergency Motion for Special Relief, and any response filed thereto by Defendants, Alan K. Patrono, Jane Hauser Patrono, Jonathan Patrono and Polly E. Patrono a/k/a Polly E. Patrono-Carlson, and hearing oral argument on the same it is **HEREBY ORDERED** that Plaintiffs' Emergency Motion for Special Relief is **GRANTED** as follows:

1. The Court's June 16, 2023, Order is hereby modified to include the following additional language in paragraph no. 2: *"Any sale, transfer, or encumbrance of the properties set forth in this paragraph without Court approval shall be deemed void ab inito. Likewise, any sale, transfer, or encumbrance of ANY property of the Defendants,*

19

*real or otherwise, or assets, that were identified, pledged, and/or are otherwise subject to the terms and conditions of Promissory Note No. 1 or Promissory Note No. 2, along with the unconditional guaranties that were sold and assigned to Plaintiff H&M Holdings Group, LLC for the full value of the notes, without Court approval shall be deemed void ab inito."*

2. All named Defendants are hereby bound by the terms and conditions of all Orders issued by the Court in this matter, including but not limited to the Court's June 16, 2023, Order expressly reserving all surviving Counts for resolution at jury trial commencing October 30, 2023. Any attempt by ANY Defendant, jointly or severally, to institute, commence, or threaten to institute or commence litigation involving ANY issue stated in the surviving Counts- directly or indirectly- shall be deemed a Contempt of this Court's June 16, 2023, Order, and appropriate sanctions, including but not limited to an award of additional counsel fees and costs, will be imposed against the Defendants, jointly and severally.

BY THE COURT:

Michael A. George
President Judge

**Distribution List:**
**Paige Macdonald-Matthes, Esquire, and Jennifer L. Bruce, Esquire**, *Obermayer Rebmann Maxwell & Hippel LLP*, 200 Locust Street, Suite 400, Harrisburg, PA 17101, *Counsel for Plaintiffs, H&M Holdings Group, LLC, Hauser Family Farms, LLC, Melinda H. Davis, and Hannah M. Hauser*

**Ronald L. Finck, Esquire and Aaron D. Martin, Esquire,** *Mette, Evans & Woodside*, 3401 North Front Street, Harrisburg, PA 17110, *Counsel for Defendants Alan K. Patrono, Jonathan Alan Patrono, Jane Hauser Patrono, Polly E. Patrono a/k/a Polly E. Patrono-Carlson, John J. Murphy, III, Patrono & Murphy, LLC, and Apple Leaf Abstracting & Settlement Company*

20

# Exhibit A

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
CIVIL

H&M HOLDINGS GROUP, LLC,
HAUSER FAMILY FARMS, LLC,
MELINDA H. DAVIS and
HANNAH M. HAUSER,
                    Plaintiffs

        v.

ALAN K. PATRONO,
JONATHAN ALAN PATRONO,
JANE HAUSER PATRONO,
POLLY E. PATRONO a/k/a
POLLY E. PATRONO-CARLSON,
JOHN J. MURPHY, III,
PATRONO & MURPHY, LLC,
APPLE LEAF ABSTRACTING &
 SETTLEMENT COMPANY and
JOHN DOE(S)/JANE DOE(S),
                    Defendants

2018-SU-1293

2023 JUN 15 PM 3: 20
ADAMS COUNTY, PA
PROTHONOTARY
FILED

## ORDER OF COURT

AND NOW, this 12th day of June, 2023, after argument on Plaintiffs' Motion for Citation of Contempt, it is hereby Ordered:

1.   Defendant Alan Patrono and Jane Hauser Patrono shall file of record verified statements confirming representations made by their counsel that they have not filed 2018 or 2019 federal income tax returns. The verification shall include confirmation that the Internal Revenue Service has not granted an extension to the filing of said returns or, if extension has been granted, proof of the same;

2.   Within thirty (30) days of the date of this Order, Alan Patrono and Jane Hauser Patrono shall provide Plaintiffs with all documentation concerning their income from all sources for the

PURSUANT TO RULE 236
You are hereby notified
that this order has been
entered in this case.

1

calendar years 2018 and 2019. In the event Alan Patrono or Jane Hauser Patrono claim that no such records exist, they shall be precluded at trial from presenting any evidence contesting Plaintiffs' evidence of income received by them during the years 2018 and 2019 or evidence supporting their Counterclaim related to loss of income for the years 2018 and 2019;

3. Within thirty (30) days of the date of this Order, Jonathan Patrono shall provide Plaintiffs with any documentation in his possession concerning his income from all sources for the calendar years 2011 through 2014. In the event Jonathan Patrono claims that no such records exist, he shall be precluded at trial from presenting any evidence contesting Plaintiffs' evidence of income received by him during the years 2011 through 2014 or evidence supporting his Counterclaim related to loss of income for the years 2011 through 2014;

4. Defendants are precluded at trial from presenting any evidence or documentation in support of their Counterclaim Counts III, IV, V, and VI except as set forth herein. Defendants' evidence, including testimony, shall be limited to information contained within the four corners of the documents previously provided by Defendants to Plaintiffs prior to April 25, 2023;

2

5. Alan Patrono is sanctioned and directed to pay legal fees to Plaintiffs' counsel in the amount of $3,500 within ninety (90) days of the date of this Order;

6. Jane Hauser Patrono is sanctioned and directed to pay legal fees to Plaintiffs' counsel in the amount of $3,500 within ninety (90) days of the date of this Order;

7. Jonathan Patrono is sanctioned and directed to pay legal fees to Plaintiffs' counsel in the amount of $3,500 within ninety (90) days of the date of this Order;

8. The Court reserves ruling on the admissibility of Defendants' expert reports until the reports have been made available to the Court for review; and

9. As the Court has sanctioned the Defendants and entered evidentiary rulings, the Motion for Citation of Contempt is denied except as otherwise set forth herein.

6/15 2023 This being a true and attested copy taken from and compared with the original.

Attest:

Deputy Prothonotary

BY THE COURT:

MICHAEL A. GEORGE
President Judge

Paige Macdonald-Matthes, Esquire & Elizabeth K. Lilienthal, Esquire
Ronald L. Finck, Esquire & Aaron D. Martin, Esquire
jvs

3

# Exhibit B

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
CIVIL

H&M HOLDINGS GROUP, LLC,
HAUSER FAMILY FARMS, LLC,
MELINDA H. DAVIS and
HANNAH M. HAUSER,
          **Plaintiffs**

     **v.**

ALAN K. PATRONO,
JONATHAN ALAN PATRONO,
JANE HAUSER PATRONO,
POLLY E. PATRONO a/k/a
POLLY E. PATRONO-CARLSON,
JOHN J. MURPHY, III,
PATRONO & MURPHY, LLC,
APPLE LEAF ABSTRACTING &
  SETTLEMENT COMPANY and
JOHN DOE(S)/JANE DOE(S),
          **Defendants**

2018-SU-1293

## FINDINGS OF FACT

1. H&M Holdings Group, LLC ("H&M") is a limited liability company formed under the laws of the Commonwealth of Pennsylvania. Plaintiffs Melinda Davis and Hannah Hauser are owners of H&M.

2. Plaintiff Hauser Family Farms, LLC ("HFF") is a limited liability company formed under the laws of the Commonwealth of Pennsylvania. Plaintiffs Melinda Davis and Hannah Hauser and Defendant Jane Hauser Patrono are owners of HFF.

3. Hauser Estate, Inc. ("Hauser Estate") is a corporation formed under the laws of the Commonwealth of Pennsylvania. Although Hauser Estate is a non-party to this litigation, bankruptcy proceedings involving that corporation are part of the factual background for some of the claims raised herein. Melinda Davis, Hannah Hauser, Jane Hauser Patrono, Jonathan Patrono, and Polly Patrono were shareholders in Hauser Estate.

4. Plaintiffs Melinda Davis and Hannah Hauser and Defendant Jane Hauser Patrono are related as sisters.

Attest:

Deputy Prothonotary

a certified copy taken from and consistent with the original.

This being

PURSUANT TO RULE 236
You are hereby notified
that this order has been
entered in this case.

5. Defendant Alan Patrono is the husband of Jane Hauser Patrono.

6. Defendant Jonathan Patrono is the son of Alan Patrono and Jane Hauser Patrono.

7. Defendant Polly Patrono a/k/a Polly Patrono-Carlson is the daughter of Alan Patrono and Jane Hauser Patrono and the sister of Jonathan Patrono.

8. In June 2011, Alan Patrono, Jane Hauser Patrono, Jonathan Patrono, Melinda Davis, and Hannah Hauser executed commercial guarantee agreements to Members 1st Federal Credit Union ("Members 1st") to secure a $300,000 line of credit from Members 1st to Hauser Estate ("Promissory Note 1").

9. On October 26, 2011, Alan Patrono, Jane Hauser Patrono, Jonathan Patrono, Melinda Davis, and Hannah Hauser executed commercial guarantees to secure a loan from Members 1st to Hauser Estate and HFF, jointly and severally, in the amount of $1,475,000 ("Promissory Note 2").

10. As of December 21, 2016, Promissory Note 1 and Promissory Note 2 were in default.

11. At some time subsequent to the formation of HFF and Hauser Estate, and prior to December 21, 2016, the relationship between the parties deteriorated. As a result, in early 2018, the parties began to discuss the sale of the Hauser Estate assets to a third party. Ultimately, the parties were unable to agree on terms concerning such a potential sale.

12. Prior to July 2018, some of the parties had retained legal counsel to represent their interests in the business disputes. All parties were aware that cashflow problems of the respective entities threatened the significant investments the parties had made in the business entities.

13. Prior to July 18, 2018, Alan Patrono, Jane Hauser Patrono, Jonathan Patrono became aware that Promissory Note 1 and Promissory Note 2 were being purchased by a third party.

14. By agreement dated July 18, 2018, Members 1st sold and assigned Promissory Note 1 and Promissory Note 2, along with the unconditional guarantees, to H&M for the full value of the notes.

2

15. On July 18, 2018, Alan Patrono and Jane Hauser Patrono executed a deed transferring their ownership in real estate located at 32 West Middle Street, Gettysburg, Pennsylvania ("32 West Middle Street"), to their daughter, Polly Patrono, for consideration of $1. The deed was filed in the Adams County Recorder of Deeds Office on July 24, 2018 in Book 6401, Page 164.

16. 32 West Middle Street is a property housing offices and apartments for lease. Alan Patrono and Jane Hauser Patrono owned the property from 1993 until the date of transfer to their daughter. There is no evidence of record of any lease agreements with or rental payments to Polly Patrono by the tenants in the property during the time period in which the property was titled to Polly Patrono.

17. As of June 30, 2019, after application of the common level ratio, Adams County Tax Services assessed 32 West Middle Street at a fair market value of $295,592.

18. On July 18, 2018, Alan Patrono and Jane Hauser Patrono transferred title of their residence at 98 East Broadway, Gettysburg, Pennsylvania ("98 East Broadway"), to their daughter, Polly Patrono, for consideration of $1. The deed was filed in the Adams County Recorder of Deeds Office on July 24, 2018 in Book 6401, Page 176.

19. As of June 30, 2019, 98 East Broadway was valued by Adams County Tax Services after application of the common level ratio to have a fair market value of $301,312.

20. 98 East Broadway has been the residence of Alan Patrono and Jane Hauser Patrono since September 16, 1994 and, despite the transfer of title, has continued as their residence uninterrupted through the date of hearing.

21. Polly Patrono does not reside at 98 East Broadway but rather resides at 120 Montclair Road, Gettysburg, Pennsylvania, where she has lived continuously at all times relevant to this litigation.

22. On July 18, 2018, Alan Patrono and Jane Hauser Patrono executed a deed transferring their ownership in real estate located at 28 West Middle

3

Street, Gettysburg, Pennsylvania ("28 West Middle Street"), to their daughter, Polly Patrono, for consideration of $1. The deed was filed in the Adams County Recorder of Deeds Office on July 24, 2018 in Book 6401, Page 180.

23. 28 West Middle Street houses the offices of Patrono & Murphy, LLC and Apple Leaf Abstracting & Settlement Company. Both businesses were affiliated with Defendants Alan Patrono and John Murphy, III at all times relevant to this litigation. Defendant Jonathan Patrono was also affiliated with the businesses at various times. Polly Patrono is not affiliated with either business.

24. The businesses referenced in paragraph 23 above have operated continuously out of 28 West Middle Street at all times relevant to this litigation and continue to operate out of the property through the date of hearing. There is no evidence of record concerning the existence of a lease with or rental payments to Polly Patrono by either business during the time period in which she was listed as title owner to the property.

25. Polly Patrono acknowledged that during the approximate three years of her ownership of 28 West Middle Street, she had no control over the property.

26. As of June 30, 2019, after application of the common level ratio, Adams County Tax Services assessed 28 West Middle Street at a fair market value of $400,840.

27. On July 18, 2018, Jane Hauser Patrono executed a deed transferring her ownership of a 43.9 acre tract of vacant land located on the Biglerville Road, Adams County, Pennsylvania ("Biglerville Road property"), to their daughter, Polly Patrono, for consideration of $1. The deed was filed in the Adams County Recorder of Deeds Office on July 24, 2018 in Book 6401, Page 168.

28. As of June 30, 2019, after application of the common level ratio, Adams County Tax Services assessed the Biglerville Road property at $203,632. Because the property is registered in the Clean and Green Program, the

4

fair market value while the property remains in the program as of June 30, 2019 was $11,176.

29. The owners of the Biglerville Road property have not paid municipal or school district taxes on the real estate for the tax years 2018 through 2022. Litigation seeking a judicial sale of the property due to delinquent taxes is currently pending.

30. On July 22, 2018, Jane Hauser Patrono executed a mortgage on the Biglerville Road property to Smigel, Anderson & Sacks, LLP. The mortgage is for an undetermined amount and purports to be security for legal services which Smigel, Anderson & Sacks, LLP performed, or were performing, on behalf of Hauser Estate. The mortgage was filed of record on July 23, 2018 in the Adams County Recorder of Deeds Office at Book 6400, Page 194. The mortgage was executed and recorded subsequent to Jane Hauser Patrono's execution of the deed transferring her ownership in the mortgaged property to Polly Patrono but prior to the recording of the deed which transferred her interest to Polly Patrono.

31. On July 18, 2018, Jonathan Patrono transferred his one-sixth interest in a property consisting of three tracts of land located on Heckenluber Road, Adams County, Pennsylvania ("Heckenluber Road property"), by deed to his sister, Polly Patrono,[1] for consideration of $1. The deed was filed in the Adams County Recorder of Deeds Office on July 18, 2018 in Book 6399, Page 349.

32. The three tracts of the Heckenluber Road property were valued by Adams County Tax Services after application of the common level ratio to have a fair market value of $1,114,608 as of June 30, 2019. The properties are in the Clean and Green Program with their fair market value as of June 30, 2019 to be $451,528.

33. Alan Patrono and Jonathan Patrono, at all relevant times, were licensed to practice law in the Commonwealth of Pennsylvania. Both were familiar with the terms of Promissory Note 1, Promissory Note 2, and the personal

---

[1] The deed identifies Polly Patrono as Polly E. Patrono-Carlson.

5

guarantees provided therewith. Both were aware of their personal liability under the notes.

34. Jane Hauser Patrono understood the terms of Promissory Note 1, Promissory Note 2, and her personal guarantee at the time she executed the same. At all times relevant to this litigation, she was also aware of her personal liability under the guarantee.

35. Prior to July 18, 2018, Jane Hauser Patrono was aware that Promissory Note 1, Promissory Note 2, and the personal guarantees were going to be assigned. She was advised by Alan Patrono that the properties needed to be transferred in order to "protect" them as the assignment of the guarantees would likely result in collection efforts against her.

36. As of July 18, 2018, Jonathan Patrono was aware that his personal guarantee prohibited the transfer of the above mentioned real estate without prior permission of the holder of the notes.

37. Jonathan Patrono executed deeds transferring his interests in the above described properties with the intent to delay the note holder's enforcement of the personal guarantee against him.

38. Jonathan Patrono executed the deeds with the intent and purpose of hindering the owners of the notes and personal guarantee from collecting the obligations secured thereby from his personal assets.

39. Prior to July 18, 2022, Alan Patrono was extensively involved in all negotiations involving HFF and Hauser Estate.

40. Prior to July 18, 2022, Alan Patrono was involved in discussions with Members 1st concerning default on Promissory Note 1 and Promissory Note 2. He was aware default on the notes would result in the notes being due on demand and subject him to personal liability under the guarantees.

41. Alan Patrono, an attorney practicing primarily in real estate since 1986, prepared, or had prepared at his direction, each of the deeds referenced above. He prepared the deeds with knowledge that Promissory Note 1, Promissory Note 2, and the guarantees had been purchased by a third party.

6

42. Subsequent to the time the above referenced deeds were executed, but prior to their recording in the Adams County Recorder of Deeds Office, Alan Patrono became aware as to the identity of the purchaser of Promissory Note 1, Promissory Note 2, and the guarantees. He was also aware that the purchasers of the notes and the guarantees would execute confession of judgment against him. With that knowledge, the above referenced deeds were recorded by him, or at his direction, with the actual intent to hinder and delay collection against the properties pursuant to the confessed judgments.

43. At the time of execution and recording of the above referenced deeds, Alan Patrono was aware of the terms in Promissory Note 1, Promissory Note 2, and the guarantees which prohibited the transfer of his personal assets without prior notice to and the consent of the note holder. Despite this knowledge, Alan Patrono did not disclose to either Members 1st or the purchasers of the notes and guarantees that he intended to transfer, and had actually transferred, title to his real estate.

44. The real estate transferred hereinabove by Alan Patrono represents all of the real estate which he owns within the Commonwealth of Pennsylvania.

45. At the time of the transfers identified hereinabove, Polly Patrono was not in the Commonwealth of Pennsylvania and was unaware as to the execution of the deeds or the transfer of titles to her. She did not become aware of the transfers of property to her until approximately July 31, 2018.

46. Subsequent to being advised that the several properties were being transferred to her, Polly Patrono was further advised by Alan Patrono that she would not be responsible for any costs or expenses related to the properties. She acknowledged she had no control over the properties.

47. On July 27, 2018, H&M, as purchasers of Promissory Note 1, Promissory Note 2, and the guarantees, initiated litigation against Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono pursuant to the confession of judgments contained in the guarantees.

7

48. On July 31, 2018, Alan Patrono and Jonathan Patrono initiated voluntary Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the Middle District of Pennsylvania on behalf of Hauser Estate.

49. Since July 27, 2018, and exclusive of the bankruptcy proceedings, litigation has been commenced in three separate judicial districts concerning the business disputes between the various parties to this litigation.

50. By deeds dated May 7, 2021 and recorded in the Adams County Recorder of Deeds Office on May 12, 2021, Polly Patrono purported to transfer her ownership in 32 West Middle Street, 98 East Broadway, 28 West Middle Street, and the Biglerville Road property to the respective properties' pre-July 18, 2018 owners.

51. By deed dated September 16, 2021, Polly Patrono executed a deed purporting to transfer a percentage ownership in the Heckenluber Road property to Jonathan Patrono in a proportion similar to the proportion owned by Jonathan Patrono prior to July 18, 2018.

52. Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono lacked any viable defense for their actions.

## CONCLUSIONS OF LAW

1. The July 18, 2018 transfers of property were transfers to a family member for nominal consideration.

2. Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono retained possession and control of the respective properties transferred subsequent to the July 18, 2018 transfer.

3. Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono did not disclose, and intentionally concealed, the July 18, 2018 transfers of property despite a contractual obligation to do so.

4. Prior to the July 18, 2018 transfers, Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono were aware of their personal liability under Promissory Note 1 and Promissory Note 2 and were aware that collection efforts on Promissory Note 1 and Promissory Note 2 were imminent.

8

5. On July 18, 2018, Jonathan Patrono transferred substantially all of his assets for nominal consideration.

6. On July 18, 2018, Alan Patrono and Jane Hauser Patrono transferred a significant portion of their assets for minimal consideration.

7. Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono transferred the subject real estate with actual intent to hinder and delay the holder of Promissory Note 1 and Promissory Note 2 efforts to collect on the notes and personal guarantees.

8. The July 18, 2018 transfers of title to real estate, and all subsequent transfers of the real estate, were fraudulent as to H&M.

9. The July 18, 2018 transfers of real estate, and all subsequent transfers of the subject properties, were committed by Alan Patrono, Jane Hauser Patrono, Jonathan Patrono, and Polly Patrono with the common purpose to do the unlawful act of defrauding creditors.

10. Injunctive relief is necessary to prevent immediate and irreparable harm to the Plaintiffs which cannot be adequately compensated by money damages as Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono have evidenced a course of conduct aimed at attempting to render their assets judgment proof.

11. Prohibiting Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono from transferring or encumbering real estate assets will result in lesser harm than the alternative of permitting Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono the ability to hinder collection of or unlawfully avoid Plaintiffs' ability to enforce a judgment should one be obtained in subsequent litigation.

12. Injunctive relief will restore the parties to their status quo as it existed prior to the efforts of Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono to hinder a creditor's ability to enforce an obligation.

13. The rights of Plaintiffs to secure the ability to collect against the assets of Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono in the event of subsequent judgment is clear.

9

14. All transfers of the real estate which are the subject of this litigation were made with actual fraudulent intent pursuant to 12 Pa. C.S.A. § 5104.

15. A viable defense does not exist for the actions of Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono as set forth hereinabove.

For the foregoing reasons, the attached Order is entered.

BY THE COURT:

_____
MICHAEL A. GEORGE
President Judge

Dated: June 16, 2023

10

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
CIVIL

H&M HOLDINGS GROUP, LLC,
HAUSER FAMILY FARMS, LLC,
MELINDA H. DAVIS and
HANNAH M. HAUSER,
                    Plaintiffs

        v.

ALAN K. PATRONO,
JONATHAN ALAN PATRONO,
JANE HAUSER PATRONO,
POLLY E. PATRONO a/k/a
POLLY E. PATRONO-CARLSON,
JOHN J. MURPHY, III,
PATRONO & MURPHY, LLC,
APPLE LEAF ABSTRACTING &
  SETTLEMENT COMPANY and
JOHN DOE(S)/JANE DOE(S),
                    Defendants

2018-SU-1293

## ORDER OF COURT

AND NOW, this 16th day of June, 2023, it is hereby Ordered that judgment is entered, jointly and severally, as follows:

1.  In favor of Plaintiffs and against Defendants Alan Patrono, Jane Hauser Patrono, and Polly Patrono on Count IV of Plaintiffs' Third Amended Complaint;

2.  In favor of Plaintiffs and against Defendants Jane Hauser Patrono and Polly Patrono on Count V of Plaintiffs' Third Amended Complaint;

3.  In favor of Plaintiffs and against Defendants Jonathan Patrono and Polly Patrono on Count VI of Plaintiffs' Third Amended Complaint; and

4.  In favor of Plaintiffs and against Defendants Alan Patrono, Jane Hauser Patrono, Jonathan Patrono, Polly Patrono a/k/a Polly Patrono-Carlson on Count VII of Plaintiffs' Third Amended Complaint.

PURSUANT TO RULE 236
You are hereby notified
that this order has been
entered in this case.

11

It is further Ordered:

1. The following transfers of real estate are voided and the deeds transferring property are vacated:

   a. The Deed dated July 18, 2018 between Alan Patrono and Jane Hauser Patrono, husband and wife, and Polly Patrono, a married woman, recorded in the Adams County Recorder of Deeds Office on July 24, 2018 in Book 6401, Page 164;

   b. The Deed dated May 7, 2021 between Polly Patrono, now joined by her husband, Michael Carlson, husband and wife, and Alan Patrono and Jane Hauser Patrono, husband and wife, as tenants by the entireties, recorded in the Adams County Recorder of Deeds Office on May 12, 2021 in Book 6793, Pages 135-138;

   c. The Deed dated July 18, 2018 between Alan Patrono and Jane Hauser Patrono, husband and wife, and Polly Patrono, a married woman, recorded in the Adams County Recorder of Deeds Office on July 24, 2018 in Book 6401, Page 176;

   d. The Deed dated May 7, 2018 between Polly Patrono, now joined by her husband, Michael Carlson, wife and husband, and Alan Patrono and Jane Hauser Patrono, husband and wife, as tenants by the entireties, recorded in the Adams County Recorder of Deeds Office on May 12, 2021 in Book 6793, Pages 131-134;

   e. The Deed of Correction dated April 18, 2023 between Polly Patrono, now joined by her husband, Michael Carlson, wife and husband, and Alan Patrono and Jane Hauser Patrono, husband and wife, as tenants

12

by the entireties, recorded in the Adams County Recorder of Deeds Office on April 19, 2023 in Book 7083, Page 511;

f. The Deed dated July 18, 2018 between Alan Patrono and Jane Hauser Patrono, husband and wife, and Polly Patrono, a married woman, recorded in the Adams County Recorder of Deeds Office on July 24, 2018 in Book 6401, Page 180;

g. The Deed dated May 7, 2021 between Polly Patrono, now joined by her husband, Michael Carlson, wife and husband, and Alan Patrono, a married man, as to an undivided one-half interest, and Jane Hauser Patrono, a married woman, as to an undivided one-half interest, as tenants in common, recorded in the Adams County Recorder of Deeds Office on May 12, 2021 in Book 6793, Pages 127-130;

h. The Deed dated July 18, 2018 between Jane Patrono, a married woman, and Polly Patrono, a married woman, recorded in the Adams County Recorder of Deeds Office on July 24, 2018 in Book 6401, Page 168;

i. The Deed dated May 7, 2021 between Polly Patrono, now joined by her husband, Michael Carlson, husband and wife, and Jane Patrono, a married woman, recorded in the Adams County Recorder of Deeds Office on May 12, 2021 in Book 6793, Pages 119-126;

j. The Deed dated July 18, 2018 between Jonathan Patrono, as to a one-half (1/2) interest, in the undivided one-third (1/3) interest, and Polly Patrono-Carlson, a married woman, in the undivided one-third (1/3) interest, recorded in the Adams County

13

Recorder of Deeds Office on July 18, 2018 in Book 6399, Page 349; and

k. The Deed dated September 16, 2021 between Polly Patrono-Carlson, a married woman, as to a one-half (1/2) interest, in the undivided one-third (1/3) interest, and Jonathan Patrono, a married man, as to one-half (1/2) interest, in the undivided one-third (1/3) interest, recorded in the Adams County Recorder of Deeds Office on September 17, 2021 in Book 6856, Pages 565-576.

All of the foregoing deeds are deemed void and legally unenforceable. The deeds set forth hereinabove shall have no effect on the title of the properties.

2. Defendants Alan Patrono, Jane Hauser Patrono, Jonathan Patrono, and Polly Patrono a/k/a Polly Patrono-Carlson are enjoined from selling, transferring, or otherwise encumbering the following real properties:

a. The property located at 32 West Middle Street, Gettysburg, Pennsylvania, owned by Alan Patrono and Jane Hauser Patrono, as evidenced by Deed dated November 1, 1993 recorded in the Adams County Recorder of Deeds Office on December 6, 1993 in Book 816, Page 84;

b. The property located at 98 East Broadway, Gettysburg, Pennsylvania, owned by Alan Patrono and Jane Hauser Patrono, as evidenced by Deed dated September 16, 1994 recorded in the Adams County Recorder of Deeds Office on September 16, 1994 in Book 939, Page 300;

14

c.  The property located at 28 West Middle Street, Gettysburg, Pennsylvania, owned by Alan Patrono and Jane Hauser Patrono, as evidenced by Deed dated August 14, 2006 recorded in the Adams County Recorder of Deeds Office on August 29, 2006 in Book 4546, Page 246;

d.  The property located on Biglerville Road, Adams County, Pennsylvania, owned by Jane Patrono, as evidenced by Deed dated September 7, 1988 recorded in the Adams County Recorder of Deeds Office on September 23, 1988 in Book 502, Page 322; and

e.  The property located on Heckenluber Road, Adams County, Pennsylvania, owned by Polly Patrono-Carlson and Jonathan Patrono, as to one-half (1/2) interest as tenants in common and an undivided one-third (1/3) interest in the property, as evidenced by Deed dated December 31, 2012 recorded in the Adams County Recorder of Deeds Office on December 31, 2012 in Book 5782, Page 472.

Any sale, transfer, or encumbrance of the properties set forth in this paragraph without Court approval shall be deemed void ab initio.

3.  Within ten (10) calendar days of the date of this Order, Defendants Alan Patrono, Jane Hauser Patrono, Jonathan Patrono, and Polly Patrono a/k/a Polly Patrono-Carlson shall, individually and/or collectively, obtain a certified copy of this Order of Court at their cost and file the same with the Adams County Recorder of Deeds Office at their cost.

15

4. The Adams County Recorder of Deeds Office is directed to index the certified copy of this Order, which is filed with the Office pursuant to paragraph 3 above, to each of the 16 deeds set forth in paragraphs 1 and 2 hereinabove. All costs to be paid by Alan Patrono, Jane Hauser Patrono, Jonathan Patrono, and Polly Patrono a/k/a Polly Patrono-Carlson jointly and severally.

5. Within ten (10) days of the date of this Order, Jane Hauser Patrono shall provide the law offices of Smigel, Anderson & Sacks, LLP with a copy of the Findings of Fact, Conclusions of Law, and Order of Court by certified mail, return receipt requested, and file proof of service with the Adams County Prothonotary's Office.

6. Within ten (10) days of the date of this Order, Jane Hauser Patrono is directed to pay all delinquent taxes and provide proof that all tax obligations to the Adams County Tax Claim Bureau are paid current for the property identified on Adams County Tax Map as 07-F09-0037E-000, Control No. 00049991, plus any other costs necessary to avoid the property being listed for tax sale and provide proof of the same to the Court and Plaintiffs' counsel.

7. Hearing on the propriety and amount of punitive damages and legal fees assessable against the Defendants shall be held immediately following conclusion of the jury trial scheduled for October 30, 2023.

As judgments entered herein are entered following bifurcation of the various causes of action filed in this matter, all surviving Counts remain viable and shall be resolved at jury trial commencing October 30, 2023.

16

BY THE COURT:

_M̲.̲O̲.̲ ̲A̲.̲ ̲G̲e̲o̲r̲g̲e̲_
**MICHAEL A. GEORGE**
**President Judge**

Paige Macdonald-Matthes, Esquire & Elizabeth K. Lilienthal, Esquire
Ronald L. Finck, Esquire & Aaron D. Martin, Esquire
jvs

17

# Exhibit C

217.  Each individual taking of apples harvested from the real property owned by Plaintiffs Melinda Davis and Hannah Hauser constituted a conversion.

218.  Defendants Kim Patrono and/or Jonathan Patrono are liable to Melinda Davis and Hannah Hauser for the full value of the converted apples harvested from the real property owned by Plaintiffs Melinda Davis and Hannah Hauser.

219.  The total amount of converted apples harvested from the real property owned by Plaintiffs Melinda Davis and Hannah Hauser is presently unknown but will be established through discovery.

WHEREFORE, Plaintiffs Melinda Davis and Hannah Hauser seek compensatory and punitive damages against the named Defendants in Count IX in excess of the compulsory arbitration limit of Adams Count, exclusive of interests and costs, and further award Plaintiffs all such other relief as is proper just under existing law and equity.

## COUNT X

### CIVIL CONVERSION

### PLAINTIFFS, MELINDA DAVIS AND HANNAH HAUSER V. DEFENDANTS KIM PATRONO AND JANE PATRONO

220.  The allegations of the foregoing paragraphs are incorporated by reference as if fully set forth herein.

221.  Plaintiffs Melinda Davis and Hannah Hauser are partial owners along with their sister Defendant Jane Patrono of certain real property located in downtown Gettysburg referred to herein as 17 On The Square.

222.  Upon information and belief, Defendant Jane Patrono wrongfully took advances against a LOC issued by PNC Bank relating to 17 On The Square and diverted such advances to herself, herself and her husband, Defendant Kim Patrono.

223. Defendant Jane Patrono also removed $20,000 from the business operating account of 17 On the Square to pay the Hauser Estate payroll without Plaintiffs, Hannah Hauser and Melinda Davis' knowledge and/or consent.

224. Upon information and belief, Defendant Jane Patrono took such advances against the LOC acting on the advice, counsel, urging and/or special insistence, and request of Defendant Kim Patrono, who was at the time serving as legal counsel for Plaintiff Melinda Davis, Defendant Kim Patrono knew or should have known that said advances against the LOC by Defendant Jane Patrono were for the benefit of Hauser Estate and/or Defendants Kim Patrono and Jane Patrono personally.

225. Defendant Kim Patrono likewise knew that Defendant Jane Patrono did not have the other business account holders' consent when she surreptitiously removed the $20,000 to use to pay the Hauser Estate payroll.

226. Defendant Jane Patrono had no right, title, or other interest in the LOC advances or in the $20,000 withdrawal from the operating account which she diverted to herself, her husband and/or Hauser Estate.

227. Defendants Kim Patrono and Jane Patrono took possession of LOC advances and business account withdrawals made by Defendant Jane Patrono, which they diverted to themselves and/or Hauser Estate without the consent of either Melinda Davis or Hannah Hauser or other lawful justification.

228. Each individual diversion of a LOC advance constitutes a conversion.

229. The removal of the $20,000 from the operating account of 17 On the Square constitutes a conversion as well.

230. Defendants Kim Patrono and Jane Patrono are liable to Plaintiffs Hannah Hauser and Melinda Davis for the full value of all LOC advances which Defendant Jane Patrono diverted to

52

herself, her husband, and/or Hauser Estate, as well as for the $20,000 surreptitiously withdrawn from the business operating account by Defendant Jane Patrono.

231. The amount of converted LOC advances taken by Defendant Jane Patrono for the benefit of herself, her husband and/or Hauser Estate, is at least $50,000, but the total amount (principal and interest) will be established through discovery.

WHEREFORE, Plaintiffs Melinda Davis and Hannah Hauser seek compensatory and punitive damages against the named Defendants in Count X in excess of the compulsory arbitration limit of Adams County, exclusive of interests and costs, and further award Plaintiffs all such other relief as is proper just under existing law and equity.

Respectfully submitted,

OBERMAYER, REBMANN, MAXWELL & HIPPEL LLP

Date: May 3, 2023

Paige Macdonald-Matthes, Esquire
Attorney No. 66266
Elizabeth K. Lilienthal, Esquire
Attorney ID 327248
200 Locust Street, Suite 400
Harrisburg, PA 17101
(717) 234-9730 Telephone
(717) 236-2485 Facsimile

53

## VERIFICATION

I, Melinda H. Davis, hereby verify that the statements made in the attached Plaintiffs' Fourth Amended Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 Pa.C.S. § 4904 relating to unsworn falsification to authorities.

I certify that I am a duly authorized representative of H & M Holdings, Group, LLC and as such, am authorized to make this Verification on its behalf

H & M Holdings, LLC

_Melinda H Davis_
Melinda H. Davis

Dated: 5/2/2023

4866-6981-7697

# Exhibit D

**Macdonald-Matthes, Paige**



**From:** Alan Kim Patrono <alank@appleleaf.com>
**Sent:** Monday, June 26, 2023 12:59 PM
**To:** Richard Thrasher <richard@puhlandthrasher.com>
**Cc:** Jane Patrono (janepatrono@comcast.net) <janepatrono@comcast.net>
**Subject:** FW: 17 Lincoln Square tax bill

Rich:

I am on behalf of Jane following up on this matter and two others that concern 17.

1

1. I have not heard anything concerning Hannah and Melinda's capital account deficit which should be paid to Jane. Please consider this notice to make the necessary payments to Jane to bring the capital accounts equal for all three sisters or Jane will file suit in the local magistrates court.

2. According to my information 17 paid $46,000 to refurbish the sister's father's Jeep. The Jeep is apparently located at the winery and is being used by Hauser Hill, an entity not owned by Jane as part of the labels for the proposed new Hauser Hill wine. You can view a presentation of such on the Hauser Hill website. Jane was not consulted nor gave her consent to use the Jeep as a promotional tool for Hauser Hill. We need to address this issue. I look forward to a response by virtue of a proposal. If such a proposal is not forthcoming Jane retains all her rights and remedies to include but not limited to informing the State and Federal licensing agencies of the failure to secure her consent.

3. As you are aware when 17 was sold the parties entered into an agreement to hold the proceeds in escrow or to use them to purchase a replacement property pursuant to section 1031 of the IRS code. It is my understanding that Hannah and Melinda have violated that agreement by not using the proceeds for a 1031 replacement property but instead have secured the return of the proceeds instead of leaving the proceeds in escrow. The purpose of this portion of the email is to demand the return of the proceeds to escrow as per the agreement. Should Hannah and Melinda refuse to do so Jane will consider them in default of the agreement leaving her with the ability to do whatever she wishes with her proceeds.

Hannah and Melinda have until July 24 to address these issues or Jane will proceed with the remedies outlined above.


Kim




**From:** Alan Kim Patrono
**Sent:** Monday, March 27, 2023 12:17 PM
**To:** Richard Thrasher <richard@puhlandthrasher.com>
**Subject:** FW: 17 Lincoln Square tax bill



Rich;

On the 23rd a letter was sent by their other counsel telling me that we should not contact Melinda or Hannah directly and pointing out that you represented them in the 17 sale so I am forwarding the email chain to you with the demand that they pay Jane the monies.

I do not know how John Martin arrived at his conclusion nor did I ask him because I just accepted his conclusion which is stated on the tax return signed by Melinda.

Kim

2

**From:** Alan Kim Patrono <alank@appleleaf.com>
**Sent:** Thursday, March 23, 2023 1:04 PM
**To:** Melinda Davis <hausercider@gmail.com>
**Cc:** Hannah Hauser <gettysburghannah@gmail.com>; john@rmfcpallc.com
**Subject:** Re: 17 Lincoln Square tax bill


Melinda:

I have been waiting for your reply. I talked to John Martin and he tells me he has explained everything to you and sent you proof that the return is correct.

Kim


**From:** Melinda Davis <hausercider@gmail.com>
**Sent:** Friday, March 17, 2023 11:24 AM
**To:** Alan Kim Patrono <alank@appleleaf.com>
**Cc:** Hannah Hauser <gettysburghannah@gmail.com>; john@rmfcpallc.com <john@rmfcpallc.com>
**Subject:** Re: 17 Lincoln Square tax bill


I expected your response. I will send you the explanation when I get home.

Since Jane started taking out $1000 or more every month, since 2018, there has been a record kept. Over the five years Hannah & I were not able to take out on specific months b/c of bills that were due, interest for the LOC due that you took from 17, etc. We took out sums, on occasion. It evens out…$40,000 to each sister, total.

Ask Jane for her records for every month, taking her "share" since (not sure of month) 2018. Melinda


Sent from my iPhone


> On Mar 17, 2023, at 11:01 AM, Alan Kim Patrono <alank@appleleaf.com> wrote:


Melinda:

I obviously got your email and I picked up the tax returns when John Martin told me they were available.

3

In reviewing the tax returns which are to be the final return I noticed that the capital accounts were not equal. Jane's was a positive 10,000 plus and yours and Hannah's were a negative 5,000 plus.

I asked John what that meant and was told that for them to be equal you and Hannah would owe Jane each the 5,000 plus less 1/2 of the accounting bill.

I copied John in case you want to check with him.

Kim

**From:** Melinda Davis <hausercider@gmail.com>
**Sent:** Thursday, March 16, 2023 9:00 PM
**To:** JANE PATRONO <janepatrono@comcast.net>
**Cc:** Alan Kim Patrono <alank@appleleaf.com>
**Subject:** 17 Lincoln Square tax bill

Please send/pay your share of the 17 Tax preparation to John Martin.

$533.34..
thanks,

Melinda

cc  Hannah

4

# Exhibit E

**PARTNER# 1**

651121

Schedule K-1
(Form 1065)
Department of the Treasury
Internal Revenue Service

**2021**

For calendar year 2021, or tax year

OMB No. 1545-0123

| | Final K-1 | | Amended K-1 |

beginning _____ ending _____

**Partner's Share of Income, Deductions, Credits, etc.** ▶ See back of form and separate instructions.

| Part I | Information About the Partnership |

A Partnership's employer identification number

B Partnership's name, address, city, state, and ZIP code

HAUSER FAMILY FARMS LLC

PO BOX 510
FAIRFIELD          PA 17320

C IRS Center where partnership filed return ▶

E-FILE

D ☐ Check if this is a publicly traded partnership (PTP)

| Part II | Information About the Partner |

E Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)

F Name, address, city, state and ZIP code for partner entered in E. See instructions

JANE H. PATRONO

98 EAST BROADWAY
GETTYSBURG        PA 17325

| | | |
|---|---|---|
| G | ☒ General partner or LLC member-manager | ☐ Limited partner or other LLC member |
| H1 | ☒ Domestic partner | ☐ Foreign partner |
| H2 | ☐ If the partner is a disregarded entity (DE), enter the partner's: | |

TIN _____
Name _____

I1 What type of entity is this partner?  **INDIVIDUAL**

I2 If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here ▶ ☐

J Partner's share of profit, loss and capital (see instructions)

| | Beginning | Ending |
|---|---|---|
| Profit | 33.333334 % | 33.333334 % |
| Loss | 33.333334 % | 33.333334 % |
| Capital | 33.333334 % | 33.333334 % |

Check if decrease is due to sale or exchange of partnership interest ▶ ☐

K Partner's share of liabilities

| | | Beginning | | Ending |
|---|---|---|---|---|
| Nonrecourse | $ | | $ | |
| Qualified nonrecourse financing | $ | | $ | |
| Recourse | $ | 124,751 | $ | 161,838 |

Check this box if Item K includes liability amounts from lower tier partnerships ▶ ☐

| L | Partner's Capital Account Analysis |

| | | |
|---|---|---|
| Beginning capital account | $ | 335,007 |
| Capital contributed during the year | $ | |
| Current year net income (loss) | $ | -24,858 |
| Other increase (decrease) (attach explanation) STMT | $ | -1 |
| Withdrawals & distributions | $ ( | ) |
| Ending capital account | $ | 310,148 |

M Did the partner contribute property with a built-in gain (loss)?
☐ Yes  ☒ No   If "Yes", attach statement. See instructions

N  Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)

Beginning $ _____
Ending $ _____

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |

| | | | | |
|---|---|---|---|---|
| 1 | Ordinary business income (loss) | -32,747 | 14 | Self-employment earnings (loss) |
| 2 | Net rental real estate income (loss) * | -4,038 | A | -32,747 |
| 3 | Other net rental income (loss) | | B | 179,036 |
| 4a | Guaranteed payments for services | | 15 | Credits |
| 4b | Guaranteed payments for capital | | 16 | Schedule K-3 is attached if checked ▶ ☐ |
| 4c | Total guaranteed payments | | 17 | Alternative minimum tax (AMT) items |
| 5 | Interest income | | A | -803 |
| 6a | Ordinary dividends | | | |
| 6b | Qualified dividends | | 18 | Tax-exempt income and nondeductible expenses |
| 6c | Dividend equivalents | | B* | 12,242 |
| 7 | Royalties | | C* | STMT |
| 8 | Net short-term capital gain (loss) | | | |
| 9a | Net long-term capital gain (loss) | | 19 | Distributions |
| 9b | Collectibles (28%) gain (loss) | | | |
| 9c | Unrecaptured section 1250 gain | | 20 | Other information |
| 10 | Net section 1231 gain (loss) | | N | STMT |
| 11 | Other income (loss) | | Z* | STMT |
| | | | AG* | STMT |
| 12 | Section 179 deduction | | 21 | Foreign taxes paid or accrued |
| 13 | Other deductions | | | |
| A | 8 | | | |

| 22 | ☐ More than one activity for at-risk purposes* |
| 23 | ☐ More than one activity for passive activity purposes* |

*See attached statement for additional information.

For IRS Use Only

For Paperwork Reduction Act Notice, see Instructions for Form 1065.
DAA
www.irs.gov/Form1065
Schedule K-1 (Form 1065) 2021

# Exhibit F

OPERATING AGREEMENT
OF
*Hauser Family Farms, LLC*
(A Pennsylvania Limited Liability Company)


This Operating Agreement of *Hauser Family Farms* (the "Company"), dated this 20th day of _____ , 2007, has been adopted by and between the Members of the Company.


## RECITALS

A.      The Company is to be organized as a Pennsylvania limited liability company by the filing of a certificate of organization with the Department of State of the Commonwealth of Pennsylvania under and pursuant to the Act.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and intending to be legally bound hereby, the Members agree as follows:

1.      Definitions. In addition to the terms defined in other provisions of this Agreement, the following terms shall have the meanings set forth below unless the context requires otherwise:

"Act." The Pennsylvania Limited Liability Company Law of 1094, 15 Pa.C.S. § 8901, et seq., and any successor statute, as amended from time to time.

"Affiliate." As to any Person, any other Person that directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with such Person or, if such Person is an individual, the Immediate Family of such Person or trusts solely for the benefit of such Immediate Family. As used in this definition, the term "control" means the possession, directly or indirectly, or as trustee or executor, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, as trustee or executor, by contract or credit arrangement or otherwise.

"Agreement." This Operating Agreement, as amended, modified, supplemented, or restated from time to time.

"Capital Account." The individual account maintained by the Company with respect to each Member as provided in Section 7.

"Capital Contribution." The aggregate amount of cash and the agreed value of any property or services (as determined by the Member and the Company) contributed by each Member to the Company as provided in section 6. In the case of a Member that acquires a Membership Interest in the Company by an assignment or transfer in accordance with the terms of this Agreement, "Capital Contribution" means the Capital Contribution of that Member's predecessor proportionate to the acquired Membership Interest.

"Certificate." The certificate of organization of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Department of State of the Commonwealth of Pennsylvania pursuant to the Act.

"Claim." See section 21(b).

"Code." The Internal Revenue Code of 1986, as amended.


**EXHIBIT**
tabbies
JAP-7
1/19/23        BK

"Company." See the preamble.

"Covered Person." A Member, any Affiliate of a Member, any officer, director, shareholder, partner, employee, representative, or agent of a Member, or their respective Affiliates, or any officer, employee, or agent of the Company or its Affiliates.

"Damages." See section 21(a).

"Immediate Family." With respect to any individual, such individual's parents, spouse, issue, and adopted children, or any of them.

"Indemnified Party." See section 21(b).

"Laws." Any of the following:

(1)      all constitutions, treaties, laws, statutes, codes, ordinances, orders, decrees, rules, regulations, and municipal bylaws, whether domestic, foreign, or international;

(2)      all judgments, orders, writs, injunctions, decisions, rulings, decrees, and awards of any governmental body;

(3)      all policies, practices, and guidelines of any governmental body; and

(4)      any amendment, modification, re-enactment, restatement, or extension of any of the foregoing, in each case binding on or affecting the party or Person referred to in the context in which such word is used.

"Majority Vote." The written approval of, or the affirmative vote by, Members holding a majority of the Voting Rights.

"Manager." A Person designated by the initial member to act as the manager of the Company pursuant to the powers set forth in this Agreement.

"Member." A Person who at the time is a member of the Company. "Members" means two or more Persons when acting in their capacities as members of the Company. For purposes of the application of a provision of the Act to the Company, the Members shall constitute one class or group of members. Annex A shall be amended from time to time to show the current Members.

"Membership Interest." The interest of a Member in the Company, including, without limitation, interests in the profits and losses, rights to distributions (liquidating or otherwise), allocations and information, and rights to consent to or approve actions by the Company, all in accordance with the provisions of this Agreement and the Act.

"Notice." See section 31(b).

"Percentage Interest." The proportionate Membership Interest of a Member expressed as a percentage as shown on Annex A.

"Person." A natural person, corporation, general or limited partnership, limited liability company, joint venture, trust, estate, association, or other legal entity or organization.

"Profits and Losses." For each taxable year or other period, an amount equal to the Company's taxable income or loss for that year or period, determined in accordance with Code

§ 703(a) (for these purposes, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code § 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(1) Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be added to such taxable income or loss.

(2) Any expenditures of the Company described in Code section 705(a)(2)(B) or that are treated as Code § 705(a)(2)(B) expenditures pursuant to Treas. Reg. § 1.704-1(b)(2)(iv)(i) and not otherwise taken into account in computing Profits and Losses pursuant to the foregoing shall be subtracted from such taxable income or loss.

(3) In the event the Gross Asset Value of any Company asset is adjusted pursuant to paragraph (2), (3), or (4) of the definition of Gross Asset Value, the amount of the adjustment shall be taken into account as gain or loss from the disposition of the asset for purposes of computing Profits and Losses.

(4) Gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of the property differs from its Gross Asset Value.

(5) In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for the taxable year or other period, computed in accordance with the definition of Depreciation under this Agreement.

(6) Notwithstanding the above, any items that are specially allocated to certain Members shall not be taken into account in computing Profits and Losses.

"Tax Payment Loan." See section 14.

"Treasury Regulations" or "Treas. Regs." The income tax regulations, including temporary regulations, promulgated under the Code, as those regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Voting Rights." The number of votes of each Member (as set forth in section 16(b)) for the purpose of voting on any matter arising under this Agreement.

"Withholding Tax Act." See section 14.

2. Organization. The Members hereby authorize the organization of the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties, and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Jonathan Patrono, Esq., as an authorized person, shall execute, deliver, and file the Certificate.

3. Purpose.

(a) The Company is formed for the object and purpose of, and the nature of the business to be conducted and promoted by the Company is, operating real estate for a family farm operation and engaging in any lawful act or activity for which limited liability companies may be

organized under the Act and engaging in any and all activities necessary, convenient, desirable, or incidental to the foregoing.

(b) The Company shall be required to enter into a lease with Hauser Estate, Inc., such that Hauser Estate, Inc. shall be responsible for the maintenance of the property plus, upon determination of the Board of Directors, Inc., a cash rental based upon the earnings of Hauser Estate, Inc. The initial Lease shall be twenty-five (25) years and six (6) months. At no time shall Hauser Family Farms, LLC be entitled to lease the premises to anyone other than Hauser Estate, Inc., unless approved in writing by Hauser Estate, Inc.

4. Term. The existence of the Company shall commence on the date the Certificate is filed in the office of the Department of State of the Commonwealth of Pennsylvania and shall continue until the Company is dissolved in accordance with the provisions of this Agreement.

5. Principal Office. The principal office of the Company shall be located at 30 West Middle Street, Gettysburg PA 17325, or at such other location as may be determined, from time to time, by the Members. The Company may also have such other offices at such other locations as, from time to time, may be determined by the Members.

6. Company Capital and Percentage Interests.

(a) Initial Capital Contributions. The initial Capital Contribution that each Member has made or is deemed to have made to the Company is set forth opposite the Member's name in Annex A.

(b) Additional Capital Contributions. A Member shall not be required to make any capital contribution to the Company not specifically agreed to in writing between the Member and the Company, or be obligated or required under any circumstances to restore any negative balance in the Member's Capital Account.

(c) No Interest. Interest shall not be paid on or with respect to the Capital Contribution or Capital Account of any Member.

(d) No Right to Return of Capital Contributions. Although the Company may make distributions to the Members from time to time as a return of their Capital Contributions, a Member shall not have the right to withdraw or demand a return of any of the Member's Capital Contribution or Capital Account, except upon dissolution or liquidation of the Company.

(e) Percentage Interests. The Percentage Interest of each Member shall be as set forth in Annex A.

7. Capital Accounts.

At all times while there is more than one Member, a Capital Account shall be established and maintained on the books of the Company for each Member.

(a) Tax Provisions. The allocation and capital account maintenance provisions of Treasury Regulations under section 704 of the Code are hereby incorporated by reference, including a "qualified income offset" within the meaning of Treas. Reg. § 1.704-1(b)(2)(ii)(d), the rules regarding allocation of "partner nonrecourse deductions" under Treas. Reg. § 1.704-2(i)(1), "minimum gain chargeback" under Treas. Reg. § 1.704-2(f) and "partner nonrecourse debt minimum gain chargeback" under Treas. Reg. § 1.704-2(i)(4), and the limitation on allocation of losses to any Member that would cause a deficit capital account in excess of such Member's capital contribution obligations and share of

minimum gain and partner nonrecourse debt minimum gain under Treas. Reg. § 1.704-1(b)(2)(ii)(d) as modified by Treas. Reg. §§ 1.704-2(g)(1) and 1.704-2(i)(6).

(b)    Contributed Property. To the extent contributed property has a fair market value at the time of contribution that differs from the contributing Member's basis in the property, and to the extent the carrying value of property of the Company for Capital Account purposes otherwise differs from the Company's basis in such property, depreciation, gain, and loss for capital account purposes shall be computed by reference to such carrying value rather than such tax basis. In accordance with section 704(c) of the Code, income, gain, loss, and deduction with respect to such property shall, solely for tax purposes, be shared among the Members so as to take account of the variation between the basis of the property to the Company and its fair market value at the time of contribution, or at the time that the carrying value of such property is adjusted under Treas. Reg. § 1.704-1(b)(2)(iv)(f), as the case may be.

8.    Allocation of Profits or Losses. At all times while there is more than one Member, Profits or Losses shall be allocated to the Members in accordance with Percentage Interests, except as otherwise provided in section 7.

9.    Distributions.

(a)    General Rule. Subject to subsection (b), distributions of cash and/or other assets or property of the Company, from whatever source (including, without limitation, net proceeds of Company operations and sale, and financing or refinancing of Company assets) shall be made to the Members in accordance with their respective Percentage Interests at such times, and in such amounts, as the Members shall determine. In making determinations regarding distributions, the Members may set aside funds and establish reserves for such items as the Members shall determine, including, without limitation, working capital, maintenance of bowling capacity, capital expenditures, acquisition of other assets by the Company, and the satisfaction of liabilities (including, without limitation, contingent liabilities).

(b)    Minimum Distribution. With respect to any taxable year of the Company in which Members are allocated taxable income for federal income tax purposes (and for this purpose all items of income, gain, loss, or deduction required to be separately stated pursuant to section 703 of the Code shall be included in the calculation of taxable income (other than the amount, if any, by which capital losses exceed capital gains)), the Company shall distribute to the Members, within 90 days after the close of that taxable year, no less than the amount determined by multiplying the Company's taxable income (computed as set forth in this sentence) by the highest composite federal, state, and local income tax rate applicable to any Member. For purposes of the preceding sentence, the Company's taxable income for a year shall be reduced by any net loss of the Company in prior years that has not previously been so taken into account under this section 9(b). Nothing herein shall require the Company to borrow money or reduce its cash flow so as to restrict its ability to operate the day-to-day activities of the business in order to make such distributions.

10.    Establishment of Reserves. The Members shall have the right and obligation to establish reasonable reserves for maintenance, improvements, acquisitions, capital expenditures, and other contingencies, such reserves to be funded with such portion of the operating revenues of the Company as the Members may deem necessary or appropriate for that purpose.

11.    Tax Returns. The Members shall arrange for the preparation of all tax returns required to be filed for the Company. Each Member shall be entitled to receive copies of all federal, state, and local income tax returns and information returns, if any, which the Company is required to file. All information needed by the Members and other Persons who were Members during the

applicable taxable year for income tax purposes shall be prepared by the Company's accountants and furnished to each such Person after the end of each taxable year of the Company.

12. Tax Elections.

(a) Elections to be Made. To the extent permitted by applicable tax law, the Company may make the following elections on the appropriate tax returns:

(1) to adopt the calendar year as the Company's taxable year;

(2) to adopt the cash method of accounting and to keep the Company's books and records on the income-tax method;

(3) if a transfer of a Membership Interest as described in section 743 of the Code occurs, on written request of the transferee, or if a distribution of Company property is made on which gain described in section 734(b)(1)(A) of the Code is recognized or there is an excess of adjusted basis as described in section 734(b)(1)(B) of the Code, to elect, pursuant to section 754 of the Code, to adjust the basis of Company properties;

(4) to elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company ratably over a period of 60 months as permitted by sections 195 and 709(b) of the Code; and

(5) any other election the Members may deem appropriate and in the best interests of the Members.

(b) No Election of Corporate Taxation. Neither the Company nor any Member may make an election for the Company to be taxable as a corporation for federal income tax purposes or to be excluded from the application of the provisions of subchapter K of chapter 1 of subtitle A of the Code or any similar provisions of applicable state law, and no provision of this Agreement shall be construed to sanction or approve such an election.

13. Tax Matters Partner. If the Company is subject to the consolidated audit procedures of sections 6221 to 6234 of the Code, the "tax matters partner" of the Company pursuant to section 6231(a)(7) of the Code shall be a Member that is designated as such by vote of the Members. Any Member who is designated "tax matters partner" shall take such action as may be necessary to cause each other Member to become a "notice partner" within the meaning of section 6223 of the Code. Any Member who is designated "tax matters partner" shall inform each other Member of all significant matters that may come to its attention in its capacity as "tax matters partner" by giving notice thereof on or before the fifth Business Day after becoming aware thereof and, within that time, shall forward to each other Member copies of all significant written communications it may receive in that capacity. The Company shall reimburse the tax matters partner for any costs incurred representing the interests of the Members in respect of Company tax matters.

14. Tax Withholding. Unless treated as a Tax Payment Loan, any amount paid by the Company for or with respect to any Member on account of any withholding tax or other tax payable with respect to the income, profits, or distributions of the Company pursuant to the Code, the Treasury Regulations, or any state or local statute, regulation, or ordinance requiring such payment (each a "Withholding Tax Act") shall be treated as a distribution to the Member for all purposes of this Agreement. To the extent that the amount required to be remitted by the Company under a Withholding Tax Act exceeds the amount then otherwise distributable to the Member, the excess shall constitute a loan from the Company to the Member (a "Tax Payment Loan"). Each Tax

Payment Loan shall be payable upon demand and shall bear interest, from the date that the Company makes the payment to the relevant taxing authority, at the applicable federal short-term rate under section 1274(d)(1) of the Code, determined and compounded semiannually. So long as any Tax Payment Loan or the interest thereon remains unpaid, the Company shall make future distributions due to the Member under this Agreement by applying the amount of any such distribution first to the payment of any unpaid interest on all Tax Payment Loans of the Member and then to the repayment of the principal of all Tax Payment Loans of the Member. The Members shall take all actions necessary to enable the Company to comply with the provisions of any Withholding Tax Act applicable to the Company and to carry out the provisions of this subsection.

15. Conflicts of Interest.

(a) Other Business Interests. Any Member or Affiliate thereof may engage in or possess an interest in other business ventures of any nature or description, independently or with others, similar or dissimilar to the business of the Company, and the Company and the Members shall have no rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom, and the pursuit of any such venture, even if competitive with the business of the Company, shall not be deemed wrongful or improper. No Member or Affiliate thereof shall be obligated to present any particular investment opportunity to the Company even if the opportunity is of a character that, if presented to the Company, could be taken by the Company, and any Member or Affiliate thereof shall have the right to take for its own account (individually or as a partner or fiduciary) or to recommend to others any such particular investment opportunity.

(b) Interested Transactions. A contract or transaction between the Company and one or more of its Members or between the Company and another domestic or foreign association in which one or more of its Members have a management role or a financial or other interest, shall not be void or voidable solely for that reason, or solely because the Member is present at or participates in the meeting of the Members that authorizes the contract or transaction, or solely because the vote of the Member is counted for that purpose, if:

(1) the material facts as to the relationship or interest and as to the transaction are disclosed or known to the Members entitled to vote thereon and the contract or transaction is specifically approved in good faith by vote of those Members; or

(2) the contract or transaction is fair to the Company as of the time it is authorized, approved, or ratified by the Members.

16. Control and Management.

(a) Power and Authority of the Manager. Management of the business and affairs of the Company shall be vested in the Manager, who shall either be a member then designated as a Managing Member or a non-member then designated as Manager. Except as otherwise provided in this Agreement, any decision, determination, or other action to be made or taken by the Manager shall be as made by all the Members. The Manager shall be Melinda H. Davis who, after certain contemplated gifts, shall be the Managing Member. Should Melinda H. Davis be unwilling or unable to serve, the Manager shall be Jonathan A. Patrono. The Manager shall have all rights and powers relating to the Company, including, but not limited to, the following:

(1) to retain all or any part of the Company's assets as long as the Members deem advisable, and to invest, reinvest, and keep invested all or any part thereof, without being restricted in any way with respect to the type of assets retained or invested in or with respect to the portion of the assets devoted to any investment;

(2)     to purchase, lease, or otherwise acquire the ownership, use, or benefit of assets, properties, rights, or privileges, real or personal, tangible or intangible, of any kind or description, whether income producing or not;

(3)     to sell, pledge, mortgage, lease without limit of time, exchange, or to grant options for the purchase, lease, or exchange of any Company assets, on such terms and conditions as the Members may determine;

(4)     to institute any legal action or proceeding on behalf of the Company;

(5)     to assign, transfer, pledge, compromise, or release any claims or debts due the Company;

(6)     to vote at any election or meeting of any corporation, partnership, limited liability company, joint venture, or other entity, in person or by proxy, to appoint agents to do so in the place and stead of the Members, and to exercise all rights (including without limitation approval and consent rights) that the Company may have with respect to such entity, whether pursuant to applicable law, governing documents, contracts, or otherwise;

(7)     to borrow money for any purpose that the Members consider to be for the benefit of the Company or to facilitate its administration, and to mortgage or pledge Company assets to secure the repayment thereof;

(8)     to retain and pay custodians, accountants, counsel, and other agents and to incur any other expenses which are reasonably related to the operation of the Company;

(9)     to enter into agreements with, and to fix and adjust the compensation of, employees of the Company; and

(10)     to invest in time deposits and savings accounts and to maintain banking accounts in any institutions determined by the Members.

(b)     <u>Voting Rights</u>.  Each Member shall have that number of Voting Rights as equals such Member's Percentage Interest in the Company (e.g., a Member who has a 10% Membership Interest in the Company has 10 Voting Rights).

(c)     <u>Voting Procedures</u>.  Members may vote in person or by proxy at a meeting of Members (which may be held by conference telephone), or by consent in lieu of a meeting. Proxies and consents shall be in writing or communicated by electronic means.

(d)     <u>Binding Effect of Actions</u>. Each Member shall be bound by, and hereby consents to, any and all actions taken and decisions made by the Manager in accordance with the terms of this Agreement. Any person designated by the Members, including a Member so designated, shall have the authority to bind the Company. Any act taken by, or any document executed by, Members holding a majority of the Voting Rights shall be binding on the Company with the same force and effect as if the action, or the execution of the document, were approved by a vote of the Members. Except as provided in this section 16(d), no Member shall have authority to bind the Company.

(e)     <u>Business Transactions</u>. Notwithstanding any other provision of this Agreement, unless approved by Members holding sixty-six percent (66%) of the Voting Rights, the Company may not:

(1)     engage in a merger or consolidation with or into any corporation, partnership, limited liability company, or any other entity, whether or not the Company shall be the surviving entity of such merger or consolidation;

(2)     sell all or substantially all of its assets to any person or entity;

(3)     divide into two or more limited liability companies; or

(4)     engage in any similar business transaction.

(5)     to borrow money for any purpose that the Members consider to be for the benefit of the Company or to facilitate its administration, and to mortgage or pledge Company assets to secure the repayment thereof;

17. Transfer of Interests; Admission of Additional Members.

(a)     It is the intent of the existing Sole Member to transfer her interest in part or in full to her three daughters and that they shall be governed by a Member's Agreement to be executed at the time of the first transfer.

(b)     Admission of new Members shall be governed by be Members Agreement to be executed by the original Member's daughters, pursuant to paragraph 17a.

18.     Dissolution.

(a)     Events of Dissolution. The Company shall dissolve, and its affairs shall be wound up, in accordance with the terms of the Member Agreement set forth in paragraph 17a.

(b)     Distributions upon Dissolution. In the event of the dissolution of the Company, the assets of the Company shall be liquidated in such manner as the Members shall determine and, after the obligations of the Company to third parties have been discharged or provided for in accordance with applicable law, the net proceeds of the liquidation shall be distributed in accordance with the following procedure:

(1)     The net proceeds shall be distributed first, among the Members, if any, who have made unrepaid loans or advances to the Company, in an amount up to the aggregate amount of such unrepaid loans and advances, and in proportion to the amount of such loans and advances and the unpaid interest thereon.

(2)     The Company may sell any or all Company property, including to Members, and any resulting gain or loss from each sale shall be computed and allocated to the Capital Accounts of the Members.

(3)     With respect to all Company property that has not been sold, the fair market value of that property shall be deemed and the Capital Accounts of the Members shall be adjusted to reflect the manner in which the unrealized income, gain, loss, and deduction inherent in property that has not been reflected in the Capital Accounts previously would be allocated among the Members if there were a taxable disposition of that property for the fair market value of that property on the date of distribution.

(4)     After completion of the steps in paragraphs (1) and (3), the remaining assets shall be distributed to the Members in an amount equal to the credit balance in each of their

Capital Accounts, after giving effect to all contributions, distributions, and allocations for all periods.

(c)     Procedure. A reasonable time shall be allowed for the liquidation of the Company in order to minimize the losses normally attendant upon a liquidation.

(d)     Certificate of Dissolution. On completion of the liquidation of Company assets as provided herein, the Members (or such other person or persons as the Act may require or permit) shall file a Certificate of Dissolution with the Department of State of the Commonwealth of Pennsylvania and take such other actions as may be necessary to terminate the existence of the Company.

(e)     Final Accounting. In connection with the Company's liquidation, the Company's accountants shall compile and furnish to each Member a statement setting forth the assets and liabilities of the Company as of the date of complete liquidation.

19.     Books and Records.

(a)     General Rule. The Members shall cause to be kept full and accurate books and records of the Company. All books and records of the Company shall be kept at the Company's principal office and shall be available at such location at reasonable times for inspection and copying by the Members or their duly authorized representatives. The Company shall maintain the following records, among others:

(1)     a current list of the full name and last known mailing address of each Member.

(2)     a copy of the Certificate and all amendments thereto.

(3)     copies of the Company's federal, foreign, state, and local income tax returns and reports.

(4)     a copy of this Agreement and all amendments thereto.

(5)     any financial statements of the Company.

(b)     Annual Financial Information. The Company shall furnish to its Members annual financial statements, including at least a balance sheet as of the end of each fiscal year and a statement of income and expenses for the fiscal year. The financial statements shall be prepared on the basis of generally accepted accounting principles, if the Company prepares financial statements for the fiscal year on that basis for any purpose, and may be consolidated statements of the Company and one or more of its subsidiaries. The financial statements shall be mailed by the Company to each of the Members within 120 days after the close of each fiscal year. Statements that are not audited or reviewed by a certified public accountant shall be accompanied by a statement of the person in charge of the Company's financial records:

(1)     stating his or her reasonable belief as to whether or not the financial statements were prepared in accordance with generally accepted accounting principles and, if not, describing the basis of presentation.

(2)     describing any material respects in which the financial statements were not prepared on a basis consistent with those of the previous year.

20. **Liability of Members.** The Members, as such, shall not be liable for the debts, obligations, or liabilities of the Company except to the extent required by the Act.

21. **Indemnification.**

(a) **Indemnification of Covered Persons.** Except as expressly prohibited by Law, the Company shall indemnify, defend, and hold harmless each Covered Person from and against any and all debts, losses, claims, damages, costs, demands, fines, judgments, contracts (implied and expressed, written and unwritten), penalties, obligations, payments, liabilities of every type and nature (whether known or unknown, fixed or contingent), including, without limitation, those arising out of any lawsuit, action, or proceeding (whether brought by or on behalf of a party to this Agreement or by any third party), together with any reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, out-of-pocket expenses, and other reasonable costs and expenses incurred in investigating, preparing, or defending any pending or threatened lawsuit, action, or proceeding) incurred in connection with the foregoing (collectively "Damages") suffered or sustained by such Covered Person by reason of any act, omission, or alleged act or omission by such Covered Person arising out of such Covered Person's activities taken primarily on behalf of the Company, or at the request or with the approval of the Company, or primarily in furtherance of the interests of the Company. Notwithstanding the foregoing, indemnification shall not be available under this section where the acts, omissions, or alleged acts or omissions upon which an actual or threatened action, proceeding, or claim is based constituted willful misconduct or recklessness.

(b) **Indemnification Procedure.** The procedure under which indemnification shall be provided under this section shall be as follows:

(1) A party seeking indemnification from the Company pursuant to subsection (a) (an "Indemnified Party") shall give prompt notice to the Company of the assertion of any claim, including any claim brought by a third party, in respect of which indemnity may be sought (a "Claim") and shall give the Company such information with respect thereto as the Company may reasonably request, but no failure to give such notice shall relieve the Company of any liability hereunder except to the extent the Company has suffered actual prejudice thereby.

(2) Except as provided in paragraph (5), the Company shall have the right, exercisable by written notice (the "Notice") to the Indemnified Party (which Notice shall state that the Company expressly agrees that as between the Company and the Indemnified Party, the Company shall be solely obligated to satisfy and discharge the Claim) within 30 days of receipt of notice from the Indemnified Party of the commencement of or assertion of any Claim, to assume the defense of the Claim, using counsel selected by the Company and reasonably acceptable to the Indemnified Party. If the Company fails to give the Indemnified Party the Notice within the stated time period, the Indemnified Party shall have the right to assume control of the defense of the Claim and all Damages in connection therewith shall be reimbursed by the Company upon demand of the Indemnified Party.

(3) The Company shall not have the right to assume the defense of a Claim:

(i) seeking an injunction, restraining order, declaratory relief, or other non-monetary relief against the Indemnified Party (whether or not the Company is also named as a party), or

(ii) if the named parties to the action (including any impleaded parties) include both the Indemnified Party and the Company and the Indemnified Party has been advised by counsel that there are one or more legal or equitable defenses

available to the Indemnified Party that are different from those available to the Company.

(4) A party defending a Claim shall not have the right to compromise or settle any claim for non-monetary relief against any other party without the other party's consent. A party defending a Claim shall not have the right to compromise or settle any claim for monetary relief against any other party without the other party's consent unless the monetary relief is paid in full by the settling party. A party shall not unreasonably withhold or deny its consent under this paragraph, but an Indemnified Party shall not be required to consent to a compromise or settlement of a Claim if in the reasonable judgment of the Indemnified Party the compromise or settlement would have a continuing material adverse effect on the Indemnified Party's business (including any material impairment of its relationships with customers and suppliers).

(5) If at any time after the Company assumes the defense of a Claim the situation changes such that the Company would not be able to assume the defense of the Claim under paragraph (3) if the Claim were newly filed at that time, the Indemnified Party shall have the same rights as if the Company never assumed the defense of the Claim.

(6) The Company or the Indemnified Party, as the case may be, shall always have the right to participate, at its own expense, in the defense of any Claim that the other is defending.

(7) Whether or not the Company chooses to defend or prosecute a Claim involving a third party, the Company and the Indemnified Party shall cooperate in the defense or prosecution thereof and shall furnish such records, information, and testimony, and attend such conferences, discovery proceedings, hearings, trials, and appeals as may be reasonably requested in connection therewith.

(c) Right to Advancement of Expenses. Except as expressly prohibited by Law, expenses (including legal fees) incurred by a Covered Person in defending any claim, demand, action, suit, or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit, or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined that the Covered Person is not entitled to be indemnified as authorized in subsection (a).

(d) Insurance. The Company may purchase and maintain insurance, to the extent and in such amounts as the Members shall deem reasonable, on behalf of Covered Persons and such other Persons as the Members shall determine, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such indemnities, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement. The Company may enter into indemnity contracts with Covered Persons and such other Persons as the Members shall determine and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this section 21 and containing such other procedures regarding indemnification as are appropriate.

(e) Non-exclusivity of Rights. The rights conferred on any person by this section 21 shall not be exclusive of any other rights which such person may have or hereafter acquire under any statute, provision of the Certificate, agreement, vote of Members, or otherwise.

(f)    **Amendment or Repeal.** Any repeal or modification of this section 21 shall not adversely affect any right or protection hereunder of any person in respect of any act or omission occurring prior to the time of such repeal or modification.

(g)    **Changes in Law.** References in this section 21 to Law shall be to such Law as it existed on the date this Agreement was executed or as such Law thereafter may be changed, except that:

(1)    in the case of any change that limits the indemnification rights or the rights to advancement of expenses that the Company may provide, the rights to indemnification and to the advancement of expenses provided in this section 21 shall continue as theretofore agreed upon to the extent permitted by law; and

(2)    if the change permits the Company without the requirement of any further action by the Members to provide broader indemnification rights or rights to the advancement of expenses than the Company was permitted to provide prior to the change, then the rights to indemnification and the advancement of expenses shall be so broadened to the extent permitted by Law.

(h)    **Applicability.** The provisions of this section 21 shall be applicable to all actions, suits, or proceedings commenced after its adoption, whether such arise out of acts or omissions which occurred prior or subsequent to such adoption and shall continue as to a person who has ceased to be a Covered Person, and shall inure to the benefit of the heirs and personal representatives of such person.

22.    **Miscellaneous.**

(a)    **Notices to Members.** Any notice required to be given to a Member under the provisions of this Agreement or by the Act shall be given either personally or by sending a copy thereof:

(1)    by first class or express mail, postage prepaid, or courier service, charges prepaid, to the postal address of the Person appearing on the books of the Company for the purposes of notice. Notice pursuant to this paragraph shall be deemed to have been given to the Person entitled thereto when deposited in the United States mail or with a courier service for delivery to that Person.

(2)    by facsimile transmission, e-mail, or other electronic communication to the Person's facsimile number or address for e-mail or other electronic communications supplied by the Person to the Company for the purpose of notice. Notice pursuant to this paragraph shall be deemed to have been given to the Person entitled thereto when sent.

(b)    **Entire Agreement.** This Agreement constitutes the entire agreement among the Members with respect to the subject matter hereof and supersedes all prior agreements, express or implied, oral or written, with respect thereto. The express terms of this Agreement control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

(c)    **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver

by that Person of its rights with respect to that default until the period of the applicable statute of limitations has run.

(d)     Execution in Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. If executed in multiple counterparts, this Agreement shall become binding when any counterpart or counterparts, individually or taken together, bear the signatures of all of the parties.

(e)     Amendments. The Certificate may be amended only if the amendment is approved by the vote, consent, or agreement of Members holding at least sixty-six percent ((66%) of the Voting Rights, except that any provision of this Agreement requiring a higher vote may only be amended or repealed by at least that higher vote. An amendment to this Agreement must be in writing and shall take effect when executed by Members holding at least the number of the Voting Rights required to approve the amendment, provided, however, that any provision relating to the Member Agreement as set forth in paragraph 17a shall require a unanimous agreement of all members to amend.

(f)     Binding Effect and Rights of Third Parties. This Agreement has been adopted to govern the operation of the Company, and shall be binding on and inure to the benefit of the Members and their respective heirs, personal representatives, successors, and assigns. This Agreement is expressly not intended for the benefit of any creditor of the Company or any other Person, except a Person entitled to indemnification or advancement of expenses under section 21. Except and only to the extent provided by applicable statute, no such creditor or other Person shall have any rights under this Agreement.

(g)     Governing Law. This Agreement shall be governed by and interpreted and enforced in accordance with the substantive laws of the Commonwealth of Pennsylvania (including, without limitation, provisions concerning limitations of actions), without reference to the conflicts of laws rules of that or any other jurisdiction, except that federal law shall also apply to the extent relevant.

(h)     Severability. If any provision of this Agreement or the application thereof to any Person or circumstance is held invalid or unenforceable to any extent, the remainder of this Agreement and the application of that provision to other Persons or circumstances shall not be affected thereby and that provision shall be enforced to the greatest extent permitted by law.

(i)     Arbitration. All disputes arising under this Agreement shall promptly be submitted to arbitration in Gettysburg, Pennsylvania, before one arbitrator in accordance with the rules of the American Arbitration Association. The arbitrator may assess costs, including counsel fees, in such manner as the arbitrator deems fair and equitable. The award of the arbitrator shall be final and binding upon all parties, and judgment upon the award may be entered in any court of competent jurisdiction.

(j)     Construction. Whenever the context requires, the gender of any word used in this Agreement includes the masculine, feminine, or neuter, and the number of any word includes the singular or plural. All references to articles and sections refer to articles and sections of this Agreement, and all references to annexes are to annexes attached hereto, each of which is made a part hereof for all purposes. The headings in this Agreement are for convenience only; they do not form a part of this Agreement and shall not affect its interpretation.

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement as of the date first above written.

Helen B. Hauser

HELEN B. HAUSER

Annex A

Date:

| Member (Name and Address) | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| Helen B. Hauser | | 100% |

# EXHIBIT F

H&M HOLDINGS GROUP, LLC,
HAUSER FAMILY FARMS, LLC,
MELINDA H. DAVIS and
HANNAH M. HAUSER,
          **Plaintiffs**

      **v.**

ALAN K. PATRONO,
JONATHAN ALAN PATRONO,
JANE HAUSER PATRONO,
POLLY E. PATRONO a/k/a
POLLY E. PATRONO-CARLSON,
JOHN J. MURPHY, III,
PATRONO & MURPHY, LLC,
APPLE LEAF ABSTRACTING &
  SETTLEMENT COMPANY and
JOHN DOE(S)/JANE DOE(S),
          **Defendants**

**2018-SU-1293**

FILED
ADAMS COUNTY, PA
PROTHONOTARY
2023 OCT 13 PM 4: 03

## ORDER OF COURT

AND NOW, this 13th day of October, 2023, it is hereby Ordered:

1. The Petition of Hammerhead Realty, LLC for Relief from Stay and Removal of Lis Pendens to Approve the Sale of 28 West Middle Street, Adams County, Pennsylvania, is denied.

2. Plaintiffs' Emergency Motion for Special Relief filed July 11, 2023 is granted in part and denied in part as follows:

    a. The request for sanctions related to the threat of litigation concerning the proceeds of 17 On the Square is denied. The Defendants are cautioned, however, concerning Pa. R. Civ. P. 1023.1 which addresses the filing of litigation for improper purposes such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation. In that regard, the Court notes that the current litigation encompasses claims concerning capital

1

account distributions during the years prior to and including the sale of 17 On the Square; and

b. Plaintiffs' request for sanctions concerning the potential listing for sale of Jane Hauser Patrono's one-third interest in HFF is denied; however, it is hereby Ordered that Defendant Jane Hauser Patrono is enjoined from selling, transferring, or otherwise encumbering her interest in any HFF property, as defined throughout this litigation, pending further Order of Court. Any sale, transfer, or encumbrance of any interest in HFF properties without prior Court approval shall be deemed void *ab initio*.

3. Defendants' Motion for Partial Summary Judgment dismissing John Murphy as a Defendant in this matter is denied. This issue presents to the Court as a motion for summary judgment. In ruling on a motion for summary judgment, the court may consider the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits to determine whether a genuine issue of material fact exists precluding the entry of judgment as a matter of law.[1] *Kuney v. Benjamin Franklin Clinic*, 751 A.2d 662, 664 (Pa. Super. 2000). In *Reutzel v. Douglas*, 870 A.2d 787, 792 (Pa. 2005), our Supreme Court instructed that an attorney must have express authority in order to bind a client to a settlement agreement. Although the Defendants have presented an email exchange between their counsel and prior Plaintiffs' counsel which firmly states "we agree to dismiss … John Murphy from the action, …" there is no evidence of record that prior Plaintiffs' counsel acted with

---

[1] The current issue presents in a different procedural posture from the litany of appellate authority discussing the enforceability of settlement agreements as discussed in *Reutzel v. Douglas*, 870 A.2d 787 (Pa. 2005) and its progeny. As the issue is raised in a motion for summary judgment, an evidentiary hearing is unnecessary. *See Brannam v. Reedy*, 906 A.2d 635, 641 (Pa. Cmwlth. 2006) (trial courts are required to hold evidentiary hearing regarding issue of whether parties have breached a settlement agreement).

2

express authority. To the contrary, Plaintiffs have submitted affidavits indicating they did not expressly authorized dismissal of any claims against Murphy nor were consulted on the matter. As there is no evidence of record that prior Plaintiffs' attorney had authority to make the settlement offer, the Motion for Summary Judgment is denied. *See **King v. Driscoll***, 296 A.3d 1178, 1184 (Pa. Super. 2023) (if existence of a settlement agreement is in dispute, the attorney's express authority to bind his client must be proven); ***Salsman v. Brown***, 51 A.3d 892, 894-95 (Pa. Super. 2012) (in upholding settlement agreement, there must be direct evidence that attorney had express authority to make settlement offer).

4. Defendants' Motion Seeking Partial Summary Judgment in favor of Defendants Alan Patrono, Jonathan Patrono, John Murphy, Patrono & Murphy, LLC, and Apple Leaf Abstracting & Settlement Company is denied.

5. Defendants' Motion for Reconsideration and Modification of the Order Dated September 25, 2023 is denied.

6. Defendants' Alternative Motion to Extend the Deadline to Comply with the Time Periods Set Forth in the Order of September 25, 2023 until October 16, 2023 is granted.

7. Plaintiffs' Motions in Limine Seeking to Preclude Expert Testimony at Trial will be addressed following the opportunity of Defendants to file a response.

8. Plaintiffs' Motions Seeking Sanctions for Alleged Discovery Violations are taken under advisement.

BY THE COURT:

_____
**MICHAEL A. GEORGE**
**President Judge**

3

Paige Macdonald-Matthes, Esquire & Jennifer L. Bruce, Esquire
Ronald L. Finck, Esquire & Aaron D. Martin, Esquire
John J. Murphy, III, Esquire
jvs

4