# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **In re:** | : | **Bankruptcy No. 1:25: bk-02214 (HWV)** |
| | : | |
| **ALAN KIM PATRONO ET AL.** | : | |
| | : | **CHAPTER 11** |
| **Debtors.** | : | |
| | : | |

**CREDITORS, H&M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA H. DAVIS and HANNAH M. HAUSER, REPLY IN OPPOSITION/OBJECTION TO DEBTORS' MOTION TO APPOINT AARON MARTIN, ESQUIRE AND METTE EVANS & WOODSIDE AS SPECIAL COUNSEL FOR THE DEBTORS**

AND NOW come Creditors, H&M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA H. DAVIS, and HANNAH M. HAUSER (hereinafter collectively "Hauser Creditors") and file their Reply in Opposition/Objection to Debtors' Motion to Appoint Aaron Martin, Esquire and Mette Evans & Woodside as Special Counsel for the Debtors (ECF No. 56), and in support thereof aver as follows:

### <u>INTRODUCTION</u>

Section 327 of the United States Bankruptcy Code sets forth the standard for the court to apply when asked to approve a motion to appoint special counsel. The facts and circumstances that give rise to the Debtors' September 30, 2025, Motion to Appoint Aaron Martin and Mette Evans & Woodside clearly demonstrate the

1

4930-8728-2286 v1

plethora of reasons why this Honorable Court should disapprove and deny Debtors' motion "whole cloth" pursuant to 11 U.S.C. §327(c).

On August 22, 2025, a mere 14 days after the Debtors filed for purported relief under Chapter 11 of the United States Bankruptcy Code ("Code") the Harrisburg law firm of Mette, Evans & Woodside (hereinafter "Mette")[1] filed a Motion for Relief from the Automatic Stay, (ECF No. 21), in which Mette specifically and unequivocally represented to this Honorable Court that they were entitled to relief from the automatic stay under 11 U.S.C. §362(d) and Fed. R. Bankr. P. 4001(a)(1) because they (a) were a creditor of the Debtors in light of the fact that they had not been paid by the Debtors; and (b) because they were now a creditor of the Debtors in this proceeding they had a "***conflict of interest in the Pending Actions [in Adams County Court of Common Pleas] . . . such that its representation of the Debtors in the underlying cases [in Adams County] will be materially limited, contrary to Pa. R.P. C. 1.7(a)***." *Id*. at ¶6. (emphasis added).

This Honorable Court may further recall the representation made by Debtors' counsel, Lawrence Young, Esquire one month later during the hearing on the Hauser Creditors' Motion to Dismiss Chapter 11 Bankruptcy on September 23, 2025, wherein Debtors' counsel bemoaned the fact that the Court determined to

---

[1] Upon information and belief, Mette Evan & Woodside officially changed its name to Mette, Attorneys at Law. *See* www.mette.com

4930-8728-2286 v1

modify the stay such that the pending proceedings in the Adams County Court of Common Pleas before the Honorable Michael George could proceed as scheduled in October 2025 and claimed that *"the Debtors' would not have counsel because their counsel intended to file to withdraw from the case."* As properly noted by this Honorable Court any motion to withdraw as counsel or any order to grant a withdrawal of counsel in the state court proceeding was for the state court to determine. Notably as of the date of the filing of Debtors' Motion there is <u>no such motion to withdraw pending</u> in Adams County, <u>nor has any order granting Aaron Martin, Esquire, Ronald Finck Esquire or Mette the right to withdraw as counsel been entered</u>.[2]

Curiously, and despite their affirmative statements made in support of their Motion for Relief from Stay regarding "the significant risk of conflict of interest if its representation of the Debtors continued," (statements made subject to Fed. R.Civ. P. 11), counsel for Mette unceremoniously filed a "Praecipe to Withdraw Motion for Relief from Stay" on Friday, September 26, 2025. (ECF No. 51).

Fast forward to Tuesday, September 30, 2025, (one day <u>after</u> the deadline set by the US Trustee Rachel Wolf for Debtors to file their required Amended

---

[2] Indeed, not only has Mette not filed to withdraw as counsel in the Adams County litigation as Debtors' Counsel advised this Court on September 23, 2024, they were going to do, Aaron Martin, Esquire filed yet another motion on behalf of ALL Defendants in Adams County on October 2, 2025!

3

4930-8728-2286 v1

Schedules, *See,* "**Exhibit "A"**", which they did <u>not</u> file and still have not filed as of the date of this filing!), Debtors' filed their Motion to Appoint Aaron Martin and Mette as Special Counsel. (ECF 56). Despite the "significant risk of conflict of interest" that Mette previously represented to this Court it had in its Motion for Relief from Stay (ECF 21), Debtors, together with their Counsel (including Aaron Martin and Mette), are now asking this Court to either ignore or accept that the conflict of interest has somehow magically disappeared such that they can serve as "special counsel".[3] Even more concerning is the fact that Debtors and their counsel failed to mention in their Motion that Attorney Martin and Mette are both subject to an Order that granted the Hauser Creditors' Sanctions Motion against them. *See* **Exhibit "B"** attached hereto. Even more concerning is the fact that this information was similarly not disclosed by the Affiant in the Affidavit of Legal Services Provider that is attached to Debtors' Motion. Finally, in the Affidavit of Legal Services Provider, the Affiant likewise failed to disclose the fact that Mette received no less than 3 separate payments between August 8, 2025, and August 11, 2025, totaling $22,916.93. *See* Monthly Operating Report dated September 17, 2025, pp.

---

[3] It is indeed curious that the inherent "conflict of interest" that Aaron Martin, Esquire, Ronald Finck, Esquire and Mette had and continue to have based on their representation of ALL remaining Defendants in the state court proceeding in Adams County that was pointed out to them on several occasions by the Honorable Michael George was disputed by counsel and/or summarily dismissed and/or ignored by counsel. That is until they were not being paid for their services. Indeed, only when they faced non-payment did counsel and Mette determine for the first time in over 7 years that they had a "conflict of interest".

4

4930-8728-2286 v1

8-9. (ECF No. 41). As said payments were made within 90 days of the Debtors bankruptcy filing, the Hauser Creditors believe and therefore aver that said payments are voidable preference payments under Section 547 of the Code. Clearly, Debtors' counsel, (as well as Mette), knows that any preference challenge to such payments will create yet an additional conflict of interest for Attorney Martin and Mette.[4]

Debtors' Motion to Approve Special Counsel is just one more example of Debtors' demonstrated willingness to engage in legal gamesmanship- this time in a deliberate attempt to avoid paying the Hauser Creditors on their secured claim, and affording preferred status to claims that would otherwise be subordinate to the Hauser Creditors' secured claim in the form of positioning Mette as an "administrative claimant". This Honorable Court should see the charade for what it is and decline to go down the proverbial rabbit hole that Debtors, together with their counsel, are asking the Court to enter. For these reasons, coupled with the objections noted below, this Honorable Court should properly deny the Debtors' Motion to Appoint Aaron Martin, Esquire and Mette as Special Counsel.

---

[4] While the Hauser Creditors certainly do not presume to speak for other creditors or the Trustee, they do intend to challenge the preference payments made to Mette that were identified in the Debtors' September 17, 2025, Monthly Operating Report.

5

4930-8728-2286 v1

**HAUSER CREDITORS' REPLY IN OPPOSITION/OBJECTION TO DEBTORS' SPECIFIC AVERMENTS IN SUPPORT OF DEBTORS' <u>MOTION</u>**

1.      Admitted.

2.      Denied as stated.  It is denied that "Debtors need the services of Special Counsel to represent them with respect to all legal matters related to the State Court proceedings."  It is further denied that Aaron Martin, Esquire and Mette are "special counsel."  To the contrary, Aaron Martin, Esquire, Ronald Finck, Esquire and Mette are all presently <u>existing counsel of record</u> in the State Court proceedings," and have been since the inception of the litigation in State Court in 2018.  As Aaron Martin, Esquire, Ronald Finck, Esquire and Mette have and continue to serve as counsel of record for the Debtors, (as well as ALL other remaining Defendants in the State Court proceedings), there is absolutely no need for this Honorable Court to designate them as "Special Counsel," for the Debtors. By way of further reply, it is clear that this is a backdoor attempt by Attorney Martin, and Mette to try and recover their anticipated counsel fees for their <u>already existing</u> legal obligation to represent the Debtors, as well as ALL other remaining Defendants for whom they have likewise entered their appearance in the Adams County litigation.  The Hauser Creditors believe and therefore aver that the Court should and must recognize this transparent attempt by Attorney Martin and Mette to try and recover their otherwise unsecured legal fees by being anointed as "Special Counsel".  Indeed, to grant such

6

4930-8728-2286 v1

Motion such that Aaron Martin, Ronald Finck and Mette can claim any additional legal fees as purported "administrative expenses: would cause further and certain additional financial harm to the Hauser Creditors, who have the largest secured claim, as well as other creditors whose claims would take a subordinate role to the purported "administrative fees". Such a thinly veiled attempt to leap frog over other secured and unsecured claimants in this case should not be countenanced by this Honorable Court ESPECIALLY when the improper conduct of counsel employed by Mette has not only been documented by the Honorable Michael George in his 1925(a) Opinion dated August 9, 2024 at page 43 ("Despite the Patrono Defendants sitting on 'giant boxes' of documents at the Patrono law office, **counsel advised the Court that all of those same documents were in the possession of bankruptcy counsel for Hauser Estate and they no longer had access to the same.** Cite June 7, 2023, Tr., page 20) (emphasis added), but the Trial Court has also issued an Order dated March 12, 2024, imposing sanctions against the Defendants and counsel [in an amount to be determined at a hearing now scheduled for October 31, 2025]. *See* **Exhibit "C".** *See also*, **Exhibit "B"** (March 12, 2024, Order), **Exhibit "D"** (May 2, 2024, Order, FN 5), and **Exhibit "E"** (July 9, 2025, Order).

3. Admitted in part and denied in part. It is admitted only that Debtors propose to retain Aaron Martin, Esquire and Mette as their "Special Counsel." It is

7

4930-8728-2286 v1

denied that Aaron Martin, Esquire and Mette should be permitted to either be called "Special Counsel" or appointed as "Special Counsel" by this Honorable Court as (a) they already currently serve as counsel of record for ALL remaining Defendants in the State Court proceedings, as evidenced by their most recent filing of an "Emergency Motion in Limine" on October 2, 2025; (b) they are and continue to be legally obligated to represent the Debtors and ALL other remaining Defendants absent an Order of Court issued by the Adams County Court of Common Pleas granting them the right to withdraw; and and (c) for all of the reasons set forth in the Introduction above, and paragraph 2 herein- all of which are restated as if more fully set forth at length herein. By way of further reply, as recently as August 22, 2025, Aaron Martin and Mette specifically represented to this Honorable Court, subject to Fed. R. Civ. P. 11, that they needed to withdraw as counsel for the Debtors because "***Mette is now a creditor of the Debtors in this proceeding, which has created a conflict of interest in [the State Court proceedings] . . . [and] for Mette to file and maintain a Claim in this proceeding will create a significant risk that its representation of the Debtors in the [State Court proceedings] will be materially limited, contrary to Pa. R.P.C. 1.7(a)."* See* ECF Doc. 21 at paragraph 6. *(*Emphasis added). Based on this admitted conflict of interest and/or interest that is clearly adverse to the Debtors or to the Estate, the Court must deny Debtors' Motion pursuant to 11 U.S.C. §327(c) and (e).

4930-8728-2286 v1

4. The Hauser Creditors believe an therefore aver that the Debtors want to find a creative way to insure that Aaron Martin and Mette do not try to file a motion to withdraw as their legal counsel in the state court proceedings for the reasons previously outlined by Aaron Martin and Mette in their Motion for Relief from Automatic Stay filed on August 22, 2025, (ECF No. 21), and as referenced by Debtors' counsel to the Court during the hearing on the Hauser Creditors' Motion to Dismiss Chapter 11 Proceeding on September 23, 2025. What the Debtors and Mette fail to disclose to this Honorable Court, however is the fact that Mette also represents the Debtors' son, Jonathan Patrono in a confession of judgment matter currently pending in the Adams County Court of Common Pleas captioned: *H&M Holdings Group, LLC v. Jonathan*, Docket No. 2018-SU-1293 (Cumberland County Court of Common Pleas Docket No, 2019-12300), as well as the other co-Defendants in a matter currently pending in the Adams County Court of Common Pleas captioned *H&M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA H. DAVIS, and HANNAH M. HAUSER v. ALAN K. PATRONO, JONATHAN ALAN PATRONO, JANE HAUSER PATRONO, POLLY E. PATRONO a/k/a POLLY E. PATRONO-CARLSON, JOHN J. MURPHY, III, PATRONO & MURPHY, LLC, APPLE LEAF ABSTRACTING & SETTLEMENT COMPANY and*

9

4930-8728-2286 v1

*JOHN DOE(S)/JANE DOE(S)*, Docket No. 2018-SU-1293.[5] This necessarily begs the question then of how serving as "Special Counsel" would not be a conflict of interest for Aaron Martin, Esquire and Mette. Further, it has already been documented by the Honorable Michael George that counsel made a material misrepresentation of fact to the Court, to wit: ("Despite the Patrono Defendants sitting on 'giant boxes' of documents at the Patrono law office, **counsel advised the Court that all of those same documents were in the possession of bankruptcy counsel for Hauser Estate and they no longer had access to the same.** Cite June 7, 2023, Tr., page 20) (emphasis added). See **Exhibit "C".** Thus, it would be counter intuitive, not to mention grossly unjust, for this Honorable Court to reward such conduct which resulted in an Order for sanctions to be imposed against counsel by granting the relief sought by Debtors in their Motion, the practical result of which would afford Aaron Martin, Esquire and Mette the ability to claim that any future legal fees were "administrative expenses" and thereby unfairly advance their creditor status. Finally, regarding Debtors' claim that they "have selected these attorneys because they have had considerable experience in matters of this character," it is undisputed that Aaron Martin, Esquire and Mette

---

[5] NOTE: John J. Murphy, III is no longer represented by Mette, effective April 11, 2024. Mette continues to represent Patrono & Murphy, LLC, as well as Apple Leaf Abstracting & Settlement Company which were purchased by John Murphy from Debtor Alan Kim Patrono in February 2022.

4930-8728-2286 v1

improvidently filed no less than 6 separate appeals in response to interlocutory orders issued by the trial court to the Pennsylvania Superior Court. The first such appeal was Quashed by the Superior Court outright. *See* **Exhibit "F".** The remaining 5 appeals were dismissed. *See* **"Exhibit G".** Not only did the improper filing of these appeals unnecessarily drive up the litigation costs for all parties in the Adams County matters, but such improvidently filed appeals were a complete waste of judicial resources.

5. Denied. It is denied that "Mette represents no other entity in connection with this case." To the contrary Aaron Martin, Esquire and Mette are counsel of record for Defendants Patrono & Murphy, LLC and Apple Leaf Abstracting & Settlement Company. Aaron Martin, Esquire and Mette likewise serve as counsel of records for Defendants Jonathan Patrono (Debtors' son) and Polly Patrono-Carlson (Debtors' daughter). It is further denied that Mette "holds no interest adverse to the interest of the Estate with respect to the matters on which it is to be employed." To the contrary, and as specifically and unequivocally represented to this Honorable Court a mere 41 days ago, the Debtors (a) have "substantially and materially fallen behind in their payment obligations under a representation agreement with Mette and Mette will be shortly submitting a Claim in this proceeding"; (b) "Mette [sought] to file a motion to withdrawal [sic] as counsel in the State Court proceedings"; and (c) "Mette is now a creditor of the Debtors, which

11

has created a conflict of interest in the [State Court proceedings]." *See* ECF 21 at ¶6. Finally, as evidenced by the Debtors September 17, 2025, Monthly Operating Report, Mette received no less than 3 separate payments between August 8, 2025, and August 11, 2025, totaling $22,916.93. *See* Monthly Operating Report dated September 17, 2025, pp. 8-9. (ECF No. 41). As said payments were made within 90 days of the Debtors bankruptcy filing, the Hauser Creditors believe and therefore aver that said payments are voidable preference payments under Section 547 of the Code. Clearly Debtors' counsel, (as well as Mette), knows that the impending preference challenge to such payments will create yet another conflict of interest for Attorney Martin and Mette.

6. Admitted in part and denied in part. It is admitted that this case is scheduled to go to a non-jury trial in the Adams County Court of Common Pleas in late October of 2025. It is further admitted that Aaron Martin, Esquire and Mette have been involved in this litigation for years. It is denied that Debtors have to "change counsel". Aaron Martin, Esquire and Mette continue to be counsel of record for the Debtors in the Adams County litigation, as well as for ALL of the remaining Defendants- who are insiders of the Debtors, as evidenced by the "Emergency Motion in Limine" filed in Adams County on October 2, 2025. Aaron Martin, Esquire and Mette are already subject to a sanctions Order in this case for their misconduct. They should not be afforded any special relief by this Honorable

4930-8728-2286 v1

Court that will reward them for their misconduct, as well as the Debtors' documented misconduct, in the form of an ability to recover their counsel fees incurred from the October 2025 state court proceedings from the Debtors' Estate as a purported administrative claim ESPECIALLY when they played a substantial role in the two year delay in reaching a final outcome of the state court litigation. Finally, for Debtors to claim that they will "have to change counsel" is patently false as Mette has not filed to withdraw as their counsel, and the trial court has not granted Aaron Martin, Esquire, Ronald Finck, Esquire or Mette the right to withdraw as counsel for the Debtors or any other remaining Defendant. As appropriately noted by this Honorable Court during the September 23, 205, hearing, that is a matter to be addressed with the trial court in Adams County, not a matter that is appropriately brought before this Honorable Court. Moreover, to assert such a claim when the Debtors' own actions have caused the purported riff with their state court counsel is akin to the child who murders their parents and then asks the court to take pity on him because he is an orphan. The Court should neither accept nor condone such folly especially when (a) there has been no motion to withdraw filed by Aaron Martin, Esquire, Ronald Finck, Esquire or Mette; (b) there has been no Order issued by the Adams County Court of Common Pleas granting counsel and/or Mette the legal right to withdraw as counsel for any of the Defendants; (c) the Hauser Creditors have already had liability determined in their favor and against

13

the Debtors, as well as the other remaining Defendants whom Aaron Martin, Esquire and Mette also represent; and (d) the misconduct of the Debtors, the remaining Defendants and their counsel during the course of the 7 year state court litigation has been well documented by the trial court.

7. Denied. It is denied that the Debtors' Motion should be granted. It is further denied that Mette has attached a proper engagement letter to Debtors' Motion.

8. The Hauser Creditors are without knowledge sufficient to form a belief as to the averments set forth in paragraph 8 of Debtors' Motion. Strict proof of the same, if relevant, is demanded at the time of hearing. It is denied that Aaron Martin, Esquire and Mette have been appointed as "Special Counsel" by this Honorable Court. To refer to them as "Special Counsel" is not only incorrect, but also wholly improper. Finally, it is denied that any compensation owed to Mette in regard to its representation of the Debtors and the remaining Defendants in the state court litigation should be paid by the Estate as such fees would clearly be post-petition fees compromised of comingled representation of multiple Defendants who are insiders.

9. Denied. It is denied that it is proper or just for Mette to "retain its prepetition claim of $332,977.15 as a condition of representation." The fact that this "condition" is even referenced in the Debtors' motion underscores just how

14

much of a conflict-of-interest Mette has in serving as "Special Counsel" and further belies the veracity of the averments set forth in paragraph 6 of Debtors' Motion.

<u>**CONCLUSION**</u>

As noted by this Honorable Court during the September 23, 2025, hearing, any motion to withdraw as counsel or any order to grant a withdrawal of counsel in the state court proceeding is for the state court to determine. There is no such motion pending in Adams County, nor is there any order granting Aaron Martin, Esquire, Ronald Finck Esquire or Mette the right to withdraw as counsel. Absent such an Order from the state court, Debtors' Motion is wholly improper.

The specific set of inherently contradictory facts and circumstances that have arisen prior to the September 30, 2025, filing of Debtors' Motion to Appoint Aaron Martin, Esquire and Mette outlined herein not only shocks the conscience, but also calls to mind Sir Walter Scott's poem, "Marmion" and its' infamous line, "Oh what a tangled web we weave when first we practice to deceive."

The Debtors' misconduct during the state court litigation is well documented. So too is the fact that the same counsel/firm who are now asking to be appointed as "special counsel" are subject to a sanctions Order issued by the trial court which is scheduled for final hearing later this month. It cannot be overstated that the same attorneys who the Debtors are now asking the Court to appoint as "special counsel" are the same attorneys who determined to file 6 separate appeals of non-appealable

15

interlocutory orders thereby driving up the legal fees that Debtors now claim they cannot pay. And Aaron Martin, Esquire and Mette are the very same counsel who recently represented to this Honorable Court that they are a creditor of the Debtors' Estate and that their position as a creditor of the Estate creates a "clear conflict of interest." Finally, these are the same counsel whose "condition of representation" in the role of "special counsel" is that they get to retain their prepetition claim in the amount of $332,977.15 against the very Estate that they are proposing to represent. *See* ECF No. 56, ¶9. The hubris in stating such a "condition of representation" is simply mystifying, as this "condition" clearly runs afoul of 11 U.S.C. §327(c) and (e).

Simply put, the Debtors' Motion to appoint the very same counsel who participated in and facilitated the delay in the final outcome of the state court litigation, and who themselves are now subject to a sanctions Order, as the proposed "Special Counsel" is beyond the pale. The Hauser Creditors implore this Honorable Court to deny the Debtors' Motion accordingly.

WHEREFORE, the Hauser Creditors, jointly and severally, respectfully request that this Honorable Court deny the Debtors' Motion to Appoint Aaron Martin, Esquire and Mette with prejudice, and further award the Hauser Creditors

4930-8728-2286 v1

all such other relief as is proper and just.

Respectfully submitted,

OBERMAYER REBMANN
MAXWELL & HIPPEL, LLP

Date: October 3, 2025

*/s/ Paige Macdonald-Matthes*
Paige Macdonald-Matthes, Esquire
Attorney ID No. 66266
Jennifer Bruce, Esquire
Attorney ID No. 329351
200 Locust Street, Suite 400
Harrisburg, PA 17101
(717) 234-9730 Telephone
(717) 236-2485 Facsimile
Email: pmm@obermayer.com
Jennifer.bruce@obermayer.com
*Counsel for Hauser Creditors*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on this 3rd day of October 2025, that a true and correct copy of the *Hauser Creditors' Reply In Opposition/Objection to the Debtors' Motion to Appoint Aaron Martin, Esquire and Mette Evans & Woodside as Special Counsel* (ECF Doc. No. 56) has been served upon all parties of interest registered with the Bankruptcy Court Clerk to receive electronic notice via the CM/ECF system.

*/s/ Paige Macdonald-Matthes*
Paige Macdonald-Matthes, Esquire

18

4930-8728-2286 v1

# EXHIBIT A

        IN THE UNITED STATES BANKRUPTCY COURT
      FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:  ALAN KIM            )   Bankruptcy No.
PATRONO, ET AL,             )   1:25:bk-02214 (HMV)
                            )
           Debtor           )   CHAPTER 11
                            )
_____   x


                  HEARING BEFORE

                   RACHEL WOLF
                    DOJ-Ust
         One Newark Center - Suite 2100
               Newark, NJ 07102

             SEPTEMBER 15,  2025


             TERESA A. CROSSIN, RMR
                 NOTARY PUBLIC


                  DEVINE DEPOSITIONS
                 573 Indian Run Drive
               Hummelstown, PA  17036
                  (717) 612-2403

COUNSEL PRESENT:

On behalf of the Debtor:
           CGA LAW FIRM
           BY:  LAWRENCE YOUNG, ESQ,
           135 North George Street
           York, PA 17401
           Lyoung@cgalaw.com

On behalf of H & M Holdings Group, LLC, Hauser Family
Farms, LLC, Hannah Hauser, Melinda Davis:
           OBERMAYER REBMANN MAXWELL & HIPPEL, LLP
           BY:  PAIGE MACDONALD-MATTHES, Esq.
           200 Locust Street - Suite 400
           Harrisburg, PA 17101-1508

On behalf of Smigel, Anderson & Sacks:
           SMIGEL, ANDERSON & SACKS
           BY: GERALD MORRISON, ESQ.
           4431 North Front Street - No. 3
           Harrisburg, PA 17110

Sub-Chapter 5 Trustee:
           LISA REINARD, ESQ.

Case 1:25-bk-02214-HWV   Doc 58   Filed 10/03/25   Entered 10/03/25 16:34:22   Desc
Main Document    Page 21 of 155

are you aware that Sub-Chapter 5 does incur costs for the Sub-Chapter 5 Trustee fees that is paid for by the estate or by your estate?

ALAN PATRONO:  Yes, we know that.

TRUSTEE WOLF:  And do you have the ability to pay for that?

MR. YOUNG:  That is something that will have to be discussed in the overall plan as one of the costs of the administration of the estate.

TRUSTEE WOLF:  Okay.  Mr. Patrono, did you hear what counsel just said and do you agree?

ALAN PATRONO:  Yes.

TRUSTEE WOLF:  Okay.  So, Mr. and Mrs. Patrono, you must file monthly operating reports each and every month while you are in Chapter 11, regardless whether you have an income or not and these operating reports must comply with US Trustee guidelines?  Do you understand these requirements?

ALAN PATRONO:  Yes.

TRUSTEE WOLF:  Do you understand that a failure to file reports in a timely fashion may cause the US Trustee to move to convert or dismiss this case?

ALAN PATRONO:  Yes.

TRUSTEE WOLF:  Okay.  So, I have

Case 1:25-bk-02214-HWV   Doc 58   Filed 10/03/25   Entered 10/03/25 16:34:22   Desc
Main Document   Page 22 of 155

completed questions of the debtors and the following

documents are to be provided to me no later than

September 29th.

So, the schedules need to be amended, specifically, the statement of financial affairs, question 5, schedule I, concerning the negative income, as well as the missing rent from the Commonwealth, and then schedule B to amend the interests in businesses that were sold.  And that needs to be reflected also in the statement of financial affairs, as well as the 2024 tax return when that becomes available and the proof that the non-debtor possession accounts have been closed.

So, I need all of that by -- well, the amendments by the 29th and then the closing of the non-accounts when they become available.

Okay.  Thank you.  This meeting is closed.

(At this time the hearing

 in the above-captioned matter

 was concluded.)

# EXHIBIT B

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
CIVIL

H&M HOLDINGS GROUP, LLC,
HAUSER FAMILY FARMS, LLC,
MELINDA H. DAVIS and
HANNAH M. HAUSER,

**2018-SU-1293**

     **Plaintiffs**

   **v.**

ALAN K. PATRONO,
JONATHAN ALAN PATRONO,
JANE HAUSER PATRONO,
POLLY E. PATRONO a/k/a
POLLY E. PATRONO-CARLSON,
JOHN J. MURPHY, III,
PATRONO & MURPHY, LLC,
APPLE LEAF ABSTRACTING &
 SETTLEMENT COMPANY and
JOHN DOE(S)/JANE DOE(S),

     **Defendants**

## ORDER OF COURT

AND NOW, this 12th day of March, 2024, it is hereby Ordered that the Defendants' Petition to Strike or, in the Alternative, Open the judgments entered in this matter on February 8, 2024 is denied.

It is further Ordered that Plaintiffs' Imposition for Sanctions is granted. The amount of attorney fees and/or other sanctions to be assessed against the Defendants and counsel shall be determined at hearing to be held immediately following the proceeding scheduled for May 20, 2024.

       BY THE COURT:

       _____
       **MICHAEL A. GEORGE**
       **President Judge**

Paige Macdonald-Matthes, Esquire & Jennifer L. Bruce, Esquire
Ronald L. Finck, Esquire & Aaron D. Martin, Esquire
jvs

# EXHIBIT C



IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
CIVIL

H&M HOLDINGS GROUP, LLC,                    2018-SU-1293
HAUSER FAMILY FARMS, LLC,
MELINDA H. DAVIS and                        No. 517 MDA 2024
HANNAH M. HAUSER,
                  Plaintiffs
          v.

ALAN KIM PATRONO,
JONATHAN ALAN PATRONO,
JANE HAUSER PATRONO,
POLLY E. PATRONO a/k/a
POLLY E. PATRONO-CARLSON,
JOHN J. MURPHY, III,
PATRONO & MURPHY, LLC,
APPLE LEAF ABSTRACTING &
  SETTLEMENT COMPANY and
JOHN DOE(S)/JANE DOE(S),
                  Defendants

## OPINION PURSUANT TO Pa. R.A.P. 1925(a)

This appeal results from the unfortunate alienation of a family which was fueled by mistrust and alleged self-serving actions which often accompany a failed family business venture.[1]  The ultimate demise of family relationships finds its genesis in efforts of family members to reinvest the significant estate of the late Helen Hauser.  Helen Hauser died on March 7, 2012.  Her heirs are sisters Melinda

---

[1] The factual and procedural history of this matter is derived from the docketed record, admissions in the pleadings, deposition and hearing testimony, and exhibits attached to the pleadings or introduced at evidentiary hearing.  The docketed filings in this matter exceed 10,000 pages.  At the time of the writing of this Opinion, this writer did not have access to the physical record as it was in the custody of the Superior Court due to a prior appeal in this litigation.  As such, this Opinion, to a large extent, is written based upon notes taken at various proceedings.  The factual history, not evidenced by docket entries or admissions in the pleadings, is based upon factual findings made by this Court following credibility determinations of testimony at the various hearings.

Davis and Hannah Hauser ("Appellees"),[2] and Jane Hauser Patrono ("Appellant"). Jane Hauser Patrono is married to Alan Kim Patrono ("Appellant"). Jonathan Patrono and Polly Patrono a/k/a Polly Patrono-Carlson are the children of Alan Patrono and Jane Hauser Patrono.[3]

During the 1990s, Helen Hauser was the owner of three pieces of property in Adams County utilized for purposes of furthering the family's apple orchard business.[4] Unfortunately, in the late 1990s into the early 2000s, the apple business was struggling to maintain profitability.

Sometime in the mid-2000s, Jonathan Patrono proposed that the family convert the orchards into a winery.[5] At Jonathan Patrono's suggestion, on October 5, 2006, Hauser Estate, Inc. ("Hauser Estate") was incorporated to operate the winery.[6]

---

[2] In addition to Melinda Davis and Hannah Hauser, the term "Appellees" as used throughout this Opinion includes H&M Holdings, LLC and Hauser Family Farms, LLC.

[3] Alan Patrono; Jonathan Patrono; Jane Hauser Patrono; Polly Patrono a/k/a Polly Patrono-Carlson; Patrono & Murphy, LLC; and Apple Leaf Abstracting & Settlement Company comprise the remaining Defendants in this matter. John Murphy was initially named as a Defendant in this litigation; however, pursuant to agreement of the parties, he has been removed as a party. Patrono & Murphy, LLC is a legal office of which Alan Patrono and John Murphy were partners during the relevant time period. Appellant Apple Leaf Abstracting & Settlement Company is a fictitious name owned Apple Real Estate Services, LLC whose shareholders are Patrono & Murphy, LLC.

   The substance of the appeal is solely related to the aspects of this Court's March 12, 2024 Order which dismissed the various Counterclaims filed by Alan and Jane Patrono. The Counterclaims which are the subject of this appeal are brought only by Alan and Jane Patrono. Yet, in a practice which has plagued the entirety of this litigation, the appeal is filed by all of the Defendants collectively. More specifically, Jonathan Patrono, Patrono & Murphy, LLC, and Apple Leaf Abstracting & Settlement Company are listed as parties in the Notice of Appeal, however, are not involved, in any way, in the subject of the appeal. This act is indicative of a procedural history in this matter where all Patrono Defendants acted collectively in pleadings and discovery rather than as individual Defendants.

[4] For purposes of this Opinion, the properties will be referred to as the Winery Property, the Orchard Property, and the Royer Farm.

[5] At least one version of Jonathan Patrono's proposal was in writing; however, the exact date of the proposal is unknown as it is undated. At the time of his proposal, Jonathan Patrono was a licensed Pennsylvania attorney who was employed by Patrono & Associates, LLC as an associate attorney. As of August 20, 2021, Jonathan Patrono remained included on public websites as an attorney with Patrono & Murphy, LLC and Apple Leaf Abstracting & Settlement Company and remains licensed to practice law in Pennsylvania as of this writing.

[6] The record is not yet fully developed as to how Hauser Estate was initially capitalized; however, the record circumstantially indicates that Melinda Davis, Hannah Hauser, and Jane Hauser Patrono

2

The corporation issued 1,000 non-voting shares and 1,000 voting shares. The 1,000 non-voting shares were generally divided equally among the respective families of the three sisters. The voting shares were allocated differently with Jonathan Patrono being awarded 51 percent of the voting shares despite making no capital contribution to the creation of the corporation. Melinda Davis and Hannah Hauser were each issued 14.5 percent of the total voting shares with 20 percent of the voting shares remaining unissued. Pursuant to the corporation by-laws and accompanying shareholders agreement, Jonathan Patrono effectively gained control of Hauser Estate.[7] Jonathan Patrono was also designated as the corporate president. Alan Patrono, a Pennsylvania licensed attorney, prepared all documents related to the incorporation of Hauser Estate.

On July 20, 2007, at the suggestion of Alan Patrono, Hauser Family Farms, LLC ("HFF") was formed. Once again, all legal work necessary to form HFF was prepared by Alan Patrono. Helen Hauser maintained a 100 percent interest in the limited liability corporation. The corporation was primarily capitalized by Helen Hauser's transfer of the Winery Property real estate to the corporation. HFF was apparently formed to operate – and perhaps insulate – the real property upon which the Hauser Estate business would be located. Alan Patrono, and/or the legal or real estate entities controlled by him, effectuated the transfer of the property.

---

equally contributed a total of approximately $600,000 either directly or by foregoing direct distribution from Helen Hauser's estate.

[7] There is some confusion concerning the date of incorporation of Hauser Estate as the shareholders agreement is dated October 5, 2006; however, the notarized signature of Jonathan Patrono is dated October 5, 2007. Neither party has filed of record the actual incorporation documents as maintained by the Pennsylvania Department of State. Circumstantially, the record supports that the corporation was formed on October 5, 2006. A shareholder's agreement executed on July 23, 2007 between the

3

On July 23, 2007, Helen Hauser gifted 1 percent of her interest in HFF to each of her daughters. Also, that same date, Jonathan Patrono, Polly Patrono, Melinda Davis, Hannah Hauser, and Jane Hauser Patrono, as shareholders of Hauser Estate, and, in some instances, as members of HFF, executed a "Shareholder/Member Agreement." The agreement contemplated the eventual transfer of the Royer Farm property to HFF. The agreement further indicated that the Royer Farm would be sold with the proceeds from the sale being used to develop a facility on the Winery Property owned by HFF. A term in the agreement restricted the transfer of the shares in either Hauser Estate or HFF to immediate family members. Additionally, despite Jonathan Patrono having no legal interest in either the Winery Property or the Royer Farm, the agreement provided that Hauser Estate purchase an annual renewable term life policy for him in the face amount of $500,000 with beneficiary designation to be determined by him. Again, the agreement was prepared by Alan Patrono. Additionally, all signatures to the agreement were witnessed by Alan Patrono. Approximately two weeks later, on August 10, 2007, Helen Hauser gifted one-third of her remaining interest in HFF to each of her three daughters. Once again, all legal documentation executed in furtherance of the transfer was prepared by Alan Patrono.

On January 31, 2008, by written agreement, HFF leased the Winery Property to Hauser Estate. The property consisted of 170 acres; less two dwelling houses located on the property. The lease term was 29.5 years with the consideration being Hauser Estate paying real estate taxes and providing maintenance of the property.

---

parties references the existence of Hauser Estate at that time. *See* Plaintiffs' Third Amended

4

No additional rent payment was due; however, the lease provided that "[a]dditional rent may be charged and paid as determined by Lessor and Lessee..."[8] The lease was executed by Jonathan Patrono as president of Hauser Estate and appears to be executed by Melinda Davis as managing member of HFF.[9] Alan Patrono prepared the lease and witnessed both signatures.

On March 7, 2012, Helen Hauser passed away and the Orchard Property, consisting of 364 acres was bequeathed to her three daughters. Alan Patrono and Melinda Davis were co-executors under Helen Hauser's will. Alan Patrono and/or his affiliated offices prepared all legal documentation necessary for the transfer of real estate and the closing of Helen Hauser's estate.

Over the years, Jonathan Patrono acted as president of Hauser Estate. There is factual dispute as to the extent he actually controlled the corporation as the record makes clear that Alan Patrono, despite his efforts in deposition and hearing testimony to minimize his involvement, actively participated in the corporation's management and decision making. Although Appellants claim all family members were regularly consulted in decision making, there are few documents produced to date that support their claim. On the other hand, significant documentation supports Alan Patrono's active participation in decision making for the corporate entities despite his lack of ownership of shares in either. For instance, although Alan Patrono denies acting as

_____

Complaint, Exhibit D.

[8] Exhibit M, pg. 1, Defendants' Answer to Plaintiffs' Third Amended Complaint with Amended New Matter and Counterclaims ("Defendants' Answer"). In his original proposal suggesting creation of the winery, Jonathan Patrono represented, "[t]he lease will be of value and not a 'phony' lease." Exhibit L, pg. 1, Defendants' Answer. As a result of the lease, Hauser Estate, with Jonathan Patrono as its majority voting shareholder, had effectively gained control over HFF real estate for minimal consideration.

5

an attorney for the parties or corporate entities, his law office was used as the corporate address on incorporation documents and corporate records were maintained at that location.

During this same time, Melinda Davis and Hannah Hauser became suspicious over the management of the two corporate entities. Requests for additional financing by Jonathan and Alan Patrono led to questions concerning the financial operation of Hauser Estate. In this regard, Hauser Estate had originally incurred start-up debt with PNC Bank which was subsequently refinanced through a loan with Members First Federal Credit Union ("Members 1st") in an amount of $300,000 ("Loan 1"). Jonathan Patrono and Alan Patrono suggested Hauser Estate increase Loan 1 to $500,000 and an additional loan of $1,475,000 ("Loan 2") be obtained.[10] The loans were secured by personal guarantees executed by Melinda Davis, Hannah Hauser, Jane Patrono, Alan Patrono, and Jonathan Patrono. Concurrent with the execution of the Members 1st loans, and in order to clarify the responsibility of each of the Hauser sisters for future debt, a contribution agreement was prepared by Alan Patrono. The contribution agreement essentially provided that liability for any loans made for the benefit of Hauser Estate and/or HFF to which the parties are borrowers shall be shared equally among the three sisters. Additionally, the agreement provided that the parties will be one-third liable for any future loans made to the

---

[9] The authenticity of Melinda Davis's signature has not yet been established by credible evidence. It is noted only that Melinda Davis, in her testimony at other hearings, has taken issue with the authenticity of her signature on a different document prepared and allegedly witnessed by Alan Patrono.

[10] The reason purported by Jonathan and Alan Patrono for the additional financing was to expand the winery into the cider business. Yet, approximately $600,000 of the Members 1st loan was paid to Alan and Jane Patrono and Apple Leaf Abstracting as repayment for alleged loans previously made to Hauser Estate. June 21, 2021 Tr., pg. 123.

6

benefit of Hauser Estate and/or HFF by either the sisters and/or Alan Patrono. Jonathan Patrono was not a party to the contribution agreement.[11]

Unfortunately, financial woes continued with net profits failing to meet the goals established in Jonathan Patrono's original business plan. Melinda Davis and Hannah Hauser continued to question the expenses at Hauser Estate. Requests for capital infusions from the respective families of the sisters became regular. Alan and Jane Patrono claim that following the Members 1st loans, they individually loaned Hauser Estate approximately $3 million in order to keep Hauser Estate operating. They claimed the loans came from their personal accounts as well as through the accounts of the businesses affiliated with Alan Patrono.

Melinda Davis and Hannah Hauser suspected the misuse and comingling of funds was the real cause of the financial bleeding. They noticed Jane Hauser Patrono was draining another jointly-owned business, 17 On the Square, by diverting over $70,000 from that business to Hauser Estate. They also were concerned that the apple crop from the Orchard Property, which was owned individually by the three

---

[11] There is a factual dispute concerning execution of the contribution agreement. The Patrono Defendants' Answer to Plaintiffs' Third Amended Complaint alleges the contribution agreement was originally executed on June 22, 2011; however, an identical copy dated December 3, 2012 was produced during discovery. Both agreements were prepared by Alan Patrono. Appellees dispute the authenticity of the signatures on the earlier document. The signatures on the first agreement were not witnessed; however, on the second agreement, all signatures were witnessed by Alan Patrono.

Prior to execution of the December 3, 2012 contribution agreement, Hannah Hauser was represented by Attorney James Hughes. Attorney Hughes was not present at execution of the agreement; however, email exchanges reflect he advised Hannah Hauser to sign the agreement based upon representation from Alan Patrono that certain language was changed in the agreement, and also that an amended shareholders agreement would be executed concurrently with the contribution agreement. Among the agreed-upon changes was the requirement that all future loans from any of the parties to Hauser Estate be evidenced by prior written agreement. Alan Patrono never made the agreed-upon changes to the contribution agreement prior to Hannah Hauser's signature. Additionally, on November 16, 2012, Attorney Hughes asked Alan Patrono to send him a copy of the executed amended shareholders agreement. Alan Patrono claimed he did not have a signed copy of the document as of that date. Incidentally, none of the approximately $3 million in loans currently being claimed by Alan and Jane Patrono are evidenced by a prior written agreement.

sisters, was being used by Hauser Estate without any compensation to the owners of the property.[12] When Melinda Davis and Hannah Hauser asked about the dissipation of Hauser Estate assets, they claimed they were told the funds were being used for "payroll expenses." Melinda Davis and Hannah Hauser suspected that Jonathan Patrono was making self-serving transactions utilizing the Members 1st loan to pay himself and that he in turn recycled the money back to Members 1st to pay the mortgage on his personal home.[13]

In an apparent effort to stop the financial bleeding, at the bequest of Jonathan and Alan Patrono, investors were sought. Jonathan Patrono proposed an investor, however, would not disclose the investor's name to Melinda Davis and Hannah Hauser citing "confidentiality concerns." Ultimately, Melinda Davis and Hannah Hauser discovered the unidentified investor was Pennsylvania Hard Cider, LLC, an entity formed by Alan Patrono and Jonathan Patrono.

With the parties' inability to locate an acceptable investor, and the unwillingness of Melinda Davis and Hannah Hauser of shareholders to further capitalize Hauser Estate without an accounting and some relinquishment of control by Jonathan Patrono, on July 31, 2018, Jonathan Patrono filed a voluntary Chapter 11 bankruptcy petition on behalf of Hauser Estate in the United States Bankruptcy

---

[12] Melinda Davis and Hannah Hauser also noticed the comingling of funds between Hauser Estate and HFF, as well as proceeds from the sale of the apple crop owned by HFF being deposited in the Hauser Estate account.

[13] In his initial business plan, Jonathan Patrono represented, "Rather than bill the new company or take a salary, my time and expertise is my capital contribution, and it will more than equal what I am proposing to receive in shares. That exact theory applies also to Polly...." Exhibit L, pg. 2, Defendants' Answer. True to his proposal, neither Jonathan Patrono nor Polly Patrono made capital contributions to any of the subject corporations; however, documents reflect that Jonathan Patrono thereafter drew a salary of possibly as much as $120,000 per year. The commencement and extent to which Jonathan Patrono, and perhaps Polly Patrono, withdrew salary or pay is not fully known as the

8

Court for the Middle District of Pennsylvania. The decision to file bankruptcy occurred after a vote of the majority of the voting shareholders at a duly authorized meeting. Melinda Davis and Hannah Hauser did not participate in the vote. They made known their opposition to the filing of bankruptcy and allege that the shareholders meeting at which the bankruptcy filing was authorized was scheduled by Jonathan Patrono for a day on which it was known they would not be available.

Around this same time period, the Members 1st loans, secured by the personal guarantees, were in default. Melinda Davis and Hannah Hauser decided to form H&M Holdings Group, LLC ("H&M"). H&M subsequently purchased the assignment of the personal guarantees from Members 1st at the full-face value of the outstanding notes held by Members 1st.

On July 27, 2018, H&M filed Confession of Judgment actions in Adams County ("Confession Action 1") under the personal guarantees against Alan Patrono, Jane Patrono, and Jonathan Patrono. In violation of the express terms of the personal guarantees, and aware that the notes had been purchased but unsure as to who the purchaser was, on July 18, 2018, Alan Patrono, Jane Patrono, and Jonathan Patrono transferred their respective interests in five separate properties to Polly Patrono for consideration of $1 in each transfer. The Patrono Defendants have each acknowledged that the purpose of the transfers was to "slow down" collection on the personal guarantees to the notes.

While the Confession of Judgment actions were pending in Adams County, on December 11, 2018, H&M, HFF, Melinda Davis, and Hannah Hauser (hereinafter

necessary documents to fully trace their income are unavailable or at least have not been provided

9

collectively referred to as "H&M") filed a *Lis Pendens* against the properties which were transferred to Polly Patrono. The *Lis Pendens* was accompanied by the filing of a Writ of Summons.[14]

On August 24, 2018, the Patrono Defendants filed a Petition to Strike or Open Confessed Judgments with Request for Stay of Execution. Perhaps foreshadowing the nature of the litigation that was to follow, Confession Action 1 involved several discovery disputes and emergency motions for relief. Additionally, mediation, which was agreed to by all parties, proved unsuccessful. Ultimately, on November 1, 2019, the Honorable Judge Thomas Campbell granted the Petition to Strike the Confessed Judgments.

On October 30, 2019, H&M initiated litigation in Dauphin County against each of the Patrono Defendants.[15] On November 27, 2019, H&M initiated Confession of Judgment actions against the Patrono Defendants in the Court of Common Pleas of Cumberland County ("Confession Action 2").[16] Confession Action 2 was met by a Petition to Strike and Open filed by each of the Patrono Defendants.

In Confession Action 2, the Patrono Defendants alleged they lent approximately $3,000,000 to Hauser Estate.[17] They claimed that under the contribution agreement, they were entitled to one-third of these loans from both Melinda Davis and Hannah Hauser as an offset in the Confession of Judgment

during discovery.

[14] It was the commencement of this action which generated the controlling docket number in this litigation.

[15] The Dauphin County action is captioned at 2019-CV-7967. It included claims of legal malpractice, breach of fiduciary duties, and fraud.

[16] The litigation filed in Cumberland County was filed under Cumberland County Docket No's. 2019-12300; 2019-12301; and 2019-12302. Ultimately, by agreement of the parties, the Cumberland

actions. They further claimed that H&M was a sham corporation and, as such, was not a proper holder of the personal guarantees.

A discovery deadline was set in Confession Action 2 which resulted in a Motion to Compel Responses to Written Discovery Requests against the Patrono Defendants. The motion alleged the Patrono Defendants were nonresponsive to a request for production of documents which included, *inter alia*, a request for the Patrono Defendants' previous five years of federal tax returns including supporting documentation. Ultimately, a discovery master was appointed. By Order dated November 5, 2020, based upon the master's report, Judge Smith directed all parties to answer the discovery requests within 20 days with the exception that the Patrono Defendants' individual financial status need not be disclosed at that time without prejudice to H&M to pursue future discovery on the issue.

In bifurcated proceedings, the Petition to Open the Confessed Judgments was denied by the Honorable Judge Matthew Smith. Hearing on the Petition to Strike was held over multiple days in February of 2021. Relevant testimony during the three-day proceeding before Judge Smith included representations by Alan Patrono that proceeds from the Members 1st loans were used to reimburse Apple Leaf Abstracting $300,000 allegedly loaned to Hauser Estate.[18] Alan Patrono claimed an additional $300,000 of the loan proceeds was used to reimburse him personally.[19] Alan Patrono testified that subsequent to the Members 1st loans, either he or affiliated

---

County Confession of Judgment actions were transferred to this jurisdiction and are now docketed in the above-captioned docket number as part of this litigation.
[17] Petition to Strike or Open Confessed Judgment, Cumberland County, paragraph 60.
[18] February 23, 2021 Tr., pg. 123.
[19] February 23, 2021 Tr., pg. 103, 123.

entities lent Hauser Estate an additional $3,000,000.[20] Jane Hauser Patrono claimed the infusion of cash from the Patronos and affiliated agencies were evidenced "by checks written to pay bills and employees."[21] Despite the infusion of funding from the Members 1st loans and the alleged loans by Alan Patrono and his affiliated businesses, Hauser Estate never made a profit or paid a dividend.[22]

During testimony before Judge Smith, an issue arose concerning the execution, timing, and accuracy of signatures on the contribution agreement prepared by Alan Patrono. In an apparent effort to explain the two separate executed contribution agreements, and the lack of the represented changes, Alan Patrono attempted to introduce at trial certain emails in his possession. The evidence, however, was precluded by Judge Smith on the basis that Alan Patrono had not previously provided the emails during discovery.[23]

On March 11, 2021, Judge Smith entered an Order opening the confessed judgments. Although he did not reach a conclusion as to whether H&M was a "sham" corporate entity, he did conclude that the defense, if proven, was meritorious and that sufficient evidence existed to require submission of the issue to a factfinder.[24] Following Judge Smith's Order, and by agreement of the parties, the Cumberland County litigation was transferred to the jurisdiction of the Adams County Court of Common Pleas on April 30, 2021.

---

[20] February 23, 2021 Tr., pg. 67, 123.
[21] February 23, 2021 Tr., pg. 30.
[22] February 23, 2021 Tr., pg. 123.
[23] February 23, 2021 Tr., pg. 126.
[24] A trial court may open a confessed judgment "if the petitioner (1) acts promptly, (2) alleges a meritorious defense, and (3) can produce sufficient evidence to require submission of the case to a jury." *Pops PCE TT, LP v. R&R Restaurant Group, LLC*, 208 A.3d 79, 85-86 (Pa. Super. 2019).

12

Unaware of the Cumberland County litigation and due to the case's inactivity, this Court listed the *Lis Pendens* litigation for a pre-trial conference on October 2, 2020. The Court's action apparently spawned activity as the Patrono Defendants filed a Rule to File Complaint on October 16, 2020. At the pre-trial conference held on October 27, 2020, it was discovered that Confession Action 2 was pending and that the H&M had also filed a Complaint in Dauphin County. The parties discussed the timing for the filing of a complaint in the pending *Lis Pendens* action, as well as consolidation of the numerous actions pending in the three separate counties. Ultimately, the filing of the Complaint in the *Lis Pendens* action was met by Preliminary Objections followed by the filing of an Amended Complaint on December 21, 2020. Two days later, on December 23, 2020, the Dauphin County action was transferred to this jurisdiction based upon stipulation of the parties.

In an effort to bring some sense to the numerous litigations, as well as the different procedural stances of the various litigations, a status conference was held on August 16, 2021. At the conference, the parties agreed to stay Confession Action 2. The parties further agreed that H&M would file a Third Amended Complaint incorporating all other causes of action alleged in either the *Lis Pendens* action or the Dauphin County litigation.

On September 7, 2021, H&M filed a Third Amended Complaint ("Complaint") against the Patrono Defendants.[25] On September 28, 2021, the Patrono Defendants

---

[25] The Third Amended Complaint consisted of claims for breach of duty of good faith; breach of fiduciary duties; professional negligence; four counts of fraudulent transfer of real estate; civil conspiracy to commit fraudulent transfer; and three counts of civil conversion. The overriding theme of the allegations in the Third Amended Complaint is a claim of co-mingling of funds among the separate corporations, self-dealing by the Patrono Defendants, and inaccurate record keeping. Plaintiffs' Third Amended Complaint, pg. 98.

13

filed an Answer to Third Amended Complaint with New Matter and Counterclaims ("Answer 1"). In their New Matter, the Patrono Defendants alleged that Alan Patrono, Jane Hauser Patrono, and their affiliated businesses lent Hauser Estate $2,970,772.80. The Patrono Defendants' Counterclaims consisted of six claims of breach of the contribution agreement; one count of unjust enrichment; one count of promissory estoppel; and eight counts of breach of fiduciary duties.

Relevant representations in the Patrono Defendants' verified Answer 1 included a representation that Jonathan Patrono, at relevant times, was receiving income for other interests in addition to that received from Hauser Estate. Answer 1, pp. 65. The Patrono Defendants also claimed that Hauser Estate continuously borrowed money from Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono and their affiliated interests. Id., pp. 359. The moneys were allegedly transferred to Hauser Estate through a series of loans that were used to pay various expenses. Id., pp. 361-62. Although Answer 1 referenced alleged loans totaling $2,970,772.80, attached to the pleading is correspondence from Jane Hauser Patrono to her sisters alleging she is owed $3,211,042.22 for the loans. Id., Exhibit WW. Although the Patrono Defendants claimed throughout the pleading that Alan Patrono acted neither as counsel nor as an officer/employee of Hauser Estate, attached to the pleading is an email from Alan Patrono clearly evidencing his active role in making decisions relative to the operations of Hauser Estate. Id., Exhibits X, BB.

Patrono Defendants' Answer 1 was met with a number of Preliminary Objections by H&M. The Preliminary Objections were 19 in number with an overarching theme relating to the insufficiency and verbosity of Defendants' 619

14

paragraph and 52 exhibit pleading. Ironically, H&M complained that the Patrono Defendants' reference to alleged loans made to Hauser Estate lacked detail and any supporting documentation. The Patrono Defendants countered the sufficiency objection by noting that discovery is available to obtain the detailed information being sought.

By Order dated March 16, 2022, the Preliminary Objections were sustained in part and overruled in part, with the Patrono Defendants being granted an opportunity to amend. In the Order, this Court specifically noted inherent contradictions and inconsistencies in the Patrono Defendants' pleading related to the amount of money allegedly lent by the Patrono Defendants to Hauser Estate and the lack of specificity in identifying the actual individual or entity by whom the money was lent. Specifically, this Court noted, "Defendants' current pleading, which lumps what appear to be several distinct loans into an aggregate claim, improperly denies the responding parties an opportunity to individually defend each of the loans which were allegedly provided..." March 16, 2022 Order, paragraph 4.

Following the Court's Order, the Patrono Defendants filed an Answer with Amended New Matter and Counterclaims ("Answer 2"). Once again, the amended pleading was met by Preliminary Objections from H&M.[26] In their Preliminary Objections and supporting Brief filed on May 4, 2022, H&M, *inter alia*, again complained about the lack of any supporting documentation for the alleged loans by the Patrono Defendants to Hauser Estate and also the Patrono Defendants' failure to

---

[26] H&M's Preliminary Objections correctly noted the Patrono Defendants realleged paragraphs in the amended pleading which were identical to paragraphs which were previously ruled improper and stricken by this Court's March 16, 2022 Order.

identify the purpose for which the loans were made. In their Brief in Opposition to the Preliminary Objections, the Patrono Defendants repeated their argument that discovery is the proper means by which to obtain the specific factual information sought by H&M, citing *General State Authority v. Lawrie & Green*, 356 A.2d 851, 854 (Pa. Cmwlth. 1976). By Order dated August 1, 2022, H&M's Preliminary Objection based upon insufficiency of the pleading was denied as the Court accepted the Patrono Defendants' implicit representation that they would act in good faith in providing the information lacking in the pleading through discovery.

After a conference on September 28, 2022, the Court entered an Order setting trial for October 30, 2023. The Order further directed that factual discovery be completed prior to January 27, 2023, with expert reports being provided by March 31, 2023 and responsive expert reports provided by June 2, 2023. The Order specifically indicated that failure to comply with the discovery schedule would result in the preclusion of evidence at trial. Additionally, the Order scheduled a settlement conference for February of 2023.

As the litigation was unfolding in court, discovery was ongoing. At his deposition on January 19, 2021, Alan Patrono conceded that proceeds from the $1.475 million Members 1st loan were entirely used to pay off Hauser Estate debt, January 19, 2021 Tr., pg. 81, including payments to Alan Patrono's personal line of credit and Apple Leaf Abstracting's line of credit. January 19, 2021 Tr., pg. 78. Alan Patrono further claimed that, following receipt of the Members 1st loans, he continued to provide loans to Hauser Estate by writing checks from his personal account. He indicated that Melinda Davis and Hannah Hauser had access to the "records" which

16

supported the loans. January 19, 2021 Tr., pg. 26-27. Although acknowledging that his personal guarantee to Members 1st required notice to Members 1st prior to Hauser incurring further debt, he attempted to excuse his failure to give Members 1st prior notice by claiming he provided Members 1st with his personal tax returns which evidenced the loans. January 19, 2021 Tr., pg. 90.

At her January 19, 2021 deposition, Jane Hauser Patrono also claimed loans by her, her husband, and her husband's law firm were made to Hauser Estate subsequent to the Members 1st loans. She indicated that she believed her husband kept documents about the purpose of the loans. January 19, 2021 Tr., pg. 23. Interestingly, she acknowledged that a number of checks written from her personal account to Hauser Estate were specific dollar and cent amounts as compared to general lump sum payments. January 19, 2021 Tr., pg. 49. Jane Hauser Patrono represented she wrote checks for significant funds from her personal account which she claimed were for Hauser Estate expenses but were payable to "cash." January 19, 2021 Tr., pg. 52.

On September 30, 2022, H&M propounded Interrogatories and Request for Production of Documents to each of the Patrono Defendants. Included in the Interrogatories was a request for the Patrono Defendants to provide "[t]he current location of any and all documents evidencing the existence and terms of [the loans allegedly made to Hauser Estate]" and a request for "all documents supporting ... such loans." Timeline with Exhibits in Support of Plaintiffs' Motion for Default Judgment ("Timeline"), Exhibit 5. The Request for Production of Documents also included requests for all documents relating to the formation, capitalization, or

operations of Hauser Estate, Inc. and HFF and all documents related to any communications concerning the subject matter of the litigation. Finally, the Request for Documents requested personal tax information for all Patrono Defendants from 2011 through the date of the request.

In response to the request concerning the loans allegedly advanced by the Patrono Defendants, the Patrono Defendants indicated "[c]opies of all documents in the Defendants' possession have been provided during the course of discovery" and directed H&M to "[s]ee documents previously produced." However, only copies of checks to Hauser Estate were previously provided without any supporting records relating to the loans. Timeline, Exhibit 6. Additionally, the Patrono Defendants raised boilerplate objections. In regard to requests for personal income tax information, the Patrono Defendants objected on the ground that it was beyond the scope of a response reasonably required by the Pennsylvania Rules of Civil Procedure and was unduly burdensome, overbroad, and aggressive.

On November 14, 2022, counsel for H&M forwarded a deficiency letter. Included in the alleged deficiencies was the failure to produce documentation concerning the alleged loans made by the Patrono Defendants. Additionally, the deficiency letter asked the Patrono Defendants to clarify the identity of the documents allegedly provided which were responsive to the specific interrogatory. The letter also pointed out the respective deficiencies in the Patrono Defendants' response to requests for interrogatories. Timeline, Exhibit 7.[27]

---

[27] In furtherance of what was rapidly developing into a "tit-for-tat" course of conduct, the next day, November 15, 2022, counsel for Patrono Defendants provided counsel for H&M a deficiency letter related to alleged deficiencies in their discovery responses to the Patrono Defendants on August 25, 2022.

18

When the deficiency letter went unaddressed, on January 6, 2023, H&M counsel made a second request for response. As additional depositions of the Patrono Defendants were scheduled to begin on January 13, 2023, the correspondence requested prompt response by the Patrono Defendants. By letter dated January 11, 2023, Patrono Defendants' counsel advised they would not be providing Alan Patrono's individual tax records. The response indicated that it otherwise included the "various documents responsive to the notice to attend separate from the requested tax returns." Timeline, Exhibit 17.[28] The correspondence from Patrono Defendants' counsel also acknowledged that the best evidence concerning the potential diversion of moneys from Hauser Estate "would be bank records or other records of the business itself, ..." *Id.*

At his subsequent deposition on January 13, 2023, Alan Patrono did not bring any of the documents requested in the notice of deposition. In response to various questions about his failure to bring those documents, Alan Patrono stated under oath that "I looked through everything that I could remember, and I looked through your responses. And when this suit started a long time ago, I sent a lot of things up to [my counsel], and **that's all I have**." January 13, 2023 Tr., pgs. 8-9 (emphasis added). Relevantly, at various times during the deposition, Alan Patrono alluded to the possibility that he could recreate the actual history related to the particular inquiry by reviewing his "notes." January 13, 2023 Tr., pg. 260; pgs. 209-210; pgs. 189-190.

---

[28] On January 11, 2023 at 3:45 p.m., 337 documents were provided by the Patrono Defendants to H&M counsel without labeling or explanation. On January 12, 2023, the Patrono Defendants provided two sets of documents to H&M counsel. The first set consisted of the 337 documents provided on January 11, 2023; however, this time the documents were Bates labeled. The second set consisted of 660 documents without explanation. The second document disclosure occurred on the day prior to

However, at other times, Alan Patrono affirmatively stated that supporting records did not exist. Specifically, when asked about the existence of supporting documents to checks which allegedly evidenced loans of the Patronos to Hauser Estate, the following exchange occurred:

Q. Would you agree with me that there is no explanation or supporting documentation?

A. **I'll agree to for all of them there's no explanation and supporting documents, but I also tell you that we gave you the checks.**

January 13, 2023 Tr., pg. 263 (emphasis added).

Later during the same sequence, he again reiterated there is no supporting documentation to the checks evidencing the alleged loans. In an apparent contradiction, Alan Patrono later acknowledged that such records existed in approximately 50 boxes in his office. January 13, 2023 Tr., pg. 266. Counsel for H&M promptly made an on-the-record request for all such supporting documentation. January 13, 2023 Tr., pg. 267. During the deposition, Alan Patrono admitted that **"The tax returns detail the contributions that we made every year."** January 13, 2023 Tr., pg. 264 (emphasis added).

Jane Hauser Patrono was deposed on January 18, 2023. During her deposition, she claimed to be generally unaware of the specifics concerning the formation and operation of the various corporate entities, however, generally relied on the guidance of her husband concerning those matters. She also claimed to be unaware of the request of her to produce documents at the deposition, January 18, 2023 Tr., pg. 11, and of the Answer and New Matter filed on her behalf. January 18,

---

scheduled depositions of the Patrono Defendants and were apparently in response to the discovery

20

2023 Tr., pg. 22. She claimed not to have possession of any documents related to the business but, relevantly, she admitted that Alan Patrono took notes of the various meetings involving the corporate entities and was "sure he kept them in a file," probably in his law office. January 18, 2023 Tr., pg. 52-53. H&M counsel promptly made an on-the-record request for a copy of the meeting minutes. January 18, 2023 Tr., pg. 63.

At his deposition on January 19, 2023, despite the lack of any prior objection on his behalf, Jonathan Patrono defiantly acknowledged he failed to comply with H&M counsel's request to bring his personal income tax returns and other documents to the deposition as specified on the deposition notice. January 19, 2023 Tr., pg. 16. In response to specific inquiry, he claimed he had not performed legal work since 2012 despite his name being listed on the website as an attorney for Apple Leaf Abstracting & Settlement Company as late as 2021. January 19, 2023 Tr., pg. 24. He stated he was unsure for whom he was working during the relevant time periods. Despite direct questioning, Jonathan Patrono would not confirm whether a 2014 loan document listing his income at $120,000 annually was accurate. January 19, 2023 Tr., pg. 69. He reiterated that **only tax documents** would accurately establish his income through the years. January 19, 2023 Tr., pg. 75. In response to his answers, H&M counsel immediately made an on-the-record request for his federal W-2 statements.

Jonathan Patrono's deposition testimony indicated there were "giant boxes" of records related to the operation of the subject corporate entities which had not yet

---

requests made by H&M counsel on September 30, 2022.

21

been provided to counsel. January 19, 2023 Tr., pg. 37. He claimed he was unaware of where the corporate minute book for Hauser Estate was currently located. January 19, 2023 Tr., pg. 64. Later in the deposition, when he once again alluded to the corporate records being housed in "boxes and boxes", January 19, 2023 Tr., pg. 133,[29] H&M counsel promptly made an on-the-record request for all such documents. January 19, 2023 Tr., pg. 135. Jonathan Patrono wavered in his later deposition testimony when he claimed he wasn't sure if he retained documents regarding Hauser Estate and wasn't certain if corporate documents were at Alan Patrono's office. He stated that a "couple months ago" was the first time he did a document search in response to prior discovery request. January 19, 2023 Tr., pg. 160-161.

At his continued deposition on January 24, 2023, Jonathan Patrono confirmed his general ignorance of specifics concerning Hauser Estate expenditures. He acknowledged that paper files related to Hauser Estate and HFF existed at Alan Patrono's office. January 24, 2023 Tr., pg. 215-216. This acknowledgment was immediately met by a repeated on-the-record request of H&M counsel for production of such documents. Jonathan Patrono generally acknowledged that he could not explain the purpose of the alleged loaned funds claiming he "cannot tell you what any of the checks exactly were for **without looking through the records**." January 24, 2023 Tr., pg. 280 (emphasis added). Contrary to his January 19, 2023 deposition testimony, he claimed that corporate minutes related to Hauser Estate were in possession of the bankruptcy receiver; however, as President of Hauser Estate, he

---

[29] Jonathan Patrono opined that Alan Patrono was fully aware of the existence of the documents at the

never requested the return of those documents in response to discovery requests in this litigation. January 24, 2023 Tr., pg. 197.

On January 25, 2023, H&M counsel forwarded correspondence confirming the on-the-record deposition requests for the host of documents. Included in those were requests for personal tax returns and all documentation supporting the alleged loans and Hauser Estate expenditures. Timeline, Exhibit 26.

On April 10, 2023, H&M filed a "Motion to Compel Discovery and for Imposition of Discovery Sanctions Against Defendants and Their Counsel" seeking compliance by the Patrono Defendants with earlier discovery requests. On April 21, 2023, the Patrono Defendants filed an Answer to Plaintiffs' Motion to Compel Discovery and Sanctions. On at least two occasions in their pleading, the Patrono Defendants claimed that other than the tax returns, all information requested in discovery has been provided. Defendants' Answer, pp. 23, 36.

On April 21, 2023, the Court conducted hearing and argument on H&M's Motion to Compel Discovery and Sanctions. Counsel for H&M indicated to the Court that, other than cancelled checks from the Patrono Defendants, there was no supporting documentation evidencing the debt or loans allegedly made by the Patrono Defendants. Following hearing, the Court specifically directed, *inter alia*, the Patrono Defendants provide H&M with copies of their individual tax returns for the years 2011 through and including 2021, including therewith any schedules and supporting documentation within 20 days of the date of the Order. Additionally, despite the Patrono Defendants' claim that they did not have any documents to

---

Patrono and Murphy law office. January 19, 2023 Tr., pg. 135.

23

support their alleged loans other than copies of the checks and bank deposit information, the Court graciously granted the Patrono Defendants an additional 20 days to provide any supporting documentation related to the alleged loans. The Court cautioned that should the Patrono Defendants fail to produce any such documentation, their testimony on the subject would be limited to evidence related to the authenticity of the written checks and bank records.

On May 25, 2023, H&M filed a Motion for Citation of Contempt Against Defendants Alan Patrono, Jane Hauser Patrono, and Jonathan Patrono alleging Alan and Jane Patrono failed to provide income tax records for 2018 and 2019 and that Jonathan Patrono failed to provide income tax records for 2011 through 2014. Additionally, H&M alleged the Patrono Defendants failed to provide other records concerning Hauser Estate operations and expenses. By Answer filed on June 6, 2023, the Patrono Defendants expressly represented to the Court, **"Defendant had previously provided or made available all documents in their possession concerning the financial records of Hauser Estate."** Defendants' Answer to Motion for Citation of Contempt, paragraph 3 (emphasis added).

At hearing on June 7, 2023, Jonathan Patrono claimed his tax returns for the years 2011 through 2014 were filed through Turbo Tax and therefore were automatically purged. As a result, he represented he did not have access to the same. Counsel for the Patrono Defendants produced a request for transcript of tax returns dated May 25, 2023 allegedly filed on behalf of Jonathan Patrono. The document indicated only a request for a copy of the tax return transcript from the IRS which would contain only line-item amounts on the tax returns but would not include

24

identification of the specific sources comprising the entry. No proof of mailing to the IRS nor any other indication that the request had actually been filed or receipt acknowledged by the IRS was presented. Alan and Jane Patrono claimed they did not file 2018 or 2019 federal tax returns.

In regard to H&M's request for supporting documentation for the alleged loans and/or expenditures related to the loans, Patrono Defendants claimed they provided reports from the Xero bookkeeping software to H&M. Patrono Defendants' counsel confirmed his previous representation to the Court that the Patrono Defendants did not have any supporting documents. Counsel went on to state, "What we have are the checks and the bank statements all of which had been produced." Counsel reiterated, "That answer has not changed." June 7, 2023 Tr., pg. 19. Counsel for Patrono Defendants further explained:

> "Those expenses that was what we needed to get from the Xero program, Your Honor, and the Xero program, as they were told back in October of 2022, when the trustee came in and took over - - the bankruptcy trustee came in and took over, he denied them access to the Xero program. That's where the documentation existed.
>
> So in light of the Court's Order, we went back - - the Patronos went back to the trustee and got permission to get into that Xero program. We printed out what we could printout, which shows the expenses. **It doesn't show - - what's left in Xero is the actual receipts for each - - or invoices for each one of the expenses, but the printouts show the amount and who it was paid for.** So they have all of that."
>
> ...
>
> THE COURT: Let me just touch on that point. Are you indicating to me that documents were turned over to the bankruptcy trustee and **copies of those were not kept by your clients or by counsel?**
>
> [ATTORNEY FOR PATRONO DEFENDANTS]: **That is correct.** That is correct..."

25

June 7, 2023 Tr., pg. 20 (emphasis added). Patrono Defendants' counsel further indicated that the Patronos did not retain copies of any documents. June 7, 2023 Tr., pg. 21. The Patrono Defendants conceded access to the Xero bookkeeping software was not granted to H&M until June 1, 2023. All Appellants were in the courtroom throughout counsel's representations.[30]

By Order dated June 12, 2023, the Court directed Alan and Jane Patrono to file verified statements confirming representations made by their counsel that they had not filed 2018 or 2019 federal income tax returns. The Court also directed that Alan and Jane Patrono provide documentation for the calendar years 2018 and 2019 related to their income sources. Additionally, the Court directed Jonathan Patrono to provide documentation in his possession concerning his income from all sources for the calendar years 2011 through 2014. In compliance with the Court's April 25, 2023 directive, the Court Order also limited evidence in support of the Counterclaims to the authenticity of actual checks and bank records evidencing monetary transfers to Hauser Estate.[31]

On July 19, 2023 – four days past the deadline established by the Court – Alan and Jane Patrono filed a verified statement indicating they did file a personal income tax return for 2018 and that a copy of the same was forwarded to counsel for H&M. They also verified they did not file 2019 federal tax returns, nor were they granted an extension.

---

[30] It is important to note that the Court has not found any misconduct on the part of counsel for Patrono Defendants at the June 7, 2023 hearing as it was clear to the Court that counsel was relying on information provided to him by the Patrono Defendants.
[31] Each Patrono Defendant was also sanctioned in the amount of $3,500.

26

On August 9, 2023, H&M again filed a Motion for Discovery Sanctions against the Patrono Defendants. The motion suggested the tax documents provided were incomplete and that Jonathan Patrono's representations that he was actively attempting to obtain tax records were contradicted by the documents he provided. Following argument on September 25, 2023, the Court ordered that the Patrono Defendants produce within seven days verified statements indicating they had provided H&M accurate copies of all federal income tax returns filed by them or on their behalf for the tax years 2011 through current. In an effort to avoid any claim of uncertainty by the Patrono Defendants, the Order was specific in identifying the documentation required to be produced. In light of the impending jury trial date, the Court directed the Patrono Defendants to provide documentation within seven days.

On October 2, 2023, the Patrono Defendants filed a "Motion for Reconsideration and Modification of the September 25, 2023 Order or, Alternatively, to Extend the Deadline" to provide the documentation. Subsequently, the Court entered an Order denying the Motion for Reconsideration, however, granting the Patrono Defendants until October 16, 2023 to comply with the terms of the September 25, 2023 Order.

On October 19, 2023, the Patrono Defendants filed a Second Motion for Reconsideration of the Order of Court dated September 25, 2023. The motion represented that on October 6, 2023, Alan Patrono notified counsel that he had at least 37 banker boxes of records potentially responsive to the Court's September 25, 2023 Order. Apparently, discovery of the boxes did not occur until after October 2, 2023 as the Patrono Defendants' prior motion made no mention of the extent of the

27

records at issue. By Order dated October 26, 2023, the Patrono Defendants' Second Motion for Reconsideration was denied.

On October 26, 2023, H&M filed a "Motion for Default Judgment Against Defendants Pursuant to Pa. R. Civ. P. 4019(c)(3) or, in the Alternative, Emergency Motion for Continuance of Trial and Request for Corresponding Imposition of Delay Sanctions." The Court scheduled an immediate telephone conference for October 27, 2023. During the conference, Patrono Defendants' counsel indicated he had not reviewed the content of the boxes referenced in his second Petition for Reconsideration and that they were not in his possession, but rather in the possession of a third party copying service. October 27, 2023 Tr., pg. 5-6. Following further discussion, the Court listed H&M's Motion for Default Judgment for hearing and argument on November 2, 2023 and granted H&M's request for trial continuance, continuing trial to February 26, 2024.[32]

---

[32] Earlier in the litigation, in an effort to streamline proceedings, the five causes of action relating to the fraudulent transfer of real estate and conspiracy were severed from the remaining causes of action. Following a non-jury trial on those issues held on April 25, 2023 and April 26, 2023, this Court found that Alan Patrono, Jane Patrono, and Jonathan Patrono transferred title to respective real estate owned by them with actual intent to defraud creditors. Specifically, the Court found that Alan Patrono, Jane Patrono, and Jonathan Patrono transferred title of their properties to Polly Patrono in an effort to avoid H&M collecting on the personal guarantees securing the Members 1st loan. As a result, the Court enjoined the Patrono Defendants from further encumbrance or transfer of the subject real estate.

On August 18, 2023, Hammerhead Realty, LLC ("Hammerhead") filed a Petition for Relief from the *Lis Pendens* on Property Located at 28 West Middle Street, Adams County, Pennsylvania. The property housed the law office of Patrono & Murphy, LLC and was one of the subject properties enjoined by previous Order of Court. By Order dated October 2, 2023, Hammerhead, through its sole shareholder, John Murphy, Esquire, was directed to disclose all written agreements relating to the sale and ownership of 28 West Middle Street. The documents disclosed by Hammerhead included a number of documents relevant to the fraudulent transfer litigation which were not previously disclosed by Alan Patrono during discovery or during Alan Patrono's testimony during the fraudulent transfer non-jury trial despite the relevancy of the documents being self-evident. For instance, Alan Patrono attempted to avoid a finding of fraud when he, on the advice of counsel, arranged the return of the properties at issue from Polly Patrono to their original title owners. He failed to mention, however, that following the return of title to him, he entered a sales agreement to once again transfer the property and also entered a one-year lease encumbering the property through December 31, 2023. Timeline, Exhibits 42 & 46. As an officer of the court, Alan Patrono remained silent about the sales agreement

28

At the beginning of the November 2, 2023 hearing, Patrono Defendants' counsel indicated that approximately 2,789 documents were forwarded to H&M counsel on October 20, 2023. The documents were reported to be the records obtained from two accountants who provided accounting services to the Patrono business entities and Alan and Jane Patrono personally. November 2, 2023 Tr., pg. 25.

At the beginning of his testimony, Alan Patrono confirmed his representations during prior proceedings, that he had provided all documentation concerning the alleged loans to Hauser Estate to his counsel. November 2, 2023 Tr., pg. 37. In regard to his personal tax returns, he claimed that an accountant prepares his tax returns; however, the accountant is unwilling to sign the tax returns as preparer. Rather, the accountant returns the tax returns to Alan Patrono who signs the documents as "self-prepared." November 2, 2023 Tr., pg. 46-47. Apparently, this practice results from the preparer being unwilling to verify the accuracy of information concerning the alleged loans to Hauser Estate. Interestingly, during his testimony, Alan Patrono continued to advance his claim that the tax returns would not contain any information relevant to the litigation, November 2, 2023 Tr., pg. 57, despite his

---

and the lease encumbrance on 28 West Middle Street at the same time during which the Court was considering issues relating to preservation of clear title to the property in order to protect creditors.

The concealed documents also included relevant information contrary to deposition and court proceeding testimony provided by Jonathan Patrono and Alan Patrono. For instance, the purchase agreement of Patrono & Associates, LLC and Apple Leaf Abstracting & Settlement Company indicated that Jonathan Patrono has not practiced law with either of those entities since 2008 despite his January 19, 2023 deposition testimony during which he claimed he worked at the respective corporate entities through 2012. Compare Timeline, Exhibit 42 with January 19, 2023 Tr., pgs. 21-24. Similarly, despite Alan Patrono's varying degrees of accuracy concerning the existence of supporting documentation for operations related to Hauser Estate, the February 10, 2022 sales agreement for 28 West Middle Street specifically includes the provision that Alan Patrono remove all materials related to Hauser Estate located at that property, including therewith, the Hauser Estate items located in Jonathan Patrono's office. Timeline, Exhibit 42.

earlier testimony acknowledging that the alleged loans to Hauser Estate were declared by him in both his 2016 and 2022 tax returns. November 2, 2023 Tr., pg. 51-52.[33]

In regard to the recently discovered 37 boxes containing tax information ("tax boxes"), Alan Patrono claimed he was unaware that the boxes even existed as of September 25, 2023. November 2, 2023 Tr., pg. 67. He indicated he was unsure as to the content of the boxes as he had not looked through them since prior to commencement of the litigation in 2018. November 2, 2023 Tr., pg. 73. He generally described the tax boxes as containing personal tax information and tax information for Apple Leaf Abstracting, Patrono & Murphy, LLC, and Patrono & Associates, LLC. November 2, 2023 Tr., pg. 83-85. He conceded at least one of the tax boxes contained financial information for HFF. November 2, 2023 Tr., pg. 84. He also conceded that checks supporting the alleged loans were written through his law firm entities including Apple Leaf Abstracting. November 2, 2023 Tr., pg. 90. During his testimony, Alan Patrono recognized the difference between records related to his personal income tax information as compared to the tax records related to his law business entities. November 2, 2023 Tr., pg. 132-133; pg. 143-144. Notably, the September 25, 2023 Order related only to his personal taxes.

During his testimony, Alan Patrono unexpectedly admitted that an additional 37 boxes of records related to Hauser Estate ("Estate boxes") were maintained in his law office. November 2, 2023 Tr., pg. 151. Although once again acknowledging he

---

[33] Alan Patrono did not explain why he declared the same loss in tax returns for two separate years.

30

did not know the specific content of documents in the boxes, November 2, 2023 Tr., pg. 152, he claimed that they included:

> **Accounting records, vendor records, miscellaneous documents for the operation of Hauser Estate over a period of x-number of years.** I don't know the time span. That's what's in there. I can't be more specific than that.

November 2, 2023 Tr., pg. 154 (emphasis added). His testimony clearly reflected that the Estate boxes were in his possession during the relevant periods of time during which the Patrono Defendants were indicating to the Court that all such records were in the possession of the bankruptcy receiver and therefore unavailable to them.[34]

During his testimony, Jonathan Patrono acknowledged he was aware of the existence of the Estate boxes as was Alan Patrono. November 2, 2023 Tr., pg. 226-227. He described the Estate boxes as the "old winery boxes." November 2, 2023 Tr., pg. 229. He also understood that the records were directly relevant to this litigation. November 2, 2023 Tr., pg. 231. Jonathan Patrono claimed, however, that there were only 5 to 10 Estate boxes at the law office. November 2, 2023 Tr., pg. 226. He claimed to have looked through the Estate boxes on two occasions; once before and once after his January 19, 2023 deposition. November 2, 2023 Tr., pg. 234. He later contradicted himself by indicating he went through the Estate boxes in the fall of 2018 and again in 2022. November 2, 2023 Tr., pg. 248. He identified the documents in the Estate boxes as being the original documents supporting the Xero

---

[34] Incidentally, his testimony reflected that the first inquiry to obtain the records maintained by the receiver was not made until May 12, 2023 and, shortly thereafter, access was granted. Apparently, a period of over four years transpired between the time when the relevancy of the records, and the request for their disclosure, was first known and his subsequent effort to obtain the records.

31

Case 1:25-bk-02214-HWV    Doc 58    Filed 10/03/25    Entered 10/03/25 16:34:22    Desc
Main Document    Page 57 of 155

accounting system. November 2, 2023 Tr., pg. 248-249. Throughout his testimony, Jonathan Patrono acknowledged he had access to the Estate boxes over the course of this litigation and only provided H&M access to what he claimed to be copies of the documents in the Xero accounting software in May of 2023.

Jane Hauser Patrono was also called as a witness during the hearing. During the majority of her testimony, she claimed ignorance as to details. She claimed lack of memory as to what documents she may or may not have seen and, as for those documents she might have seen, she could not recall any details. She essentially claimed that in regard to all issues relevant to this litigation, she deferred to her husband, Alan Patrono, and allowed him to make decisions in regard to the litigation on her behalf.

The final witness who provided material information was the law partner of Alan Patrono, Attorney John Murphy. Attorney Murphy testified that he observed three or four boxes in Alan Patrono's office which were labeled with the names of the winery corporate entities relevant to this litigation. November 3, 2023 Tr., pg. 311. He further indicated there were approximately 25-30 additional boxes labeled with the names of the relevant corporate entities which were housed in a different location in the law office. November 3, 2023 Tr., pg. 312. He claimed not to have seen Jonathan Patrono use the offices housing the Estate boxes since approximately 2007-2008. November 3, 2023 Tr., pg. 312.

Finally, Jonathan Patrono was re-called as a witness. He once again claimed that everything in the Estate boxes was also entered in the Xero accounting system. November 3, 2023 Tr., pg. 360. He stated the records in the Xero accounting system

32

spanned 2012 through 2018 and included backup documentation for Hauser Estate expenditures. November 3, 2023 Tr., pg. 364.[35] He further claimed that all information in the Estate boxes was entered in the Xero accounting system by his bookkeeper. November 3, 2023 Tr., pg. 384.

During a cursory review of the Xero system conducted in the courtroom, the Court did not observe any entries by the bookkeeper but rather observed entries which indicated they were entered by Jonathan Patrono. November 3, 2023 Tr., pg. 393-396. Additionally, the Court observed numerous entries which lacked any backup information or supporting documentation. Two of the entries observed during the brief review lacked supporting documentation, however, were designated as payments by Hauser Estate to Polly Patrono. November 3, 2023 Tr., pg. 395-396.

Following the close of testimony and argument, on February 8, 2024, this Court entered default judgment in favor of H&M and against Alan Patrono and Jonathan Patrono on the cause of action for breach of fiduciary duty; against Jane Hauser Patrono on the count of civil conspiracy for breach of fiduciary duty; on a claim of professional negligence against Alan Patrono and Jonathan Patrono; on two counts of civil conversion against Alan Patrono and Jonathan Patrono; and on the claim of civil conversion against Alan and Jane Patrono. The Court also entered default judgment against Alan and Jane Patrono on all of their Counterclaims.

On February 29, 2024, the Patrono Defendants filed a "Petition to Open Default Judgments on Various Counterclaims and to Strike, or in the alternative,

---

[35] This claim is directly in contradiction to the claim made by Alan Patrono, under oath, at his January 13, 2023 deposition, *see* Tr., pg. 263, and by the Patrono Defendants' counsel to the undersigned, in open court, and in the presence of Jonathan Patrono, on June 7, 2023. *See* Tr., pg. 20. At those proceedings, Alan Patrono continuously and adamantly claimed such documents did not exist.

33

Open Default Judgments on Counterclaims." By Order dated March 12, 2024, the Petition to Open/Strike the Default Judgments entered on February 8, 2024 was denied. This appeal followed.

In discussing the merits of this appeal, it is important to consider whether the appeal is an improper interlocutory appeal. Relevant to this discussion is the procedural record which reflects that this Court's Order granting the default judgments, and the subsequent Order denying the Petition to Open and/or Strike Default Judgments, were entered pursuant to Pa. R. Civ. P. 4019(c)(3). That rule authorizes a court to enter judgment of default against a party who has been disobedient in complying with discovery obligations. *See also **Taylor v. City of Phila.***, 692 A.2d 308, 313-14 (Pa. Cmwlth. 1997) *affirmed* 699 A.2d 730 (Pa. 1997) (judgment by default may be entered against disobedient party as sanctioned for failure to respond adequately to discovery requests); ***Fox v. Gabler***, 626 A.2d 1141, 1143 (Pa. 1993) (court acts well within its discretion and latitude in entering judgment by default against disobedient party inadequately responding to discovery requests). Case law is equally clear that it is improper to challenge a default judgment entered by the trial court pursuant to Pa. R. Civ. P. 4019(c)(3) by a petition to strike and/or open. *See **Simpson v. Allstate Ins.***, 504 A.2d 335, 337 (Pa. Super. 1986); ***Miller Oral Surgery, Inc. v. Dinello***, 493 A.2d 741, 743 (Pa. Super. 1985); ***Livolsi v. Crosby***, 495 A.2d 1384, 1385 (Pa. Super. 1985). The proper method for review of the trial court's action in entering default judgment pursuant to Pa. R. Civ. P. 4019 is to file an appeal within the time prescribed by the Pennsylvania Rules of Appellate Procedure after final judgment consisting of a determination of both liability and

34

damages by the trial court. *Livolsi*, 495 A.2d at 1385. Under this well-established authority, the current appeal should be quashed as an improper interlocutory appeal.

In order to avoid this conclusion, Appellants argue, contrary to the Court's clear language in its Order, that the judgments entered against Appellants on their Counterclaims are actually judgments of *non pros*. In their pleadings before this Court, Appellants cited *Dombrowski v. Cherkassky*, 691 A.2d 976 (Pa. Super. 1997), in support of their argument. *Dombrowski*, however, does nothing more than define a *non pros* as a judgment entered due to the failure of a plaintiff to properly and/or promptly prosecute a case. *Id.* at 976-77. *Dombrowski* neither discusses nor prohibits relief authorized elsewhere in the Pennsylvania Rules of Civil Procedure. *See generally Id.* Specifically, *Dumbrowski* does not, in any way, speak to the authority of the court under Pa. R. Civ. P. 4019 to address discovery violations. *Id.*

The gist of Appellants' argument appears to be a suggestion that Rule 4019 limits a court to entering a judgment of *non pros*, rather than default judgment, in circumstances where a counterclaim plaintiff commits significant discovery violations. This writer has been unable to find any authority for the proposition, nor has any been cited by Appellants. Importantly, R. Civ. P. 4019 does not impose any such limitation. In light of the lack of any definitive guidance, this Court concluded for purposes of clarity and efficiency that the entry of default judgment, under the circumstances, was procedurally and practically proper as Pa. R. Civ. P. 4019, without any other clarification or reservation, expressly permits the same.

Importantly, accepting Appellants' arguments will result in an absurd, and inefficient, result in both this and future litigations. Evidence of such a ludicrous interpretation is the current procedural conundrum facing both this and the appellate court.[36] Specifically, this Court has entered default judgments under Rule 4019 against Appellants and other Patrono Defendants on H&M's several causes of actions. Pursuant to the authority of *Livolsi*, *supra*, interlocutory appeal on those matters is clearly improper. If, as suggested by Appellants, the judgments entered on Appellants' Counterclaims are required by law to be considered judgments of *non pros*, an appeal on the Counterclaims is permissible pursuant to Pa. R. App. P. 311 (an order refusing to open or strike judgment as an interlocutory appeal is permitted as of right). In that circumstance, the end result is a bifurcated, inefficient, and lengthy resolution of essentially identical issues in the same litigation through multiple appeals. Under Appellants' theory, the default judgments entered on the causes of action brought by H&M in the Complaint are not subject to interlocutory review; however, the judgments entered on the Patrono Defendants' Counterclaims are permitted interlocutory appeal. As such, Appellants' position directly violates the stated goal of appellate procedure in limiting appellate review to final orders so as to prevent piecemeal determinations and the consequent protraction of litigation. ***Rivera v. Carbon County Tax Claim Bureau***, 857 A.2d 208, 212 (Pa. Cmwlth. 2004), *appeal denied* 878 A.2d 866, 583 Pa. 692. Since Pa. R. Civ. P. 4019 does not prohibit, but rather authorizes, the entry of default judgment under the current

---

[36] In addition to this appeal, there are, or have been, four separate appeals related to this litigation before the Superior Court docketed at 985 MDA 2023; 986 MDA 2023; 518 MDA 2024; 519 MDA 2024; and 520 MDA 2024. As a result, the record is duplicative and, at times, confusing and disjointed in each of the appeals.

36

circumstances, Appellants should not be permitted to redefine the Court's action in order to further delay ultimate resolution of the substantive issues before the Court.

Regardless of how the judgment is styled, it does not change the fact that judgment was properly entered against Appellants on the Counterclaims and that the Petition to Strike and/or Open the judgments was properly denied. Regardless of whether the judgment is treated as a default judgment or a judgment of *non pros*, relief from either requires the complainant to establish a reasonable explanation or a legitimate excuse for the conduct that gave rise to entry of the judgment. Compare Pa. R. Civ. P. 3051 (petitioner seeking relief from judgment must show, *inter alia*, a reasonable explanation or legitimate excuse for conduct giving rise to the judgment) with **Hutchison by Hutchison v. Luddy**, 611 A.2d 1280, 1292 n.10 (Pa. Super. 1992), *appeal granted*, 625 A.2d 1193, 533 Pa. 660, *appeal dismissed*, 649 A.2d 435, 538 Pa. 484) (sanction under Pa. R. Civ. P. 4019 must consider whether reasonable justification exists for parties' questionable conduct). In light of the record set forth hereinabove, as will further be discussed below, there is no reasonable explanation or legitimate excuse for Appellants' egregious conduct in this litigation.

Before discussing the merits of the sanction imposed by the Court, the Court will address Appellants' separate claim of error in entering judgment against Jane Hauser Patrono. In their Concise Statement of Matters Complained of on Appeal, Appellant Jane Hauser Patrono claims the evidence did not establish that she was responsible for the failure to produce documents as they were not in her possession.

Throughout this litigation, the Patrono Defendants have acted in unison as all pleadings have been collectively pled and filed despite the existence of multiple

Defendants. During discovery proceedings and throughout court hearings, Jane Hauser Patrono has consistently represented that she has allowed her husband, Alan Patrono, to act as her agent on her behalf in every aspect of this litigation. To now argue that his failure to properly respond to discovery cannot bind her simply defies the record.

The irony of her current claim is that it highlights the inconsistency of the Patrono Defendants' position throughout this litigation. Despite drafting significant legal documents for the formation and operation of Hauser Estate and HFF, and actually conducting negotiations and performing management services on behalf of the corporate entities, Alan Patrono attempts to redefine his role from that of legal counsel to one of a family member only doing favors for his relatives. If that is indeed true, he has no legal right to possess any of the documents concerning Hauser Estate or any of the other corporate entities as they properly belong to the corporate entities, or the officers and shareholders of the corporate entities, to which they relate. Under these circumstances, as a shareholder, Jane Hauser Patrono had a right superior to Alan Patrono to any documents related to Hauser Estate and/or HFF. Just as importantly, the documents at issue were located in a building of which she was part owner. By her own testimony, she was aware of the existence of the boxes containing Hauser Estate documents at all relevant times to this litigation. It is nonsensical to argue that Jane Hauser Patrono did not have access to documents over which she had legal authority which were located in a building of which she was part owner at a time when she had knowledge of the documents' existence. The fact that she delegated litigation authority to her husband does not absolve her of

38

responsibility for the significant discovery violations. As such, she is equally subject to the appropriate sanctions.

The primary thrust, and the pivotal issue, of the current appeal is the propriety of the sanctions imposed against the Appellants on their Counterclaims. Appellants argue the sanction of entering judgment against them on their Counterclaims was an unnecessarily severe penalty. Appellate courts have instructed that in determining whether discovery violations warrant the sanction dismissal, the court must consider:

1. the nature and severity of the discovery violation;
2. the willfulness or bad faith on the part of the defaulting party;
3. the extent of prejudice to the opposing party;
4. the ability of the prejudice to be cured; and
5. the importance of the precluded evidence in light of the failure to comply.

***Rohm & Haas Co. v. Lin***, 992 A.2d 132, 142 (Pa. Super. 2010).

In analyzing this issue, it is important to understand the full nature of the Patrono Defendants' noncompliance with discovery requirements. Certainly, significant effort has been devoted, unnecessarily, to obtaining the Patrono Defendants' federal tax records; however, the Patrono Defendants' noncompliance with reasonable discovery requests is much more aggravated. Since the initiation of this litigation in 2018, the consistent and dominating theme advanced by H&M focuses on allegations of fraudulent conduct by the Patrono Defendants resulting in the financial failure of Hauser Estate at the expense of personal financial gain by the Patrono Defendants. In furtherance of those allegations, H&M has alleged the existence of doctored records and have attempted to uncover documents supporting this claim as well as documents evidencing monetary transfers to the Patrono Defendants without concurrent legitimate expense and corporate mismanagement

39

and manipulation by the Patrono Defendants. Critically, the Patrono Defendants, personally and through counsel, have repeatedly claimed under oath and in court proceedings, that the very documents which would corroborate or refute H&M's claims did not exist. It is against this backdrop, after five years of litigation, that one must view the disclosure of approximately 30 to 37 boxes of Estate records within days of trial.

Generally, discovery is liberally allowed with respect to any matter which is not privileged, and which is otherwise relevant to the cause being tried. Pa. R. Civ. P. 4003.1. The threshold inquiry in determining relevancy focuses upon whether the discovery request can be reasonably calculated to lead to the discovery of admissible evidence. Pa. R. Civ. P. 4003.1(a). Appellants have not cited, nor has this Court located, any authority that applies a different standard to a party's personal tax records.

The income tax records of Alan and Jane Patrono are relevant, and thus subject to discovery, because of the Counterclaims asserting significant personal loans to Hauser Estate. Prior to the Members 1st loan in 2015, Alan and Jane Patrono, individually and through related businesses, alleged they made $600,000 in loans to the corporation. Post-2015, they alleged they made almost $3 million in additional loans to Hauser Estate. At his deposition, Alan Patrono acknowledged the loans would be evidenced on their tax records, thereby directly placing the documents at issue as material evidence. As the existence and the amounts of the alleged loans are matters central to this litigation, the tax records are pivotal to assist the fact-finder in making credibility determinations. Moreover, Alan and Jane Patrono

40

have indicated contradicting amounts for the alleged loans and ambiguously identified their actual source, either personally or through Alan Patrono's various business entities. In light of Alan Patrono's repetitive claims that the only supporting documents to the alleged loans are the actual checks and bank statements, the personal tax returns take on heightened importance as either verification or contradiction. In regard to the relevancy of most recent tax returns, Alan Patrono has testified that he included losses related to the alleged loans in his personal tax return as recently as 2022.

In regard to Jonathan Patrono, both his role and status as an attorney for Patrono & Associates, LLC and the amount of actual income received from Hauser Estate, are matters in dispute in this litigation. Contradictory information exists as to when he concluded his legal practice to assume greater duties for Hauser Estate. The precise date of that transition will be reflected by evidence of income during the relevant period. In light of the looming professional malpractice claim against Jonathan Patrono, that date has heightened importance. Similarly, his actual income throughout the period of time he was serving in his role with Hauser Estate is directly relevant to whether he manipulated estate assets to his financial benefit.[37] Indeed, during his depositions, Jonathan Patrono recognized the importance of the tax records when he conceded his personal income tax records would have information relevant to the litigation which was not available elsewhere.

Unquestionably, the importance of the tax returns was evident to all parties as early as 2018 when H&M properly utilized the discovery pursuant to the Rules of Civil

Procedure in an attempt to obtain the same from Appellants. Appellants, however, refused to answer repeated discovery requests and failed to bring the tax records to depositions in response to proper requests for production of documents. Although the Appellants repeatedly stated their position that the tax returns were not a proper target of discovery, they were directed by the Court to disclose the records. It was not until the eve of trial that they claimed unavailability for the first time.[38] It was only on May 25, 2023, the same day as the filing of Appellees' Motion for Citation of Contempt, that Jonathan Patrono allegedly made any effort to obtain his tax records from the Internal Revenue Service. Alan and Jane Patrono simply maintained they did not file 2018 and 2019 federal taxes. When the Court directed Appellants to file verified statements confirming their representations in court concerning the unavailability of documents, it took the Appellants over 30 days to comply. Even then, their compliance was marginal as they did not fully provide documentation of income for the relevant years as directed. Their cavalier approach to compliance with this Court's Order resulted in the September 25, 2023 Order which expanded the search for supporting documentation. Appellants' response, however, was to obfuscate the record, and perhaps intentionally delay trial, with a document dump of corporate tax records rather than personal tax records. Incidentally, at least one of the 37 boxes of supposed tax records located by Appellants contained records related to HFF, the content of which remains unknown.

---

[37] As previously indicated, Jonathan Patrono, in attempting to gain support for his proposal to create the winery, indicated he would not draw a salary.

[38] In their 24-page Answer to Appellees' Motion to Compel Discovery, Appellants never indicated any lack of possession or filing of their personal income tax records. Despite this Court's Order dated April 25, 2023 directing Appellants to produce their tax returns within 20 days, for the first time on May 10,

42

Even more egregious is the Appellants' treatment of the business records of Hauser Estate. Throughout this litigation, the Appellants have made affirmative and clearly erroneous statements during depositions and in actual court hearings as to the lack of any supporting documentation concerning the alleged loans from Appellants to Hauser Estate. As previously mentioned, on June 7, 2023, counsel for Appellants affirmatively advised the Court that supporting documents for the alleged loans did not exist. Despite the Patrono Defendants sitting on "giant boxes" of documents at the Patrono law office, counsel advised the Court that all of those same documents were in the possession of bankruptcy counsel for Hauser Estate and they no longer had access to the same. June 7, 2023 Tr., pg. 20.

The record is saturated with directions by the Court to produce Hauser Estate records and repeated denials by Appellants as to their existence. Yet, for the first time at hearing held just days prior to the commencement of jury trial, the Appellants acknowledged that approximately 30 boxes of records related to Hauser Estate, the contents of which are unknown, were and had been in their possession the entire time.[39]

---

2023, Appellants claimed the unavailability of certain tax records. Even then, Jonathan Patrono waited 15 days before making any effort to retrieve the information from the IRS.

[39] The Court rejects the self-serving testimony of Jonathan Patrono claiming the existence of only "five to ten boxes" and his representations as to the contents of the Estate boxes. Jonathan Patrono's testimony is contradictory on several key points related to his inspection of the Estate boxes and their content. His testimony is also contradicted by that of Alan Patrono, who had much more contact with the Estate boxes and who indicated the number of Estate boxes to be approximately 37. Alan Patrono's testimony is also corroborated by Attorney John Murphy who had more opportunity than Jonathan Patrono to view the Estate boxes. Attorney Murphy credibly indicated approximately three or four Estate boxes were located in Alan Patrono's office and an additional 25-30 Estate boxes were located in a separate room. This Court determined as a matter of fact that the Estate boxes exceeded 28 in number and possibly are as many as 37. Additionally, there is at least one additional box which has been identified as holding tax information for HFF that conceivably holds business records relevant to this litigation. This Court also found that neither Alan Patrono nor Jonathan Patrono credibly testified as to their knowledge of the contents of the Estate boxes other than that the boxes

43

Throughout this litigation, there is direct and circumstantial evidence that:

1. At least one signature of an H&M Plaintiff on a document prepared by Alan Patrono was forged;
2. Alan Patrono represented to Hannah Hauser and Melinda Davis's counsel that he would make changes to documents before they were executed when, in fact, he subsequently did not make those changes, yet permitted execution of the same;
3. Appellants converted checks for apple crops made out to HFF to the accounts of Hauser Estate without authority;
4. Appellants wrote checks for significant dollar amounts made out to "cash" and allegedly tendered to Hauser Estate but for which no documentation identifying the purpose of the payments has been produced;
5. Appellants transferred real estate with the intended purpose of defrauding creditors;
6. Appellants Alan and Jane Patrono failed to timely file at least one federal tax return or obtain an extension for the filing thereof;
7. Appellants produced two versions of a contribution agreement allegedly executed by Plaintiffs Hannah Hauser and Melinda Davis both of which appears to be the same document but were executed on completely different dates;
8. Appellants repeatedly transferred and encumbered real estate securing significant loans with Members 1st despite contractual representations of which they were aware which indicated they would not do so; and
9. Hearing evidence presented by Alan Patrono was precluded by the Cumberland County Court of Common Pleas due to a discovery violation.

While these issues, and other allegations of a significant number of self-serving business transactions alleged by Appellees, are best vetted by the finders of fact in a trial, if true, they are certainly an indication of the trustworthiness of Appellants' representations. Appellants' admitted suppression of approximately 30 boxes of relevant documentation not only circumstantially corroborates H&M's allegations, but also precludes a fair hearing on the same as Appellants have knowingly denied Appellees access to important records.

---

included "Accounting records, vendor records, and miscellaneous documents for the operation of Hauser Estate over a period of x-number of years." November 2, 2023 Tr., pg. 154.

44

The Appellants' repeated claims that H&M was granted access to the bookkeeping records contained in the Xero accounting program is nothing more than a red herring. First of all, access to the same was not granted until May of 2023. The grant of access to the Xero accounting program at that time neither explains nor justifies Appellants' failure to produce dozens of Estate boxes of documents which were in their possession over the five-year course of this litigation. Moreover, the Xero accounting program only relates to documents post-2015 when, in fact, material activities related to the subject of this litigation occurred prior thereto. Whether the dozens of Estate boxes are pre-Xero accounting records is unknown as Appellants have not disclosed those records as of yet. Moreover, this Court rejected Appellants' claim that the Xero accounting program contains all of the records which may be in the boxes. Indeed, a small sample of the Xero accounting program records displayed during hearing was, at best, inconclusive, if not contradictory, to Jonathan Patrono's claim on this issue. It is not unreasonable to expect a party to perform an actual inventory of records potentially related to pending litigation so their content can be affirmatively known. However, rather than pursue this course of conduct, for approximately five years the Appellants denied the existence of the records when, in all actuality, the records were in their possession.

The severity of the Appellants' discovery violations is beyond question. Moreover, when viewed within the entire record, Appellants acted willfully and with bad faith. The extent of the prejudice to Appellees is self-evident. Ultimate disclosure of the documents occurred just weeks prior to trial which had been scheduled for over a year. Because of Appellants' noncompliance, it was impossible

Case 1:25-bk-02214-HWV    Doc 58    Filed 10/03/25    Entered 10/03/25 16:34:22    Desc
Main Document      Page 71 of 155

for Appellees to determine the extent of inculpatory evidence which was withheld, or which might lead to further avenues of discovery. Interestingly, even as of this writing, Appellants have made no effort to provide the records or present evidence of their content or insignificance. Importantly, the prejudice cannot be cured without significant delay and expense to Appellees. Numerous experts have been retained by the Appellees in preparation for trial whose testimony does not take into account potentially thousands of pages of documents which may relate to substantive issues. Requiring Appellees to "hit the restart button" and commence preparation of this litigation from scratch is simply unfair.

The Superior Court reiterated the expectations on a party in responding to discovery requests as follows:

> A party's belief that discovery orders are wrong does not justify or excuse its violation of those orders. Rather, such defiance is a direct affront to the authority of the trial court and to the integrity of the judicial system and rule of law.
>
> A litigant cannot be permitted to determine what constitutes discoverable information. The Pennsylvania Superior Court in addressing a similar discovery issue in *George*, [] expressed its reluctance "to allow a participant in a lawsuit to dictate the determination of what is, and what is not, relevant. To allow this practice is akin to allowing a participant in a contest to referee the contest. In the contest of litigation, the judge and the judge alone, acts as the referee."

*Rohm & Haas Co.*, 992 A.2d at 143, (citing 6 Standard Pa. Practice, 2d, 34:85, p. 441; *Luszczynski v. Bradley*, 729 A.2d 83 (Pa. Super. 1999); *George v. Schirra*, 814 A.2d 202, 205 (Pa. Super. 2002); Trial Court Opinion (1556 EDA 2008), 7/17/08, at 11-12.)

46

In sum, this litigation involves significant allegations of misrepresentation and fraud. The litigation involved three separate jurisdictions over a period in excess of five years. From initiation of the litigation throughout the life thereof, Appellees have attempted to gain access to documents concerning the formation and operation of Hauser Estate and loans alleged to have been provided to Hauser Estate by Appellants. At times, Appellants have denied the existence of documents and failed to provide access of the same to Appellees. Suddenly, at a hearing just weeks before trial, Appellants, while discussing tax records, inadvertently disclosed the existence of at least 28 boxes, and as many as 37 boxes, of documents which relate to the formation and operation of Hauser Estate, and which include documents not previously provided to Appellees. Even more egregious is the fact that two of the three Appellants are licensed attorneys who are presumably familiar with their ethical obligations including their duty of candor to the Court. It is difficult to imagine a more glaring or deplorable misconduct on the part of a party in responding to reasonable discovery requests.

For the foregoing reasons, it is respectfully requested that this Court's Order be affirmed and the appeal in this matter be dismissed.

BY THE COURT:

_____
**MICHAEL A. GEORGE**
**President Judge**

Date filed: August 9, 2024

47

# EXHIBIT D



IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
CIVIL

H&M HOLDINGS GROUP, LLC,
HAUSER FAMILY FARMS, LLC,
MELINDA H. DAVIS and
HANNAH M. HAUSER,
         **Plaintiffs**

    **v.**

ALAN K. PATRONO,
JONATHAN ALAN PATRONO,
JANE HAUSER PATRONO,
POLLY E. PATRONO a/k/a
POLLY E. PATRONO-CARLSON,
PATRONO & MURPHY, LLC,
APPLE LEAF ABSTRACTING &
  SETTLEMENT COMPANY and
JOHN DOE(S)/JANE DOE(S),
         **Defendants**

2018-SU-1293

## ORDER OF COURT

AND NOW, this 2nd day of May, 2024, it is hereby Ordered that all further proceedings in this matter are stayed pending resolution of the appeals filed before the Pennsylvania Superior Court. The proceedings scheduled for May 22, 2024 and May 23, 2024 are cancelled pending further Order of Court. The arbitration hearing scheduled for June 21, 2024 is continued subject to rescheduling by the Court.

BY THE COURT:

_____
**MICHAEL A. GEORGE**
**President Judge**

Paige Macdonald-Matthes, Esquire & Jennifer L. Bruce, Esquire
Ronald L. Finck, Esquire & Aaron D. Martin, Esquire
Court Administration
jvs



IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
CIVIL

H&M HOLDINGS GROUP, LLC,
HAUSER FAMILY FARMS, LLC,
MELINDA H. DAVIS and
HANNAH M. HAUSER,
                    **Plaintiffs**
        **v.**

ALAN K. PATRONO,
JONATHAN ALAN PATRONO,
JANE HAUSER PATRONO,
POLLY E. PATRONO a/k/a
POLLY E. PATRONO-CARLSON,
PATRONO & MURPHY, LLC,
APPLE LEAF ABSTRACTING &
  SETTLEMENT COMPANY and
JOHN DOE(S)/JANE DOE(S),
                    **Defendants**

**2018-SU-1293**

## OPINION

The ~~current~~ issue before the Court is whether hearings currently scheduled to determine damages and sanctions against the above-captioned Defendants and counsel should be stayed pursuant to Pa. R. App. P. 1701 (divesting a trial court of jurisdiction to act following appeal except in limited circumstances) pending Defendants' interlocutory appeals to the Superior Court. For the reasons set forth below, further proceedings in this litigation will be stayed. Before discussing the merits of that decision, this Court feels compelled to address certain liberties with the record taken by the Defendants in their various arguments.

On February 8, 2024, pursuant to Pa. R. Civ. P. 4019(c)(3) this Court entered default judgment in favor of the Plaintiffs and against the Defendants on several causes of action contained in Plaintiffs' Third Amended Complaint. Additionally, the

Court entered default judgment on a majority of Counterclaims raised by the Defendants/Counterclaim Plaintiffs. The default judgments against Defendants/Counterclaim Plaintiffs were entered as a sanction for discovery violations, including the failure to comply with a prior court order.[1]

On February 29, 2024, Defendants filed a petition seeking to open/strike the default judgments entered on Plaintiffs' causes of action and to strike, or in the alternative, open the default judgments entered in favor of Plaintiffs on Defendants' Counterclaims ("Petition to Open/Strike").[2] In their petition, Defendants misstated the Court's February 8, 2024 Order by unilaterally redefining the Court's action as being one of judgment by *non pros* citing Pa. R. Civ. P. 237.3 (related to relief from judgment of *non pros* or by default). Defendants doubled down on this misstatement by devoting significant argument to the law related to judgment by *non pros*.[3] On March 1, 2024, Plaintiffs filed an emergency motion to strike Defendants' Petition to Open/Strike and requesting the imposition of sanctions against Defendants ("Motion to Strike and for Sanctions"). By Order dated March 12, 2024, this Court denied

---

[1] At two days of hearing held on November 2, 2023 and November 3, 2023 to consider Plaintiffs' request for discovery sanctions, Defendant Alan Patrono disclosed that he had possession of as many as 74 boxes of documents which were not shared through discovery; 37 of which pertained to the businesses which are the subject of this litigation, with the additional 37 related to business and personal tax information. This litigation was commenced in December of 2018 and involved significant discovery since its initiation. The disclosure of 37 boxes of documents was first made on October 6, 2023, which was 24 days before the scheduled jury trial. Disclosure of potentially 37 additional boxes of documents was not made until Alan Patrono testified under oath on November 2, 2023: a date two days after jury trial was originally scheduled to commence. These disclosures follow a tortured history of litigation concerning a number of discovery hearings related to Defendants' noncompliance with discovery requests.

[2] The petition was titled "Petition to Open Default Judgments on Various of Plaintiffs/Counterclaim Defendants' Claims and to Strike, or in the alternative, Open "Default" Judgments on Counterclaims Under the Court's Order of February 8, 2024" ("Petition to Open/Strike").

[3] Inexplicably, Defendants cite **Dombrowski v. Cherkassky**, 691 A.2d 976 (Pa. Super. 1997), for the proposition that default judgment cannot be entered against a counterclaim plaintiff. This writer's reading of **Dombrowski** reveals that it does not even remotely stand for such a proposition.

2

Defendants' Petition to Open/Strike.[4] The Court also granted Plaintiffs' Motion for Sanctions and scheduled an evidentiary hearing to assess attorney fees and other sanctions for May 20, 2024. It is this Order which is the subject of the current appeal to the Pennsylvania Superior Court.

Initially, it is noted that Pa. R. Civ. P. 4019(c)(3) authorizes a court to enter judgment of default against a party who has been disobedient in complying with discovery obligations. *See also* ***Taylor v. City of Phila.***, 692 A.2d 308, 313-14 (Pa. Cmwlth. 1997) *affirmed* 699 A.2d 730 (Pa. 1997) (judgment by default may be entered against disobedient party as sanctioned for failure to respond adequately to discovery requests); ***Fox v. Gabler***, 626 A.2d 1141, 1143 (Pa. 1993) (court acts well within its discretion and latitude in entering judgment by default against disobedient party inadequately responding to discovery requests). Case law is equally clear that it is improper to challenge a default judgment entered by the trial court pursuant to Pa. R. Civ. P. 4019(c)(3) by a petition to strike and/or open. *See* ***Simpson v. Allstate Ins.***, 504 A.2d 335, 337 (Pa. Super. 1986); ***Miller Oral Surgery, Inc. v. Dinello***, 493 A.2d 741, 743 (Pa. Super. 1985); ***Livolsi v. Crosby***, 495 A.2d 1384,

---

[4] Once again, Defendants' attempt to distract from and convolute the actual procedural history by arguing that the Court acted on Plaintiffs' Motion to Strike rather than on Defendants' initial Petition to Open/Strike. Following the initial mischaracterization, Defendants again attempt to alter the actual issue in their brief by claiming a violation by the Court of the "motion" practice pursuant to the Pennsylvania Rules of Civil Procedure and Adams County Local Rules of Civil Procedure. The Court does not take Defendants' bait to engage in this distraction. The Court did not rule on Plaintiffs' Motion to Strike the Petition to Open as it was moot due to the Court denying Defendants' Petition to Open/Strike on its own lack of merit. Pursuant to petition practice under the Pennsylvania Rules of Civil Procedure, Pa. R. Civ. P. 206.1-206.7, and Adams County Local Rule 206.4(c), "[t]he Court, in its discretion, may determine that there are extraordinary circumstances justifying immediate relief..." Instantly, Defendants filed a clearly improper Petition to Open/Strike creating unnecessary procedural complexity and potentially delaying further proceedings in a six-year-old litigation where Defendants' actions have already caused significant delay. In this Court's opinion, immediate relief in acting on a frivolous petition was proper. To the extent the Court acted on Plaintiffs' Motion for Sanctions, final judgment has not yet been entered as further hearing on the issue remains pending.

3

1385 (Pa. Super. 1985). The proper method for review of the trial court's action in entering default judgment pursuant to Pa. R. Civ. P. 4019 is to file an appeal within the time prescribed by the Pennsylvania Rules of Appellate Procedure after final judgment consisting of a determination of both liability and damages by the trial court. *Livolsi*, 495 A.2d at 1385.

In keeping with what one might consider to be a pattern of obfuscation, Defendants have not only misleadingly defined the Court's action as entry of judgment by *non pros* but have also created unnecessary delay in reaching final resolution of this litigation through the filing of petitions which are clearly improper under unequivocal appellate authority. This pattern continues in the Defendants' current appeal to the Superior Court despite the longstanding appellate authority rejecting the propriety of their actions discussed above. Unfortunately, the unnecessarily litigious nature of this controversy is a disservice to all parties.

Equally unfortunate, Defendants' actions have effectively stalled the legal machinery. Pa. R. App. P. 1701 provides that after an appeal is taken, the trial court may no longer proceed further in the matter unless limited exceptions apply. Nevertheless, the rule acknowledges that where the appeal relates only to a particular item or claim, the trial court may continue to pursue resolution of any other unrelated claims involved in the litigation. Pa. R. App. P. 1701(c). "Whether and to what extent a trial court may proceed under Rule 1701(c) depends on 'whether the orders on appeal are relevant to or at issue in the proceedings continuing in the trial court.'" *Commonwealth v. McClure*, 172 A.3d 668, 699 (Pa. Super. 2017), quoting *R.W.E. v. A.B.K.*, 961 A.2d 161, 170 n. 7 (Pa. Super. 2008).

4

Defendants' appeal challenges this Court's denial of the Petition to Open/Strike default judgments which were entered by the Court in regard to liability only. The question of damages currently remains unresolved as further proceedings were scheduled to be held on that issue. It is nonsensical for this Court to proceed to several days of hearing on damages when the issue of liability is tangentially, even though perhaps improperly, before the Appellate Court. Clearly, the finding of liability is directly relevant to an award of damages as the latter cannot occur without the former.

Nevertheless, in order to avoid further delay, Plaintiffs argue that the Court should continue to proceed in this matter claiming an exception under Pa. R. App. P. 1701 is applicable. Specifically, Plaintiffs correctly assert that an exception applies where the appeal in question is an appeal from a non-appealable interlocutory order. Pa. R. App. P. 1701(b)(6). Defendants counter by noting Pa. R. App. P. 311 specifically permits interlocutory appeals by right from orders refusing to open, vacate, or strike off judgments.

In essence, Defendants argue that their improper filing of a Petition to Open/Strike a judgment entered by the Court pursuant to Pa. R. Civ. P. 4019(c)(3) legitimizes an appeal as of right from what otherwise would have been a clearly improper interlocutory appeal. While it is tempting to disregard this procedural manipulation and continue with lower court proceedings, this Court will act with restraint. If the Appellate Court determines Defendants' actions are indeed improper interlocutory appeals, the delay in further proceedings in the trial court should be minimal with any prejudice to Plaintiffs being remedied by sanctions if appropriate. If

5

the Appellate Court proceeds to addressing the appeal on the merits and rules in favor of Defendants, then further extensive court proceedings will be for naught, thereby resulting in unnecessary expense to all parties. If on the other hand, the Appellate Court considers the merits of the appeal and denies the same, this Court will certainly be able to take into account the wisdom of the Appellate Court in the context of Defendants' procedural actions in determining the amount of financial sanction which may be appropriate. Thus, moving forward at this time serves no practical purpose.

For the foregoing reasons, the attached Order is entered.[5]

BY THE COURT:

**MICHAEL A. GEORGE**
**President Judge**

Date filed: May 2, 2024

---

[5] Currently scheduled before the Court are hearings related to the amount of damages to be awarded pursuant to the default judgments; appropriate financial sanctions against defense counsel and the Defendants; and a severed count scheduled for arbitration hearing on the merits. All matters will be stayed until the Appellate Court has acted so as to avoid the further unnecessary complexity to trial court proceedings and potential appellate review.

6

# EXHIBIT E

IN THE COURT OF COMMON PLEAS OF ADAMS COUNTY, PENNSYLVANIA
CIVIL

H&M HOLDINGS GROUP, LLC,
HAUSER FAMILY FARMS, LLC,
MELINDA H. DAVIS and
HANNAH M. HAUSER,
          Plaintiffs

    v.

ALAN K. PATRONO,
JONATHAN ALAN PATRONO,
JANE HAUSER PATRONO,
POLLY E. PATRONO a/k/a
POLLY E. PATRONO-CARLSON,
JOHN J. MURPHY, III,
PATRONO & MURPHY, LLC,
APPLE LEAF ABSTRACTING &
  SETTLEMENT COMPANY and
JOHN DOE(S)/JANE DOE(S),
          Defendants

**2018-SU-1293**

**2025 JUL 10 PM 1: 27**
**FILED ADAMS COUNTY, PA PROTHONOTARY**

## ORDER OF COURT

AND NOW, this 9th day of July, 2025, after scheduling conference held on July 2, 2025, it is hereby Ordered:

1.    In the actions transferred from Cumberland County at No. 2019-12300, 2019-12301, and 2019-12302:

    a.    All discovery in these matters shall be completed on or before August 18, 2025. Discovery shall be limited to written interrogatories and requests for the production of documents; and

    b.    A two-day non-jury trial is scheduled in these matters commencing on October 23, 2025 at 8:30 a.m. in Courtroom No. 4, third floor of the Adams County Courthouse. Trial shall continue, as necessary, through October 24, 2025.

2.    A two-day non-jury trial on damages related to Counts I, II, III, VIII, VIX, and X of Plaintiffs' Complaint shall be held commencing on October 27, 2025 at 8:30 a.m. in Courtroom No. 4, third floor of the Adams County Courthouse. Trial shall

PURSUANT TO RULE 236
You are hereby notified that this order has been entered in this case.

1

continue, as necessary, through October 28, 2025 at which time counsel are directed to appear.

3. Hearing on damages and sanctions related to the causes of action identified in Counts IV, V, VI, and VII of Plaintiffs' Complaint shall be held commencing on October 30, 2025 at 8:30 a.m. in Courtroom No. 1, fourth floor of the Adams County Courthouse.

4. Hearing on the imposition of sanctions including attorney fees related to any prior finding of a discovery violation shall be held commencing on October 31, 2025 at 8:30 a.m. in Courtroom No. 1, fourth floor of the Adams County Courthouse.

5. Hearing on sanctions including attorney fees related to Defendants' previously filed Motion to Strike and/or Open Judgment shall be held commencing on October 31, 2025 at 1:00 p.m. in Courtroom No. 1, fourth floor of the Adams County Courthouse. The Court notes that Defendants have summarily challenged the propriety of hearing on this issue claiming the Superior Court has determined the underlying issue to have arguable merit. Both parties are directed to address this issue by brief filed with the Court on or before July 22, 2025. The matter will be considered on briefs without argument.

6. Except as otherwise identified hereinabove, all discovery in these matters is closed with the exception of the production of expert reports. In that regard, Plaintiffs' counsel shall provide Defendants' counsel with expert reports in compliance with the Pennsylvania Rules of Civil Procedure for all experts intended to be called in any of the above scheduled proceedings on or before August 29, 2025. Defendants' counsel shall provide Plaintiffs' counsel with all expert reports for any expert intended to be called in any of the above scheduled proceedings on or before September 29, 2025. Plaintiffs are granted until October 15, 2025 to provide any supplemental reports in response to

2

Defendants' expert reports. Failure to comply with the time periods set forth hereinabove shall result in the preclusion of evidence at trial/hearing.

It is further Ordered that counsel are attached to this Court for all dates set forth hereinabove.

BY THE COURT:

_____
MICHAEL A. GEORGE
Senior Judge

Paige Macdonald-Matthes, Esquire & Jennifer L. Bruce, Esquire
Ronald L. Finck, Esquire & Aaron D. Martin, Esquire
jvs

_____7/6_____ 20 25 This being a true and attested copy taken from and compared with the original.

Attest:

_____
Deputy Prothonotary

3

# EXHIBIT F

H & M HOLDINGS GROUP, LLC,    :  IN THE SUPERIOR COURT OF
HAUSER FAMILY FARMS, LLC,    :     PENNSYLVANIA
MELINDA H. DAVIS AND HANNAH M.  :
HAUSER    :  Adams County Civil Division
    :  2018-SU-1293
    :
    v.    :
    :
    :  No. 986 MDA 2023
ALAN K. PATRONO, JONATHAN ALAN  :
PATRONO, JANE HAUSER PATRONO,  :
POLLY E. PATRONO A/K/A POLLY E.  :
PATRONO-CARLSON, JOHN J.  :
MURPHY, III, PATRONO & MURPHY,  :
LLC, APPLE LEAF ABSTRACTING &  :
SETTLEMENT COMPANY AND JOHN  :
DOE(S)/JANE DOE(S)  :
    :
    :
APPEAL OF: ALAN KIM PATRONO,  :
JONATHAN ALAN PATRONO, JANE  :
HAUSER PATRONO AND POLLY E.  :
PATRONO-CARLSON  :

## <u>ORDER</u>

Upon consideration of October 23, 2023 "Application to Quash Appeal," filed by Appellees H&M Holdings Group, LLC; Hauser Family Farms, LLC; Melinda H. Davis; and Hannah Hauser and the response thereto, the Application is **GRANTED** and the appeal is **QUASHED**.

Appellees' request for sanctions contained within their Application to Quash Appeal is **DENIED**.

All pending applications are **DENIED as moot**.

PER CURIAM

# EXHIBIT G

J-A04036-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| H&M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA H. DAVIS AND HANNAH M. HAUSER | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | No. 985 MDA 2023 |
| ALAN K. PATRONO, JONATHAN ALAN PATRONO, JANE HAUSER PATRONO, POLLY E. PATRONO A/K/A POLLY E. PATRONO-CARLSON, JOHN J. MURPHY, III, PATRONO & MURPHY, LLC, APPLE LEAF ABSTRACTING & SETTLEMENT COMPANY AND JOHN DOE(S)/JANE DOE(S) | : | |
| | : | |
| APPEAL OF: ALAN KIM PATRONO, JONATHAN ALAN PATRONO, JANE HAUSER PATRONO AND POLLY E. PATRONO-CARLSON | : | |

Appeal from the Order Entered June 16, 2023
In the Court of Common Pleas of Adams County
Civil Division at No(s):  2018-SU-1293

BEFORE:  LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:        **FILED: MAY 15, 2025**

Alan Kim Patrono ("Alan"), Jonathan Alan Patrono ("Jonathan"), Jane
Hauser Patrono ("Jane"), and Polly E. Patrono-Carlson ("Polly") (collectively,
"the Patronos") appeal from the interlocutory order finding they violated the

Pennsylvania Uniform Voidable Transfer Act ("PUVTA"),[1] and prohibiting them from transferring or encumbering property. We dismiss the appeal.

This matter arises out of a family dispute over the management and debts of a now-bankrupt winery and hard cider manufacturer known as "Hauser Estate."[2] Jane is the daughter of Helen Hauser and is married to Alan. They have two adult children, Jonathan and Polly, who is married to Michael Carlson ("Michael"). Alan and Jonathan are attorneys. Hannah M. Hauser ("Hannah") and Melinda H. Davis ("Melinda") are Jane's sisters.

Hauser Estate obtained loans from Members First Federal Credit Union ("Members First"), which Hannah, Melinda, Jane, Alan, and Jonathan each secured with personal guaranties. Hauser Estate began to fail, and it defaulted on the Members First loans. Hannah and Melinda believed Jane, Alan, and Jonathan were mismanaging Hauser Estate for their own personal gains, while

---

[1] *See* 12 Pa.C.S.A. §§ 5101-5114. Briefly, PUVTA (previously entitled the Pennsylvania Uniform Fraudulent Transfers Act ("PUFTA"), but amended and renamed effective February 2018) provides a transfer of property is voidable where, *inter alia*, the transfer was made by a debtor "with actual intent to hinder, delay, or defraud any creditor . . .." 12 Pa.C.S.A. §§ 5104(a)(1) (defining a voidable transfer); *see also* 12 Pa.C.S.A. § 5107(a)(1) (defining remedies and permitting a creditor to obtain "[a]voidance of the transfer . . . to the extent necessary to satisfy the creditor's claim"). Additionally, "[s]ubject to applicable principles of equity and in accordance with applicable rules of civil procedure," PUVTA permits, as a remedy, "an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred . . .." 12 Pa.C.S.A. § 5107(a)(3)(i).

[2] Jonathan held a majority of the voting shares of Hauser Estate and the position of president. Hannah and Melinda held minorities of the voting shares.

Jane, Alan, and Jonathan questioned whether Hannah and Melinda were acting in Hauser Estate's best interests.

Events surrounding the family disputes accelerated in July 2018. Hannah and Melinda formed H&M Holdings Group, LLC ("H&M"), which purchased the notes and guaranties on the Members First loans. Around that time, Jane, Alan, and Jonathan transferred their interests in real property to Polly for nominal consideration ("the 2018 transfers").[3] Although the deeds executing the 2018 transfers referred to Polly as a married person, the deeds did not name Polly's husband, Michael, as a grantee. By the end of July 2018, H&M commenced the first in a series of actions in Adams, Dauphin, and Cumberland Counties involving numerous plaintiffs and defendants.

As the different actions unfolded, the Patronos, and Michael, executed and recorded deeds in 2021 and 2023 ("the 2021 and 2023 deeds"), which, the Patronos asserted, restored Jane, Alan, and Jonathan's interests in the subject properties to their pre-2018 states for the same nominal consideration in the 2018 transfers. *See* The Patronos' Mot. for Partial Summ. J., 3/6/23, at 3 (arguing the 2018 transfers had been reversed "such that title has reverted to the original owners . . ."); *see also* the Patrono's Brief at 35

---

[3] The properties transferred to Polly are located in Adams County, and included parcels known as, or referred to, as: (1) 32 West Middle Street, Gettysburg; (2) 98 East Broadway, Gettysburg; (3) 28 West Middle Street, Gettysburg; (4) the Biglersville Road property; and (5) the Heckenluber Road property (collectively, "the subject properties"). *See* Order, 6/16/23, at 14-15; *see also* Exs. P-7, P-12, P-18, P-20, P-26.

(asserting "[t]itle to each of the properties had gone back to the original title-holders in July 2021").  The 2021 and 2023 deeds for four of the subject properties named Michael and Polly, as husband and wife, as grantors, and Michael and Polly both signed those deeds. *See* Exs. P-9, P-11, P-15, P-19, P-24.[4]

The trial court, having before it actions commenced in Adams County and having been the recipient of the transfer of other actions from Dauphin and Cumberland Counties, directed the filing of a third amended complaint to clarify the actions.  H&M, Hannah, and Melinda, among others ("the H&M parties"), filed the court-ordered third amended complaint, which included four counts against the Patronos for fraudulent transfers, or conspiracy to commit fraudulent transfers, in violation of PUVTA ("the PUVTA claims").  The parties agreed to separate the PUVTA claims from the other actions for a nonjury trial, which occurred in April 2023.  A jury trial on the remaining claims in the third amended complaint was scheduled for October 2023.[5]

_____

[4] We note there were five exhibits regarding the transfers of four properties because two exhibits involved a deed and a deed of correction involving 98 East Broadway.  *See* Exs. P-11, P-15.  Additionally, Michael was not named as a grantor on the one deed purporting to restore Jonathan's interest in property.  *See* Ex. P-28.

The H&M parties have disputed whether the 2021 and 2023 deeds actually returned Jane, Alan, and Jonathan's interests to the same states as before the 2018 transfers.

[5] The Patronos have filed separate appeals from other interlocutory orders in the related actions.  We address those appeals at J-A04037-25 through J-A04040-25.

Following two days of trial on the PUVTA claims, and upon consideration of the parties' post-trial memorandums, the trial court found against the Patronos and in favor of the H&M parties. *See* Op. & Order, 6/16/23, at 9 ("the June 16, 2023 order"). The June 16, 2023 order voided the deeds related to the 2018 transfers and the 2021 and 2023 deeds. Further, the June 16, 2023 order "enjoined [the Patronos] from selling, transferring, or otherwise encumbering the [subject properties]," and added "[a]ny sale, transfer, or encumbrance of the [subject] properties . . . without [c]ourt approval shall be deemed void *ab initio*." *Id*. at 14-15 (italics added).[6] The order deferred a hearing on punitive damages and legal fees assessable against the Patronos until trial on the remaining claims in the third amended complaint. *See id*. at 15.

The Patronos appealed the June 16, 2023 order within thirty days. The Patronos complied with the trial court's order to submit a Pa.R.A.P. 1925(b) statement and therein challenged the court's determination they violated

_____

[6] Two months after the entry of the June 16, 2023 order, John Murphy ("Murphy"), a named defendant in the third amended complaint and Alan's law firm partner, filed a petition for relief. Pet. for Relief, 8/18/23, at 1. Murphy, acting as a managing member of Hammerhead Realty, LLC, a non-party in the actions, indicated, *inter alia*, Jane and Alan had entered into an agreement of sale of 28 West Middle Street in January 2023. *See id*. at 1-2. Hammerhead sought court approval to complete the sale, about which Jane and Alan had made no mention of this pending sale during their testimony at the April 2023 trial. The trial court denied the petition for relief.

- 5 -

PUVTA.[7] The trial court filed a Rule 1925(a) opinion responding to the issues as stated in the Patronos' Rule 1925(b) statement.

On appeal, the Patronos now raise the following issues for review:

1. The trial court erred in failing to find insolvency but nevertheless issuing an injunction where the challenged real estate transfers had been restored to their prior owners before judicial process compelling reversion had issued.

2. The trial court lacked subject matter jurisdiction to avoid conveyances of real estate and vacate deeds involving a non-party.

The Patronos' Brief at 10.

Before considering these issues, we address whether this interlocutory appeal is properly before this Court and whether the Patronos preserved their issues for review. On questions of appellate court jurisdiction and issue preservation, our standard of review is *de novo*, and our scope of review is

_____

[7] The Patronos raised the following errors complained of on appeal:

1. The trial court failed to find that [H&M] held a right to payment not subject to good faith dispute entitling them to relief under PUVTA.

2. The trial court failed to find that [the Patronos] were rendered insolvent by the transfers on which it found liability/basis for relief under PUVTA.

3. The evidentiary record did not support the trial court's finding that [the Patronos] had fraudulent intent in their actions.

Rule 1925(b) Statement, 8/4/23, at 1 (some capitalizations omitted). All three of the Patronos' errors complained of on appeal referred to "plaintiffs/appellants" rather than the parties.

- 6 -

plenary.  ***See Chongqing Kangning Bioengineering Co., Ltd. v. Conrex Pharm. Corp.***, 327 A.3d 209, 214 (Pa. Super. 2024).

Here, there is no dispute that the June 16, 2023 order was not a final order.  ***See*** Pa.R.A.P. 341(b).  Nevertheless, the Patronos seek to appeal as of right under Pa.R.A.P. 311(a)(4), which provides:

> **(a) General Rule.**  An appeal may be taken as of right . . . from the following types of orders:
>
> * * * *
>
> *(4) Injunctions.*  An order that grants or denies, modifies or refuses to modify, continues or refuses to continue, or dissolves or refuses to dissolve an injunction unless the order was entered:
>
>> (i) Pursuant to 23 Pa.C.S.[A.] §§ 3323(f), 3505(a); or
>>
>> (ii) After a trial but before entry of the final order.  ***Such order is immediately appealable, however, if the order enjoins conduct previously permitted or mandated or permits or mandates conduct not previously mandated or permitted, and is effective before entry of the final order***.

Pa.R.A.P. 311(a)(4) (emphasis added); ***see also*** The Patronos' Brief at 1.

Following our review, we exercise jurisdiction in this appeal to the extent the June 16, 2023 order enjoined the Patronos from transferring the subject properties.  ***See*** Pa.R.A.P. 311(a)(4)(ii).  Before trial in this matter, the Patronos were free to transfer or encumber the subject properties.  The June 16, 2023 order clearly sought to restore the ownership of the subject properties as it stood prior to the 2018 transfers and, critically, prevent the Patronos from engaging in further transfers until resolution of all remaining claims against all parties.  Thus, the June 16, 2023 order enjoined conduct

Case 1:25-bk-02214-HWV    Doc 58    Filed 10/03/25    Entered 10/03/25 16:34:22    Desc
Main Document      Page 95 of 155

the Patronos were previously permitted to engage in before trial, and the restraint took immediate effect before the entry of a final order. ***See*** Pa.R.A.P. 311(a)(4)(ii); ***Matenkoski v. Greer***, 213 A.3d 1018, 1025 (Pa. Super. 2019) (holding that a post-trial order prohibiting a party from operating a car repair business was appealable under Rule 311(a)(4)(ii) where (1) there was no prior order prohibiting the conduct, (2) the conduct was previously permitted, and (3) the restraint took effect after trial but before the entry of a final order);[8] ***see also Com. ex rel. Kane v. UPMC***, 129 A.3d 441, 473 (Pa. 2015) (concluding Rule 311(a)(4) permitted an appeal as of right from an order that was "prohibitory in nature, in that it bar[red] both parties from taking further action . . . without obtaining approval from the Commonwealth Court"). Therefore, Rule 311(a)(4)(ii) provides this Court with appellate jurisdiction, and we decline to quash this appeal.

Nevertheless, a review of the record establishes the Patronos have failed to preserve their first issue challenging the injunctive relief issued by the trial court. Pennsylvania Rule of Appellate Procedure 302(a) states, "Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Here, at the conclusion of trial, the trial court stated its preliminary findings that the Patronos had engaged in fraudulent transfers, and the parties and the court discussed possible remedies, including

---

[8] We note the Patronos did not file post-trial motions before taking this appeal. However, as stated in ***Matenkoski***, the filing of post-trial motions is not a prerequisite for taking an interlocutory appeal challenging the issuance of injunctive relief. ***See Matenkoski*** 213 A.3d at 1025 n.5.

- 8 -

punitive damages, different forms of injunctive relief, and the appointment of a receiver. ***See*** N.T., 4/27/23, at 402-08. The trial court indicated it would impose an injunction on future transfers of the property while the remaining claims in the third amended complaint proceeded to the scheduled jury trial. ***See id***. at 408-09, 415-16. In the following exchange, the Patronos' counsel clarified the court did not intend to impose a permanent injunction, which counsel for H&M parties had orally requested:

> [The Patronos' counsel]: If there's a request for a permanent injunction, that raises a whole host of issues . . .. I mean, the individuals could never sell this property regardless of [the] disposition of the rest of the case.
>
> THE COURT: Until the primary litigation is concluded.
>
> [The Patronos' counsel]: So that would not be a true permanent injunction?
>
> THE COURT***: It would not be a permanent injunction. It would depend on the judgment*** . . . ***entered following the trial coming up, the jury trial*** [on the remaining claims in the third amended complaint].

***Id***. at 416 (emphasis added). The Patronos' counsel did not object to the intended issuance of a temporary injunction. ***See id***. In their post-trial memorandum, the Patronos then argued they did not violate PUVTA. As to the possible remedies, they briefly asserted, "[E]ven if technical [PUVTA] violations have been made out, ***the only remedy should be the remedy imposed by the court at the conclusion of trial, to wit, an interim, non-prejudicial order prohibiting transfer or encumbrance*** . . .." The Patronos' Post Trial Mem. Sur Claims under PUVTA, 5/19/23, at 2 (emphasis

- 9 -

added); *see also id*. at 9 (indicating a non-prejudicial temporary restraint on alienation or encumbrance was the only "appropriate" relief if the trial court found PUVTA violations). Therefore, the Patronos essentially conceded the appropriateness of a temporary restraint on their ability to transfer or encumber the subject properties pending the outcome of the entire litigation. *Cf. Brown v. Commonwealth Dep't of Health*, 434 A.2d 1179, 1181 (Pa. 1981) (stating that "[o]rdinarily, a party who consents to . . . a judgment or order cannot appeal therefrom") (internal citation omitted).

Additionally, Pennsylvania Rule of Appellate Procedure 1925(b) requires an appellant to "concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." Pa.R.A.P. 1925(b)(4)(ii). "Issues not included in the [s]tatement . . . are waived." Pa.R.A.P. 1925(b)(4)(vii). Here, the Patronos' Rule 1925(b) statement did not challenge the court's injunction. *See e.g.* Rule 1925(b) Statement, 8/4/23, at 1 ("The trial court failed to find that [the Patronos] were rendered insolvent by the transfers on which it found liability/basis for relief under PUVTA") (some capitalizations omitted). Fairly construed, the Patronos' Rule 1925(b) statement challenged only the violations of PUVTA, and the trial court's Rule 1925(a) opinion did not address the newly raised claims concerning its decision to temporarily restrain the Patronos' ability to transfer or encumber the subject properties. *See Satiro v. Maninno*, 237 A.3d 1145, 1150 (Pa. Super. 2020) ("When a court has to guess what issues an appellant

- 10 -

is appealing, that is not enough for meaningful review") (internal citation omitted).

For these reasons, we conclude the Patronos waived their challenge to the issuance of injunctive relief by failing to object to that relief in the trial court and by failing to preserve their issue in their Rule 1925(b) statement. **See** Pa.R.A.P. 302(a); **see also** Pa.R.A.P. 1925(b)(4)(vii). Therefore, we will not consider their first issue challenging the issuance of the injunction absent a finding of insolvency.

In their second issue, the Patronos claim the H&M parties failed to join an indispensable party, namely, Polly's husband, Michael, who was named on most of the 2021 and 2023 deeds as a grantor and signed those deeds. It is well settled that "[t]he failure to join an indispensable party is a non-waivable defect that implicates the trial court's subject matter jurisdiction." **Northern Forests II, Inc. v. Keta Realty Co.**, 130 A.3d 19, 28-29 (Pa. Super. 2015) (internal citation omitted). "The want of jurisdiction over the subject matter may be questioned at any time . . . in the trial court, before or after judgment, or for the first time in an appellate court . . .." **Turner v. Estate of Baird**, 270 A.3d 556, 560 (Pa. Super. 2022) (internal citations and quotation marks omitted).

- 11 -

To the extent we must address the Patronos' indispensable party claim,[9] the threshold question in that analysis is whether justice can be done in the absence of a third party. ***See In re Estate of Anderson***, 317 A.3d 997, 1005 (Pa. Super. 2024). A court faced with a claim that a party is indispensable must consider: (1) whether the absent party has a right or an interest related to the claim, (2) the nature of that right or interest, (3) whether that right or interest is essential to the merits of the issue, and (4) whether justice can be afforded without violating the due process rights of absent parties. ***See Estate of Anderson***, 317 A.3d at 1005. A party is not indispensable where no redress is sought against him and his rights would not be prejudiced by any decision in the case. ***See Strasburg Scooters, LLC v. Strasburg Rail Road, Inc.***, 210 A.3d 1064, 1069 (Pa. Super. 2019). Our standard of review is *de novo*, and our scope of review is plenary. ***See Estate of Anderson***, 317 A.3d at 1004.

On appeal, the Patronos cite the general proposition that when an action affects property held or claimed by tenants in the entireties, both spouses, here, Polly and Michael, are indispensable parties. ***See*** The Patronos' Brief at

_____

[9] As stated above, we have exercised appellate jurisdiction in this case over the restraints on the Patronos' transferring and encumbering the subject properties under Pa.R.A.P. 311(a)(4)(ii). We note Michael was not subject to those restraints. To the extent we must address the indispensable party issue as a matter of subject matter jurisdiction, we disapprove of the fact the Patronos failed to raise this issue in the trial court. We further disapprove of the Patronos raising fundamentally inconsistent arguments that Michael was an indispensable party to the litigation while continuing to assert the 2021 and 2023 deeds returned the subject properties to their pre-2018 states and rendered the PUVTA claims concerning the 2018 transfers moot.

- 12 -

24-25. They argue because Michael signed most of the 2021 and 2023 deeds, he had an essential interest which prevented a court from adjudicating the PUVTA claims in his absence. **See id**.

The Patronos' argument borders on frivolity. In the 2018 transfers, Jane, Alan, and Jonathan deeded their interests in the subject properties to Polly. Michael was not named as a grantee. Therefore, those deeds did not satisfy all four unities necessary to establish his interest in real property in the entireties. **See Fratangelo v. Fratangelo**, 520 A.2d 1195, 1201 (Pa. Super. 1987) (stating that the "[t]he presumption that all property coming into [a] marriage is matrimonial property is not equivalent to the creation of entireties property, which requires that the property be acquired in joint names of husband and wife"); **see also In re Estate of Rivera**, 194 A.3d 579, 586 (Pa. Super. 2018) (noting that a tenancy in the entireties requires not only a legally binding marriage, but also the satisfaction of four unities: (1) unity of time, which requires that the interests of the tenants vest at the same time; (2) unity of title, which requires the tenants to have obtained their title by the same instrument; (3) unity of possession, which requires the tenants to have an undivided interest in the whole estate; and (4) unity of interest, which requires the tenants to have estates in the property of the same type, duration, and amount). Moreover, there was no indication Michael and Polly ever satisfied the four unities following the 2018 transfers. **See** N.T., 4/21/23 at 44, 46, 66, 77 (the H&M parties' expert indicating there were no quitclaim deeds from Polly conveying her interest to herself and Michael as husband and

- 13 -

wife; also indicating it is typical in Adams County to join a spouse on a deed, but doing so was not necessary in this case because Michael was not "an owner"); N.T., 4/27/23, at 260 (indicating Polly believed Michael took title or an interest because he was her husband and she was told it was better if he signed "the transfer back"), 266 (indicating Polly did not execute a quitclaim deed).

Accordingly, we discern no basis to conclude Michael had an interest in the subject properties as a tenant in the entireties. At most, Michael would have had an equitable interest in marital property acquired by Polly during marriage. *See* The Patronos' Reply Brief at 7-8. However, there is no indication that Polly, from whom Michael's equitable interests would arise, took her interest in the subject properties in good faith and for reasonable consideration; nor does the record indicate Polly, or Michael, intended to retain, or profit from, any interest transferred to Polly in 2018. Thus, any interest Michael would have had in the property was too attenuated to consider him an indispensable party. *Cf*. *U.S. Bank Nat'l Ass'n for Pennsylvania Hous. Fin. Agency v. Watters*, 163 A.3d 1019, 1023 n.3 (Pa. Super. 2017) (concluding a wife's equitable interest in property during a pending divorce did not make her an indispensable party in a foreclosure action where she did not own the property and had no interest in the mortgage or mortgage loan obtained by her husband). Put differently, justice could be done by avoiding the transfers in Michael's absence and return the Patronos' interests to their pre-2018 states. Accordingly, as our review reveals no facial

merit to the Patronos' claim that Michael was an indispensable party, or other basis to question the subject matter jurisdiction of the trial court, we conclude this issue does not constitute a basis to avoid dismissal.

In sum, having concluded the Patronos waived their challenge to the injunctive relief issued by the court and finding no facial basis to challenge the subject matter jurisdiction of the trial court, we dismiss this appeal.

Appeal dismissed.

Judge Nichols joins this memorandum.

President Judge Lazarus concurs in the result.


Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary


Date: 05/15/2025

- 15 -

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| H & M HOLDINGS GROUP, LLC, HAUSER FAMILY FARMS, LLC, MELINDA HAUSER DAVIS & HANNAH M. HAUSER | : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | No. 517 MDA 2024 |
| ALAN KIM PATRONO, JONATHAN ALAN PATRONO, JANE HAUSER PATRONO, POLLY E. PATRONO A/K/A POLLY E. PATRONO-CARLSON, JOHN J. MURPHY, III, PATRONO & MURPHY, LLC, APPLE LEAF ABSTRACTING & SETTLEMENT COMPANY AND JOHN DOE(S)/JANE DOE(S) | : : : : : : : : : : : : | |
| Appellants | | |

Appeal from the Order Entered March 13, 2024
In the Court of Common Pleas of Adams County
Civil Division at No(s): 2018-SU-1293

BEFORE: LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.: **FILED: MAY 15, 2025**

Alan Kim Patrono ("Alan") and Jane Hauser Patrono ("Jane") (collectively, "the Patronos") appeal from the order entering default judgments as discovery sanctions. We quash this appeal.

This matter arises out of a family dispute over the management and debts of a now-bankrupt winery and hard cider manufacturer, known as "Hauser Estate." Jane is the daughter of Helen Hauser ("Helen") and is married to Alan. They have two adult children, Jonathan and Polly. Alan and

Jonathan are attorneys. Hannah M. Hauser ("Hannah") and Melinda H. Davis ("Melinda") are Jane's sisters.

Helen had owned several properties in Adams County and used her land for her family's apple orchard business. In 2006, at Jonathan's suggestion, the family converted their orchard business into a wine and hard cider business. Jonathan held a majority of the voting shares of Hauser Estate and the position of president. Hannah and Melinda held minorities of the voting shares. In 2007, the family also created Hauser Family Farms ("HFF"), a limited liability corporation, to which Helen transferred the real property on which Hauser Estate was operating. Helen died in 2012.

Hauser Estate obtained loans from Members First Federal Credit Union ("Members First"), which Hannah, Melinda, Jane, Alan, and Jonathan each secured with personal guaranties ("the guaranties"). The guaranties contained arbitration clauses and confession of judgment provisions. Alan also drafted a contribution agreement among the three sisters, Melinda, Hannah, and Jane, that provided each sister would be one-third liable for future loans made by any one of the sisters, or Alan, to benefit Hauser Estate ("contribution agreement").[1]

---

[1] While the Patronos asserted the contribution agreement bound Hannah and Melinda, Hannah and Melinda disputed whether the contribution agreement was enforceable as it did not contain all terms they requested. *See* Answer to Third Am. Compl. with Am. New Matter and Counterclaims, 4/5/22, at 60-61, 74-75; Answer to Am. New Matter and Counterclaims and New Matter, 9/12/22, at 12.

Hauser Estate began to fail, and it defaulted on the Members First loans. The family discussed a sale of Hauser Estate but could not agree on a buyer. As the disputes among the family members increased, Alan drafted a corporate governance agreement for Hauser Estate ("governance agreement").[2]  Still, Hannah and Melinda believed Jane, Alan, and Jonathan were mismanaging Hauser Estate for their own personal gains, while Jane, Alan, and Jonathan questioned whether Hannah and Melinda were acting in Hauser Estate's best interests.

Events surrounding the family disputes accelerated in July 2018. Hannah and Melinda formed their own company, H&M Holdings Group, LLC ("H&M"), which purchased the notes and guaranties on the Members First loans.  Around the time of the purchase, the Patronos, along with their son, Jonathan, engaged in numerous transfers of their interests in real property to Polly, Jane and Alan's daughter/Jonathan's sister ("the 2018 transfers").  By the end of July 2018, H&M commenced the first in a series of actions in Adams, Dauphin, and Cumberland Counties and involve numerous plaintiffs and defendants.

_____

[2] The Patronos asserted the governance agreement created in Hauser Estate an executive committee to resolve family disputes.  **See** Answer to Third Am. Compl. with Am. New Matter and Counterclaims, 4/5/22, at 67-68.  They also claimed that the governance agreement had the goal of preserving the Members First loans and preventing defaults on the loans.  **See e.g.**, Jane's Pet. to Strike or Open, Cumberland County, 2019-12302, 12/26/19, at 9. Hannah and Melinda admitted there was a governance agreement but denied that it created an executive committee.  **See** Answer to Am. New Matter and Counterclaims and New Matter, 9/12/22, at 12.

- 3 -

Relevant to this appeal, H&M, Hannah, Melinda, among others ("the H&M parties") filed a complaint in Dauphin County against the Patronos, their children, Jonathan and Polly, and others for professional negligence and breaches of fiduciary duty. The parties agreed to transfer that matter to Adams County, where H&M had already commenced separate actions, which included the filing of *lis pendens* against the Adams County properties involved in the 2018 transfers. The trial court directed all plaintiffs to file a third amended complaint in an attempt to clarify the actions.

In September 2021, the H&M parties filed the court-ordered third amended complaint, wherein they alleged the Patronos breached their fiduciary duties; conspired to breach fiduciary duties, committed professional malpractice, fraudulently transferred or conspired to fraudulently transfer property in violation of the Pennsylvania Uniform Voidable Transaction Act ("PUVTA")[3] ("the PUVTA claims"), and converted or conspired to convert apple crops, proceeds on apples, and funds from a different line of credit.[4]  ***See*** Third Am. Complaint, 9/7/21, at 33-47. The Patronos filed an answer, new

---

[3] ***See*** 12 Pa.C.S.A. §§ 5101-5114.

[4] The named plaintiffs in the third amended complaint were H&M, HFF, Hannah, and Melinda. The named defendants in the third amended complaint included Jane, Alan, Jonathan, and Polly, as well as John Murphy ("Murphy"), the law firm of Patrono & Murphy, and Apple Leaf Abstracting & Settlement Company. Murphy, also an attorney, was Alan's partner in the firm of Patrono & Murphy, and in Apple Leaf Abstracting & Settlement Company. Murphy, Patrono & Murphy, and Apple Leaf Abstracting & Settlement Company have not filed briefs in this appeal.

- 4 -

matter, and counterclaims, and, after the court sustained, in part, and overruled, in part, preliminary objections, filed an answer with amended new matter and counterclaims. The amended counterclaims included the Patronos' assertions they made $3 million in personal loans to Hauser Estate, for which Hannah and Melinda were each one-third liable under the sisters' contribution agreement ("the contribution counterclaim"). The parties then agreed to separate the PUVTA claims for a nonjury trial, to be followed by a jury trial on the remaining claims and counterclaims.[5]

During the course of the PUVTA nonjury trial that resulted in findings against the Patronos (and their son and daughter, Jonathan and Polly, respectively), discovery proceedings continued on the remaining claims and counterclaims. The contribution counterclaim resulted in a particularly protracted discovery dispute. The H&M parties demanded further documentation to corroborate the Patronos' assertions they personally loaned Hauser Estate $3 million. Throughout discovery, the Patronos insisted they had turned over all documents in their possession or control: essentially copies of checks and deposit records.

The trial court held multiple hearings and attempted to resolve this and related discovery disputes. Following an April 2023 hearing, the court afforded

---

[5] We note the Patronos and their children have taken related interlocutory appeals from the trial court's issuance of an injunction after finding against them on the PUVTA claim, which we address at J-A04036-25. The Patronos individually and their son Jonathan have all taken interlocutory appeals from another order denying their petition to compel arbitration, which we address at J-A04038-25 through J-A04040-25.

the Patronos twenty days to locate further documentation to support their contribution counterclaim and directed them to provide personal income tax returns as well as Hauser Estate documents. Following a hearing in June 2023, the court sought personal verifications from the Patronos to support their counsel's representations that they did not have access to the information or documents the H&M parties had requested. Following a September 2023 hearing, the court required the Patronos to provide personal verifications that the tax returns and supporting documents they provided to counsel were accurate and to also provide verified statements of their compliance with the court's order. The Patronos filed motions for reconsideration of the September 2023 order. The trial court denied reconsideration but extended the deadline for compliance.

In October 2023, three days after the expiration of the extended discovery deadline, **and eleven days before a scheduled trial date**, the Patronos' counsel filed another motion for reconsideration, wherein counsel averred Alan recently discovered thirty-seven boxes of Hauser Estate documents. **See** Second Mot. to Reconsider, 10/19/23, at 4 (unpaginated).[6]

---

[6] The second motion for reconsideration asserted Alan informed counsel of the discovery of the boxes on October 6, 2023. As discussed by the trial court, Alan later testified that he was unaware of the existence of the boxes until September 25, 2023. **See** Trial Ct. Op., 8/9/24, at 30-32 (discussing, in part, N.T., 11/2/23, at 67, 73). Although Alan also testified that he was not sure what the boxes contained, he later contradicted his own testimony by indicating the boxes contained documents concerning the operation of Hauser Estate. **See id**. (discussing, in part, N.T., 11/2/23, at 73, 154).

That revelation prompted the H&M parties to file for default judgments as discovery sanctions pursuant to Pa.R.Civ.P. 4019(c)(3).[7] In November 2023, the trial court held additional hearings on the motion for default judgments, and, on February 8, 2024, entered default judgments against the Patronos, and other defendants, on nearly all of the remaining claims in the third amended complaint and on the Patronos' counterclaims.[8]

On February 29, 2024, the Patronos filed a petition to strike or open the default judgments. They asserted, in relevant part, that the trial court should have designated the dismissal of the counterclaims as judgments of *non pros* rather than default judgments. The H&M parties filed a response to strike that petition and for additional attorney's fees. The trial court, on March 13, 2024, denied Jane and Alan's petition to strike or open the default judgments, granted Hannah and Melinda's request for attorney's fees, and scheduled a hearing for a determination of those fees. The Patronos timely appealed from

---

[7] Pennsylvania Rule of Civil Procedure 4019(c)(3) permits a court to "enter[] a judgment of *non pros* or by default" against a disobedient party during discovery. **See** Pa.R.Civ.P. 4019(c)(3).

[8] The entry of default judgments did not resolve all issues against all parties arising out of the third amended complaint because the court deferred a hearing on damages, attorney's fees, and other sanctions. Additionally, the H&M parties' counts against Murphy, Alan's business partner, remained outstanding, as did a counterclaim regarding proceeds of an apple crop owed to Polly, the latter of which the court directed to compulsory arbitration due to the amount at issue. Lastly, a related action concerning an opened confessed judgment on the Members First loans, which the trial court had stayed, remained pending, and in the same order granting the H&M parties' motion for default judgments, the trial court lifted the stay.

the order denying their petition to strike or open, and they and the trial court complied with Pa.R.A.P. 1925.

The Patronos raise the following issue for our review:

> Whether the trial court erred in entering "default" judgments as a discovery sanction on the Patronos' counterclaims when such judgments were, or should have been, by law in the nature of judgments of *non pros*, and rejecting application of Pa.R.C[iv].P. 3051 to the Patronos' petition to strike or open the wrongly fashioned judgments.

The Patronos' Brief at 6 (some capitalization omitted).

Before considering this issue, we note the Patronos' claim that the trial court erred in entering judgments by default, rather than judgments of *non pros*, closely relates to the threshold question of whether this Court has jurisdiction to consider this appeal. Because questions concerning this Court's jurisdiction present questions of law, our standard of review is *de novo* and our scope of review is plenary. **See Chongqing Kangning Bioengineering Co., Ltd. v. Conrex Pharm. Corp.**, 327 A.3d 209, 214 (Pa. Super. 2024); **see also Gould v. Wagner**, 316 A.3d 634, 639 (Pa. Super. 2024).

The Patronos assert the trial court erred in entering defaults judgments on their counterclaims because they were the parties bringing the counterclaims. **See** The Patronos' Brief at 19-25. In support, they contend Pennsylvania law recognizes party-based distinctions between judgments of *non pros*, which sanctions parties who fail to prosecute their claims, and judgments by default, which generally apply when parties fail to defend against a claim. **See id**. at 22-24. The Patronos contend because they raised

- 8 -

counterclaims, they essentially stood in the shoes of plaintiffs, and their noncompliance with discovery constituted a failure to prosecute their counterclaims rather than a failure to defend. The Patronos assert the trial court's failure to recognize the party-based distinction between judgments of *non pros* and by default resulted in the erroneous denial of its petition to strike the judgments on its counterclaims and the improper grant of additional sanctions based on the mere filing of the petition to strike or open. ***See id***. at 29-30.

The Patronos further argue the trial court's refusal to enter judgments of *non pros* on their counterclaims impedes their procedural and appellate rights. ***See id***. at 32. The Patronos reason Pa.R.Civ.P. 3051 requires a party suffering a judgment of *non pros* to file a petition to strike or open to preserve issues for review, even for a discovery sanction. ***See id***. at 26-31. The Patronos suggest that if the trial court had properly denominated the judgments entered on the counterclaims as judgments of *non pros*, rather than by default, the court would have more properly considered their petition to strike or open as an opportunity to review its own decisions. ***See id***. at 34-35.[9] Moreover, they contend the court's denial of their petition to strike or open would have allowed them to take this interlocutory appeal as of right

_____

[9] The Patronos add that judgments of *non pros* and by default are distinguishable because a judgment by default generally has preclusive effect as *res judicata*, while a judgment of *non pros* generally will not. The Patronos' Brief at 36-37. They contend that the denomination of the judgments on the counterclaims as by default improperly limited their ability to reraise claims in subsequent proceedings. ***See id***.

- 9 -

under Pa.R.A.P. 311(a)(1), which permits immediate appeals from orders refusing to open or strike judgments. **See** The Patronos' Reply Brief at 7-10; **see also** Pa.R.A.P. 311(a)(1) (stating that "[a]n appeal may be taken as of right and without reference to Pa.R.A.P. 341(c) from . . . [a]n order refusing to open, vacate, or strike off a judgment"). The Patronos conclude the entry of the judgments by default on the counterclaims constituted a fatal defect on the face of the record, the judgments must be stricken, and the matter be remanded with directions for the trial court to enter new judgments of *non pros* on the counterclaims, allow the filing of a new petition to open the *non pros*, and to consider the new petition using the standards for opening a judgment under Pa.R.Civ.P. 3051. **See** The Patronos' Brief at 22,-24, 49.

The trial court, in its Pa.R.A.P. 1925(b) statement, determined it properly denied the Patronos' petition to strike or open the judgments entered on their counterclaims. The trial court suggested the language of Pa.R.Civ.P. 4019(c)(3) provided it with a basis to enter judgments by default as discovery sanctions regardless of whether it did so on the H&M parties' claims against the Patronos or the counterclaims against the H&M parties. **See** Trial Ct. Op., 8/9/24, at 35. The trial court did not specifically address the Patronos' claim that the entry of default judgments on counterclaims is technically inappropriate but noted its acceptance of the Patronos' argument would result in "bifurcated, inefficient, and lengthy resolution of essentially identical issues in the same litigation through multiple appeals." **Id**. at 36.

- 10 -

Following our review, we acknowledge the distinction between judgments of *non pros* and by default. A judgment by default generally imposes responsibility on a party who had an opportunity to defend a claim but did not do so and generally protects against a dilatory conduct that thwarts another party's ability to establish its own claims. ***See Attix v. Lehman***, 925 A.2d 864, 867 (Pa. Super. 2007); ***Allegheny Hydro No. 1 v. Am. Line Builders, Inc.***, 722 A.2d 189, 195 (Pa. Super. 1998). A judgment of *non pros* sanctions a party for failing to prosecute its own claims promptly. ***See Collura v. L & E Concrete Pumping, Inc.***, 686 A.2d 392, 396 (Pa. Super. 1996).

In the context of discovery disputes, this Court has consistently stated that a party has no right to file a petition to strike or open a default judgment entered as discovery sanction. ***See Miller Oral Surgery, Inc. v. Dinello***, 493 A.2d 741, 743 (Pa. Super. 1985) (stating general rule that "default judgment entered pursuant to Pa.R.C[iv].P. 4019(c)(3) is comparable to a judgment entered after hearing. A party may request a court to reconsider a sanction order entering judgment, of course, but neither reconsideration nor refusal to reconsider will transform an interlocutory order into one that is final and appealable"); ***Angelichio v. Myers***, 110 A.3d 1046, 1050-51 (Pa. Super. 2015) (applying ***Miller Oral Surgery***). However, the same is not true for a judgment of *non pros*. ***See Sahutsky v. Mychak, Geckle & Welker, P.C.***, 900 A.2d 866, 869 (Pa. Super. 2006) (stating that "in all cases where *non pros* has been entered, including [Pa.R.Civ.P.] 4019 sanction cases . . . , a

- 11 -

petition to strike off or open must be timely filed after the *non pros* in order to preserve the issue for appeal"); Pa.R.Civ.P. 3051, cmt. (stating Rule 3051 was amended in 1991 to provide uniform procedures concerning the different types of judgments of *non pros*, including judgments of *non pros* entered under Pa.R.Civ.P. 4019(c)(3)).  Thus, an order entering a judgment by default as a discovery sanction cannot be immediately appealed.  However, because Pa.R.Civ.P. 3051 requires a party to file a petition to strike or open a judgment of *non pros*, at least for the purpose of issue preservation, and Pa.R.A.P. 311(a) permits an appeal from an order refusing to strike a judgment, there is at least a colorable argument that the denial of such a petition could be immediately appealable.

Nevertheless, we conclude the Patronos' argument that the instant order is immediately appealable is flawed.   Here, the trial court entered default judgments on the Patronos' counterclaims, and our case law holds that the Patronos had no right to file a petition to strike or open a default judgment, or take an immediate appeal while other claims against other parties remained outstanding.  ***See Miller Oral Surgery***, 493 A.2d at 743; ***Angelichio***, 110 A.3d at 1050-51.  Instead, the Patronos had a right to file for reconsideration asking the court to redesignate the type of judgments it entered on the counterclaims and for leave to file the proposed petition to strike or open if the trial court granted reconsideration.  The filing of a petition to strike or open a judgment alone was technically improper, and the purported denial of that petition did not give rise to an immediate appeal under Pa.R.A.P. 311(a).

- 12 -

*See Miller Oral Surgery*, 493 A.2d at 743; *Angelichio*, 110 A.3d at 1050-

51. Accordingly, we quash this appeal.[10]

_____

[10] Even assuming Pa.R.A.P. 311(a)(1) vested this Court with jurisdiction in this appeal, we would not accept the Patronos' arguments that they are entitled to a remand for the re-entry of judgments of *non pros*, and essentially a restart of the procedures for another interlocutory appeal of the same issue. The crux of the Patronos' argument is that the trial court's improper designation of judgments on the counterclaims constituted a fatal defect or irregularity on the face of the record. However, pursuant to Pa.R.Civ.P. 4019(c)(3), the trial court has the authority, upon a motion by a party, to enter a judgment of *non pros* or by default. Aside from the party-based distinction between *non pros* and default, the Patronos identify no defects or irregularities in the procedures leading to the imposition of discovery sanctions that would require striking the judgments on their counterclaims. The Patronos do not assert that the entry of judgments against them was improper; they only assert error in the type of judgments entered. Such defect would be technical and subject to correction without invalidating the underlying judgments. *Cf*. *Dominic's Inc. v. Tony's Famous Tomato Pie Bar & Rest., Inc.*, 214 A.3d 259, 272 (Pa. Super. 2019) (noting that the striking of a judgment annuls the original judgment and leaves the parties as if no judgment had been entered); *J.F. v. D.B.*, 941 A.2d 718, 721 (Pa. Super. 2008) (noting that where a judgment is stricken from the record, the rights of the parties are left as though no such judgment had ever been entered); *cf. also West Penn Sand & Gravel Co. v. Shippingport Sand Co.*, 80 A.2d 84, 86 (Pa. 1951) (noting formal defects, mistakes and omissions in judgments "may be corrected by amendment where the cause of the action is not changed, where the ends of justice require the allowance of such amendment, and where the substantive rights of defendant or of any third persons will not be prejudiced thereby") (internal citations omitted). We further note that the Patronos offered no arguments the trial court abused its discretion when sanctioning their conduct during discovery, nor do they challenge the trial court's determination they could not establish reasonable explanation or legitimate excuse for their conduct giving rise the entry of the judgments against them. *See* Trial Ct. Op., 8/9/24, at 37 (concluding that "[i]n light of the record . . . there is no reasonable explanation or legitimate excuse for [the Patronos'] egregious conduct in this litigation"). Accordingly, while we do not address the merits of the alleged error in denominating the judgments as default rather than *non pros*, we would conclude the Patronos'
*(Footnote Continued Next Page)*

- 13 -

Appeal quashed.

President Judge Lazarus joins this memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/15/2025

---

proposed remedy, which would be a vehicle for further delay in this matter, would be out of proportion with the alleged error.

We note that the H&M parties have requested additional sanctions for the filing of this appeal for the sole purpose of delay. **See** The H&M Parties' Brief as 63. However, as there was at least a colorable basis for the Patronos' arguments, we decline at this juncture to impose sanctions, but caution the Patronos that similar interlocutory appeals in these actions could be construed as dilatory or vexatious conduct.

- 14 -

J-A04038-25
J-A04039-25
J-A04040-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| H&M HOLDINGS GROUP, LLC, ASSIGNEES OF MEMBERS FIRST FEDERAL CREDIT UNION | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| JANE H. PATRONO | : : | No. 518 MDA 2024 |
| Appellant | : | |

Appeal from the Order Entered April 4, 2024
In the Court of Common Pleas of Adams County
Civil Division at No(s): 2018-SU-1293

| | | |
|---|---|---|
| H&M HOLDINGS GROUP, LLC | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| ALAN KIM PATRONO | : : | |
| Appellant | : | No. 519 MDA 2024 |

Appeal from the Order Entered April 4, 2024
In the Court of Common Pleas of Adams County
Civil Division at No(s): 2018-SU-1293

| | | |
|---|---|---|
| H&M HOLDINGS GROUP, LLC, ASSIGNEE OF MEMBERS FIRST FEDERAL CREDIT UNION | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : : | |
| JONATHAN PATRONO | : : | No. 520 MDA 2024 |
| Appellant | : | |

J-A04038-25
J-A04039-25
J-A04040-25

Appeal from the Order Entered April 4, 2024
In the Court of Common Pleas of Adams County
Civil Division at No(s): 2018-SU-1293

BEFORE: LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:        **FILED: MAY 15, 2025**

Jane H. Patrono ("Jane"), Alan Kim Patrono ("Alan"), and Jonathan Patrono ("Jonathan") (collectively, "the Patronos") appeal from the order denying their petitions to compel arbitration.[1] We affirm.

This appeal arises out of a family dispute over the management and debts of a now-bankrupt winery and hard cider producer, known as "Hauser Estate." Jane is the daughter of Helen Hauser ("Helen"). Jane is married to Alan, and they have two adult children, Jonathan and Polly Patrono Carlson ("Polly"). Alan and Jonathan are attorneys. Hannah M. Hauser ("Hannah") and Melinda H. Davis ("Melinda") are Jane's sisters.

Helen had owned several properties in Adams County and used her land for her family's apple orchard business. In 2006, at Jonathan's suggestion, the family converted their orchard business into a wine and hard cider business under Hauser Estate. Jonathan held a majority of the voting shares of Hauser Estate and the position of president. Hannah and Melinda held

---

[1] These interlocutory appeals involving the refusal to compel arbitration are properly before this Court. **See** Pa.R.A.P. 311(a)(8); **see also** 42 Pa.C.S.A. §§ 7320(a)(1), 7321.29(a)(1), 7342(a) (discussing right to appeal order denying motions to compel arbitration). We have consolidated these appeals *sua sponte* as they involve the same facts, procedures, and legal issues, and the Patronos have filed identical briefs in all three appeals.

- 2 -

minorities of the voting shares. In 2007, the family also created Hauser Family Farms ("HFF"), a limited liability corporation ("LLC"), to which Helen transferred the real property on which Hauser Estate was operating. Helen died in 2012.

Hauser Estate obtained loans from Members First Federal Credit Union ("Members First"), which Hannah, Melinda, Jane, Alan, and Jonathan each secured with personal guaranties ("the guaranties"). The guaranties contained arbitration clauses and confession of judgment provisions.[2] Alan

_____

[2] The arbitration clauses stated:

> Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement. This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party. Judgment upon any award rendered by any arbitrator may be entered in any court having

*(Footnote Continued Next Page)*

- 3 -

also drafted a contribution agreement among the three sisters, Melinda, Hannah, and Jane, that provided each sister would be one-third liable for future loans made by any one of the sisters, or Alan, to benefit Hauser Estate ("contribution agreement").[3]

Hauser Estate began to fail, and it defaulted on the Members First loans. The family discussed a sale of Hauser Estate but could not agree on a buyer. As the disputes among the family members increased, Alan drafted a corporate governance agreement for Hauser Estate ("governance agreement").[4] Still, Hannah and Melinda believed Jane, Alan, and Jonathan

_____

> jurisdiction. Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction. The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes. The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

Compl., Cumberland County, 2019-12302, 11/27/19, Exs. B & D.

[3] While the Patronos asserted the contribution agreement bound Hannah and Melinda, Hannah and Melinda disputed whether the contribution agreement was enforceable as it did not contain all terms they requested. *See* Answer to Third Am. Compl. with Am. New Matter and Counterclaims, 4/5/22, at 60-61, 74-75; Answer to Am. New Matter and Counterclaims and New Matter, 9/12/22, at 12.

[4] The Patronos asserted the governance agreement created in Hauser Estate an executive committee to resolve family disputes. *See* Answer to Third Am. *(Footnote Continued Next Page)*

- 4 -

were mismanaging Hauser Estate for their own personal gains, while Jane, Alan, and Jonathan questioned whether Hannah and Melinda were acting in Hauser Estate's best interests.

Events surrounding the family disputes accelerated in July 2018. Hannah and Melinda formed H&M Holdings Group, LLC ("H&M"), which purchased the notes and guaranties on the Members First loans. Around that time, the Patronos engaged in numerous transfers of their interests in real property to Polly, Jane and Alan's daughter/Jonathan's sister ("the 2018 transfers"). By the end of July 2018, H&M filed complaints in Adams County for confession of judgment against the Patronos based on the notes and guaranties H&M acquired from Members First ("the first confessed judgments"). A court granted the Patronos' motions to strike off the first confessed judgments after unsuccessful attempts at mediation.[5]

Meanwhile, Hannah, Melinda, H&M, and others (collectively, "the H&M parties") commenced a series of actions in various counties, which included

---

Compl. with Am. New Matter and Counterclaims, 4/5/22, at 67-68. They also claimed that the governance agreement had the goal of preserving the Members First loans and preventing defaults on the loans. *See e.g.*, Jane's Pet. to Strike or Open, Cumberland County, 2019-12302, 12/26/19, at 9. Hannah and Melinda admitted there was a governance agreement but denied that it created an executive committee. *See* Answer to Am. New Matter and Counterclaims and New Matter, 9/12/22, at 12.

[5] The Adams County court struck the first confessed judgments because H&M failed to attach proper documentation to its complaints and improperly filed notices under both Pa.R.Civ.P. 2958.1 and 2958.3. *See* Adams County Order and Op., 2018-SU-813 to 815, 11/1/19, at 3-6.

- 5 -

filing *lis pendens* against the Adams County properties involved in the 2018 transfer and filing a complaint in Dauphin County, which the parties later agreed to transfer to Adams County.

Additionally, in Cumberland County, H&M filed new complaints for confession of judgment against the Patronos based on the notes and the guaranties H&M purchased from Members First. The Patronos, in relevant part, responded with petitions to open wherein they pleaded defenses challenging: (1) whether and when Hauser Estate defaulted on the Members First loans; (2) whether any prior default had been cured; (3) whether default or non-default rates of interest were included in the amounts confessed; (4) whether Hannah and Melinda breached governance agreements when they purchased the notes and guaranties; (5) whether Hannah and Melinda breached their fiduciary duties as co-guarantors; (6) whether H&M was a "sham corporation;" and (7) whether Hannah and Melinda breached the contribution agreement. ***See e.g.***, Jane's Pet. to Strike or Open, Cumberland County, 2019-12302, 12/26/19, at 23-28. The Patronos' petitions to open did not refer to the arbitration clauses in the guaranties.[6] The Cumberland County

---

[6] "A petition to open a confessed judgmentsis an appeal to the equitable powers of the court." ***Neducsin v. Caplan***, 121 A.3d 498, 504 (Pa. Super. 2015) (internal citation and quotation marks omitted). A trial court may open a confessed judgment:

*(Footnote Continued Next Page)*

- 6 -

court, following lengthy litigation there, opened the judgment and transferred the matter to Adams County ("the opened confessed judgments"). *See* Order, Cumberland County, 2019-12300 to 12302, 3/11/21, at 1-2.[7] Jane, Alan, and Jonathan also apparently filed a motion, in which H&M concurred, to coordinate the opened confessed judgments with the other actions in Adams County, which the Cumberland County court granted. *See* Order, Cumberland County, 2019-12300 to 12302, 5/3/21, at 1 (stating the Cumberland County

---

 if the petitioner (1) acts promptly, (2) alleges a meritorious defense, and (3) can produce sufficient evidence to require submission of the case to a jury.

\* \* \* \*

A meritorious defense is one upon which relief could be afforded if proven at trial.

*Id*. at 506–07 (internal citations and quotation marks omitted).

[7] In Cumberland County, the parties each requested discovery, litigated discovery issues before a discovery master, and presented evidence over multiple days of hearings. The Cumberland County court concluded the Patronos pleaded sufficient evidence supporting two meritorious defenses, one concerning the date of the default, the other concerning whether Hannah and Melinda formed a sham company to protect their own personal assets. The Cumberland County court declined to reach any other possible defenses, including the Patronos' claims for offsets based on Hannah and Melinda's breach of the contribution agreement. *See* Order, Cumberland County, 2019-12300 to 12302, 3/11/21, at 2-3 & nn. 3, 5. Once the Cumberland County confessed judgments were opened, the subsequent proceedings were generally limited to the papers filed in the litigation to open the judgments. *See* Pa.R.Civ.P. 2960 ("If a judgment is opened in whole or in part the issues to be tried shall be defined by the complaint if a complaint has been filed, and by the petition, answer and the order of the court opening the judgment. There shall be no further pleadings. . . .").

- 7 -

court granted the Patronos' motion to coordinate actions); ***see also*** Order, Cumberland County, 2019-12300 to 12302, 4/7/21, at 1 (indicating H&M concurred in the motion to coordinate actions).

In an attempt to clarify the multiple actions commenced in and transferred to Adams County, the trial court ordered the H&M parties to file a third amended complaint ("third amended complaint"), while staying further proceedings on the opened confessed judgments transferred from Cumberland County. ***See*** Order, 8/16/21, at 1 (stating that "pursuant to agreement of the parties, further proceedings in these matters [the opened confessed judgments from Cumberland County] are stayed indefinitely pending further order of court") (some capitalization omitted).[8]

The H&M parties filed a third amended complaint, wherein they alleged the Patronos breached their fiduciary duties, conspired to breach fiduciary duties, committed professional malpractice, fraudulently transferred or conspired to fraudulently transfer property in violation of the Pennsylvania Uniform Voidable Transaction Act ("PUVTA")[9] ("the PUVTA claims"), and converted or conspired to convert apple crops, proceeds on apples, and funds from a different line of credit. ***See*** Third Am. Complaint, 9/7/21, at 33-47.

---

[8] The trial court vacated the Cumberland County order coordinating the opened confessed judgmentsmatter with the other actions in Adams County. ***See*** Order, 8/16/21, at 1.

[9] ***See*** 12 Pa.C.S.A. §§ 5101-5114.

Case 1:25-bk-02214-HWV   Doc 58   Filed 10/03/25   Entered 10/03/25 16:34:22   Desc
Main Document      Page 125 of 155

The Patronos filed an answer, new matter, and counterclaims, and, after the court sustained, in part, and overruled, in part, preliminary objections, filed an answer with amended new matter and counterclaims, which included several allegations and claims they first raised when opening the confessed judgments in Cumberland County, including: (1) H&M was a sham corporation; (2) Hannah and Melinda breached the contribution agreement; and (3) promissory estoppel related to the contribution agreement.  ***See*** Answer to Third Am. Compl. with Am. New Matter and Counterclaims, 4/5/22, at 2, 53, 75-80, 85-94.  Despite the overlap between the issues raised in their intended defenses to the opened confessed judgments and their defense and their counterclaims to the third amended complaint, the Patronos did not refer to the arbitration clauses in the guaranties in the answer, new matter, or counterclaims.

The parties then agreed to a nonjury trial on the PUVTA claims, to be followed by a jury trial on the remaining claims and counterclaims.  The trial court, following the nonjury trial, found in favor of H&M and against the Patronos on the PUVTA claims, avoided numerous transfers from and to the Patronos, and enjoined the Patronos and Polly from engaging in further transfers without court approval.  The trial court deferred a hearing on punitive

- 9 -

damages and attorney's fees until the resolution of the remaining claims in the third amended complaint.[10]

Meanwhile, the discovery proceedings continued on the remaining claims in the third amended complaint and counterclaims, and the counterclaims concerning the contribution agreement resulted in a particularly protracted discovery dispute. The H&M parties demanded further documentation to corroborate the Patronos' assertions Jane and Alan personally loaned Hauser Estate $3 million. Throughout discovery, the Patronos insisted they had turned over all documents in their possession or control: essentially, copies of checks and deposit records. The trial court held hearings in April 2023, June 2023, and September 2023, attempting to resolve the discovery dispute over Jane and Alan's personal loans. In October 2023, three days after the expiration of an extended discovery deadline, and ***eleven days before a scheduled trial date***, the Patronos' counsel averred Alan recently discovered thirty-seven boxes of Hauser Estate documents in his law office. That revelation prompted the H&M parties to file for default judgments as discovery sanctions. In November 2023, the trial court held additional hearings on the motion for default judgments, and, on February 8, 2024, entered default judgments against the Patronos and other defendants, on

---

[10] The Patronos and Polly have separately appealed the interlocutory order enjoining them from transferring property without court approval. We address that appeal at J-A04036-25.

nearly all of the remaining claims in the third amended complaint, and on the Patronos' counterclaims. In the same February 8, 2024 order entering default judgments,[11] the trial court lifted the stay on the opened confessed judgment.

In March 2024, counsel for the Patronos contacted counsel for the H&M parties, and, for the first time, suggested the opened confessed judgments be submitted to arbitration. The H&M parties thereafter filed a preemptive emergency motion asking the trial court to find any right to demand arbitration waived. The Patronos did not reply to the emergency motion but, on March 12, 2024, filed a petition to compel arbitration and stay other proceedings. After further back-and-forth between the parties, the trial court, on April 4, 2024, denied the Petronos' petition to compel arbitration. The Patronos timely appealed, and both they and the trial court complied with Pa.R.A.P. 1925.

The Patronos raise the following issues for review:

1. Whether trial court erred in ruling that Patrono[s] had waived the right to arbitration without holding an evidentiary hearing and in the absence of sufficient undisputed facts.

2. Whether the [trial] court erred in finding waiver without finding prejudice to H&M or undue advantage to Patrono[s].

3. Whether the [trial] court erred in implicitly finding a late invocation of the arbitration provision without referring such issue to arbitration for determination.

The Patronos' Briefs at 4 (some capitalization omitted).

_____

[11] Jane and Alan have separately appealed the interlocutory order entering default judgments as discovery sanctions. We address that appeal at J-A04037-25.

- 11 -

We consider the Patronos' issues together as they all address the fundamental question of whether the trial court erred or abused its discretion in finding they "waived" their right to demand arbitration. When reviewing an order denying a motion to compel, "we are limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion." ***DiDonato v. Ski Shawnee, Inc.***, 242 A.3d 312, 318 (Pa. Super. 2020) (internal citations and quotation marks omitted).

Generally,

> [w]hen one party to an agreement seeks to prevent another from proceeding to arbitration, judicial inquiry is limited to determining (1) whether a valid agreement to arbitrate exists between the parties and, if so, (2) whether the dispute involved is within the scope of the arbitration provision. If a valid arbitration agreement exists between the parties and [an] appellant's claim is within the scope of the agreement, the controversy must be submitted to arbitration.

***Highmark Inc. v. Hosp. Serv. Ass'n of Northeast Pennsylvania***, 785 A.2d 93, 98 (Pa. Super. 2001) (internal citations, quotation marks, and brackets omitted).

However, "[t]he right to enforce an arbitration clause can be waived." ***Id***. at 100. A party that avails itself of the judicial process by attempting to win favorable rulings from the judicial system following the filing of a complaint waives the right to proceed through arbitration. ***See DiDonato***, 242 A.3d at 318. As this Court explained,

> When deciding whether a party accepted judicial process to constitute waiver of a claim to arbitration, courts assess whether

- 12 -

> the party: (1) failed to raise the issue of arbitration promptly; (2) engaged in discovery; (3) filed pretrial motions that do not raise the issue of arbitration; (4) waited for adverse rulings on pre-trial motions before asserting arbitration; or (5) waited until the case is ready for trial before asserting arbitration. Significantly, a party cannot avail itself of the judicial process and then pursue an alternate route when it receives an adverse judgment. To allow litigants to pursue that course and thereby avoid the waiver doctrine and our rules of court is to advocate judicial inefficiency; this we are unwilling to do. Nevertheless, the mere filing of a complaint or answer without resulting prejudice to the objecting party will not justify a finding of waiver of the right to arbitration.

*Id*. (internal citations and quotation marks omitted).

The Patronos assert the trial court erred in denying their petition to compel arbitration on the opened confessed judgments. Focusing on the language of the arbitration clauses, they note the clauses are broadly phrased to include all claims arising out of the guaranties, but also permit the parties to seek equitable relief from the courts. *See* The Patronos' Brief at 25-26, 37-40. They argue all litigation to strike the first confessed judgments and in the opening the confessed judgments in Cumberland County should not be counted against them because they were simply exercising their rights to seek equitable relief as permitted by the arbitration clauses. *See id*. at 37-40.

The Patronos further argue they did not avail themselves of judicial processes after the Adams County court received the opened confessed judgments from Cumberland County. *See id*. at 41-46. They emphasize the court had stayed proceedings on the opened confessed judgments in 2021, the H&M parties agreed to the stay, the opened confessed judgments remained dormant and separate from the actions on the third amended

complaint, and they timely sought arbitration as soon as the trial court lifted the stay in 2024. *See id*. at 23-24, 41-46, 58. The Patronos add they did not engage in discovery, file pre-trial motions, wait for adverse rulings, or wait until the eve of trial on the opened confessed judgments to seek arbitration. *See id*. at 41-46.

Although the Patronos acknowledge the extensive litigation on the third amended complaint, they argue, "It's difficult to understand how the goings-on of other cases from which the present case was 'severed' undercut the applicability of the [a]rbitration [c]lause[s] to *this* case, to which it unquestionably attaches." *Id*. at 44. They also assert the trial court failed to consider whether H&M was prejudiced or they gained an undue advantage while the opened confessed judgments were stayed, and the trial court should have permitted the arbitrators to determine whether they waived the right to arbitrate. *See id*. at 50, 61-63.

The trial court determined it properly denied the petition to compel arbitration of the opened confessed judgments because the Patronos availed themselves of judicial processes before and after the stay without ever raising the issue of arbitration. *See* Trial Ct. Op., 6/3/24, at 10-11. The court noted the Patronos had ample opportunity to preserve their right to arbitration when litigating the first confessed judgments in 2018 to 2019, and in the litigation on the opened confessed judgments in 2019 to 2021. *See id*. at 9-10. The court emphasized the Patronos agreed to submit to the jurisdiction of the

- 14 -

Adams County court by stipulating to the transfer of the opened confessed judgments from Cumberland County to Adams County without demanding arbitration. *See id*. at 10-11. The trial court added that while the opened confessed judgments was "procedurally paused," "it was unquestionably interwoven in the overarching litigation involving the parties, which was extremely active for over four additional years." *Id*. at 11. The court noted the parties litigated discovery on common issues in the opened confessed judgments, the third amended complaint, and the counterclaims. *See id*. at 11. The court concluded the prejudice resulting from the extensive litigation of the issues the Patronos now assert are arbitrable, was "self-apparent," and could address issues of waiver of arbitration based on the Patronos' conduct in availing themselves of judicial processes. *See id*. at 11-14.

Following our review, we conclude the record supports the trial court's findings.[12] The Patronos engaged in lengthy litigation to open the confessed judgments in Cumberland County, which included requests for discovery, the appointment of a discovery master, and multiple days of hearings. There is no indication the Patronos demanded arbitration, let alone referred to the arbitration clauses in the guaranties. Furthermore, when the Patronos sought to coordinate the opened confessed judgments with the other cases in the

---

[12] There is no meaningful dispute that the arbitration clauses in the guaranties, if properly invoked, would have governed the issues raised in the opened confessed judgment.

- 15 -

Adams County court, they did not invoke or refer to the guaranties' arbitration clauses.

Significantly, although the trial court in Adams County stayed proceedings on the opened confessed judgment, the Patronos then *affirmatively raised defenses and/or counterclaims* to the third amended complaint identical to the ones they intended to raise in the opened confessed judgment. These included claims that: (1) H&M was a sham corporation; (2) the breach of the contribution agreement; and (3) breaches of fiduciary duties as co-guarantors. *Compare* Answer, Am. New Matter, and Counterclaims, 4/5/22, at 2 (denying H&M is a bona fide business entity and asserting it was a "sham" corporation), 75-78 (counterclaims for breaches of the contribution agreement), 85-94 (counterclaims for breaches of fiduciary duties as co-guarantors); *with* Jane's Pet. to Strike or Open, Cumberland County, 2019-12302, 12/26/19, at 24-26 (asserting breach of fiduciary duty as co-guarantors), 26-27 (asserting H&M was a sham corporation), 27 (seeking offset for breaches of the contribution agreement). The Patronos not only raised these claims after the stay on the opened confessed judgment, but also engaged in a nearly year-long discovery dispute over their disclosure of evidence to substantiate their counterclaim that Hannah and Melinda breached the contribution agreement, all without notifying the court that the same issues could be subject to arbitration.

- 16 -

Although a party may promptly raise a right to enforce an arbitration provision and take limited steps to preserve its rights and interests during discovery, *see Smay v. E.R. Stuebner*, *Inc.*, 864 A.2d 1266, 1278 (Pa. Super. 2004), the facts of this case more closely resemble those in *Stanley-Laman Grp., Ltd. v. Hyldahl*, 939 A.2d 378, 387-88 (Pa. Super. 2007), and *GE Lancaster Investments, LLC v. Am. Exp. Tax & Bus. Servs., Inc.*, 920 A.2d 850, 856 (Pa. Super. 2007), where parties availed themselves of judicial processes in an attempt to secure advantages and acted inconsistently with the right to arbitration.[13]  Thus, we discern no basis to conclude the trial court abused its discretion when concluding Jane, Alan, and Jonathan waived their

---

[13] In *Smay*, this Court concluded a party did not waive its right to enforce an arbitration provision where it consistently asserted its right to arbitration and used the judicial system only to preserve that right and protect its interests during discovery after timely invoking an arbitration clause.  *See Smay*, 864 A.2d at 1278.  In *Stanley-Laman Grp.*, this Court concluded parties availed themselves of judicial processes and thereby waived their right to seek arbitration when they sought, and obtained, a preliminary injunction from the court, filed a complaint seeking damages, responded to the defendant's answers and counterclaims, and engaged in discovery, before requesting arbitration.  *See Stanley-Laman Grp.*, 939 A.2d at 387.  In *GE Lancaster Investments*, this Court concluded a defendant availed itself of judicial processes, when, after the plaintiff commenced an action by writ of summons and the defendant sought to compel the filing of a complaint, the defendant opposed the plaintiff's motions to extend the time for filing a complaint and for pre-complaint discovery.  *See GE Lancaster Investments*, 920 A.2d at 856.  There, the defendant sought to compel arbitration only after the trial court granted limited pre-complaint discovery and extended the time for filing a complaint.  *See id*.

- 17 -

right to arbitration.[14]  Moreover, given the Patronos' dilatory conduct during the extensive litigation of the third amended complaint, and discovery on their counterclaims, we agree with the trial court that the unfair prejudice and unfair advantage is self-apparent.  **See Goral v. Fox Ridge, Inc.**, 683 A.2d 931, 934 (Pa. Super. 1996) (agreeing with a party that requiring arbitration would result in unfair prejudice because in addition to the costs of litigation already incurred, arbitration would carry additional costs and allow the party seeking to compel arbitration to re-raise a statute of limitations defense).  Thus, finding no abuse of discretion in the trial court's decision to deny the Patronos' petition to compel arbitration, we affirm.

Order affirmed.

---

[14] This Court has acknowledged certain waivers of the right to arbitration are matters for the arbitrators to decide.  **See Highmark**, 785 A.2d 93, 100 (Pa. Super. 2001) (stating that "[w]hile a party can waive the right of arbitration, the question of the timeliness of a demand for arbitration is not of interpretation of the agreement and not one of the existence or scope of the arbitration provision; it is thus outside the bounds of our review and its resolution must be left to arbitration") (internal citations and quotation marks omitted).  However, once a party avails itself of judicial processes, a court may determine whether the party's conduct in court constitutes waiver.  **See GE Lancaster Investments**, 920 A.2d at 856; **Smay**, 864 A.2d at 1278; **Stanley-Laman Grp.**, 939 A.2d at 387.  To the extent the Patronos fault the trial court for not holding a hearing before determining waiver for availing oneself of judicial processes, they do not cite, and we have not found, any authority requiring a hearing.

- 18 -

J-A04038-25
J-A04039-25
J-A04040-25

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 05/15/2025

- 19 -

J-A04038-25
J-A04039-25
J-A04040-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| H&M HOLDINGS GROUP, LLC, ASSIGNEES OF MEMBERS FIRST FEDERAL CREDIT UNION | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : : | |
| JANE H. PATRONO | : : | No. 518 MDA 2024 |
| Appellant | : | |

Appeal from the Order Entered April 4, 2024
In the Court of Common Pleas of Adams County
Civil Division at No(s):  2018-SU-1293

| | | |
|---|---|---|
| H&M HOLDINGS GROUP, LLC | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : : | |
| ALAN KIM PATRONO | : : : | |
| Appellant | : | No. 519 MDA 2024 |

Appeal from the Order Entered April 4, 2024
In the Court of Common Pleas of Adams County
Civil Division at No(s):  2018-SU-1293

| | | |
|---|---|---|
| H&M HOLDINGS GROUP, LLC, ASSIGNEE OF MEMBERS FIRST FEDERAL CREDIT UNION | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : : | |
| JONATHAN PATRONO | : : | No. 520 MDA 2024 |
| Appellant | : | |

Appeal from the Order Entered April 4, 2024
In the Court of Common Pleas of Adams County
Civil Division at No(s): 2018-SU-1293

BEFORE: LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:       **FILED: MAY 15, 2025**

Jane H. Patrono ("Jane"), Alan Kim Patrono ("Alan"), and Jonathan Patrono ("Jonathan") (collectively, "the Patronos") appeal from the order denying their petitions to compel arbitration.[1] We affirm.

This appeal arises out of a family dispute over the management and debts of a now-bankrupt winery and hard cider producer, known as "Hauser Estate." Jane is the daughter of Helen Hauser ("Helen"). Jane is married to Alan, and they have two adult children, Jonathan and Polly Patrono Carlson ("Polly"). Alan and Jonathan are attorneys. Hannah M. Hauser ("Hannah") and Melinda H. Davis ("Melinda") are Jane's sisters.

Helen had owned several properties in Adams County and used her land for her family's apple orchard business. In 2006, at Jonathan's suggestion, the family converted their orchard business into a wine and hard cider business under Hauser Estate. Jonathan held a majority of the voting shares of Hauser Estate and the position of president. Hannah and Melinda held

---

[1] These interlocutory appeals involving the refusal to compel arbitration are properly before this Court. **See** Pa.R.A.P. 311(a)(8); **see also** 42 Pa.C.S.A. §§ 7320(a)(1), 7321.29(a)(1), 7342(a) (discussing right to appeal order denying motions to compel arbitration). We have consolidated these appeals *sua sponte* as they involve the same facts, procedures, and legal issues, and the Patronos have filed identical briefs in all three appeals.

- 2 -

minorities of the voting shares.  In 2007, the family also created Hauser Family Farms ("HFF"), a limited liability corporation ("LLC"), to which Helen transferred the real property on which Hauser Estate was operating.  Helen died in 2012.

Hauser Estate obtained loans from Members First Federal Credit Union ("Members First"), which Hannah, Melinda, Jane, Alan, and Jonathan each secured with personal guaranties ("the guaranties").  The guaranties contained arbitration clauses and confession of judgment provisions.[2]  Alan

_____

[2] The arbitration clauses stated:

> Borrower and Guarantor and Lender agree that all disputes, claims and controversies between them whether individual, joint, or class in nature, arising from this Guaranty or otherwise, including without limitation contract and tort disputes, shall be arbitrated pursuant to the Rules of the American Arbitration Association in effect at the time the claim is filed, upon request of either party. No act to take or dispose of any Collateral shall constitute a waiver of this arbitration agreement or be prohibited by this arbitration agreement.  This includes, without limitation, obtaining injunctive relief or a temporary restraining order; invoking a power of sale under any deed of trust or mortgage; obtaining a writ of attachment or imposition of a receiver; or exercising any rights relating to personal property, including taking or disposing of such property with or without judicial process pursuant to Article 9 of the Uniform Commercial Code. Any disputes, claims, or controversies concerning the lawfulness or reasonableness of any act, or exercise of any right, concerning any Collateral, including any claim to rescind, reform, or otherwise modify any agreement relating to the Collateral, shall also be arbitrated, provided however that no arbitrator shall have the right or the power to enjoin or restrain any act of any party.  Judgment upon any award rendered by any arbitrator may be entered in any court having

*(Footnote Continued Next Page)*

- 3 -

also drafted a contribution agreement among the three sisters, Melinda, Hannah, and Jane, that provided each sister would be one-third liable for future loans made by any one of the sisters, or Alan, to benefit Hauser Estate ("contribution agreement").[3]

Hauser Estate began to fail, and it defaulted on the Members First loans. The family discussed a sale of Hauser Estate but could not agree on a buyer. As the disputes among the family members increased, Alan drafted a corporate governance agreement for Hauser Estate ("governance agreement").[4]  Still, Hannah and Melinda believed Jane, Alan, and Jonathan

---

jurisdiction.  Nothing in this Guaranty shall preclude any party from seeking equitable relief from a court of competent jurisdiction.  The statute of limitations, estoppel, waiver, laches, and similar doctrines which would otherwise be applicable in an action brought by a party shall be applicable in any arbitration proceeding, and the commencement of an arbitration proceeding shall be deemed the commencement of an action for these purposes.  The Federal Arbitration Act shall apply to the construction, interpretation, and enforcement of this arbitration provision.

Compl., Cumberland County, 2019-12302, 11/27/19, Exs. B & D.

[3] While the Patronos asserted the contribution agreement bound Hannah and Melinda, Hannah and Melinda disputed whether the contribution agreement was enforceable as it did not contain all terms they requested.  *See* Answer to Third Am. Compl. with Am. New Matter and Counterclaims, 4/5/22, at 60-61, 74-75; Answer to Am. New Matter and Counterclaims and New Matter, 9/12/22, at 12.

[4] The Patronos asserted the governance agreement created in Hauser Estate an executive committee to resolve family disputes.  *See* Answer to Third Am. *(Footnote Continued Next Page)*

- 4 -

were mismanaging Hauser Estate for their own personal gains, while Jane, Alan, and Jonathan questioned whether Hannah and Melinda were acting in Hauser Estate's best interests.

Events surrounding the family disputes accelerated in July 2018. Hannah and Melinda formed H&M Holdings Group, LLC ("H&M"), which purchased the notes and guaranties on the Members First loans. Around that time, the Patronos engaged in numerous transfers of their interests in real property to Polly, Jane and Alan's daughter/Jonathan's sister ("the 2018 transfers"). By the end of July 2018, H&M filed complaints in Adams County for confession of judgment against the Patronos based on the notes and guaranties H&M acquired from Members First ("the first confessed judgments"). A court granted the Patronos' motions to strike off the first confessed judgments after unsuccessful attempts at mediation.[5]

Meanwhile, Hannah, Melinda, H&M, and others (collectively, "the H&M parties") commenced a series of actions in various counties, which included

---

Compl. with Am. New Matter and Counterclaims, 4/5/22, at 67-68. They also claimed that the governance agreement had the goal of preserving the Members First loans and preventing defaults on the loans. *See e.g.*, Jane's Pet. to Strike or Open, Cumberland County, 2019-12302, 12/26/19, at 9. Hannah and Melinda admitted there was a governance agreement but denied that it created an executive committee. *See* Answer to Am. New Matter and Counterclaims and New Matter, 9/12/22, at 12.

[5] The Adams County court struck the first confessed judgments because H&M failed to attach proper documentation to its complaints and improperly filed notices under both Pa.R.Civ.P. 2958.1 and 2958.3. *See* Adams County Order and Op., 2018-SU-813 to 815, 11/1/19, at 3-6.

- 5 -

filing *lis pendens* against the Adams County properties involved in the 2018 transfer and filing a complaint in Dauphin County, which the parties later agreed to transfer to Adams County.

Additionally, in Cumberland County, H&M filed new complaints for confession of judgment against the Patronos based on the notes and the guaranties H&M purchased from Members First. The Patronos, in relevant part, responded with petitions to open wherein they pleaded defenses challenging: (1) whether and when Hauser Estate defaulted on the Members First loans; (2) whether any prior default had been cured; (3) whether default or non-default rates of interest were included in the amounts confessed; (4) whether Hannah and Melinda breached governance agreements when they purchased the notes and guaranties; (5) whether Hannah and Melinda breached their fiduciary duties as co-guarantors; (6) whether H&M was a "sham corporation;" and (7) whether Hannah and Melinda breached the contribution agreement. ***See e.g.***, Jane's Pet. to Strike or Open, Cumberland County, 2019-12302, 12/26/19, at 23-28. The Patronos' petitions to open did not refer to the arbitration clauses in the guaranties.[6] The Cumberland County

_____

[6] "A petition to open a confessed judgmentsis an appeal to the equitable powers of the court." ***Neducsin v. Caplan***, 121 A.3d 498, 504 (Pa. Super. 2015) (internal citation and quotation marks omitted). A trial court may open a confessed judgment:

*(Footnote Continued Next Page)*

- 6 -

court, following lengthy litigation there, opened the judgment and transferred the matter to Adams County ("the opened confessed judgments"). *See* Order, Cumberland County, 2019-12300 to 12302, 3/11/21, at 1-2.[7] Jane, Alan, and Jonathan also apparently filed a motion, in which H&M concurred, to coordinate the opened confessed judgments with the other actions in Adams County, which the Cumberland County court granted. *See* Order, Cumberland County, 2019-12300 to 12302, 5/3/21, at 1 (stating the Cumberland County

---

 if the petitioner (1) acts promptly, (2) alleges a meritorious defense, and (3) can produce sufficient evidence to require submission of the case to a jury.

\* \* \* \*

A meritorious defense is one upon which relief could be afforded if proven at trial.

*Id*. at 506–07 (internal citations and quotation marks omitted).

[7] In Cumberland County, the parties each requested discovery, litigated discovery issues before a discovery master, and presented evidence over multiple days of hearings. The Cumberland County court concluded the Patronos pleaded sufficient evidence supporting two meritorious defenses, one concerning the date of the default, the other concerning whether Hannah and Melinda formed a sham company to protect their own personal assets. The Cumberland County court declined to reach any other possible defenses, including the Patronos' claims for offsets based on Hannah and Melinda's breach of the contribution agreement. *See* Order, Cumberland County, 2019-12300 to 12302, 3/11/21, at 2-3 & nn. 3, 5. Once the Cumberland County confessed judgments were opened, the subsequent proceedings were generally limited to the papers filed in the litigation to open the judgments. *See* Pa.R.Civ.P. 2960 ("If a judgment is opened in whole or in part the issues to be tried shall be defined by the complaint if a complaint has been filed, and by the petition, answer and the order of the court opening the judgment. There shall be no further pleadings. . . .").

- 7 -

court granted the Patronos' motion to coordinate actions); ***see also*** Order, Cumberland County, 2019-12300 to 12302, 4/7/21, at 1 (indicating H&M concurred in the motion to coordinate actions).

In an attempt to clarify the multiple actions commenced in and transferred to Adams County, the trial court ordered the H&M parties to file a third amended complaint ("third amended complaint"), while staying further proceedings on the opened confessed judgments transferred from Cumberland County. ***See*** Order, 8/16/21, at 1 (stating that "pursuant to agreement of the parties, further proceedings in these matters [the opened confessed judgments from Cumberland County] are stayed indefinitely pending further order of court") (some capitalization omitted).[8]

The H&M parties filed a third amended complaint, wherein they alleged the Patronos breached their fiduciary duties, conspired to breach fiduciary duties, committed professional malpractice, fraudulently transferred or conspired to fraudulently transfer property in violation of the Pennsylvania Uniform Voidable Transaction Act ("PUVTA")[9] ("the PUVTA claims"), and converted or conspired to convert apple crops, proceeds on apples, and funds from a different line of credit. ***See*** Third Am. Complaint, 9/7/21, at 33-47.

---

[8] The trial court vacated the Cumberland County order coordinating the opened confessed judgmentsmatter with the other actions in Adams County. ***See*** Order, 8/16/21, at 1.

[9] ***See*** 12 Pa.C.S.A. §§ 5101-5114.

The Patronos filed an answer, new matter, and counterclaims, and, after the court sustained, in part, and overruled, in part, preliminary objections, filed an answer with amended new matter and counterclaims, which included several allegations and claims they first raised when opening the confessed judgments in Cumberland County, including: (1) H&M was a sham corporation; (2) Hannah and Melinda breached the contribution agreement; and (3) promissory estoppel related to the contribution agreement. *See* Answer to Third Am. Compl. with Am. New Matter and Counterclaims, 4/5/22, at 2, 53, 75-80, 85-94. Despite the overlap between the issues raised in their intended defenses to the opened confessed judgments and their defense and their counterclaims to the third amended complaint, the Patronos did not refer to the arbitration clauses in the guaranties in the answer, new matter, or counterclaims.

The parties then agreed to a nonjury trial on the PUVTA claims, to be followed by a jury trial on the remaining claims and counterclaims. The trial court, following the nonjury trial, found in favor of H&M and against the Patronos on the PUVTA claims, avoided numerous transfers from and to the Patronos, and enjoined the Patronos and Polly from engaging in further transfers without court approval. The trial court deferred a hearing on punitive

- 9 -

damages and attorney's fees until the resolution of the remaining claims in the third amended complaint.[10]

Meanwhile, the discovery proceedings continued on the remaining claims in the third amended complaint and counterclaims, and the counterclaims concerning the contribution agreement resulted in a particularly protracted discovery dispute. The H&M parties demanded further documentation to corroborate the Patronos' assertions Jane and Alan personally loaned Hauser Estate $3 million. Throughout discovery, the Patronos insisted they had turned over all documents in their possession or control: essentially, copies of checks and deposit records. The trial court held hearings in April 2023, June 2023, and September 2023, attempting to resolve the discovery dispute over Jane and Alan's personal loans. In October 2023, three days after the expiration of an extended discovery deadline, and ***eleven days before a scheduled trial date***, the Patronos' counsel averred Alan recently discovered thirty-seven boxes of Hauser Estate documents in his law office. That revelation prompted the H&M parties to file for default judgments as discovery sanctions. In November 2023, the trial court held additional hearings on the motion for default judgments, and, on February 8, 2024, entered default judgments against the Patronos and other defendants, on

_____

[10] The Patronos and Polly have separately appealed the interlocutory order enjoining them from transferring property without court approval. We address that appeal at J-A04036-25.

- 10 -

nearly all of the remaining claims in the third amended complaint, and on the Patronos' counterclaims. In the same February 8, 2024 order entering default judgments,[11] the trial court lifted the stay on the opened confessed judgment.

In March 2024, counsel for the Patronos contacted counsel for the H&M parties, and, for the first time, suggested the opened confessed judgments be submitted to arbitration. The H&M parties thereafter filed a preemptive emergency motion asking the trial court to find any right to demand arbitration waived. The Patronos did not reply to the emergency motion but, on March 12, 2024, filed a petition to compel arbitration and stay other proceedings. After further back-and-forth between the parties, the trial court, on April 4, 2024, denied the Petronos' petition to compel arbitration. The Patronos timely appealed, and both they and the trial court complied with Pa.R.A.P. 1925.

The Patronos raise the following issues for review:

1. Whether trial court erred in ruling that Patrono[s] had waived the right to arbitration without holding an evidentiary hearing and in the absence of sufficient undisputed facts.

2. Whether the [trial] court erred in finding waiver without finding prejudice to H&M or undue advantage to Patrono[s].

3. Whether the [trial] court erred in implicitly finding a late invocation of the arbitration provision without referring such issue to arbitration for determination.

The Patronos' Briefs at 4 (some capitalization omitted).

_____

[11] Jane and Alan have separately appealed the interlocutory order entering default judgments as discovery sanctions. We address that appeal at J-A04037-25.

- 11 -

We consider the Patronos' issues together as they all address the fundamental question of whether the trial court erred or abused its discretion in finding they "waived" their right to demand arbitration. When reviewing an order denying a motion to compel, "we are limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion." *DiDonato v. Ski Shawnee, Inc.*, 242 A.3d 312, 318 (Pa. Super. 2020) (internal citations and quotation marks omitted).

Generally,

> [w]hen one party to an agreement seeks to prevent another from proceeding to arbitration, judicial inquiry is limited to determining (1) whether a valid agreement to arbitrate exists between the parties and, if so, (2) whether the dispute involved is within the scope of the arbitration provision. If a valid arbitration agreement exists between the parties and [an] appellant's claim is within the scope of the agreement, the controversy must be submitted to arbitration.

*Highmark Inc. v. Hosp. Serv. Ass'n of Northeast Pennsylvania*, 785 A.2d 93, 98 (Pa. Super. 2001) (internal citations, quotation marks, and brackets omitted).

However, "[t]he right to enforce an arbitration clause can be waived." *Id*. at 100. A party that avails itself of the judicial process by attempting to win favorable rulings from the judicial system following the filing of a complaint waives the right to proceed through arbitration. *See DiDonato*, 242 A.3d at 318. As this Court explained,

> When deciding whether a party accepted judicial process to constitute waiver of a claim to arbitration, courts assess whether

- 12 -

> the party: (1) failed to raise the issue of arbitration promptly; (2) engaged in discovery; (3) filed pretrial motions that do not raise the issue of arbitration; (4) waited for adverse rulings on pre-trial motions before asserting arbitration; or (5) waited until the case is ready for trial before asserting arbitration. Significantly, a party cannot avail itself of the judicial process and then pursue an alternate route when it receives an adverse judgment. To allow litigants to pursue that course and thereby avoid the waiver doctrine and our rules of court is to advocate judicial inefficiency; this we are unwilling to do. Nevertheless, the mere filing of a complaint or answer without resulting prejudice to the objecting party will not justify a finding of waiver of the right to arbitration.

***Id***. (internal citations and quotation marks omitted).

The Patronos assert the trial court erred in denying their petition to compel arbitration on the opened confessed judgments. Focusing on the language of the arbitration clauses, they note the clauses are broadly phrased to include all claims arising out of the guaranties, but also permit the parties to seek equitable relief from the courts. ***See*** The Patronos' Brief at 25-26, 37-40. They argue all litigation to strike the first confessed judgments and in the opening the confessed judgments in Cumberland County should not be counted against them because they were simply exercising their rights to seek equitable relief as permitted by the arbitration clauses. ***See id***. at 37-40.

The Patronos further argue they did not avail themselves of judicial processes after the Adams County court received the opened confessed judgments from Cumberland County. ***See id***. at 41-46. They emphasize the court had stayed proceedings on the opened confessed judgments in 2021, the H&M parties agreed to the stay, the opened confessed judgments remained dormant and separate from the actions on the third amended

- 13 -

complaint, and they timely sought arbitration as soon as the trial court lifted the stay in 2024. *See id*. at 23-24, 41-46, 58. The Patronos add they did not engage in discovery, file pre-trial motions, wait for adverse rulings, or wait until the eve of trial on the opened confessed judgments to seek arbitration. *See id*. at 41-46.

Although the Patronos acknowledge the extensive litigation on the third amended complaint, they argue, "It's difficult to understand how the goings-on of other cases from which the present case was 'severed' undercut the applicability of the [a]rbitration [c]lause[s] to *this* case, to which it unquestionably attaches." *Id*. at 44. They also assert the trial court failed to consider whether H&M was prejudiced or they gained an undue advantage while the opened confessed judgments were stayed, and the trial court should have permitted the arbitrators to determine whether they waived the right to arbitrate. *See id*. at 50, 61-63.

The trial court determined it properly denied the petition to compel arbitration of the opened confessed judgments because the Patronos availed themselves of judicial processes before and after the stay without ever raising the issue of arbitration. *See* Trial Ct. Op., 6/3/24, at 10-11. The court noted the Patronos had ample opportunity to preserve their right to arbitration when litigating the first confessed judgments in 2018 to 2019, and in the litigation on the opened confessed judgments in 2019 to 2021. *See id*. at 9-10. The court emphasized the Patronos agreed to submit to the jurisdiction of the

- 14 -

Adams County court by stipulating to the transfer of the opened confessed judgments from Cumberland County to Adams County without demanding arbitration. *See id*. at 10-11. The trial court added that while the opened confessed judgments was "procedurally paused," "it was unquestionably interwoven in the overarching litigation involving the parties, which was extremely active for over four additional years." *Id*. at 11. The court noted the parties litigated discovery on common issues in the opened confessed judgments, the third amended complaint, and the counterclaims. *See id*. at 11. The court concluded the prejudice resulting from the extensive litigation of the issues the Patronos now assert are arbitrable, was "self-apparent," and could address issues of waiver of arbitration based on the Patronos' conduct in availing themselves of judicial processes. *See id*. at 11-14.

Following our review, we conclude the record supports the trial court's findings.[12] The Patronos engaged in lengthy litigation to open the confessed judgments in Cumberland County, which included requests for discovery, the appointment of a discovery master, and multiple days of hearings. There is no indication the Patronos demanded arbitration, let alone referred to the arbitration clauses in the guaranties. Furthermore, when the Patronos sought to coordinate the opened confessed judgments with the other cases in the

---

[12] There is no meaningful dispute that the arbitration clauses in the guaranties, if properly invoked, would have governed the issues raised in the opened confessed judgment.

- 15 -

Adams County court, they did not invoke or refer to the guaranties' arbitration clauses.

Significantly, although the trial court in Adams County stayed proceedings on the opened confessed judgment, the Patronos then ***affirmatively raised defenses and/or counterclaims*** to the third amended complaint identical to the ones they intended to raise in the opened confessed judgment. These included claims that: (1) H&M was a sham corporation; (2) the breach of the contribution agreement; and (3) breaches of fiduciary duties as co-guarantors. ***Compare*** Answer, Am. New Matter, and Counterclaims, 4/5/22, at 2 (denying H&M is a bona fide business entity and asserting it was a "sham" corporation), 75-78 (counterclaims for breaches of the contribution agreement), 85-94 (counterclaims for breaches of fiduciary duties as co-guarantors); ***with*** Jane's Pet. to Strike or Open, Cumberland County, 2019-12302, 12/26/19, at 24-26 (asserting breach of fiduciary duty as co-guarantors), 26-27 (asserting H&M was a sham corporation), 27 (seeking offset for breaches of the contribution agreement). The Patronos not only raised these claims after the stay on the opened confessed judgment, but also engaged in a nearly year-long discovery dispute over their disclosure of evidence to substantiate their counterclaim that Hannah and Melinda breached the contribution agreement, all without notifying the court that the same issues could be subject to arbitration.

- 16 -

Although a party may promptly raise a right to enforce an arbitration provision and take limited steps to preserve its rights and interests during discovery, *see Smay v. E.R. Stuebner*, *Inc.*, 864 A.2d 1266, 1278 (Pa. Super. 2004), the facts of this case more closely resemble those in *Stanley-Laman Grp., Ltd. v. Hyldahl*, 939 A.2d 378, 387-88 (Pa. Super. 2007), and *GE Lancaster Investments, LLC v. Am. Exp. Tax & Bus. Servs., Inc.*, 920 A.2d 850, 856 (Pa. Super. 2007), where parties availed themselves of judicial processes in an attempt to secure advantages and acted inconsistently with the right to arbitration.[13] Thus, we discern no basis to conclude the trial court abused its discretion when concluding Jane, Alan, and Jonathan waived their

---

[13] In *Smay*, this Court concluded a party did not waive its right to enforce an arbitration provision where it consistently asserted its right to arbitration and used the judicial system only to preserve that right and protect its interests during discovery after timely invoking an arbitration clause. *See Smay*, 864 A.2d at 1278. In *Stanley-Laman Grp.*, this Court concluded parties availed themselves of judicial processes and thereby waived their right to seek arbitration when they sought, and obtained, a preliminary injunction from the court, filed a complaint seeking damages, responded to the defendant's answers and counterclaims, and engaged in discovery, before requesting arbitration. *See Stanley-Laman Grp.*, 939 A.2d at 387. In *GE Lancaster Investments*, this Court concluded a defendant availed itself of judicial processes, when, after the plaintiff commenced an action by writ of summons and the defendant sought to compel the filing of a complaint, the defendant opposed the plaintiff's motions to extend the time for filing a complaint and for pre-complaint discovery. *See GE Lancaster Investments*, 920 A.2d at 856. There, the defendant sought to compel arbitration only after the trial court granted limited pre-complaint discovery and extended the time for filing a complaint. *See id*.

right to arbitration.[14]  Moreover, given the Patronos' dilatory conduct during the extensive litigation of the third amended complaint, and discovery on their counterclaims, we agree with the trial court that the unfair prejudice and unfair advantage is self-apparent.  **See Goral v. Fox Ridge, Inc.**, 683 A.2d 931, 934 (Pa. Super. 1996) (agreeing with a party that requiring arbitration would result in unfair prejudice because in addition to the costs of litigation already incurred, arbitration would carry additional costs and allow the party seeking to compel arbitration to re-raise a statute of limitations defense).  Thus, finding no abuse of discretion in the trial court's decision to deny the Patronos' petition to compel arbitration, we affirm.

Order affirmed.

---

[14] This Court has acknowledged certain waivers of the right to arbitration are matters for the arbitrators to decide.  **See Highmark**, 785 A.2d 93, 100 (Pa. Super. 2001) (stating that "[w]hile a party can waive the right of arbitration, the question of the timeliness of a demand for arbitration is not of interpretation of the agreement and not one of the existence or scope of the arbitration provision; it is thus outside the bounds of our review and its resolution must be left to arbitration") (internal citations and quotation marks omitted).  However, once a party avails itself of judicial processes, a court may determine whether the party's conduct in court constitutes waiver.  **See GE Lancaster Investments**, 920 A.2d at 856; **Smay**, 864 A.2d at 1278; **Stanley-Laman Grp.**, 939 A.2d at 387.  To the extent the Patronos fault the trial court for not holding a hearing before determining waiver for availing oneself of judicial processes, they do not cite, and we have not found, any authority requiring a hearing.

- 18 -

J-A04038-25
J-A04039-25
J-A04040-25


Judgment Entered.


Benjamin D. Kohler, Esq.
Prothonotary


Date: 05/15/2025

- 19 -